***FILED***

5:36 pm, Feb 03, 2021

**U.S. DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

AES:DCP/MTK
F. #2016R01393

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -

LARBY AMIROUCHE,

               Defendant.

– – – – – – – – – – – – – – –X

I N D I C T M E N T

Cr. No. **1:21-cr-00064(RPK)(RML)**
(T. 18, U.S.C., §§ 982(a)(1), 982(a)(2),
982(b)(1), 1014, 1344, 1349, 1956(h),
2 and 3551 et seq.; T. 21, U.S.C.,
§ 853(p))

THE GRAND JURY CHARGES:

INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    The Defendant and Relevant Entities

1.    The defendant LARBY AMIROUCHE, a citizen of the United States, was the managing member of Angry Elephant Marketing LLC and Purple Whale Management LLC.

2.    Angry Elephant Marketing LLC ("Angry Elephant") was a domestic limited liability company formed in Nevada in or about January 2013. The managing member of Angry Elephant was the defendant LARBY AMIROUCHE.

3.    Purple Whale Management LLC ("Purple Whale") was a domestic limited liability company formed in Florida in or about September 2014. The managing member of Purple Whale was the defendant LARBY AMIROUCHE.

4.    Co-Conspirator 1, a United States citizen whose identity is known to the Grand Jury, worked for the defendant LARBY AMIROUCHE at a number of his companies, including Angry Elephant.

5.     Financial Institution #1 was a bank, the identity of which is known to the Grand Jury, the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC").

6.     Financial Institution #2 was a bank, the identity of which is known to the Grand Jury, the deposits of which were insured by the FDIC.

7.     Financial Institution #3 was a bank, the identity of which is known to the Grand Jury, the deposits of which were insured by the FDIC.

8.     Financial Institution #4 was a bank, the identity of which is known to the Grand Jury, the deposits of which were insured by the FDIC.

II.     Relevant Principles and Definitions

9.     A "merchant account" was a financial account available to retailers through financial institutions called merchant acquiring banks or "acquirers." Financial Institutions #2, #3 and #4 were examples of merchant acquiring banks. Certain merchant acquiring banks were members of credit card associations, such as MasterCard or Visa. A retailer with a merchant account at a merchant acquiring bank that was a member of a credit card association could accept or process consumer credit or debit card payments; a retailer without such an account could not accept or process such payments.

10.     A "payment processor" was a company that entered into a contract with a merchant acquiring bank to manage the bank's merchant processing program. Payment processors would, among other things, vet potential retailers to ensure that the retailers met the bank's and processor's underwriting criteria. Some retailers were denied merchant accounts because the payment processor concluded that the company applying for the merchant account was too much of a risk. For example, the payment processor may have concluded that the

2

retailer might be at risk of operating in an illegal way or that the retailer would generate excessive consumer chargebacks.

11.     A "chargeback" was a demand by a credit card provider for a retailer or payment processor to refund a fraudulent or disputed transaction.   To protect against chargeback loss, payment processors held in reserve a certain percentage of the funds due to the retailer's account each month.  If a payment processor received a chargeback request from a credit card company, it deducted the amount from the reserve fund prior to releasing those funds to the retailer.  If a payment processor received no chargeback requests, it released the full amount of the reserve to the retailer.

III.     The Fraudulent Schemes

12.     In or about and between January 2012 and April 2016, the defendant LARBY AMIROUCHE, together with others, devised and engaged in fraudulent internet marketing schemes that utilized internet e-commerce websites that purported to sell, among other things, various types of dietary supplements, hair care products, skin care products, testosterone and web-based business tutorials.  Contrary to conducting legitimate e-commerce, the websites were used as vehicles to defraud both domestic and international customers as well as numerous financial institutions.

13.     The defendant LARBY AMIROUCHE orchestrated three related, fraudulent schemes (collectively, the "Schemes").  First, AMIROUCHE charged consumer credit cards for products that were ordered, but never delivered to the consumer.  Second, AMIROUCHE charged consumer credit cards for products that were not purchased by the consumers.  Third, customers unwittingly incurred repeated charges for products that they had ordered from AMIROUCHE's websites.

