

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JPL:DCP
F. #2016R01150

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 30, 2023

By ECF

The Honorable Kiyo A. Matsumoto
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Larby Amirouche
>        Criminal Docket No. 21-64 (KAM)

Dear Judge Matsumoto:

The government submits this letter in connection with sentencing for the defendant Larby Amirouche, which is scheduled for November 3, 2023 at 11:00 a.m.[1]  For the reasons set forth below, the government respectfully requests that the Court impose a sentence near the advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 60 months' imprisonment.

I.      Factual Background

On May 5, 2022, the defendant pled guilty before Your Honor to the sole count of a superseding information charging the defendant with one count conspiracy to commit bank fraud in violation of 18 U.S.C. § 371.  Presentence Investigation Report dated October 13, 2022 ("PSR") ¶ 1.  As set forth below, the defendant's criminal conduct was serious and merits a custodial sentence.

---

[1] Counsel for the defendant has asserted that the defendant has legally changed his name to Luke Williams.  See Dkt. Entry 43, Defendant's Sentencing Letter dated August 1, 2023 ("Def. Ltr." at 1).  The government has not been provided with documentation underlying that name change.  Regardless, the government will refer to the defendant as Larby Amirouche in these sentencing materials as the defendant was formally charged as Larby Amirouche, has entered into a plea agreement with the government as Larby Amirouche and is referred to as Larby Amirouche throughout the Presentence Investigation Report.

A.    The Criminal Schemes

The defendant's guilty plea stems from his leadership of a fraudulent internet marketing schemes that utilized internet e-commerce websites that purported to sell, among other things, various types of dietary supplements, hair care products, skin care products, testosterone and web-based business tutorials.  Contrary to conducting legitimate e-commerce, the websites were used as vehicles to defraud both domestic and international customers as well as numerous financial institutions.

The defendant orchestrated three related, fraudulent schemes (collectively, the "Schemes").  First, the defendant and his co-conspirators charged consumer credit cards for products that were ordered, but never delivered to the consumer.  Second, the defendant and his co-conspirators charged consumer credit cards for products that were not purchased by the consumers.  Third, customers unwittingly incurred repeated charges for products that they had ordered from the defendant's websites.

The defendant and his co-conspirators took steps to distance themselves from their fraudulent conduct that allowed them to recover profit without being connected to the websites. At the defendant's direction, co-conspirators recruited nominee or "straw" owners to be the public face of fraudulent shell companies that were in fact established and controlled by the defendant. Merchant accounts, which allowed the shell companies to receive credit card payments, were then established in the names of the shell companies and linked to the various e-commerce websites registered and controlled by the defendant.  The defendant utilized nominees, in part, because the defendant and the corporate entities he controlled had been barred from opening new merchant accounts due to previous fraudulent activity.

The defendant also utilized the nominees' personally identifiable information ("PII") to establish dozens of shell companies with associated bank accounts and merchant accounts that were linked to the websites.  Although the nominees knew that the merchant accounts would be set up in their names, in reality, the defendant and his co-conspirators controlled all aspects of the operation, including the access and control of the bank accounts and merchant accounts associated with the websites.

Once these shell companies were active, each generated thousands of dollars in profits from the Schemes.  Some customers of the websites realized they had been defrauded and requested chargebacks from their credit card company, which were then passed on by the credit card company to the merchant accounts.   Because of the excessively high rate of chargebacks associated with websites controlled by the defendant, the merchant acquiring banks ultimately shut down the merchant accounts associated with those websites.  However, by this time, the defendant and his co-conspirators had already generated significant profits from the Schemes, which were subsequently laundered back to the defendant and his co-conspirators.

B.    Use of Nominees

As noted above, the defendant and his co-conspirators recruited nominees by telling nominees that they could make money quickly by investing in a company that engaged in online marketing and sales.   Nominees were told that their PII would appear on the incorporation

2

paperwork for the company, but that the nominees would not play an active role in the management of the company.   Once the nominees agreed to participate, the defendant registered the companies with the Florida Secretary of State using the PII of the nominees.  In exchange for the use of their PII, the nominees were promised a one-percent share of all sales of the company.

