1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 21-CR-64(KAM)
                                   :
                                   :
                                   :
        -against-                  : United States Courthouse
                                   : Brooklyn, New York
                                   :
                                   :
LUKE ANDREW WILLIAMS,              : Friday, November 3, 2023
FORMERLY KNOWN AS LARBY            : 11:00 a.m.
AMIROUCHE,                         :
                                   :
        Defendant.                 :

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE KIYO A. MATSUMOTO
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government: BREON S. PEACE, U.S. ATTORNEY
                    EASTERN DISTRICT OF NEW YORK
                        271 Cadman Plaza East
                        Brooklyn, New York 11201
                    BY:  DAVID C. PITLUCK
                        Assistant United States Attorney

For the Defendant:   KUSHNER LAW GROUP PLLC
                        16 Court Street - 36th Floor
                        Brooklyn, New York 11241
                    BY:MICHAEL P. KUSHNER, ESQ.

Court Reporter:     LINDA A. MARINO, OFFICIAL COURT REPORTER
                    225 Cadman Plaza East/Brooklyn, NY 11201
                    lindacsr@aol.com

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

*Proceedings*                                                   2

1    THE COURTROOM DEPUTY:  Good morning, everyone.  This

2  is criminal cause for a sentencing, Docket 21-CR-64, USA v.

3  Larby Amirouche, also known as Luke Williams.

4    Will the Government's attorney state your appearance

5  please.

6    MR. PITLUCK:  Good morning, your Honor.  David

7  Pitluck for the United States.

8    THE COURT:  Good morning.

9    THE COURTROOM DEPUTY:  And on behalf of Defendant?

10    MR. KUSHNER:  Good morning, your Honor.  Michael

11  Kushner on behalf of the Defendant, who is seated at the table

12  with me.  His parents are in the audience as well.

13    THE COURT:  Thank you.

14    Would you like me to call you Mr. Amirouche or

15  Williams?

16    THE DEFENDANT:  Williams, please.

17    THE COURT:  All right.  I'll call you Mr. Williams.

18    Just for the record, I'm going to note the name

19  change on all the official documents, including the judgment

20  in this case.  And I'll address that in a moment.

21    In the meantime, Mr. Williams, would you raise your

22  right hand, please?

23    THE COURTROOM DEPUTY:  Do you solemnly swear or

24  affirm that the statements you're about to make before this

25  Court shall be the truth, the whole truth, and nothing but the

*Proceedings*                                                    3

1    truth?

2                THE DEFENDANT:  Yes.

3                THE COURTROOM DEPUTY:  Thank you.

4                THE COURT:  Sir, do you speak and understand English

5    without any difficulty?

6                THE DEFENDANT:  Yes.

7                THE COURT:  Thank you.

8                We're here today for the sentencing of Luke Andrew

9    Williams.  I note that the Defendant has changed his name

10   since he has pleaded guilty.  He was indicted and pled guilty

11   as Larby Amirouche.

12               I did receive from Probation an order for the name

13   change issued by the Circuit Court of Lake County, Illinois,

14   dated July 26, 2022, reflecting that the Defendant's name has

15   been legally changed to Luke Andrew Williams.

16               It is his preference that he be referred to by that

17   name, but I will order that the caption be amended to reflect

18   the name change and that he is formerly known as Larby

19   Amirouche, so that the name will be recognized.

20               Now, as you can see, Mr. Williams, we have a court

21   reporter here who is making a record of today's proceedings.

22   The transcript will be made part of the official court record

23   if you choose to exercise your appellate rights.

24               I would like to confirm with the Government that all

25   victims who would be entitled to notice have received

*Proceedings*                                                    4

1   reasonable notice of today's sentencing and had the

2   opportunity to complete and return victim impact statements.

3          MR. PITLUCK:  Yes, your Honor, all victims that we

4   were able to reach were notified.

5          THE COURT:  Do you anticipate there will be other

6   victim impact statements?

7          MR. PITLUCK:  No, your Honor.

8          THE COURT:  In preparation for Mr. Williams'

9   sentencing, I've reviewed the superseding information, his

10  waiver of his right to be prosecuted by an indictment, his

11  plea agreement, and the transcript of his change of plea

12  hearing on May 5, 2022.

13         I've also reviewed the probation department's

14  presentence investigation report, also referred to as "PSR,"

15  and the sentencing recommendation, both dated October 13,

16  2022.

17         I've reviewed the probation department's addendum to

18  the presentence report, dated July 28, 2023, and the second

19  addendum, dated October 31, 2023.

20         I've also reviewed the unredacted version of

21  Mr. Williams' medical records, which were filed under seal.

22  And Mr. Williams' sentencing memorandum and its attached

23  letters of support.

24         I've reviewed the personal financial statement and

25  business financial statement that Mr. Williams completed and

*Proceedings* 5

1   submitted to Probation in accordance with 18 U.S. Code,

2   Section 3664.  Both of those financial statements were under

3   oath and were dated July 24, 2023.

4         I've reviewed the Government's sentencing

5   memorandum, and, finally, I reviewed Mr. Williams' letter,

6   filed November 2, 2023, noting that he has not paid the

7   forfeiture money judgment as required by paragraph seven of

8   his plea agreement and paragraph two of the Court's order of

9   forfeiture.  Those documents require that he pay the

10   forfeiture 30 days in advance of sentencing.

11         So, he hasn't?

12         MR. KUSHNER:  Correct, your Honor.

13         THE COURT:  Well, does he intend to pay it?

14         MR. KUSHNER:  As I indicated in the letter, your

15   Honor, Mr. Williams doesn't have access to the funds to

16   satisfy the $1.8 million.  So, he intends to pay it through an

17   agreement after post release supervision -- through post

18   release supervision, paying a portion of his income.

19         THE COURT:  Well, he had an agreement with the

20   Government to pay it 30 days in advance.  I'm not sure why the

21   agreement was made if he wasn't intending or wasn't capable of

22   paying it.  This specifically said 30 days before sentencing.

23         Does the Government have a view on this?

24         MR. PITLUCK:  Your Honor, I discussed it with --

25         Is it okay if I remain seated so I'm closer to the

*Proceedings*                                                      6

1    microphone?

2                THE COURT:  You may remain seated, that's fine.

3                MR. PITLUCK:  I discussed it with our asset recovery

4    team.  We obviously had entered the agreement with that

5    expectation, but if the realities are that there's no money

6    there, our office will agree to a payment plan; however, we're

7    going to and formally request that the Court order that as a

8    special condition of supervised release to ensure that the

9    forfeiture and restitution obligations are paid.

10               THE COURT:  One thing to know is that the law

11   requires that interest accrue on unpaid restitution.  It is

12   going to be ordered to be paid immediately in a lump sum.  And

13   if there is -- and I'll also put in provisions for monthly

14   payments.

15               I would also note that I believe the financial

16   statement indicated there was about $400,000 in an account in

17   Mr. Williams' name or Mr. Amirouche's name.  I'm not sure what

18   name it's in, but that is money that should be made available

19   and paid over towards satisfaction of both the restitution

20   order, which has priority over the forfeiture, both of those

21   accounts ought to be accessed or attached or whatever the

22   Government does in post judgment enforcement proceedings.

23               Mr. Williams, I understand that you are a United

24   States citizen; is that correct?

25               THE DEFENDANT:  Yes.

1          THE COURT:  And the reason I ask, sir, is because if

2   you are not, I would address consular notification and

3   immigration consequences.  But because you are a citizen, I

4   need not address that.

5          Sir, you have the right to counsel and Mr. Kushner

6   has represented you.

7          Are you satisfied with his representation?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And counsel, are there any unresolved

10  conflicts, contentions, issues, or difficulties in your

11  relationship that I should address?

12         MR. KUSHNER:  One moment, your Honor.

13         (Pause in proceedings.)

14         MR. KUSHNER:  I'm sorry, your Honor.  I was

15  interrupted.

16         Could you ask the question one more time?

17         THE COURT:  I asked whether there are any unresolved

18  contentions, conflicts, or issues between you and your client

19  that I should address.

20         MR. KUSHNER:  No, your Honor, not with respect to

21  representation.

22         THE COURT:  Was there something you wanted to say?

23         MR. KUSHNER:  Yes, your Honor.

24         So, the money that you just referenced, the $400,000

25  that is in an account, that's in a company account that

*Proceedings*                                                          8

1   Mr. Williams controls that company.  That money is from an

2   EIDL loan that company obtained.

3          And I can talk to the Government about that

4   afterwards, I suppose.

5          THE COURT:  Well, a judgment is enforceable.  I

6   don't know whether that loan has been reduced to judgment.

7   The Government may attach any assets in which Mr. Williams has

8   a direct or indirect interest to satisfy restitution.

9          So, I think that it could be made available to pay

10  restitution if he's sincere about compensating his victims.

11  And certainly a defendant's willingness to recognize that

12  victims need to be compensated for their losses does factor

13  into my sentencing evaluation.

14         MR. KUSHNER:  I understand that, your Honor.

15         But with respect to those funds, they were

16  distributed by the SBA within the last two years to that

17  account.  I'm not sure if -- I haven't reviewed the SBA loan

18  agreement that the economic injury loan provided for, but I

19  don't know if his paying of that funds over to the Government

20  in exchange for forfeiture and restitution in this case is

21  even permissible by the terms of that agreement.

22         THE DEFENDANT:  Well, that is an interesting issue

23  because both the obligation to pay restitution is enforceable

24  by the United States and the obligation if this loan were to

25  go in default would be collectible by the United States

1    through a lawsuit.

2            The point I'm making is that the judgment, once it's

3    entered today, will have a priority over a debt obligation

4    that has not been reduced to judgment.  So, I would hope that

5    there wouldn't be a lot of litigation about the payment of

6    that obligation.  The Government is permitted under its post

7    judgment enforcement powers to collect restitution.  And they

8    may seize or attach or garnish any assets in which a defendant

9    has an interest.

10            So, to the extent these funds are provided to a

11   company over which Mr. Williams has control, I leave that to

12   the Government to sort out.

13            Did you have a view, Mr. Pitluck?

14            MR. PITLUCK:  Your Honor, I don't.  We have people

15   that specialize in this.

16            I think it's a very salient question.  We prosecute

17   people all the time for using these loans for improper

18   purposes.  They are supposed to be used for the company, for

19   operations, to pay payroll.

20            But it's an interesting question as to whether or

21   not a debt that is owed to the Government by the person who

22   was assigned the loan is a permissible purpose.  But I'm sure

23   it's come up before and I will check with the people in our

24   office who focus on this area.

25            THE COURT:  All right.  I think that maybe there was

1    a source of confusion, but my understanding was the original

2    PSR indicated that Mr. Williams had ongoing business from

3    which he derives substantial income.  And then the more recent

4    report indicated that he wasn't -- he had suspended business

5    operations, that he had no money, that he was living at home

6    with his parents, yet he declared rental obligations to the

7    tune of $4,000 or $3,000, if I'm not mistaken.  So, there were

8    a lot of questions that were raised in the sworn financial

9    statements, which are under penalty of perjury.