3

14.     To profit from the Schemes, the defendant LARBY AMIROUCHE and his co-conspirators took elaborate measures to distance themselves from their fraudulent conduct.   At the direction of AMIROUCHE, co-conspirators recruited nominee or "straw" owners to be the public face of fraudulent shell companies that were established and controlled by AMIROUCHE.   Merchant accounts, which allowed the shell companies to receive credit card payments, were then established in the names of the shell companies and linked to the various e-commerce websites registered and controlled by AMIROUCHE.  AMIROUCHE utilized nominees, in part, because AMIROUCHE and the corporate entities he controlled had been barred from opening new merchant accounts due to previous fraudulent activity.

15.     The defendant LARBY AMIROUCHE also utilized the nominees' personally identifiable information ("PII") to establish dozens of shell companies with associated bank accounts and merchant accounts that were linked to the websites.   In reality, AMIROUCHE and his co-conspirators controlled all aspects of the operation, including the access and control of the bank accounts and merchant accounts associated with the websites.

16.     Once these shell companies were active, each generated thousands of dollars in profits from the Schemes.   Some customers of the websites realized they had been defrauded and requested chargebacks from their credit card company, which were then passed on by the credit card company to the merchant accounts.   Because of the excessively high rate of chargebacks associated with websites controlled by the defendant LARBY AMIROUCHE, the merchant acquiring banks ultimately shut down the merchant accounts associated with those websites.  However, by this time, AMIROUCHE and his co-conspirators had already generated significant profits from the Schemes, which were subsequently laundered back to AMIROUCHE.

4

A.   Recruitment and Use of Nominees

17.   At the direction of the defendant LARBY AMIROUCHE, co-conspirators recruited nominees under the guise that the nominees could make money quickly by investing in a company that engaged in online marketing and sales.   Nominees were told that their PII would appear on the incorporation paperwork for the company, but that the nominees would not play an active role in the management of the company.   Once the nominees agreed to participate, AMIROUCHE registered the companies with the Florida Secretary of State using the PII of the nominees.

18.   In exchange for the use of their PII, the nominees were promised a one-percent share of all sales of the company.   The defendant LARBY AMIROUCHE and his co-conspirators also represented to the nominees that any corporate tax liability assessed to the companies would be handled by AMIROUCHE.

19.   In addition to providing PII for company incorporation, nominees were also informed that they would be required to open a bank account on behalf of the company at various financial institutions, including Financial Institution #1, primarily in South Florida.   The bank accounts were necessary to allow payment processors to wire proceeds generated by the websites to the shell companies.

20.   Prior to opening these bank accounts, the defendant LARBY AMIROUCHE and his co-conspirators coached nominees on what information to provide in the account opening documentation.   At the direction of AMIROUCHE and his co-conspirators, the nominees made false statements to the financial institutions, including: (1) that the nominees would control the operations of the companies; (2) the alleged business purpose of the companies; and (3) the provision of false addresses and contact information.   Once the bank

accounts were opened, the nominees were directed by AMIROUCHE and his co-conspirators to establish online access to the accounts. Thereafter, the nominees were directed to provide their online usernames and passwords to AMIROUCHE and his co-conspirators to allow them access to the accounts.

21.    The defendant LARBY AMIROUCHE also directed his co-conspirators to impersonate nominees while communicating with banks in order to rectify any issues that may have arisen with the merchant accounts.  For example, on or about June 17, 2013, AMIROUCHE emailed Co-Conspirator 1 and directed Co-Conspirator 1 to contact a financial institution to reset a login and password for a shell company merchant account.  Specifically, AMIROUCHE stated:

> For [the shell company], I set up an account and forgot to complete it.  What needs to happen is you call in as the signer [nominee] and tell them you need the account reset or created….What you need to end the call with is the login and password info maybe they will email one of them but basically need this handled should be easy.

22.    Nominees were generally permitted to withdraw approximately $500 from their respective accounts every two weeks as compensation for the provision of their PII and for signing certain documents, such as merchant account applications, at the direction of the defendant LARBY AMIROUCHE.