In addition to providing PII for company incorporation, nominees were also informed that they would be required to open a bank account on behalf of the company at various financial institutions, including Financial Institution #1, primarily in South Florida.  The bank accounts were necessary to allow payment processors to wire proceeds generated by the websites to the shell companies. Prior to opening these bank accounts, the defendant and his co-conspirators coached nominees on what information to provide in the account opening documentation.  At the direction of the defendant and his co-conspirators, the nominees made false statements to the financial institutions, including: (1) that the nominees would control the operations of the companies; (2) the alleged business purpose of the companies; and (3) the provision of false addresses and contact information.  Once the bank accounts were opened, the nominees were directed by the defendant and his co-conspirators to establish online access to the accounts. Thereafter, the nominees were directed to provide their online usernames and passwords the defendant and his co-conspirators to allow them access to the accounts.

The defendant also directed his co-conspirators to impersonate nominees while communicating with banks in order to rectify any issues that may have arisen with the merchant accounts.   For example, on or about June 17, 2013, the defendant emailed a co-conspirator and directed her to contact a financial institution to reset a login and password for a shell company merchant account.  Specifically, the defendant stated:

> For [the shell company], I set up an account and forgot to complete it.  What needs to happen is you call in as the signer [nominee] and tell them you need the account reset or created….What you need to end the call with is the login and password info maybe they will email one of them but basically need this handled should be easy.

Nominees were generally permitted to withdraw small amounts of money their respective accounts every two weeks as compensation for the provision of their PII and for signing certain documents, such as merchant account applications, at the defendant's direction.

C.        Establishment of Fraudulent Merchant Accounts

Once the shell companies were established and nominees had opened bank accounts, merchant accounts needed to be opened for those shell companies so that they could begin processing credit card transactions through the websites.  To that end, the defendant and his co-conspirators established merchant accounts for the shell companies with various merchant payment processing services companies.

The defendant and his co-conspirators prepared and submitted applications to open merchant accounts in the names of the nominees and their associated shell companies.  The merchant account applications contained false information because, among other things, (1) the nominees were used to conceal the identity of the true applicant, i.e., the defendant; (2) the

applications at times contained forged signatures of nominees prepared by the defendant and his co-conspirators; (3) the applications contained mock-ups of website pages that purported to sell certain products, often referred to as "dummy websites," despite the fact that the applied-for merchant account was later utilized in conjunction with a "live" website that sold different products; (4) the applications contained fraudulent product fulfillment agreements with outside vendors; (5) the applications contained business email addresses and phone numbers that were controlled by the defendant and his co-conspirators, rather than the nominees; and (6) the applications contained business addresses that were merely the personal addresses of the nominees.

For example, on or about March 19, 2013, the defendant emailed a co-conspirator and another individual and directed them to complete and sign merchant applications for three shell companies on behalf of their assigned nominees.   The merchant applications, which contained the PII and purported signatures of the three nominees, were subsequently submitted by the defendant to the Payment Processors.

Once the merchant account applications were submitted, the Payment Processors, as part of their underwriting process, conducted verification calls with the applicants.  During these verification calls, at the direction of the defendant, co-conspirators posed as and impersonated the nominees or, alternatively, coached the nominees to provide fraudulent responses to the Payment Processors.

D.    Website Launch

Once a merchant account had been approved and opened on behalf of a shell company, the defendant launched a "live" website that usually differed from the "dummy" website that was attached to the shell company's merchant account application.  In many cases, the "dummy" website attached to the application would purport to sell nutritional supplements, but once the website went "live," it actually sold online tutorial programs.  This difference was notable because the Payment Processors' underwriting process for a merchant account that dealt in online tutorials was more robust than that for an account that sold tangible products, such as nutritional supplements.