10           My question was it appeared that he wasn't operating

11   a business any longer and I don't know really where the truth

12   lies.  That's not my issue today, it's just that I am

13   obligated to impose a restitution order and judgment.  And the

14   forfeiture judgment is going to be made part of this judgment

15   as well.  And payment of those obligations will be a condition

16   of supervised release or probation, the violation of which

17   could result in a revocation.

18           So, maybe you want to speak to whether or not he is

19   still operating businesses and deriving income or whether he

20   isn't, but I thought the latest indicator was that those

21   businesses had not been operating since the criminal case

22   commenced.

23           MR. KUSHNER:  Your Honor, he is not making any

24   income.  He is operating a business trying to generate income,

25   but it hasn't happened yet.

*Proceedings* 11

1    THE COURT:  What kind of business is it?

2    MR. KUSHNER:  He'll speak about that when he speaks

3  to his letter, but he runs -- he can speak now about that.

4    THE COURT:  If you are comfortable letting him

5  speak, that's fine.

6    THE DEFENDANT:  So, I'm in the process of getting

7  into the Persian carpet industry in India.  I had summer

8  interns this past summer that attend University of Chicago,

9  Cornell, that I hired.  We worked on different types of

10  businesses that would be good to consider getting into

11  business with.

12    I opened a company this year -- my mom opened a

13  company in India that I'm using to hire IT people for a small

14  office, like 800 square feet.  And I had a couple of people

15  visit factories in India to explore the possibility of doing

16  this business.

17    And, also, we're developing an application for human

18  resources that's like preemployment screening technology, so

19  like assessments in different types of applications for people

20  that are looking for jobs.  Or some of this will be, like, AI

21  detection-proof so that there's less of this AI use to try to

22  get employment.

23    So, very clean businesses that are very different

24  than what in the indictment period I was doing.

25    THE COURT:  I think we'll talk about this a little

*Proceedings*                                                12

 1  bit more later, about the Second Circuit's authorization of a

 2  District Court, a sentencing judge, imposing certain

 3  employment restrictions that might relate to similar scenarios

 4  from which the criminal conduct arose.

 5          You mentioned that this is your company or is it

 6  your mother's company?

 7          THE DEFENDANT:  The company in India that was opened

 8  is in my mom's name.

 9          THE COURT:  Why is that?

10          THE DEFENDANT:  For India, I'm not able to open -- I

11  don't have a passport and I'm not able to open a business

12  there.

13          I also opened a company in Poland, but I'm not doing

14  anything with it.  That was opened in my name because they

15  don't require a passport.  You can do it with your license.

16  That was earlier this year.

17          So, I opened it with a law firm and I plan on trying

18  to hire marketing type of people there because they're

19  familiar with the culture here.  And I really like Poland.

20  So, there was that motion from the previous year, and that's

21  the reason for the Poland business, because I really like

22  Poland for business.

23          THE COURT:  So, I hope that you will find a way to

24  make a lawful income and pay your debts to your victims and on

25  the forfeiture.

*Proceedings*                                                                13

 1          While you are on supervised release, you won't be

 2   allowed to go abroad.

 3          THE DEFENDANT:  Okay.

 4          THE COURT:  Or to have a passport or to use a

 5   passport.  So, just something to keep in mind in terms of

 6   business planning.

 7          THE DEFENDANT:  Yes, your Honor.

 8          THE COURT:  Sir, you have the right to counsel.

 9          I just ask you, are you satisfied with Mr. Kushner's

10   representation in this case?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Mr. Williams does appear to be fully

13   alert and to be following these proceedings closely.

14          Do you agree with that observation, Mr. Kushner?

15          MR. KUSHNER:  Yes, your Honor.

16          THE COURT:  Do you know of any reason why we should

17   not proceed with his sentencing today?

18          MR. KUSHNER:  No, your Honor.

19          THE COURT:  Mr. Williams, were you able to review

20   the presentence report, the addenda by the probation

21   department, the Government's submissions, and your attorney's

22   own submissions regarding your sentencing?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Did you have any difficulty

25   understanding those submissions?

*Proceedings*                                                  14

1          THE DEFENDANT:  No.

2          THE COURT:  Were you able to discuss those

3    submissions with your attorney?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Are you ready now to be sentenced, sir?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  You may recall that you entered a plea

8    of guilty on May 5, 2022.

9          Do you wish to dispute or contest the validity of

10   that plea?

11         THE DEFENDANT:  No, I do not.

12         THE COURT:  You may recall that at your change of

13   plea hearing, you were placed under oath and asked questions

14   about your understanding of the charges, your rights, and the

15   consequences of your plea.  You were also asked to tell me in

16   your own words what you did in connection with the charge to

17   which you pled guilty.

18         Were your answers to my questions during your plea

19   hearing truthful, sir?

20         THE DEFENDANT:  Yes, your Honor.

21         THE COURT:  I reviewed the transcript of

22   Mr. Williams' plea hearing and I confirmed, as I previously

23   found, that Mr. Williams' guilty plea was knowing and

24   voluntary and based upon a full understanding of his rights

25   and the consequences, the penal consequences, of his plea of

*Proceedings*                                                    15

1    guilty.

2              I confirmed there was a factual basis for this

3    guilty plea and I accepted Mr. Williams' plea of guilty to the

4    superseding information, which charged him as follows:

5              On or about and between January 2012 and April 2016,

6    both dates being approximate and inclusive, within the Eastern

7    District of New York and elsewhere, Mr. Williams knowingly and

8    intentionally conspired to execute a scheme and artifice to

9    defraud one or more financial institutions, the deposits of

10   which were insured by the Federal Deposit Insurance

11   Corporation, specifically Financial Institution 1, 2, 3, and

12   4, entities the identities of which are known to the United

13   States Attorney, and to obtain monies, funds, credits, assets,

14   and other property owned by and under the custody and control

15   of those financial institutions by means of one or more

16   materially false and fraudulent pretenses, representations,

17   and promises, contrary to 18 U.S. Code Section 1334.

18             Mr. Williams accomplished this by:

19             A, on or about March 19, 2023, e-mailing

20   Co-conspirator 1 and another individual, individuals whose

21   identities are known to the United States Attorney, and

22   directing them to complete and sign merchant applications for

23   accounts at payment processing companies associated with

24   financial institutions containing material misrepresentations

25   for three shell companies in the name of nominee owners of the

1    shell companies;

2           And, B, on or about June 17, 2013, e-mailing

3    Co-conspirator 1 and directing Co-conspirator 1 to contact a

4    financial institution to reset a login and password for a

5    shell company merchant account that was held in the name of a

6    nominee so that Mr. Williams could access and control that

7    account;

8           And, C, on or about August 4, 2015, sending a text

9    message to Co-conspirator 1 and others and directing

10   Co-conspirator 1 to provide login information for e-mail

11   accounts belonging to corporations that Mr. Williams

12   controlled but which were held in the names of nominee owners

13   and directing another member of the conspiracy to use those

14   e-mail accounts to fraudulently request the release of funds

15   from bank accounts belonging to the corporations that

16   Mr. Williams secretly controlled, contrary to U.S. Code 371

17   and following and 18 U.S. Code Section 3551.

18          At the change of plea hearing, I found that

19   Mr. Williams knowingly and voluntarily waived his right to

20   prosecution by an indictment, that he consented to prosecution

21   by an information, and he allocuted that between January 2012

22   and April 2016, together with others, he agreed to file false

23   documents with financial institutions in order to obtain money

24   and properties from those banks.  He explained that he knew

25   that if he were to submit the false statements to the bank,

*Proceedings*                                                                    17

1   the bank would likely extend or make available funds to

2   Mr. Williams and/or his co-conspirators.

3           He further explained that when he made this

4   agreement with others to engage in this fraudulent activity

5   with regard to the bank, he knew that he was making an illegal

6   agreement.

7           Mr. Williams, you have the right to have what is

8   called a *Fatico* fact-finding hearing, during which parties may

9   present evidence that is relevant to sentencing, especially if

10  there are issues in dispute.

11          Would you like to have such a hearing, sir?

12          THE DEFENDANT:  No, your Honor.

13          THE COURT:  In addition, Mr. Williams, although you

14  did not submit a sentencing letter -- just writing to the

15  Court -- you do have the right to make a statement here in

16  open court, and I'm happy to hear from you if you'd like to be

17  heard.

18          THE DEFENDANT:  Yes, your Honor, I do.

19          THE COURT:  Please just speak slowly and keep your

20  voice up.  You may remain seated if you're more comfortable.

21          THE DEFENDANT:  Thank you.

22          MR. KUSHNER:  Your Honor, you'd like him to speak

23  now?

24          THE COURT:  Sure, if he's ready.

25          THE DEFENDANT:  Your Honor, I stand here with a

*Proceedings*                                                    18

1   clear recognition of the wrong I have done.  I've spent the

2   past two and a half years under indictment thinking about the

3   horrible decisions that I made when I was young and immature,

4   when I was a young and immature man.

5          The crimes I committed were a result of poor

6   judgment exacerbated by my battle with bipolar illness.  I was

7   very young during the period of the indictment.  I was

8   motivated by greed and the pressures of living in Miami Beach

9   and Las Vegas, two cities notorious for people to visit and

10  make decisions they later regret.

11         But I'm here to take full accountability.  I've

12  learned from my errors and have committed myself to changes

13  that will prevent such actions in the future.  Since my

14  indictment, I have undertaken a sincere and rigorous process

15  of self-improvement and community service, which I am

16  desperate to continue.

17         In August of 2021, I was baptized into the Catholic

18  faith.  My faith has been a cornerstone of my rehabilitation

19  and it has helped me to understand the importance of

20  accountability and integrity.

21         My faith has been a cornerstone of my

22  rehabilitation.  Its teachings have provided me with a moral

23  compass that was previously absent in my life, particularly as

24  I reflect on the scripture, "...you may be sure that your sin

25  will find you out."  Numbers 32:23.  This passage has reminded

*Proceedings*                                                          19

1    me that accountability and integrity must guide my actions.

2            I have attended Mass every Sunday for over two

3    years, only missing a few days.  I read my Bible app daily,

4    where I have a current streak of 209 and a best at 358, and

5    attend weekly Bible study on Wednesday mornings since July of

6    2021.  This activity shows my commitment to living a righteous

7    life by adhering to the teachings of my faith.

8            My family has been unwavering in their support

9    throughout the past two and a half years, providing not just

10   emotional backing but also reinforcing the importance of my

11   continued treatment and adherence to my bipolar and ADHD

12   medication.  Their support has been vital in maintaining my

13   resolve to stay on this new path.