B.    The Submission of Fraudulent Merchant Account Applications

23.    Once the shell companies were established and nominees had opened bank accounts, merchant accounts needed to be opened for those shell companies so that they could begin processing credit card transactions through the websites.  To that end, the defendant LARBY AMIROUCHE and his co-conspirators established merchant accounts for the shell companies with various merchant payment processing services, including, but not limited to: (1)

Merchant Processor #1, an agent of Financial Institution #4; (2) Merchant Processor #2, an agent of Financial Institution #2; (3) Merchant Processor #3, an agent of Financial Institution #3; and (4) Merchant Processor #4, an agent of Financial Institution #4 (collectively, the "Payment Processors," the identities of which are known to the Grand Jury).

24.     A typical merchant account application required various types of owner and business information, including, but not limited to: (1) the full name of the individual opening the account; (2) his or her date of birth; (3) his or her social security number; (4) a U.S. government issued identification number; (5) an employer identification number; (6) the physical address of the business; (7) a business email address; (8) a business website; (9) a merchant type; and (10) fulfillment agreements for retail products between the applicant and product fulfillment centers.

25.     The defendant LARBY AMIROUCHE and his co-conspirators prepared and submitted these applications in the names of the nominees and their associated shell companies. The merchant account applications contained false information because, among other things, (1) the nominees were used to conceal the identity of the true applicant, i.e., AMIROUCHE; (2) the applications at times contained forged signatures of nominees prepared by AMIROUCHE and his co-conspirators; (3) the applications contained mock-ups of website pages that purported to sell certain products, often referred to as "dummy websites," despite the fact that the applied-for merchant account was later utilized in conjunction with a "live" website that sold different products; (4) the applications contained fraudulent product fulfillment agreements with outside vendors; (5) the applications contained business email addresses and phone numbers that were controlled by AMIROUCHE and his co-conspirators, rather than the

nominees; and (6) the applications contained business addresses that were merely the personal addresses of the nominees.

26.     For example, on or about March 19, 2013, the defendant LARBY AMIROUCHE emailed Co-Conspirator 1 and another individual and directed them to complete and sign merchant applications for three shell companies on behalf of their assigned nominees. The merchant applications, which contained the PII and purported signatures of the three nominees, were subsequently submitted by AMIROUCHE to the Payment Processors.

27.     Once the merchant account applications were submitted, the Payment Processors, as part of their underwriting process, conducted verification calls with the applicants. During these verification calls, at the direction of the defendant LARBY AMIROUCHE, co-conspirators, including Co-Conspirator 1, posed as and impersonated the nominees or, alternatively, coached the nominees to provide fraudulent responses to the Payment Processors.

28.     For example, on or about October 9, 2013, the defendant LARBY AMIROUCHE sent an email directing Co-Conspirator 1 to register a phone number on Skype using an area code consistent with one of AMIROUCHE's victims ("Victim-1," an individual whose identity is known to the Grand Jury).   AMIROUCHE directed Co-Conspirator 1 to set up a voicemail account for that Skype number that contained the following message, "Hi it's [Victim-1] leave a message."   AMIROUCHE then forwarded Victim-1's credit card information to Co-Conspirator 1, and a purported invoice for nutritional supplements.   AMIROUCHE also directed Co-Conspirator 1 to "just confirm purchase."

8

C.      The "Live" Websites Launch

29.      As discussed above, once a merchant account had been approved and opened on behalf of a shell company, the defendant LARBY AMIROUCHE launched a "live" website that usually differed from the "dummy" website that was attached to the shell company's merchant account application.  In many cases, the "dummy" website attached to the application would purport to sell nutritional supplements, but once the website went "live," it actually sold online tutorial programs.  This difference was notable because the Payment Processors' underwriting process for a merchant account that dealt in online tutorials was more robust than that for an account that sold tangible products, such as nutritional supplements.

30.      To make it appear that the websites were selling the products for which they were approved to sell, the defendant LARBY AMIROUCHE created fraudulent invoices that contained fictitious consumer email addresses and phone numbers.  In reality, these "customer" email addresses and phone numbers were controlled by AMIROUCHE and his co-conspirators.  Thus, when a Payment Processor called to verify a purchase, AMIROUCHE, his co-conspirators—posing as "customers"—would confirm that the purchase was legitimate and that the product was received.  In some cases, AMIROUCHE and his co-conspirators would coach nominees on how to respond to these verification calls.  In this manner, AMIROUCHE and his co-conspirators could ensure that the verification calls did not alert the Payment Processors to their fraudulent activity.