To make it appear that the websites were selling the products for which they were approved to sell, the defendant created fraudulent invoices that contained fictitious consumer email addresses and phone numbers.   In reality, these "customer" email addresses and phone numbers were controlled by the defendant and his co-conspirators.  Thus, when a Payment Processor called to verify a purchase, the defendant and his co-conspirators—posing as "customers"—would confirm that the purchase was legitimate and that the product was received.  In some cases, the defendant and his co-conspirators would coach nominees on how to respond to these verification calls.  In this manner, the defendant and his co-conspirators could ensure that the verification calls did not alert the Payment Processors to their fraudulent activity.

Additionally, fraudulent invoices were created to disguise foreign credit card purchases.  This was because many Payment Processors placed limits on the amount of foreign transactions that would be accepted.  The defendant circumvented these policies by altering invoices with fraudulent U.S. customer data to make it appear that foreign purchases had in fact come from domestic sales.  The defendant also hired a company to create billing software that

4

allowed him to alter and fabricate invoices in order to stay in compliance with the requirements of the Payment Processors.

### E.   Customers Request Chargebacks

As a result of the Schemes, the Payment Processors reported large amounts of chargebacks stemming from fraudulent transactions reported by both retail consumers of the websites and unauthorized credit card purchases transacted by the websites. At the direction of the defendant and his co-conspirators contacted the Payment Processors and attempted to negotiate an early release of the reserve funds for the shell company merchant accounts before the merchant acquiring banks could alert the Payment Processors to any chargebacks. At the defendant's direction, a co-conspirator contacted the Payment Processors seeking the early release of reserve funds and to pose as the nominee for the shell company. That co-conspirator utilized talking points prepared by the defendant when communicating with the Payment Processors that included a number of lies. Ultimately, the Payment Processors determined that the excessive chargebacks were being caused by an unusual amount of fraudulent credit card activity associated with the individual websites. As a result, many Payment Processors terminated the merchant accounts associated with the individual websites.

Notwithstanding these terminations, the defendant was able to profit from the Schemes. First, given the voluminous number of websites controlled by the defendant and the number of individual sales with each website, a significant amount of individuals across all of the websites did not notice fraudulent charges on their statements and did not report it to their credit card company. To counteract the termination of certain merchant accounts, the defendant pressured his co-conspirators to recruit additional nominees, open new shell companies and establish new merchant accounts linked to new fraudulent e-commerce websites. Second, the Payment Processors would regularly release a percentage of the reserve funds prior to the excessive chargebacks being brought to their attention. These funds were wired to the shell companies' bank accounts previously established by the nominees and controlled by the defendant.

### F.   Wire Activity Between the Shell Companies

Many of the shell companies controlled by the defendant generated significant profits from the Schemes. At the defendant's direction, these funds were funneled to a bank account held in the name of Flare Education, LLC, a company controlled by the defendant. In total, approximately 35 shell companies controlled by the defendant, and registered using the PII of nominees, transferred via wire approximately $6,554,656 to the defendant's account at Flare Education. These transfers were made from bank accounts opened by nominees at the direction of the defendant in the name of their respective shell companies at Miami-based banks. The shell company bank accounts were also controlled by the defendant and his co-conspirators.

Thereafter, between February 2014 and August 2015, the Flare Education, LLC account transferred via wire a total of approximately $971,200 to Angry Elephant and $354,000 to Purple Whale. As discussed above, Angry Elephant and Purple Whale are entities controlled by the defendant.