14           I also have two therapists, Dr. Smiley and

15   Dr. Fields, that I speak to on a weekly basis which has helped

16   me in managing my bipolar issues and keeping them completely

17   under control since March of 2021.

18           I am also exercising regularly, including attending

19   over 425 yoga classes since August of 2021.  This practice has

20   been essential in preventing manic symptoms caused by bipolar

21   disorder and has replaced the chaotic drive for material

22   success with the pursuit of inner peace.

23           I have also volunteered over 80 times at the

24   Deerfield Free Store, which has assisted hundreds of refugees

25   and displaced individuals in building new lives in the United

*Proceedings*                                                      20

1  States.  By volunteering with the Deerfield Free Store, I've

2  been given a chance to contribute positively to society.  I

3  help to move heavy furniture, which is a task that many of the

4  other volunteers are unable to do.  I assist refugee shoppers

5  in finding the items they need.  I take care of donation

6  dropoffs, which ensures that the Free Store has a steady

7  supply of items to distribute.  I am also responsible for the

8  technical infrastructure of the Free Store.

9          As a result of my commitment to give back, and being

10  fortunate to volunteer alongside amazing people, it has made

11  me a more confident and compassionate person and I am

12  committed to using my skills and talents to help others.  I've

13  also engaged in other volunteer work, including at Paths, a

14  homeless shelter; Feed My Starving Children events; and many

15  other church functions and projects.

16          I am working hard to build a new life for myself.

17  Recently, I opened an office in Bangalore, India, where I have

18  a small team of IT professionals working on an HR application

19  for preemployment screening.  I've also opened a company in

20  Poland, where I'm hopeful to visit and hire a small team that

21  focuses on marketing and e-commerce for a Persian carpet

22  business that I would like to launch.

23          I hired four interns for three months this past

24  summer that attend the University of Chicago and Cornell

25  University and thoroughly researched the Persian carpet

*Proceedings* 21

1  industry and various others to identify good business

2  opportunities.  My team hired two textile experts and they

3  need to visit several factories to conduct due diligence and

4  negotiate price.  I'm committed to product quality, focusing

5  on carpets with high KPSI and the highest quality wool, with a

6  testing lab in place to assess each carpet purchased.

7        These businesses bear no resemblance to the business

8  activity that took place during the period of the indictment

9  and illustrates a changed way of approaching business, from

10  who I'm surrounding myself with and products that provide

11  excellent value to would-be consumers.

12        As I continue to build a life centered around faith,

13  community service, good faith business practices, and personal

14  growth, I ask that you consider the strides I've taken toward

15  rehabilitation.  I am deeply sorry for my actions and the pain

16  they have caused.  I cannot change the past, but I am wholly

17  dedicated to a future where I can be of service to others and

18  live a life that reflects the values I now hold dear.

19        I respectfully request that you allow me the

20  opportunity to continue this work without the interruption of

21  imprisonment.  My commitment to my faith, my mental health,

22  and my community is unwavering, and I'm determined to use

23  these pillars as the basis for a life that contributes

24  positively to society.  I am confident that I can make a

25  positive contribution to society if I'm give the chance.

*Proceedings*                                                    22

1      THE COURT:  Thank you, sir.  I have every faith that

2   you will be on a law-abiding path going forward.  Some of the

3   hardest lessons in life are the most valuable.  I don't sit

4   here in judgment of you as a person, but, rather, I must judge

5   the offense and the consequences and the impact of that

6   offense on others.

7      I don't know whether you thought about your plan for

8   compensating your victims.  I haven't heard anything about

9   that, but have you thought about it?

10     THE DEFENDANT:  My intention is to use the proceeds

11  from funds that are derived from the business to pay

12  restitution and to pay the judgment as fast as I can.

13     I take the penalty very seriously.  I know that this

14  is a serious thing.  I'm not going to avoid it.  I think about

15  it a lot, actually, and I am determined to pay back every

16  penny.  And I'm very serious about this.

17     The last two and a half years, I've spent an

18  enormous amount of time thinking about the damage that I

19  caused consumers that I never met.  And I understand that I

20  need to do the right thing and prioritize it.  So, I will not

21  avoid it and you have my word that I will pay it as fast as I

22  humanly can.

23     THE COURT:  There are so many millions of dollars

24  that were realized and they were deposited into accounts that

25  you control.  I was just having trouble understanding what

*Proceedings*                                                    23

1    happened to all that money.

2            It would be expected that after realizing -- was it

3    close to $5 million in gains from this scheme that went on for

4    several years, that one would have a sense of what happened to

5    the money.  I don't know.

6            Maybe the Government knows.  I don't know whether

7    the Government had an opportunity to try to track down some of

8    those funds.

9            MR. PITLUCK:  Your Honor, we have.  There is really

10   three traunches of money.

11           There's all the money that went through the account.

12   The Government's theory, and the Defendant accepts this,

13   that's all fraudulent proceeds because it was derived using

14   fraudulent accounts and misrepresentations made to banks and

15   consumers.

16           However, some of the funds that were purchased by

17   the thousands of consumers, the people did get the products

18   that they bought.  So, some of the $6 million was actually

19   legitimate transactions.

20           THE COURT:  Well, "some" meaning what portion of

21   that $6 million, roughly?

22           MR. PITLUCK:  Your Honor, we interviewed as many

23   victims as we could.  There were thousands of them.  It was

24   impossible to identify what was lost and what was actually

25   provided to them.  We directionally have an idea, but it's

*Proceedings*                                              24

1   impossible to get the number accurately.

2           THE COURT:  I'm not demanding precision, I just

3   think that -- do we have a rough sense of proportion?

4           These are not high end items, right, dietary

5   supplements and --

6           MR. PITLUCK:  Some of them are classes, your Honor.

7           THE COURT:  What?

8           MR. PITLUCK:  Some of them are online programs.

9           THE COURT:  Okay.

10          MR. PITLUCK:  So, what we're using for the

11  forfeiture for the gain was the proceeds of that that went

12  into accounts that were controlled individually by

13  Mr. Williams.

14          THE COURT:  Okay.

15          MR. PITLUCK:  That is the $1.8 million.

16          THE COURT:  Okay.  But once they went into those

17  accounts and to the extent they may be entitled to a deduction

18  for products actually received by a consumer, have you done

19  any investigation as to where the rest of the money went?

20          MR. PITLUCK:  Your Honor, we saw some money go out

21  the door to purchase items or in cash, but we didn't account

22  for every dollar that went into the Defendant's account.  Some

23  of them went to other people that were working for him, other

24  co-conspirators in the scheme.

25          THE COURT:  Well, we know there are more than five,

*Proceedings*                                                          25

1   so was it an equal split among everybody?

2           MR. PITLUCK:  No, it wasn't, your Honor.

3           THE COURT:  Is there anything else either Mr.

4   Williams or his counsel wish to say?

5           MR. KUSHNER:  With respect to the financial number

6   that you were just mentioning, your Honor, in explanation

7   somewhat, Mr. Williams would like the Court to be aware that

8   some of the money that went into the accounts that he

9   controlled was used to pay marketing costs and expenses

10  related to the businesses and it wasn't all profit that came

11  into his pocket at that point in time.

12          I don't necessarily believe it's that important to

13  what we're talking about.  There's a forfeiture number we

14  have.  And where we're at with the restitution amount, what we

15  have come up with is reflective of what can be done here.

16          THE COURT:  I'll just explain why I'm asking.

17          One of the issues that I consider in determining

18  whether someone should serve an incarceratory term and for how

19  long, that is an issue that I consider in the context of:  Who

20  are the victims?  What is the chance that those victims will

21  be paid more readily if I impose a more lenient term?  Is

22  there any hope that these victims will be paid?  How sincere

23  and what efforts have been made before sentencing to think

24  about those victims or to set aside funds for those victims or

25  to assist the Government in locating funds that might have

*Proceedings*                                                    26

 1   been obtained by Mr. Williams during the multiyear course of

 2   that fraudulent scheme?

 3              These are all issues that I don't have answers to.

 4              MR. KUSHNER:  I understand, your Honor.

 5              So, as reflected in the restitution order that the

 6   Government and I entered into, the only identifiable victims

 7   at this time are the banks that were the processing companies

 8   in the mix of this, and the identifiable amount of loss to

 9   those victims is $114,000.

10              And as Mr. Williams indicated, he is -- I'm sorry

11   that we weren't prepared to answer that question about the

12   EIDL loan, whether it could be used to satisfy that $114,000.

13   But if that is part of the terms of that agreement, if he can,

14   we would do that.

15              THE DEFENDANT:  Yeah.

16              MR. KUSHNER:  We were under the impression, perhaps

17   erroneously, and I apologize to the Court for not

18   investigating it further, that that money couldn't be used to

19   satisfy this schedule.

20              THE COURT:  I'm not ordering that it is, I'm just

21   noting that there is very little disclosed about that loan

22   except that it was sitting in an account controlled by

23   Mr. Williams and it was a substantial six-figure amount and it

24   would have satisfied the restitution order and part of the

25   forfeiture.  And I'm hearing now more today about the nature

*Proceedings*                                                    27

1    of the loan and why you don't think it's available.

2              But I don't know what the truth is, truthfully.

3              MR. KUSHNER:  Your Honor, Mr. Williams would like to

4    talk about the victims in this case and the identity of them.

5              THE DEFENDANT:  The majority of the victims, your

6    Honor, were consumers.  There were banks that did take a loss.

7    The majority of the banks that were involved during the period

8    of the indictment did not take a loss and made good money on

9    the business.

10             The consumers that we have -- that's locatable in

11   discovery theoretically could be contacted to determine, if

12   they were called, if they received product.  There's a

13   combination of people that were purchasing digital products

14   versus physical products.  Depending on the date and time that

15   the person ordered and what they purchased, they received

16   product.

17             Sometimes people didn't receive any product.  And in

18   those instances, I mean even without that, we can say that all

19   of the victims are due money because they were deceived in the

20   process of purchasing.

21             There hasn't been an opportunity to decide what --

22   my understanding is to not contact anybody.

23             THE COURT:  No, you shouldn't.

24             THE DEFENDANT:  Right.

25             But my sincere intention, and I mean this with all

*Proceedings*                                                                    28

1   my heart, is to make every penny holden to the victims.  I do

2   think about this.  It's weighing on me.

3        If there's some imposed judgment or some order that

4   you make towards this exact issue, I will very happily and am

5   very much committed to making right on this.  I can tell you

6   that I'll be working my tail off to try to earn money so that

7   I can do that.

8        I'm not the type of person that is just going to let

9   this go and I'm not going to work that hard for, you know,

10  whatever.  I'm going to be -- I'm a very driven person, I'm

11  very consistent at everything that I put my mind to.  I can

12  assure you that the judgment and the restitution will be paid

13  and I can promise you that.