31.      Additionally, fraudulent invoices were created to disguise foreign credit card purchases.  This was because many Payment Processors placed limits on the amount of foreign transactions that would be accepted.  The defendant LARBY AMIROUCHE circumvented these policies by altering invoices with fraudulent U.S. customer data to make it

9

appear that foreign purchases had in fact come from domestic sales.  AMIROUCHE also hired a

company to create billing software that allowed him to alter and fabricate invoices in order to

stay in compliance with the requirements of the Payment Processors.

32.     For example, on or about April 21, 2015, the defendant LARBY

AMIROUCHE emailed four co-conspirators, including Co-Conspirator 1, and stated, in sum and

substance, that a payment processor was complaining about the high rate of foreign transactions.

In response, AMIROUCHE directed the co-conspirators, in sum and substance, to mask foreign

customers with customer data from U.S.-based customers to hide the true identities of the

individuals who were making payments.

D.     Customers Request Chargebacks

33.     As a result of the Schemes, the Payment Processors reported large

amounts of chargebacks stemming from fraudulent transactions reported by both retail

consumers of the websites and unauthorized credit card purchases transacted by the websites,

including within the Eastern District of New York.

34.     At the direction of the defendant LARBY AMIROUCHE, co-conspirators

contacted the Payment Processors and attempted to negotiate an early release of the reserve

funds for the shell company merchant accounts before the merchant acquiring banks could alert

the Payment Processors to any chargebacks.  For example, in an email on or about March 3,

2015, at the direction of the defendant LARBY AMIROUCHE, Co-Conspirator 1 instructed

another co-conspirator to contact the Payment Processors seeking the early release of reserve

funds and to pose as the nominee for the shell company.   Co-Conspirator 1, at AMIROUCHE's

direction, further instructed the co-conspirator to utilize the following talking points when

communicating with the Payment Processors:

When you call here are some things you say to persuade the risk representative:

- You need to pay your employees, so any increment they can release will help.

- There is a good amount of money in the reserve account, so releasing a partial amount will still allow for remaining funds to cover any chargebacks.

- The account has been closed for a couple months now…

35.     Ultimately, the Payment Processors determined that the excessive chargebacks were being caused by an unusual amount of fraudulent credit card activity associated with the individual websites.   As a result, many Payment Processors terminated the merchant accounts associated with the individual websites.

36.     Notwithstanding these terminations, the defendant LARBY AMIROUCHE was able to profit from the Schemes.    First, given the voluminous number of websites controlled by AMIROUCHE and the number of individual sales with each website, a significant amount of individuals across all of the websites did not notice fraudulent charges on their statements and did not report it to their credit card company.  To counteract the termination of certain merchant accounts, AMIROUCHE pressured his co-conspirators to recruit additional nominees, open new shell companies and establish new merchant accounts linked to new fraudulent e-commerce websites.  Second, the Payment Processors would regularly release a percentage of the reserve funds prior to the excessive chargebacks being brought to their attention.   These funds were wired to the shell companies' bank accounts previously established by the nominees and controlled by AMIROUCHE.

E.      Wire Activity Between the Shell Companies

37.     Many of the shell companies controlled by the defendant LARBY

AMIROUCHE generated significant profits from the Schemes.   At the direction of

AMIROUCHE, these funds were funneled to a bank account held in the name of Flare

Education, LLC, a company controlled by AMIROUCHE.  For example, one company

controlled by AMIROUCHE, Jump Learning, LLC, wired approximately $780,000 to Flare

Education, LLC.   Both Jump Learning, LLC and Flare Education, LLC were utilized by

AMIROUCHE to perpetrate the Schemes against unwitting victims.

38.     In total, approximately 35 shell companies controlled by the defendant

LARBY AMIROUCHE, and registered using the PII of nominees, transferred via wire

approximately $6,554,656 to the Flare Education, LLC account.   These transfers were made

from bank accounts opened by nominees at the direction of AMIROUCHE in the name of their

respective shell companies at Miami-based banks.   The shell company bank accounts were also

controlled by AMIROUCHE and his co-conspirators.

39.     Thereafter, between February 2014 and August 2015, the Flare Education,

LLC account transferred via wire a total of approximately $971,200 to Angry Elephant and

$354,000 to Purple Whale.  As discussed above, Angry Elephant and Purple Whale are entities

controlled by the defendant LARBY AMIROUCHE.