II.      Applicable Sentencing Guidelines

The government respectfully submits that, consistent with the PSR, the following Guidelines apply to the defendant:

| | | |
|---|---|---|
| | Base Offense Level<br>(§§ 2B1.1(a)(2)) | 6 |
| Plus: | Loss of More than $3,500,000<br>(§ 2B1.1(b)(1)(J)) | +18 |
| Plus: | Offense was committed through mass marketing<br>(§ 2B1.1(b)(2)(a)(ii)) | +2 |
| Plus: | Sophisticated Means<br>(§ 2B1.1(b)(10)(B)) | +2 |
| Plus: | Possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification<br>(§ 2B1.1(b)(11)(C)(ii) | +2 |
| Plus: | Organizer or Leader of a Criminal Activity that involved five or more participants<br>(§ 3B1.1(a)) | +2 |
| Less: | Acceptance of Responsibility<br>(§ 3E1.1) | -3 |
| | Total: | 31 |

Because the defendant falls within Criminal History Category I, a total offense level of 31 carries a range of imprisonment of 108-135 months.  However, the statutory maximum for the defendant's count of conviction, 18 U.S.C. § 371, is 60 months, making the effective Guidelines range 60 months.

The Guidelines range set forth above differs slightly from the defendant's plea agreement with the government, in which the defendant stipulated the government's Guidelines calculation.  The only difference between the Guidelines range in the defendant's plea agreement and that provided by Probation of the PSR is the two-level enhancement for the unauthorized use of PII pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(ii). (PSR ¶ 43).  That enhancement applies when the offense involves "the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification."  § 2B1.1(b)(11)(C)(ii).  The government agrees with Probation that merchant account numbers constitute means of identification pursuant to the Guidelines.  See United States v. Williams, No. 19-CR-315-1 (VLB), 2023 WL 2613503, at *11 (D. Conn. Mar. 23, 2023) (holding that "a new bank account with a bank account number and bank cards constitute means of identification).  And there can be no dispute, pursuant to the facts set forth above and the conduct underlying the defendant's guilty plea that

6

these merchant accounts were unlawfully produced within the context of this enhancement. It is of no relevance under this provision that some of the nominee owners knew that their PII was being used to open the merchant accounts. The defendant and his co-conspirators made misrepresentation on the materials used to open the accounts and to the financial institutions in follow up calls. This is all that is required for the enhancement to apply. See United States v. Stroud, 20-CR-00248-SVW, 2023 WL 4602655, at *4 (C.D. Cal. July 18, 2023) (rejecting the argument that the enhancement did not apply because the account holders consented to setting up the fraudulent accounts, holding that the Guidelines provision "only requires that the loan numbers were unlawfully obtained or produced from any other means of identification.").

The government did not include this enhancement in the plea agreement with the defendant and the defendant is not bound to stipulate to its inclusion. However, the enhancement will have no effect on the defendant's Guidelines calculation as the statutory maximum for the defendant's sentence was already well below the applicable Guidelines level calculated in the plea agreement.

Finally, the government respectfully submits that the defendant should be afforded the benefit of a proposed amendment to the United States Sentencing Guidelines, scheduled to go into effect on November 1, 2023, would serve to further reduce the defendant's Guidelines range by two levels. The proposed amendment, which would be U.S.S.G. § 4C1.1 is titled "Adjustment for Certain Zero Point Offenders." That proposed amendment reduces the offense level by two points for defendants that meet each of ten separate criteria. As the defendant meets each of the criteria and the enhancements will almost certainly be in effect on the date of the defendant's sentencing, the government respectfully submits that the Court should apply that two-level reduction to the defendant's PSR. That would result in a total offense level of 29 and a range of imprisonment of 87-108 months. However, the statutory maximum would remain at 60 months, making the effective Guidelines range 60 months.

III.    The Appropriate Sentence

    A.    Applicable Law

"A district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford

adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

B.      The Nature and Circumstances of the Offense and Principles of Deterrence Warrant a Sentence of Incarceration

As he recognizes, the defendant's conduct in this case was extremely serious. The defendant was the leader of a criminal scheme that repeatedly and systematically engaged in a protracted and complex scheme to defraud consumers and banks. He did so while creating false documents, lying to financial institutions and deceiving nominees who thought they were joining a business endeavor. Without regard for the damaging effects of his actions, he engaged in years' long criminal conduct designed to steal from financial institutions and consumers in order to line his own pocket. And contrary to what the defendant may have told his family (see PSR ¶ 60 (the defendant's father reported that "the people the defendant worked with took advantage of him due to his young age")), the defendant was the ringleader of this scheme. The evidence clearly demonstrates that the defendant was the one directing either the nominees to lie, or instructing his co-conspirators to have the nominees lie, to financial institutions. As the defendant now recognizes, his fraud had a profound affect on consumers, financial institutes and the litany of nominees he enlisted to commit his fraudulent conduct. Such a crime warrants serious punishment.