14       THE COURT:  Thank you.

15       Did you want to be heard, counsel?

16       MR. KUSHNER:  With respect to other issues for

17  sentencing, yes, your Honor.

18       THE COURT:  Go ahead.

19       MR. KUSHNER:  Your Honor, I submitted a pretty

20  substantial --

21       THE COURT:  I've read it.

22       MR. KUSHNER:  -- pleading on behalf of the

23  Defendant, and I'm sure your Honor read it and had a chance to

24  think about it long and hard.  I just want to highlight a

25  couple of the issues that I think are relevant to where we go

*Proceedings*                                                29

1   with this today.

2          Judge, the passage of time since the alleged

3   conspiracy, we're looking at seven years ago.  This conspiracy

4   alleged to have ended 2016.  From 2017 up until today, 2023,

5   there's been no suggestion that Mr. Williams has engaged in

6   any sort of suspicious or fraudulent activity.  What's before

7   your Honor is a record that shows that he has been trying to

8   rectify the wrongs that he's had.

9          He has engaged CPAs and accountants to try and amend

10  his returns from the period of time during this conspiracy to

11  accurately reflect his income.  He has come current on his IRS

12  obligations.  He has come clear with the IRS on his filings

13  and has come to some agreements with them.

14         I think that the passage of time really speaks

15  towards the specific deterrence for this defendant, right?

16         Would a sentence of incarceration deter him from

17  doing any future -- be necessary to deter him from doing any

18  future suspicious or fraudulent activity?

19         I think the record reflects that that's not the

20  case.  He's been for seven years doing good deeds.

21         The next thing I would ask the Court to review is

22  his extraordinary rehabilitation, Judge.  Mr. Williams told

23  you in his speech, you've seen it in the letters of

24  recommendation that came to the Court, he has completely

25  devoted his life to the community around Chicago.  He has

*Proceedings*                                                    30

1    impacted hundreds of refugees and other indigent people who

2    have nowhere else to turn.  His church that he devotes himself

3    to relies on him for IT services, physical labor,

4    communication with individuals who don't speak English.

5            He recently had to go and assist a Ukrainian couple

6    and their two young children who came to Chicago and needed to

7    utilize the Free Store and couldn't find it.  The church

8    pastor called him and said:  Mr. Williams, go find this

9    person.

10           When you look at his personal characteristics in

11   terms of his rehabilitation and good deeds, I think it

12   warrants a nonjail sentence, your Honor.

13           And finally, the last thing I want to highlight is

14   his mental health disorders, your Honor.  I've provided

15   medical records that go back before the alleged conspiracy to

16   2011.  There's been hospitalizations, there's continuous

17   treatment, for the serious and debilitating mental health

18   disorders.

19           We didn't provide that to say that that was the

20   excuse for the offense in 2012 to 2016, it was to provide

21   context to your Honor of what was going on with Mr. Williams'

22   life, the struggles that he was going through, the struggles

23   that he's continued to go through, and to help your Honor see

24   what strides he's taken since 2021 to get on an even keel with

25   his therapy, medication, and treatment.

*Proceedings*                                                              31

1          I'm sure you read the letters from his parents.

2    They are here.  They came here from Chicago to be in the

3    courtroom with Mr. Williams and to be here for your Honor.

4    They actually wanted to say something to your Honor.  I said I

5    would express it on their behalf.

6          As you read their letters and as you sit with them,

7    you see the pain and the anguish that they have suffered not

8    knowing whether Mr. Williams was going to be alive the next

9    day, and, if so, what shape he would be in.

10          And what a jail sentence would mean to the progress

11   that he's made I think is important for the Court to consider.

12          He has this team that's set up, Dr. Smilely, Dr.

13   Fields, and Dr. Galston, who he meets with once a week,

14   each -- sorry, two doctors he meets with once a week.  The

15   psychiatrist he meets with once very couple months for

16   medication management.  He sees them -- he saw them last night

17   from here.  Wherever he is, they are on his side.

18          And the medication that he is prescribed, I'm sure

19   we're all aware because it was in the news a few weeks ago,

20   BOP has policies against providing inmates with ADHD with

21   certain amphetamine treatment.  He is prescribed Mydayis and

22   Adderall for his treatment in connection with the

23   anti-psychotics that he takes, as well as Alprazolam.

24          He would not get that treatment -- it's my

25   understanding that he would not be able to get that treatment

*Proceedings*                                                    32

1    in BOP at least initially.  They have a matrix with which they

2    decide what treatment they can provide to people, and

3    amphetamines is their last resort.  So, putting him into an

4    incarceratory setting would set back that treatment and

5    therapy that he's been getting and has progressed so strongly

6    in.

7              For these reasons, your Honor, I suggest that a

8    nonincarceratory sentence is appropriate in this situation and

9    it wouldn't be greater than necessary.

10             THE COURT:  Thank you.

11             Does the Government want to be heard?

12             I know that you have advocated for a guideline

13   sentence, if I'm not mistaken; is that correct?

14             MR. PITLUCK:  Your Honor, I think the wording that

15   we used was "near the guidelines."  I don't want to -- we

16   submitted a lengthy sentencing memorandum, I don't want to

17   repeat it, but the conduct here is I think what is driving our

18   request for a sentence.

19             This was very serious conduct and I think what might

20   be getting lost a little bit is that there was a team of

21   people doing this and Mr. Williams was the head of that team.

22   He was ringleader.  He roped in a lot of people, some

23   willingly, some not so willingly or cognizant of what they

24   were doing, into a criminal scheme.

25             There were a lot of people who agents had

*Proceedings*                                                          33

1   interviewed and approached who had criminal exposure because

2   of their involvement with him.  Some people had serious

3   criminal exposure.  And they all willingly followed him.  And

4   that had an effect on a lot of people, including the victims.

5           And your Honor, one other point I just want to make

6   is we went out to a lot of consumers.  There's no way we could

7   have found or notified all of them.  There were thousands.

8   Many of them had been made whole by various financial

9   institutions and many of these financial institutions did --

10  they made money as part of the scheme, but they also had

11  mechanisms in place to try to limit losses.  And those

12  misrepresentations limited those.

13          So, it's not a glamorous fraud when financial

14  institutions are the victims.  Many times they don't even want

15  to participate, it seems.  They've written off the losses

16  here.  But it's important to us, it's important to my office,

17  to make sure that these financial institutions aren't the ones

18  laboring and bearing the losses for everybody else just

19  because they do have policies to make consumers whole.

20          So, that is why the restitution orders are directed

21  at them, because they did lose money on these schemes, they

22  did extend money to consumers.

23          Unless the Court has any questions, I'm not going to

24  belabor all the points in our sentencing memorandum.

25          THE COURT:  I understand the point that many times

*Proceedings*                                                          34

1   it is the bank that is the victim but it's because the banks

2   make their customers whole.  They do have mechanisms to try to

3   detect fraud but they're not always successful because like --

4   well, as occurred in this case, it was a very, very

5   sophisticated scheme to avoid detection.  And there were a lot

6   of layers and pseudonyms and nominees and lies that were told

7   to the bank.

8          I don't think that a bank or an individual has any

9   less standing in court to be recognized as a victim and to be

10  compensated for losses that were caused through criminal

11  activity.

12         I do want to acknowledge that Mr. Williams has

13  brought his parents.  I have definitely read your letters --

14  I've read all the letters that were submitted -- and I want to

15  thank you for your presence.  I recognize, as defense counsel

16  mentioned, that these last ten years must have been very

17  painful years for you.  I can imagine how difficult it was and

18  how frightening it's been to get calls to travel to distant

19  places to retrieve your son when he's having difficulties, you

20  wonder whether he's going to harm himself, you wonder whether

21  a certain therapy is going to assist him this time.  I imagine

22  it must have been excruciating.  And I'm very sympathetic to

23  you and to Mr. Williams for the mental health challenges that

24  he's faced.  I'm glad to hear that he is getting appropriate

25  therapeutic treatment.

*Proceedings*                                                    35

1        I've read the records.  Many of the records that I

2   read were concurrent with the ability to focus and create and

3   execute a very sophisticated scheme and to direct multiple

4   people how to act so that the scheme would remain undetected

5   for as long as possible.  So, though there may have been

6   serious mental health challenges, they did not seem to cloud

7   Mr. Williams' ability to think creatively, deceptively, in a

8   planning manner, to organize and direct and lead a team of

9   co-conspirators who were perpetrating the fraud for many

10  years.

11        And I think that since his arrest and the

12  commencement of this case, it does appear that he's taken

13  personal responsibility to try to address those issues that

14  led him to the criminal conduct that's at issue here.  So, all

15  of that is commendable.  And, again, I have great sympathy for

16  the family members and the friends who know Mr. Williams and

17  have recognized the difficulties that he's had yet remain

18  sportive and loving of his recovery.  I think that is very

19  important to consider and I have considered it.

20        With regard to the presentence report, the PSR

21  calculated Mr. Williams' advisory guidelines total offense

22  level at 31 and his criminal history category was I.  That

23  would provide an advisory guidelines sentencing range between

24  108 and 135 months; however, the statutorily authorized

25  maximum sentence is five years and the PSR acknowledges that

*Proceedings*            36

1   the restricted guideline term of imprisonment is thereby

2   reduced to 60 months.  Neither party's sentencing memorandum

3   raised any objections to the facts reported in the PSR.

4         Let me just review the factual circumstances that

5   led to the sentencing, and then I will independently calculate

6   the advisory guidelines, as I'm required to do.

7         Between January 2012 and April 2016, Mr. Williams

8   devised and orchestrated fraudulent marketing schemes using

9   e-commerce websites that purported to sell various types of

10   dietary supplements, hair care products, skin care products,

11   testosterone, and web-based business tutorials.

12         Mr. Williams orchestrated three fraudulent schemes:

13   The first involved Mr. Williams charging customer credit cards

14   for products that were ordered but never delivered; the second

15   involved Mr. Williams charging customers for products that

16   were never purchased; and the third involved customers

17   unwittingly incurring repeated charges for products they had

18   ordered once from one of Mr. Williams' websites.

19         Mr. Williams took elaborate measures to distance

20   himself from the fraudulent conduct and insulate his

21   involvement.  He used several co-conspirators who, in turn,

22   recruited nominees to act as public faces of the fraudulent

23   shell companies that Mr. Williams controlled.  Merchant

24   accounts, which allowed the shell companies to receive credit

25   card payments, were set up in the names of the shell companies

*Proceedings*                                                    37

1  and linked to various e-commerce websites registered and

2  controlled by Mr. Williams.

3           Mr. Williams used nominees because he and the

4  entities that he controlled were banned by payment processors

5  from opening new merchant accounts due to previous fraudulent

6  activity.

7           And that goes to my consideration of deterrence and

8  protection of the public.