COUNT ONE
(Conspiracy to Commit Bank Fraud and Wire Fraud)

40.     The allegations contained in paragraphs one through 39 are realleged and

incorporated as if fully set forth in this paragraph.

12

41.     In or about and between January 2012 and April 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LARBY AMIROUCHE, together with others, did knowingly and intentionally conspire:

(a)     to execute a scheme and artifice to defraud one or more financial institutions, and to obtain moneys, funds, credits and other property owned by, and under the custody and control of, Financial Institution #1, Financial Institution #2, Financial Institution #3 and Financial Institution #4 by means of one or more materially false and fraudulent pretenses, representations and promises, contrary to Title 18, United States Code, Section 1344; and

(b)     to devise a scheme and artifice to defraud and to obtain money and property from Financial Institution #1, Financial Institution #2, Financial Institution #3 and Financial Institution #4 by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
### (Bank Fraud)

42.     The allegations contained in paragraphs one through 39 are realleged and incorporated as if fully set forth in this paragraph.

43.     On or about and between January 2012 and April 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LARBY AMIROUCHE, together with others, did knowingly and intentionally execute a scheme and artifice to defraud one or more financial institutions, the deposits of which were insured by

the Federal Deposit Insurance Corporation, to wit: Financial Institution #1, Financial Institution #2, Financial Institution #3 and Financial Institution #4, and to obtain moneys, funds, credits, assets and other property owned by, and under the custody and control of, such financial institution by means of one or more materially false and fraudulent pretenses, representations and promises, to wit: the submission of false merchant account applications.

(Title 18, United States Code, Sections 1344, 2 and 3551 et seq.)

COUNT THREE
(False Statements to a Bank)

44.     The allegations contained in paragraphs one through 39 are realleged and incorporated as if fully set forth in this paragraph.

45.     In or about and between January 2012 and April 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LARBY AMIROUCHE, together with others, knowingly made false statements for the purpose of influencing in any way the action of an institution the accounts of which are insured by the Federal Deposit Insurance Corporation, upon an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, and insurance agreement and application for insurance and a guarantee, and any change and extension of any of the same, by renewal, deferment of action or otherwise, and the acceptance, release and substitution of security therefor, to wit: AMIROUCHE provided false information to induce financial institutions insured by the Federal Deposit Insurance Corporation, including Financial Institutions #1 through #4, to create merchant accounts.

(Title 18, United States Code, Sections 1014, 2 and 3551 et seq.)

14

COUNT FOUR
(Money Laundering Conspiracy)

46.     The allegations contained in paragraphs one through 39 are realleged and incorporated as if fully set forth in this paragraph.

47.     In or about and between January 2012 and April 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LARBY AMIROUCHE, together with others, did knowingly and intentionally conspire to conduct one or more financial transactions in and affecting interstate and foreign commerce, specifically, the interstate and foreign wire transfer of money, which transactions in fact involved the proceeds of one or more specified unlawful activities, to wit: bank fraud, in violation of Title 18, United States Code, Section 1344, and making false statements to a bank, in violation of Title 18 United States Code, Section 1014, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, (a) with the intent to promote the carrying on of such specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i), (b) knowing that the financial transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i), and (c) knowing that the financial transactions were designed in whole and in part to avoid a transaction reporting requirement under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(ii).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

48.     The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count One, the government will seek forfeiture in

15

accordance with Title 18, United States Code, Section 982(a)(2), which requires any person convicted of such offense to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

49.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(2) and 982(b)(1); Title 21, United States Code, Section 853(p))

<u>CRIMINAL FORFEITURE ALLEGATION AS TO COUNT TWO</u>

50.    The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

16

51.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

FOREPERSON

SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

17

F.#: 2016R01393

FORM DBD-34

JUN. 85

No.

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

## LARBY AMIROUCHE,

Defendant.

# INDICTMENT

(T. 18, U.S.C., §§ 982(a)(1), 982(a)(2), 982(b)(1), 1014, 1344,
1349, 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p))

*A true bill.*

_____

_Foreperson_

*Filed in open court this* _____ *day, of* _____ *A.D. 20* __

___ _____ *Clerk*

*Bail, $* _____

*David C. Pitluck, Assistant U.S. Attorney (718) 254-6108*

18