A sentence of incarceration is also necessary here in order to ensure that the sentencing goals of specific and general deterrence are appropriately met. The defendant maintains that specific deterrence has been achieved because he has lost his reputation, assets and his income, combined with the inability to engage in similar activities. See Def. Ltr. at 7. While specific deterrence is difficult to gauge in the abstract, it is clear that the loss of reputation, assets and income is insufficient to deter the defendant. In December 2009, the defendant and his former business partner entered into a $175,000 settlement resolving a consumer fraud lawsuit brought by the Attorney General for the State of Arizona. See Press Release "Terry Goddard Settles Deceptive Advertising Suit for $175,000," available at https://www.azag.gov/press-release/terry-goddard-settles-deceptive-advertising-suit-175000. That lawsuit alleged that the defendant and others "used the Internet to advertise "14-day risk-free" trial offers of various "nutritional supplements," purportedly for only a nominal cost for shipping and handling." The press release noted that the defendant "failed to adequately disclose to consumers material terms and conditions that rendered the trial offers far from 'risk-free' and resulted in significant, unauthorized charges to consumers." The lawsuit also alleged "that many consumers were told that their cancellation request could not be processed due to technical problems or were led to believe that their cancellation request was processed only to be charged for more unauthorized orders." Id. While the defendant did not admit to the fraudulent conduct in resolving the suit, he and his co-defendant paid nearly $200,000 in civil penalties, fees and restitution. Yet this public loss of assets and income did not deter him.

Just two years following this settlement, the defendant began engaging in a criminal scheme that ultimately led to his guilty plea.  The defendant's scheme in Arizona had at least one of the same hallmarks of the instant scheme – the willingness to lie to consumers for a profit.  This is a strong indication that something more is required to deter the defendant beyond the loss of income, assets or reputation.[2]

With regard to general deterrence, a sentence of incarceration will send a strong message to the community that this type of criminal conduct will be punished with a significant period of incarceration.  Such a sentence will make plain that frauds targeting consumers and submitting a litany of false documents to financial institutions, serious frauds that affect financial institutions and consumers will simply not be tolerated.

> C.     <u>The Personal Circumstances Cited by the Defendant Do Not Justify a Non-Custodial Sentence</u>

The primary reason that the defendant believes a non-incarceratory sentence is appropriate is because he suffers from a serious mental illness that "significantly impaired his judgment and decision making during the commission of the offense."  <u>See</u> Def Ltr. at 3, 5.  Based on the defendant's submission, the government recognizes that the defendant has mental health issues and, indeed, it is the primary reason that the government agreed to resolve the case with a count of conviction resulting in a 60-month statutory maximum.  That resolution has already provided the defendant with a material benefit as the Guidelines range is more than two years below the bottom of the otherwise applicable Guidelines.  However, the government respectfully submits that the defendant's personal circumstances do now warrant the extraordinary downward departure, to a non-incarceratory sentence, that the defendant seeks.

As an initial matter, the defendant's general assertion that his mental health issues contributed to his criminal conduct because they impaired his judgment and decision making do not justify the sentence he seeks.  Indeed, the defendant's criminal conduct spanned years and was not the product of a one-time aberration, a single decision or the manipulative input of others.  The evidence established that it was the defendant who orchestrated the complex fraudulent scheme, and it was the defendant who repeatedly directed co-conspirators and nominees to engage in criminal conduct.  The defendant was in control of his business and the criminal scheme and at no point during this scheme did he pause or reconsider the conduct.  Moreover, the defendant's medical records demonstrate that he has received focused treatment for his health issues, including with the support of his family and friends.  Although the defendant has faced some adversity in his life, he is lucky enough to have relative financial security and strong family ties, which many defendants appearing before the Court do not.  As he recognizes, he had a good childhood and has the support of his parents, his sister and numerous friends.  (PSR ¶¶ 59-64).