9           Mr. Williams used nominees' personal identifiable

10 information, or PII, to set up dozens of shell companies with

11 bank accounts and merchant accounts linked to Mr. Williams'

12 websites.  Mr. Williams and his co-conspirators controlled all

13 aspect of the operation, including assets and control of the

14 accounts.  Once the shell companies were active, each

15 generated thousands of dollars in profits from Mr. Williams'

16 scheme.

17          Some customers of Mr. Williams' websites realized

18 that they had been defrauded and requested chargebacks from

19 their credit card company.  Their credit card companies passed

20 these chargebacks to the merchant banks.  Because of the high

21 rate of chargebacks associated with websites controlled by

22 Mr. Williams, the merchant-acquiring bank ultimately shut down

23 the merchant accounts associated with those websites.

24          By that time, however, Mr. Williams and his

25 co-conspirators had already generated a significant profit

*Proceedings*                                                    38

 1   from the schemes, which were subsequently laundered back to

 2   Mr. Williams.

 3           Mr. Williams directed his co-conspirators to recruit

 4   nominees by telling them that they could make money quickly

 5   and easily by investing in online marketing and sales

 6   companies.  They were told that their personal identifiable

 7   information would appear on the company's incorporation

 8   paperwork but that they would not play any active roles, have

 9   roles, in managing the company.

10           Once a nominee agreed to participate, Mr. Williams

11   would register it with the Florida Secretary of State using

12   the PII from the nominee.  In return, the nominees were

13   promised a one percent share of all sales of the company.

14   Mr. Williams and his co-conspirators also told the nominees

15   that any corporate tax liability assessed to the companies

16   would be assessed to Mr. Williams.

17           As part of Mr. Williams' scheme, the nominees were

18   also told that they would have to open bank accounts on the

19   company's behalf at various financial institutions, primarily

20   in South Florida.  The bank accounts were necessary to allow

21   payment processors to wire proceeds generated by the website

22   to the shell companies controlled by Mr. Williams.

23           Before the bank accounts were opened, Mr. Williams

24   and his co-conspirators coached the nominees on what

25   information to give on the account opening documentation.

*Proceedings* 39

1    Also at the direction of Mr. Williams and his co-conspirators,

2    the nominees made false statements to institutions, including

3    that they were in control of the operation of the companies,

4    the alleged business purpose of the companies, and false

5    addresses and contact information.

6            Once the bank accounts were opened, Mr. Williams and

7    his co-conspirators directed the nominees to establish online

8    access to the accounts.  Then, the nominees gave Mr. Williams

9    and his co-conspirators the nominees' user names and passwords

10   so that Mr. Williams could access those accounts.

11           Mr. Williams and his co-conspirators impersonated

12   the nominees while communicating with banks in order to

13   troubleshoot problems that arose with the merchant accounts.

14   For example, on June 27, 2013, Mr. Williams e-mailed a

15   co-conspirator with specific instructions, including what to

16   say, to contact a financial institution to reset a login and

17   password for a shell company's merchant account.

18           Nominees were generally permitted to withdraw $500

19   from their respective account once every two weeks as

20   compensation for the use of their personal identifiable

21   information and for signing certain documents, such as

22   merchant account applications, all of which were at the

23   direction of Mr. Williams.

24           Once the shell companies were established and had

25   bank accounts, Mr. Williams and his co-conspirators

*Proceedings*                                                    40

1   established merchant accounts for the shell companies with

2   various payment processing services.  A typical merchant

3   account application requires various types of owner and

4   business information.  Mr. Williams and his co-conspirators

5   prepared and submitted these applications in the names of the

6   nominees and their associated shell companies.  The merchant

7   account applications contained false information because the

8   nominees were used to conceal the true identity of the

9   applicant:  Mr. Williams.

10          The false information included forged signatures of

11  nominees, false mock-ups of dummy websites that purported to

12  sell certain products, fraudulent product fulfillment

13  agreements with outside vendors, business e-mails and phone

14  numbers that were controlled by Mr. Williams and his

15  co-conspirators and not by the actual nominees, and business

16  addresses that were merely the personal addresses of the

17  nominees.

18          After the merchant account applications were

19  submitted, the payment processors would conduct verification

20  calls with the applicants.  During these calls, at

21  Mr. Williams's direction, his co-conspirators impersonated the

22  nominees or coached them to provide fraudulent responses to

23  the verification callers.

24          Next, once the websites went live and a merchant

25  account had opened on behalf of a shell company, Mr. Williams

*Proceedings*                                                    41

1   launched a live website that differed from the dummy website

2   that was attached to the shell company's merchant account

3   application in terms of the product sold.  These differences

4   mattered because payment processors then deriving the

5   processes for merchant accounts that dealt in the product sold

6   on the dummy website was often far less rigorous than the

7   process for those that dealt in the product sold on the live

8   website.

9         Mr. Williams created fake invoices with false

10  customer e-mail addresses and phone numbers.  The e-mail

11  addresses and phone numbers were actually controlled by

12  Mr. Williams and his co-conspirators who posed as customers

13  and confirmed the purchases were legitimate and products were

14  received.  Mr. Williams and his co-conspirators would coach

15  nominees on how to respond to these verification calls.

16        Mr. Williams also used fraudulent invoices to mask

17  foreign credit card purchases.  This allowed him to avoid

18  limits the payment processors placed on the number of foreign

19  transactions that they would accept.

20        And finally, with regard to the chargebacks, because

21  of these schemes, payment processors reported excessive

22  chargebacks.  These chargebacks were due to retail customers

23  of the websites reporting fraudulent transactions and

24  unauthorized credit card purchases that the websites

25  transacted, including in the Eastern District of New York.

*Proceedings*                                                        42

1        At Mr. Williams' direction, the co-conspirators

2   contacted the payment processors and attempted to negotiate

3   early releases of reserved funds for the shell companies'

4   merchant accounts.  They did this to secure the releases

5   before the merchant-acquiring banks could alert the payment

6   processors about the chargeback based on fraudulent activity.

7        The payment processors eventually determined that

8   the excessive chargebacks were caused by fraudulent card

9   activity associated with the websites.  And, as a result, many

10  payment processors terminated the merchant accounts associated

11  with the websites.

12       Still, Mr. Williams managed to profit from his

13  schemes.  Due to the large number of websites he controlled

14  and the large sales volume of each website and the long,

15  longstanding nature of this fraudulent scheme, many customers

16  never noticed fraudulent charges on their statements; thus,

17  they never reported the fraudulent charges to their credit

18  company.

19       Also, to counteract the termination of certain

20  merchant accounts, Mr. Williams pressured his co-conspirators

21  to continue recruiting nominees, setting up shell companies,

22  and opening merchant accounts linked to the fraudulent

23  e-commerce website.

24       Mr. Williams also profited because payment

25  processors regularly released some of the reserve funds before

*Proceedings*                                                              43

1   they learned of the excessive chargebacks.  These funds were

2   then wired to the shell companies' bank accounts set up by the

3   nominees and controlled by Mr. Williams.  Many of the shell

4   companies that Mr. Williams created generated significant

5   profits.

6            At Mr. Williams' direction, co-conspirators funneled

7   the funds back to a bank account in the name of Flare

8   Education, which Mr. Williams controlled.

9            Over the course of the fraudulent scheme,

10  Mr. Williams controlled roughly 35 shell companies that were

11  registered using nominees' personal identifiable information.

12  Proceeds totaling $6,547,656 were wired to the Flare Education

13  account that Mr. Williams controlled.  These transactions were

14  made from bank accounts opened by nominees in the names of

15  their respective shell companies at Miami-based financial

16  institutions.  The Flare Education account, after receiving

17  these funds, then transferred $971,200 to Angry Elephant, LLC,

18  and $354,000 to Purple Whale, LLC, each of which Mr. Williams

19  controlled.

20           As we know, the indictment remains pending.  In

21  Paragraph 5A of the plea agreement, the Government agreed that

22  at the conclusion of Mr. Williams' sentence it would move to

23  dismiss the underlying indictment with prejudice.  I'll

24  confirm with the Government that they will do that at the

25  conclusion of this proceeding.

*Proceedings*                                                          44

1        MR. PITLUCK:  Yes, your Honor.

2        THE COURT:  I next have to independently calculate

3   Mr. Williams' offense level using the 2021 edition of the

4   United States Sentencing Guidelines.

5        Mr. Williams pleaded guilty to the superseding

6   information, which charged one count of conspiracy to commit

7   bank fraud, in violation of 18 U.S. Code Section 371.

8        A violation of that statute is governed by guideline

9   2X1.1(a), which instructs that the base offense level is

10  calculated based on the applicable guideline for the

11  underlying offense.  A violation of the substantive underlying

12  offense, 18 U.S. Code Section 1344, is governed by

13  2B1.1(a)(2), which provides a base offense level of six.

14       Guideline 2B1.1(b)(1) instructs that the Court

15  increase the offense level based on the amount of the loss.

16  Here, the total loss was $6,554,656.  That amount is more than

17  $3.5 million but less than $9.5 million, and, therefore,

18  2B1.1(b)(1) instructs that the base offense level be increased

19  by 18 points.

20       Because the offense involved ten or more victims and

21  was committed through mass marketing and resulted in financial

22  hardship to one or more victims, 2B1.1(b)(2)(A) instructs that

23  the level be increased by two points.

24       The offense involved sophisticated means.

25  Specifically, Mr. Williams was the ringleader of a group of

*Proceedings*                                                                    45

1    conspirators who recruited nominees to set up shell companies.

2    He did this to circumvent bans that payment processors had

3    previously imposed on him and entities that he controlled to

4    prohibit them from opening merchant accounts.  He instructed

5    his co-conspirators to impersonate nominees while

6    communicating with banks.

7            He created dummy websites to attach to merchant

8    account applications in order to ensure that they would be

9    subject to a less rigorous underwriting process.

10            He hired a company to create billing software to

11   help him fabricate and alter invoices so that he could stay in

12   compliance with payment processors' requirements.

13            He had his co-conspirators reach out directly to

14   payment processors to negotiate early releases of reserve

15   funds so that he could receive the monies before the banks

16   alerted the processors to excessive chargebacks.  He directed

17   his co-conspirators to funnel the shell companies' funds to

18   bank accounts that he controlled.

19            Because this offense involved the foregoing

20   sophisticated means, 2B1.1(b)(10)(C) instructs that the Court

21   increase the offense level by two.

22            I will apply another enhancement based on the

23   offense involving the possession of five or more means of

24   identification that unlawfully were obtained by the use of

25   another means of identification.  I note that the parties did

*Proceedings* 46

1    not stipulate to the application of this enhancement in their

2    agreement, but Probation and the Government have both agreed

3    that this enhancement should apply.

4           Mr. Williams directed his co-conspirators to use

5    nominees' personal identifiable information, including names,

6    Social Security numbers, and dates of birth, to obtain bank

7    account numbers for the merchant accounts that Mr. Williams

8    controlled.