---

[2] The defendant's claims that damage to his reputation and his business are undercut by the fact that the defendant has changed his name.  Reputational searches for Luke Williams will not alert the public that Luke Williams was formerly Larby Amirouche, who has a fraud conviction in federal court.

Relatedly, the defendant has also urged the Court to "contemplate the adverse impact Luke's imprisonment would have on his family and his business." Def. Ltr. at 3. But the extraordinary family circumstances that the Second Circuit has held to warrant a downward departure are wholly absent in this case. For example, in United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991), the court found extraordinary circumstances where the defendant and his wife cared for their four- and eleven-year-old daughters and the defendant's disabled father and paternal grandmother. Those circumstances stand in stark contrast to those at issue here. While the defendant's family will be impacted by his absence, he does not care for young children or disable adults. And any effects on the defendant's business endeavors are the direct consequence of his criminal conduct.

In short, none of the circumstances cited by the defendant justify the extraordinary departure he seeks.

### D. Avoiding Unwarranted Sentencing Disparities

As the Court is aware, one of the factors the Court is required to consider pursuant to § 3553(a) is the need to avoid unwarranted sentencing disparities. See U.S.S.G. § 3553(a)(6). The defendant claims that a non-custodial sentence would avoid unwarranted sentencing disparities. He cites statistics provided by the United States Sentencing Commission that "nearly a third (32.2%) of all sentences under Guideline 2B1.1 where the defendant had a criminal history Category of I were non-custodial sentence." (Def. Ltr. at 7).

As an initial matter, even adopting the defendant's proffered statistics, over two-thirds of defendants in his selected category did receive a custodial sentence, which would create a sentencing disparity between those defendants and Amirouche. Furthermore, an analysis of data for defendants who are more comparable to Amirouche demonstrates that the defendant's requested sentence would create a material and unwarranted sentencing disparity. The defendant's analysis includes defendants in each of the four sentencing zones (A through D). Of course, that includes defendants under sentencing zone A, which includes non-custodial sentences within the applicable Guidelines. When the analysis is further refined to include only defendants in sentencing zone "D," this defendant's zone, the data makes plain that non-custodial sentences are unusual. In the Second Circuit alone, only 11.4% of defendants that were sentenced pursuant to U.S.S.G. § 2B1.1, in Criminal History Category I and in sentencing zone "D" received non-custodial sentences. Moreover, the average length of those sentences was 24 months. Accordingly, contrary to the defendant's argument, a custodial sentence in this case would help to avoid unwarranted sentencing disparities.

### E. Forfeiture and Restitution

The government also requests that the Court incorporate both forfeiture and restitution into the defendant's sentence. On April 12, 2023, the Court so-ordered the government's preliminary order for forfeiture for entry of a forfeiture money judgment for $1,888,647.49. See Dkt. Entry 36. The government also requests that the Court so-order the government's proposed order for restitution, attached hereto as Exhibit A, for $114,171.59. The proposed restitution amount, which the defendant has consented to, compensates the victim financial institutions for their losses in the defendant's scheme.

10

IV.     Conclusion

   For the reasons set forth above, the government respectfully requests that the Court impose a sentence near the applicable Guidelines range of 60 months' imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By:       /s/       
        David C. Pitluck
        Assistant U.S. Attorney
        (718) 254-6108

Exhibit A: Proposed Order of Restitution

cc: Michael Kushner, Esq. (by ECF and e-mail)
   U.S.P.O. Jennifer Baumann, U.S.P.O. Erica Vest (by e-mail)