9           The Second Circuit has relied on the definition of

10   "means of identification" found in 18 U.S. Code Section

11   1028(d)(7), which includes any name or number that may be used

12   alone or in conjunction with any other information to identify

13   a specific individual.  So, therefore, bank accounts may count

14   as means of identification.  I cite *United States v. Sash*, 396

15   F.3d 515 and 521, decided by the Second Circuit in 2005.

16          A bank account with a bank account number is a means

17   of identification under *United States v. Williams*, 2023 WL

18   2613503, at *11, decided in the District of Connecticut on

19   March 23, 2023.

20          Thus, Guideline 2B1.1(b)(11)(C)(ii) instructs that

21   the offense level be increased by two levels.

22          Next, I will apply a four-point upward adjustment

23   because Mr. Williams was an organizer or leader of criminal

24   activity that involved five or more participants or otherwise

25   extensive.

*Proceedings*                                                              47

1        I've reviewed the sophisticated means by which

2   Mr. Williams created, organized, recruited, and directed this

3   fraudulent scheme at every step:  He instructed his

4   co-conspirators to recruit and how to recruit nominees; he

5   directed the nominees to lie to banks; he directed the

6   nominees to set up online accounts; he told the

7   co-conspirators to impersonate the nominees when payment

8   processors conducted verification calls; he told the

9   co-conspirators to mask foreign customer data with domestic

10  customer data to circumvent foreign transaction limits; he

11  directed his co-conspirators to negotiate with payment

12  processors to secure early releases of reserved funds before

13  chargebacks occurred; he told his co-conspirators how to

14  funnel the shell companies' funds to bank accounts under his

15  control.

16        And, as the PSR notes, there were at least five

17  participants involved, thus Guideline 3B1.1(a) instructs to

18  increase the offense level by four.

19        There is one charge in this case, so grouping does

20  not apply.

21        By pleading guilty, Mr. Williams accepted

22  responsibility for his actions and is, thus, entitled to a

23  two-point reduction under Guideline 3E1.1(a).

24        In addition, 3E1.1(b) allows me to apply an

25  additional one-point reduction if the Government makes a

*Proceedings*                                                                48

1    motion stating that Defendant assisted authorities in the

2    investigation and prosecution of his own misconduct by timely

3    notifying authorities of his intention to plead guilty and

4    saved the Government the time and expense of preparing for

5    trial.

6              I imagine that the Government is moving for this

7    additional one point.

8              MR. PITLUCK:  Yes, your Honor.

9              THE COURT:  And I grant it.

10             The PSR states that Mr. Williams has no prior

11   criminal convictions; thus, he falls within criminal history

12   category I.

13             The Government admirably pointed out in its

14   sentencing memorandum that the amendments to the guidelines

15   that took place and went into effect two days ago added a new

16   two-point downward adjustment, Section 4C1.1, for offenders

17   with no criminal history points that meet certain criteria.

18             Although the Government has opined that this

19   adjustment should apply to Mr. Williams, I respectfully

20   disagree because 4C1.1(a)(10) provides that a defendant is

21   only eligible for this adjustment if the defendant did not

22   receive an adjustment under 3B1.1 for having an aggravating

23   role in the offense.

24             Because Mr. Williams did receive an adjustment under

25   3B1.1(a) for being an organizer and leader of a criminal

*Proceedings*                                                        49

1    activity that involved five or more participants or was

2    otherwise extensive, Mr. Williams I believe does not qualify

3    for the adjustment in 4C1.1.

4           Does the Government disagree or defense counsel

5    disagree?

6           MR. PITLUCK:  Your Honor, it's interesting you

7    should raise that point.  We considered it as an office in

8    conjunction with our appeals.

9           I submit that Subsection 10 is inartfully drafted

10   given that there is a way to read it that says that you have

11   to have the adjustment under 3B1.1 and also not be engaged in

12   a continuing criminal enterprise and whether those things

13   should be read in conjunction; in order to be removed from

14   zero-point offender status, you have to have that and not be

15   engaged...

16          It's a little circular to say, but I think our

17   office -- we haven't had to address this, this is the first

18   time, given that these went into effect on Wednesday, but we

19   really were seeking more guidance as to whether or not those

20   two things were inclusive or exclusive of each other.

21          Does that make sense to the Court?

22          THE COURT:  I understand what you're saying.

23          I think that Courts generally want to and should

24   impose the more lenient guideline when possible.  So, for

25   example, if the guidelines become more stringent and impose a

*Proceedings*                                                    50

1   higher penalty because of the ipso facto clause, we won't

2   apply that.  Oftentimes we'll be asked to apply a guideline in

3   effect at the time of the offense or at the time of

4   sentencing.  Or if there's a change in the guidelines that

5   results in a benefit to the defendant, we'll be inclined to

6   impose it.

7           I don't know if defense counsel wants to be heard on

8   this issue.  I'm happy to hear from you if you do, sir.

9           MR. KUSHNER:  The Government just made my point,

10  Judge.  It's written in conjunction and not additionally.  I

11  believe it's "and" continuing criminal enterprise.

12          So, I believe it's appropriate.

13          THE COURT:  For that reason, then, I will give the

14  additional two-point reduction.  So, by doing so, you're not

15  going to get an answer from the Appellate Court, but maybe in

16  some other case you will.

17          MR. PITLUCK:  I think that's right, your Honor.  I

18  think we were relying a little bit on the statutory drafting

19  here.  If they intended it to apply to all defendants who had

20  an aggravating role, our view is perhaps, in the most

21  conservative reading of it as possible, they would have had

22  that as a separate provision.

23          I don't know.  It's a little bit lower stakes here

24  because either way the 60-month statutory maximum applies, but

25  we didn't want to create an appeal issue where none existed.

*Proceedings*                                                                51

1           THE COURT:  Nobody wants to do that because I'm sure

2    everyone wants finality.  There's been a lot of resources

3    devoted to this.

4           So, the downward adjustment under 4C1.1 for offenses

5    with no prior criminal history points and given the meeting of

6    this criteria as assessed by the Government, then I will apply

7    this adjustment.

8           MR. PITLUCK:  We have suggested to the Sentencing

9    Commission that this one could be clarified a little bit more.

10   Judge Gleeson has not yet returned our calls.

11          THE COURT:  Well, I hope he does because I think

12   he's certainly going to want to think about any suggestions

13   that you have to make the guidelines more clear and less

14   subject to disagreement among the parties.

15          Are you saying, though, that this would result in a

16   criminal history category of I nonetheless and a total

17   adjusted offense level of 31?

18          MR. PITLUCK:  No, your Honor.  I think moving it

19   would take it to 29.  He remains criminal history category I,

20   but there's an additional two-point reduction as I read the

21   new 4C1.1.

22          THE COURT:  Let me just see where that leaves us

23   under the new guidelines, which I don't think I have a copy

24   of --

25          MR. PITLUCK:  I have the 2021 here.

*Proceedings*                                                    52

1          THE COURT:  What I'd like to do is look this up and

2     then show it to Mr. Williams' counsel and make sure that we're

3     getting it right.

4          So, for a level 29 and criminal history category of

5     I, the range of sentence would be 87 to 108 months.

6          Is that what you have, Mr. Pitluck?

7          MR. PITLUCK:  Yes.

8          THE COURT:  Do you want to see it, Mr. Kushner?

9          MR. KUSHNER:  No, Judge, I have it.

10         That's accurate.

11         MR. PITLUCK:  He's higher tech than us.  He has it

12    on his computer.

13         THE COURT:  Well, that's good.

14         But, again, the statutory maximum is 60 months, so

15    that is the controlling upward limitation on Mr. Williams'

16    sentence.

17         Just so you understand, sir, I'm obligated to

18    correctly calculate the guidelines, so that's why we're going

19    through this exercise even though at the end of the day the

20    maximum is 60 months.

21         Now, these are the sentencing options both under the

22    Criminal Code and the advisory guidelines.

23         The maximum term of imprisonment for a violation of

24    18 U.S. Code Section 371 is 60 months.  The statutorily

25    authorized maximum is less than the minimum of the applicable

*Proceedings*                                                    53

1   guideline range of 87 to 108 months; and, therefore, I will be

2   bound by the 60-month limitation, meaning I will not exceed 60

3   months, not that I will impose 60 months.

4           The supervised release term provides that the Class

5   D felony classification of this offense would result in a

6   maximum term of supervised release of three years under

7   18 U.S. Code Section 3583(b)(2).  And under 5D1.2(a) of the

8   guidelines, the advisory range of supervision is one to three

9   years.

10          Because a violation of Section 371 is a Class D

11  felony, Section 3561(c)(1) would require one to five years --

12  if I were to impose would require one to five years of

13  probation.  And if I did impose probation, Section 3563(a)(2)

14  would require that I also impose one of the following absent

15  extraordinary circumstances:  A fine, restitution, or

16  community service.

17          Application Note 2 to Section 5B1.1 states that the

18  guidelines do not authorize a sentence of probation where the

19  applicable guideline range is ten months or more.  Because the

20  guideline sentence here is 60 months, the guidelines do not

21  authorize me to impose a sentence of probation.

22          The fine amount under Section 3571, Title 18,

23  provides that the maximum fine is $250,000.  5E1.2(c)(3) of

24  the guidelines provide a guideline range of fine between --

25          We're now at 29.  I have this calculated at level

*Proceedings*                                                    54

1   31, but for 29 the range of fine may no longer be $30,000 to

2   $300,000.

3          But I will say this:  Based on the information

4   provided in the presentence report, I find that Mr. Williams

5   is not able to pay a fine or likely to become able to pay a

6   fine given that there's a priority for restitution and for the

7   forfeiture.  Those are substantial obligations, so I will not

8   impose a fine in any event.

9          Defense counsel, were you going to say something,

10  sir?

11         MR. KUSHNER:  No, your Honor, I apologize.  I was

12  just looking up the guideline range for the 29, if you wanted

13  it, that's all.

14         THE COURT:  Well, why don't you tell me?

15         MR. KUSHNER:  I didn't get to it yet.

16         THE COURT:  That's all right.  I'm not going to

17  impose a fine.

18         Does anyone mind if I don't articulate what the fine

19  is?  I think it might be the same.

20         Does anyone disagree?

21         MR. PITLUCK:  No, your Honor.  The record is clear.

22         THE COURT:  All right.  So, the fine range would be

23  between $30,000 and $300,000, but I will not impose a fine.

24         Mr. Williams, however, must pay a mandatory special

25  assessment under 18 U.S. Code Section 3013(a)(2)(A) that's due

*Proceedings*                                                        55

1    and payable immediately.  It's also authorized under Guideline

2    5E1.3.

3              5E1.4 of the guidelines provides that forfeiture

4    must be imposed on a convicted defendant as provided by

5    statute.  The statute 18 U.S. Code Section 982(a)(2) provides

6    that for any person convicted of a conspiracy to violate

7    18 U.S. Code Section 1344, the Court shall order that the

8    person forfeit to the United States any property constituting

9    or derived from the proceeds that the person obtained,

10   directly or indirectly, as a result of the violation.

11             He stipulated to in paragraph seven of his agreement

12   that he would pay $1,888,647.89 in a forfeiture money

13   judgment.  And although it's not paid in full 30 days in

14   advance of today as stipulated, I will enter an order of

15   forfeiture, which I executed on April 12, 2023, and will

16   incorporate it into the judgment.  It will be due and payable

17   in addition to his restitution.

18             Mr. Williams did stipulate in his agreement with the

19   Government that paragraph eight of the agreement and paragraph

20   three of the order of forfeiture that he will forfeit any

21   other property in which he has an interest up to the value of

22   the outstanding balance of the forfeiture amount under 21 U.S.

23   Code Section 853(p) and 21 U.S. Code 853(p)(1)(A) through (E).

24             Under Section 5E1.1 and 18 U.S. Code Section 3663(a)

25   restitution is mandatory and will be ordered.  On November 1,

*Proceedings* 56

1  2023, the Court entered an order of restitution in the amount

2  of $114,171.59 payable to seven financial institution victims.

3  The order will be incorporated into the judgment and will be

4  due and payable immediately.

5         Mr. Pitluck has confirmed that he does not expect

6  any other victims will come forward with a victim impact

7  statement.

8         MR. PITLUCK:  That's correct, Judge.

9         THE COURT:  Thank you.

10        Mr. Williams, you have the right to appeal your

11 sentence that I'm about to impose subject to any waiver of

12 your appellate rights in your agreement with the Government.

13 You did agree to waive any right to appeal if I impose a

14 sentence of 60 months or less.  I take no position whether

15 that appellate waiver is enforceable.  That's an issue for the

16 Appellate Court.

17        If you want to file an appeal, sir, you must do so

18 within 14 days of judgment being entered against you.  And if

19 you cannot afford to pay the cost of an appeal, you may apply

20 important for leave to do so without paying the filing fee if

21 you can establish you're indigent.  I don't know whether you

22 can do that, sir.

23        But I would ask counsel to please make sure that if

24 his client wants to pursue his appellate rights, that you

25 would file a timely notice of appeal.

*Proceedings*                                                    57

1          MR. KUSHNER:  Yes, your Honor, I will do so.

2          THE COURT:  And will you represent him also, sir?

3          MR. KUSHNER:  Yes, your Honor.

4          THE COURT:  Thank you.

5          Is there any issue regarding return of property that

6    I should address before we have to deal with any other motions

7    or proceedings regarding property?

8          MR. PITLUCK:  Not that I'm aware of, Judge.

9          MR. KUSHNER:  No, your Honor.

10          THE COURT:  There may be a requirement that he not

11   apply for a new passport.  The passport will be returned to

12   him at the conclusion of the entire sentence.

13          Other than that, I appreciate not having other

14   issues about that.

15          In determining Mr. Williams' sentence, I've given

16   respectful consideration to the advisory guidelines, which are

17   no longer mandatory, and all of the factors set forth in the

18   Criminal Code at 18 U.S. Code Section 3553(a)(1) through (7).

19          Under 18 U.S. Code 3553(a)(1), I consider the nature

20   and circumstances of Mr. Williams' offense, which I find to be

21   very serious.  He devised and supervised a very sophisticated

22   scheme over a four-year period.  And we've talked in detail

23   about the numerous steps that he took to hide and operate this

24   fraudulent scheme and we talked about his role in this

25   offense.  All of this was done to enrich himself at the

*Proceedings*                                                    58

1   expense of his victims who, in total, lost $6 million as a

2   result and it is a significant offense.

3           I've also considered Mr. Williams' personal

4   characteristics and his family history and circumstances.  He

5   was born July 23, 1989, in Evanston, Illinois, to an average

6   income household with loving parents and a sibling in Highland

7   Park, Illinois.  He had a good childhood and still has close

8   relationships with his family members.  There's no history of

9   abuse of any kind in his family.  He is single and has no

10  marital history or children.  While under pretrial

11  supervision, Mr. Williams has been living in his parents' home

12  in Highland Park, Illinois, with their financial support.

13          I note that he has taken steps, affirmative steps,

14  to try to recognize his behavior and to set himself on a

15  course where he will not encounter similar difficulties that

16  led him to his criminal conduct.

17          Mr. Williams is generally in good physical health,

18  though he was in and out of the hospital for mycobacterium

19  abscessus in 2014 and underwent spine surgery in 2020 due to a

20  herniated disc.

21          I would like this placed under seal, the next

22  paragraph.

23

24          (Continued on the following page.)

25

*SEALED* 59

(The following portion is sealed by order of the Court.)



(Continued on the following page.)

*Proceedings*                                                      60

1          (Sealed portion ends.)

2          THE COURT:  The medical records which I noted

3    earlier, which were contemporaneous with the ongoing conduct

4    that led to the criminal charges in this case, despite the

5    concerning nature of his medical condition, did not affect his

6    ability to orchestrate, conceive of, and execute the offense

7    conduct.

8          Mr. Williams occasionally used marijuana from age 23

9    until the date of his arrest in February of 2021.  He

10   experimented with LSD, psychodelic mushrooms, and Percocet.

11   He was given Percocet as part of postsurgical pain relief.

12         While under pretrial supervision, he tested positive

13   twice for marijuana and he reported to Probation that the

14   positive presence of marijuana in his urinalysis was due to

15   the use of CBD oils for medical purposes.

16         Mr. Williams graduated from Highland Park High

17   School in 2007 and attended Purdue University for one year

18   before he dropped out in 2008.  Since then, he has been

19   self-employed over a long series of internet marketing

20   companies.  Until he was indicted, he was earning

21   approximately $300,000 to $500,000 per year from his internet

22   ventures.

23         I've reviewed all of the many letters of support

24   from Mr. Williams' loved ones and friends.  They depict

25   Mr. Williams as a kind, honest, and generous friend and loving

*Proceedings*                                                                 61

1  family member.  They also note that Mr. Williams recently

2  converted to -- has found faith to be a great strength to him

3  and he's volunteered extensively at his church and a donation

4  center behind the church called the Deerfield Free Store.

5         I appreciate that he has done charitable work since

6  his arrest and that his parents have noted that his volunteer

7  work and mental health treatment have improved his conditions

8  during his course of pretrial supervision.

9         In accordance with 18 U.S. Code 3553(a)(2), I've

10  also considered the need for the sentence imposed to reflect

11  the seriousness of the offense, to promote respect for the

12  law, provide just punishment, and to afford adequate

13  deterrence; both specific deterrence to Mr. Williams and

14  general deterrence to others who may be tempted to engage in

15  this type of internet fraudulent conduct.

16         Also, I must consider the protection of the public

17  from further crimes of the Defendant, consider the risk of

18  recidivism, and also provide the Defendant with needed

19  educational or vocational training, medical care, or other

20  corrective treatment in the most effective manner.

21         I have concerns about deterrence based on the

22  information reported by the PSR.

23         In December 2009, Mr. Williams and a colleague

24  entered into a settlement to resolve a civil consumer fraud

25  suit brought by the Arizona Attorney General.  The lawsuit

*Proceedings*                                                    62

1  alleged that Mr. Williams used the internet to advertise

2  risk-free trial offers for various nutritional supplements

3  while failing to disclose material terms in a way that caused

4  customers to incur inappropriate charges.

5          It further alleged that the defendants falsely

6  misrepresented the customers could cancel by calling a

7  toll-free number, but that customer service line was

8  frequently unreachable or out of service and consumers were

9  often told that their cancellation requests could not be

10 processed due to technical problems.

11         It further alleged in the lawsuit that other

12 consumers were told that their cancellation requests were

13 processed, only to later be charged for more unauthorized

14 order.

15         Although Mr. Williams did not have to admit to the

16 fraudulent conduct to resolve this case, he and his colleague

17 paid nearly $200,000 in penalties, fees, and restitution.

18         This happened roughly two years before Mr. Williams

19 started engaging in the conduct that is the subject of the

20 instant criminal prosecution.  The conduct alleged in the

21 civil lawsuit brought by the State Attorney General of Arizona

22 is not the same as the conduct alleged in this criminal case,

23 but it shares common threads to raise concerns about the risk

24 of recidivism and protection of the public.

25         Additionally, as I explained to him, finding the

*Proceedings*                                                    63

1    sophisticated means enhancement, Mr. Williams took elaborate

2    steps in both those schemes to avoid detection.

3         I have faith and hope that Mr. Williams will turn

4    his life around after today, although I do have some degree of

5    concern that he might simply follow the same path while

6    working even harder to avoid detection.  I am concerned about

7    using his mother's name to start another internet-based

8    business abroad.

9         I think that the Government has pointed out that the

10   name change that Mr. Williams recently obtained may reduce

11   some of the harm that his own conduct caused to his reputation

12   and it may make it harder for people who interact with

13   Mr. Williams to learn about this case.  And for that reason, I

14   am including both names on the judgment in this case.

15        Now, I've also considered the types of sentences

16   available under 3553(a)(3) and I'm concerned about the

17   sufficiency of the monetary components of the sentence, the

18   forfeiture and restitution, given the staggering amount of the

19   loss and the Government's difficulty in finding all of the

20   proceeds of this offense.

21        Nonetheless, I will be prepared to impose a

22   forfeiture money judgment and restitution as I will state

23   later.

24        I also hope that Mr. Williams will, as he stated

25   here today, take affirmative steps to compensate his victims

*Proceedings*                                                              64

1   and pay his forfeiture.  He will be under the Court's

2   supervision and he will have to be truthful and complete in

3   his financial disclosures.  He has to be very transparent and

4   there are a lot of things he won't be able to do without first

5   obtaining the permission of Probation, who is acting for the

6   Court in supervising Mr. Williams.

7          I've considered the need under 3553(a)(6) to avoid

8   sentencing disparities among defendants with similar records

9   who have been found guilty of similar conduct.

10         Mr. Williams noted in his sentencing submissions

11  that roughly a third of the sentences under 2B1.1 of the

12  guidelines where the defendant had a criminal history category

13  of I resulted in noncarceral sentences.  But the Government

14  also has clarified this by looking more closely at the data.

15  When sentenced under 2B1.1 with criminal history categories of

16  I are further narrowed to include only those in Zone D, which

17  is where Mr. Williams' guideline sentence range lies, only

18  11.4 percent of the sentences are noncarceral and the average

19  sentence length is 24 months.

20         So, I considered that in wanting to avoid sentencing

21  disparities for similarly situated defendants.

22         Based on the calculations set forth in the PSR,

23  Probation has requested a sentence of 60 months of

24  imprisonment, which is the statutory maximum.

25         Mr. Williams has requested he receive no prison time

*Proceedings*                                                    65

1   and that he instead be sentenced to home confinement followed

2   by five years of supervised release.  The maximum, however, is

3   three years of supervised release.  In support of such a

4   sentence, he stressed his lack of criminal history and his

5   extensive mental health struggles.

6            The Government seeks a sentence of 60 months of

7   imprisonment, which is the statutory maximum, or somewhere in

8   that area.  It stresses Mr. Williams' leadership and

9   organizational role in the scheme and the necessity of a

10  carceral sentence to deter similar conduct.

11           After giving respectful consideration to the

12  advisory sentencing guidelines and to all of the factors set

13  forth in 18 U.S. Code Section 3553(a), I will impose a

14  sentence that falls below the Court's calculated advisory

15  guidelines range and is sufficient but not greater than

16  necessary to employ the goals of sentencing, including, but

17  not limited to, punishment and deterrence and protection of

18  the public.

19           In determining the sentence, I've considered the

20  need to avoid sentencing disparities; the need to promote

21  respect for the law and the need to ensure deterrence both for

22  Mr. Williams and others who may be tempted to engage in bank

23  fraud or similar crimes; the need to protect consumers, the

24  banks, and the public from such conduct; and I've also

25  considered the nonviolent nature of Mr. Williams' offense.

*Proceedings*                                                      66

1          In fashioning an appropriate sentence, I've looked

2   beyond the circumstances of Mr. Williams' offense and have

3   acknowledged his lack of criminal history, his charitable

4   efforts since his arrest, and his extensive mental health

5   challenges.

6          A below-guidelines sentence is imposed with the

7   Court's expectation that Mr. Williams will use his best

8   efforts to expeditiously, legally, and honorably satisfy his

9   restitution and forfeiture obligations.  Accordingly, I'm

10  authorized to find and do find all of the facts appropriate

11  for a determination of sentence as follows:

12         I sentence Mr. Williams to a term of 20 months in

13  custody.

14         I ask if Mr. Williams would like the Court to

15  recommend a specific designation.

16         MR. KUSHNER:  Yes, Judge.  I will submit a letter to

17  the Court.  In and around the Chicago area.

18         THE COURT:  Can we talk about a surrender date,

19  please?

20         Will he self-surrender or surrender to the marshals

21  in Chicago?

22         MR. KUSHNER:  I would ask for self-surrender to the

23  facility.

24         THE COURT:  Okay.  That will be generally

25  approximately six weeks for him to be designated and he would

*Proceedings*                                                        67

1   surrender before 2 p.m.

2          MR. KUSHNER:  Could we have a date at the end of

3   January?

4          THE COURT:  Sure.  If he's not designated you can

5   just write me, but he will surrender on January 31.

6          And Mr. Kushner, please confirm via ECF that your

7   client has, indeed, surrendered.

8          MR. KUSHNER:  I will, your Honor.

9          I'll also submit a letter today or Monday at the

10  latest about the facility.

11         THE COURT:  What I will do is I will recommend -- I

12  can't order them, but I will recommend that they place him in

13  a facility close to the Chicago metropolitan area to

14  facilitate family visits and that he receive ongoing mental

15  health treatment.

16         MR. KUSHNER:  I think that should be sufficient,

17  your Honor, but I will do some research.  If there is a

18  facility that's more appropriately aligned with his treatment

19  that he's receiving right now, I'll submit a letter to the

20  Court requesting that -- specifically request they do that.

21         I understand you have no authority to direct the

22  BOP, but if there -- unfortunately, I'm not familiar with the

23  Chicago facilities.  There may be one more appropriately

24  aligned with his treatment right now, and, if so, I'll propose

25  it to the Court to suggest.

*Proceedings*                                                      68

1        THE COURT:  All right.  Thank you.  So, close of

2   business today, the earlier the better, because I would like

3   to post the judgment today, if I could.

4        MR. KUSHNER:  Yes, your Honor.

5        THE COURT:  Thank you.

6        Probation is not an option here given the custodial

7   term, but I will impose a term of three years of supervised

8   release.

9        After his release, he will serve the first three

10  months of supervised release in home confinement with

11  electronic monitoring and he may provide an address.  If he

12  plans to live with his parents, then the probation officer in

13  Illinois will note that.

14        He will be granted leave to work, worship, and

15  engage in pre-cleared charitable work if he wants to continue

16  that work.  Also, he'll have leave from home confinement for

17  medical appointments and therapy.

18        As a condition of supervised release, he must pay

19  his restitution order and forfeiture in full.  He must provide

20  the U.S. Probation Department and the Department of Justice

21  with complete and truthful financial disclosure regarding his

22  financial records, including comingled funds, funds in which

23  he has an interest whether or not his name is on those funds,

24  expenses, assets, liabilities, and yearly tax returns.

25        With the exception of the financial accounts

*Proceedings*                                                    69

1  reported already and noted within the presentence report,

2  Mr. Williams may not open or maintain any new additional

3  accounts, whether individual, in a business, or jointly, and

4  that includes checking, savings, business accounts, for either

5  personal or business purposes, without first notifying and

6  getting the approval of U.S. Probation.

7           He must cooperate with a probation officer in the

8  investigation of his financial dealings and he shall provide

9  truthful monthly statements of his income and expenses.

10          Mr. Williams shall cooperate in the signing of any

11  necessary authorizations to release information forms

12  permitting the U.S. Probation Department access to his

13  financial information and records, including tax returns.

14          Mr. Williams shall maintain full-time verifiable

15  employment and cooperate with the U.S. Probation Department in

16  the investigation and approval of any position of

17  self-employment, including any independent, entrepreneurial,

18  or freelance employment or business activity.

19          If approved for self-employment, Mr. Williams shall

20  provide the U.S. Probation Department with full disclosure of

21  his self-employment, all persons who have an interest in the

22  entities that he runs, who is responsible for running those

23  entities, and provide all business and financial records

24  including, but not limited to, records identified in Probation

25  Form 48F, which is a request for self-employment records.  And

*Proceedings*                                                          70

1   Probation has authority to request other financial or business

2   records.

3           Pursuant to *United States v. Hurtado*, 756 F. Appx.

4   63, decided by the Second Circuit Court of Appeals in 2018,

5   and Section 5F1.5(a) of the guidelines, Mr. Williams must not

6   use any aliases or nominees or engage in any occupation,

7   business, profession, or volunteer activity that would require

8   or enable him to engage in online advertising or e-commerce

9   without the prior approval of the probation department.

10          I find that this condition is necessary because a

11  reasonably direct relationship exists between Mr. Williams'

12  occupation, business, or profession and the sophisticated

13  multiyear conduct relevant to the offense of conviction, and,

14  further, that imposing this restriction is reasonably

15  necessary to protect the public because there is reason to

16  believe that absent this restriction Mr. Williams could

17  continue to engage in unlawful conduct similar to that for

18  which he was convicted.  And, again, it was sophisticated and

19  very difficult to detect --

20          MR. KUSHNER:  Judge, what was the case?  I'm so

21  sorry.

22          THE COURT:  *United States v. Hurtado*, H-U-R-T-A-D-O,

23  756 F. Appx. 63.

24          MR. KUSHNER:  Thank you.

25          THE COURT:  As I noted earlier, we talked about all

*Proceedings*                                                    71

1   of the means and methods that he employed, but I am also

2   concerned about the fact that Mr. Williams engaged in the

3   criminal conduct in this case shortly after the Arizona

4   enforcement settlement was resolved and shows at least with

5   regard to this particular offense that there was a continuing

6   risk to the safety of the public.

7           Mr. Williams must participate in a mental health

8   treatment program and follow the rules and regulations of that

9   program.  He must provide disclosure to Probation so that they

10  can assess his ability to pay for any therapy or medication.

11  The probation officer will supervise, in consultation with the

12  treatment provider, Mr. Williams' participation in a mental

13  health treatment program.  He must take all mental health

14  medications that are prescribed by the treating physician and

15  he should, again, assist in obtaining third-party payments

16  from insurance companies or Medicaid or Medicare.

17          I decline to impose a fine because I consider

18  restitution and the forfeiture to have priority in this case.

19          The $100 mandatory special assessment must be paid

20  immediately.  I suggest he pay it on his way out of the

21  courthouse today and obtain a receipt and provide it to the

22  Government so they can record his assessment as having been

23  paid.

24          I've entered an order of restitution in the amount

25  of $114,171.59 payable in full immediately, meaning the

*Proceedings*                                                                    72

1   Government may enforce the full amount immediately.  If this

2   is not possible, at a minimum rate of $20 per moth while he is

3   in custody.  And starting on the first day of the first month

4   after his release, he must pay at least ten percent of his

5   gross monthly income after deductions required by law or $300

6   per month, whichever is greater.  And again, he commences

7   payment on the first day of the first month of his release and

8   continues paying on the first day of the month until he pays

9   in full.

10          Payments must be sent to the clerk of this court at

11  the U.S. Courthouse for the Eastern District of New York.  The

12  address is stated.  Counsel will provide it to him.

13          MR. KUSHNER:  Yes, your Honor.

14          THE COURT:  In addition, I've entered a forfeiture

15  order in the amount of $1,888,647.89, which was to be paid in

16  full 30 days before today.  But because he did not pay that

17  amount, it will be part of this judgment and will be a

18  forfeiture money judgment.  That must be paid as provided in

19  the forfeiture order and agreement.

20          Is the Government prepared at this time to dismiss

21  the indictment?

22          MR. PITLUCK:  Yes, your Honor.  We move to dismiss

23  the underlying indictment against the Defendant.

24          THE COURT:  I will do so.

25          Mr. Williams, I do wish you the best and I do

*Proceedings*                                                                    73

1  commend all of the steps you've taken to put your life on a

2  law-abiding path.

3          I'm sorry for your parents and your family members

4  and your loved ones because I realize that every sentence has

5  collateral consequences.  But I'm hoping that the fact that

6  your parents are here showing their love and support and their

7  faith in you will encourage you to maintain all of the steps

8  that you've taken towards a law-abiding life and I hope that

9  you won't appear back in this court for any violations going

10  forward.

11          I want to thank defense counsel for his

12  representation of Mr. Williams and I would hope that you will

13  assist him in making all of his payments that have been

14  ordered, filing a timely notice of appeal, and paying the

15  special assessment.

16          Is there anything else I need to address before we

17  adjourn?

18          MR. PITLUCK:  Not from the Government.

19          MR. KUSHNER:  No, your Honor.

20          THE COURT:  Thank you.  We're adjourned.

21          (Matter concluded.)

22                          *  *  *  *  *

23  *I (we) certify that the foregoing is a correct transcript*
    *from the record of proceedings in the above-entitled matter.*

24

25  */s/ Linda A. Marino*                    *November 9, 2023*
    *LINDA A. MARINO*                              *Date*

*Linda A. Marino, Official Court Reporter*