United States District Court
Eastern District of New York

----------------------------------X

United States of America,

    - against -                          **Memorandum and Order**

Larby Amirouche, f/k/a Luke Andrew        No. 21-cr-64 (KAM)
Williams,                                 No. 24-cv-2596 (KAM)

           Defendant.

----------------------------------X

**Kiyo A. Matsumoto, United States District Judge:**

    Luke Andrew Williams (formerly Larby Amirouche)[1] attempted
to conceal his e-commerce scamming operation by using shell
companies he formed with other people's personal information,
lying to banks about the companies' ownership and the products
they sold, and fabricating invoices to make his companies'
activities appear legitimate.  The Government charged Williams
with crimes exposing him to a potential sentence of thirty years
of imprisonment.  Williams hired an attorney who negotiated a
plea agreement reducing that exposure to five years and then
persuaded the Court to impose a sentence of less than two years.
Now proceeding *pro se*, Williams moves to vacate his conviction
on the ground that his attorney was ineffective.  For the
reasons below, the Court respectfully denies the motion.[2]

---

[1] Regardless of whether Williams legally changed his name, the Court will
refer to him by the name he has most recently been using.
[2] Williams has filed various ancillary motions, (*see* ECF Nos. 95, 98, 100-01,

**Background**

I.   **Factual Background**

From January 2012 to April 2016, Williams orchestrated three schemes involving websites that purported to sell dietary supplements, hair and skin care products, testosterone, and web-based tutorials.  (ECF No. 31, Presentence Investigation Rep. ("PSR"), ¶¶ 10–11.)  The first scheme involved charging consumers for products that were ordered but never delivered. (*Id.* ¶ 11.)  The second scheme involved charging consumers for products that were never ordered.  (*Id.*)  The third scheme involved charging customers repeatedly for products they ordered only once.  (*Id.*)

Because payment processors had barred Williams's own companies from opening merchant accounts due to previous fraudulent activity, Williams recruited "nominees" to serve as fronts for shell companies he controlled.  (*Id.* ¶ 12.)  The nominees were told that their personal identifiable information ("PII") would appear on the paperwork but they would not actively manage the companies.  (*Id.* ¶ 15.)  Once a nominee agreed to participate, Williams would form a shell company using the nominee's PII.  (*Id.*)  In exchange, the nominee was promised a one percent share of the company's sales.  (*Id.* ¶ 16.)

Williams also required nominees to open bank accounts for

_____

103–04, 106–07), which the Court also denies, (*see infra* VII).

the shell companies, into which payment processors wired proceeds generated by Williams's websites. (*Id.* ¶ 17.) Williams and his co-conspirators coached the nominees to lie on the bank account opening documentation to induce the banks to open the accounts. (*Id.* ¶ 18.) The nominees then set up online access for the accounts and provided their login credentials to Williams and his co-conspirators. (*Id.*) When Williams and his co-conspirators encountered technical issues with the accounts, Williams directed his co-conspirators to contact the banks and impersonate the nominees to resolve them. (*Id.* ¶ 19.)

Once the shell companies were formed and connected with bank accounts, Williams and his co-conspirators applied for merchant accounts on their behalf so that the companies could begin processing credit card transactions. (*Id.* ¶ 21.) Williams and his co-conspirators lied on the applications and forged the nominees' signatures. (*Id.* ¶ 22.) They also attached false mock-ups of "dummy" e-commerce websites and fraudulent product fulfillment agreements with vendors. (*Id.*) The products listed for sale on the dummy websites differed from the products from the "live" websites that launched after the merchant accounts had been approved and opened. (*Id.* ¶ 25.) The purpose of the dummy websites was to avoid the more rigorous underwriting process that would have applied had Williams and his co-conspirators accurately represented the products that the

live websites would sell.  (*Id.*)  Williams then directed his co-conspirators to impersonate the nominees or coach the nominees to provide fraudulent responses when payment processors conducted verification calls.  (*Id.* ¶ 24.)

Once the merchant accounts had opened and the live websites had launched, Williams fabricated invoices with false consumer email addresses and phone numbers to make it appear that the live websites were selling the products they were approved to sell.  (*Id.* ¶ 26.)  In reality, these email addresses and phone numbers belonged to Williams, his co-conspirators, and the nominees.  (*Id.*)  When payment processors called to verify purchases, Williams and his co-conspirators would impersonate the customers listed on the invoices (or coach the nominees how to respond) to confirm the purchases.  (*Id.*)  Williams also fabricated invoices to mask foreign credit card purchases and thereby evade payment processors' foreign transaction limits. (*Id.* ¶ 27.)  Williams hired a company to create billing software so that he could alter and fabricate these invoices.  (*Id.*)

As a result of Williams's schemes, payment processors began reporting large amounts of chargebacks stemming both from fraudulent transactions reported by consumers and from unauthorized credit card purchases.  (*Id.* ¶ 28.)  Williams then directed his co-conspirators to contact the payment processors to negotiate early releases of reserve funds in the merchant

4

accounts before acquiring banks could alert the payment processors to the chargebacks. (*Id.* ¶ 29.)  Many payment processors eventually determined that the chargebacks resulted from fraudulent credit card activity associated with Williams's websites, which prompted them to terminate the merchant accounts associated with Williams's websites. (*Id.* ¶ 30.)

Still, Williams profited from his schemes.  First, given the many websites he controlled and large sales volume that each site generated, many consumers who were fraudulently charged as a result of Williams's schemes never reported the fraudulent charges. (*Id.* ¶ 31.)  Second, when Williams realized his merchant accounts were being terminated, he began creating new websites and pushed his co-conspirators to recruit more nominees to open new shell companies and associated merchant accounts. (*Id.*)  Third, some payment processors released reserve funds before discovering the excessive chargebacks, and these funds were wired back to the shell companies' bank accounts. (*Id.*) In total, Williams controlled roughly 35 shell companies, which collectively wired $6,554,656 to bank accounts he controlled. (*Id.* ¶¶ 32–33.)

## II.  **Procedural Background**

Williams's activities eventually attracted the attention of law enforcement, and a grand jury returned a four-count indictment against him on February 3, 2021.  Williams initially

pleaded not guilty and was released on bond.  On May 5, 2022, he pleaded guilty to a one-count Superseding Information pursuant to an agreement with the Government.  On November 3, 2023, the Court sentenced Williams to twenty months of imprisonment, three years of supervised release, restitution in the amount of $114,171.59, and forfeiture in the amount of $1,888,647.89. Williams surrendered to the Bureau of Prisons ("BOP") on March 29, 2024, to begin serving his sentence.

### A.    The Charges

The grand jury indicted Williams for conspiring to commit bank fraud and wire fraud, committing bank fraud, making false statements to a bank, and conspiring to commit money laundering. (ECF No. 1, Indictment.)  The conspiracy alleged in the Indictment extended from January 2012 to April 2016.  (*Id.* ¶¶ 12, 41, 43, 45, 47.)  The money laundering conspiracy charge had a statutory maximum sentence of twenty years of imprisonment, *see* 18 U.S.C. § 1956, and each of the other three charges had a statutory maximum sentence of thirty years of imprisonment, *see* 18 U.S.C. §§ 1014, 1344, 1349.

Williams was arrested on February 23, 2021, in the Northern District of Illinois and released on bond with instructions to appear for an arraignment in the Eastern District of New York. (PSR p. 1.)  Williams retained an attorney, Michael Peter Kushner, who entered his appearance on February 25, 2021.  (ECF

6

No. 5, Notice of Appearance.)  On March 1, 2021, Williams was arraigned before this Court, pleaded not guilty, and was released on bond.  (ECF No. 9, Crim. Cause for Arraignment by Video; ECF No. 10, Minute Entry for Crim. Proceeding.)

On May 5, 2022, Williams waived his right to prosecution by indictment, (ECF No. 47, Waiver of Indictment), and the Government filed a Superseding Information containing a single charge under the general federal conspiracy statute, (ECF No. 48, Superseding Information); *see* 18 U.S.C. § 371.  As with the Indictment, the Superseding Information alleged a conspiracy extending from January 2012 to April 2016.  (*Id.* ¶ 1.)  The single charge had a statutory maximum sentence of five years of imprisonment.  *See* 18 U.S.C. § 371.

The same day, Williams signed an agreement with the Government to plead guilty to the Superseding Information.  (ECF No. 85-1, Plea Agreement.)  The Plea Agreement stated that Williams faced a "[m]aximum term of imprisonment" of "5 years" and estimated that the federal Sentencing Guidelines would recommend imposing the statutory maximum sentence.  (*Id.* ¶¶ 1–2.)  The Government agreed that it would "take no position concerning where within the Guidelines range determined by the Court the sentence should fall."  (*Id.* ¶ 5.)[3]

_____

[3] Williams's argument that the Government violated this provision of the Plea Agreement by "taking a position on sentencing," (*see* ECF No. 108, Reply to Opp'n to Mot. Vacate, at 45), is meritless.  The Plea Agreement prohibited

The Plea Agreement further provided that Williams "agree[d] not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence" if the Court imposed "a term of imprisonment of 60 months or below" and that this appellate and collateral attack waiver was "binding without regard to the sentencing analysis used by the Court." (*Id.* ¶ 4.)  The waiver further provided, however, that it would not "preclude [Williams] from raising a claim of ineffective assistance of counsel in an appropriate forum." (*Id.*)

**B.   Guilty Plea**

On May 5, 2022, Williams pleaded guilty in open court to the single count in the Superseding Indictment.  (ECF No. 25, May 5, 2022, Hr'g Tr ("Plea Tr.").)[4]  Before pleading guilty, Williams swore an oath to provide truthful answers and confirmed he understood that his oath would subject him to perjury charges if he gave untruthful answers.  (*Id.* 2:24–3:16.)  The Court questioned Williams about his understanding of the charge to which he pleaded guilty, his sentencing exposure, and his rights.  The Court then asked him to describe his acts in

---

the Government only from taking a position on "where within" the Guidelines range the sentence should fall, (Plea Agreement ¶ 5), not from taking a position that the sentence should fall "near" the Guidelines range, which is what the Government did, (*see* ECF No. 44, Oct. 30, 2023, Ltr. from D. Pitluck; ECF No. 85-3, Nov. 3, 2023, Hr'g Tr. 32:14–18).

[4] The guilty plea hearing proceeded by video by consent of the parties because Williams resided in Chicago and Kushner had contracted COVID-19.  (*See* ECF No. 23, Apr. 25, 2022, Ltr. from M. Kushner.)

connection with the charged conduct.

First, the Court confirmed that Williams's plea was knowing and voluntary.  Williams testified that he was thirty-two years old, had completed some college, and could communicate in English.  (*Id.* 3:25–4:9.)  He testified that he had been hospitalized for mental health issues in March 2021 and that he was currently being treated for mental health issues and taking prescribed medications.  (*Id.* 4:14–5:15, 6:10–22.)  He explained, however, that his medications did not affect his ability to think clearly, understand his surroundings, or make important decisions.  (*Id.* 5:16–6:6.)  Williams further testified that his mind was clear and that he understood why he was present in court.  (*Id.* 7:1–6.)  Williams affirmed that he wished to "plead[] guilty to a superseding information" with "the Docket Number 21-CR-64," which "charge[d] [Williams] with a single count of conspiracy to commit bank fraud."  (*Id.* 8:8–17.) Williams further testified that he received a copy of the Superseding Information and understood the charge.  (*Id.* 9:9–13.)  Williams also testified that he was "satisfied" with Kushner's representation and that he and Kushner had "sufficient time to review the charges, [Williams's] rights, and the consequences of [the] plea agreement."  (*Id.* 10:4–13.)

Next, Williams waived his right to be indicted by a grand jury, testifying that he had "sufficient time to ask [Kushner]

about [the] procedure of waiving indictment" and that he understood "what [he was] signing" as well as "the import or the [e]ffect of signing a waiver of indictment."  (*Id.* 10:14–13:13.) Based on Williams's answers, given under oath and subject to penalty of perjury, the Court found that Williams knowingly and voluntarily waived his right to indictment, and the Court accepted the waiver.  (*Id.* 13:14–18.)

Next, the Court admonished Williams as to the rights he would waive by pleading guilty, and Williams testified that he understood each waiver.  (*See id.* 14:1–10 (speedy and public trial with assistance of counsel), 14:11–20 (presumption of innocence and reasonable doubt standard), 14:21–15:5 (unanimous verdict), 15:6–24 (confrontation of witnesses, compulsory process, privilege against self-incrimination).)  The Court further admonished Williams that after pleading guilty, Williams would have "no right to appeal" and the Government would be "free of any obligation to prove anything about what [he] did in connection with the charges" in the Superseding Information. (*Id.* 15:25–16:20.)  Williams confirmed that he understood his appellate and collateral attack waiver and nonetheless reiterated that he wished to plead guilty.  (*Id.* 16:21–17:9.)

The Court then reviewed the Plea Agreement with Williams. Williams testified that he had "an opportunity to review [his] plea agreement" with Kushner before he signed it, that he

10

understood "the terms of the agreement," and that he "agree[d] to those terms." (*Id.* 17:10-17, 19:2-14.)  The Court advised Williams that he "face[d] a maximum term of imprisonment of five years" and that he would "have to pay restitution in the full amount to each victim for his or her losses."  (*Id.* 19:22-20:19.)  The Government stated that "the losses . . . exceed[ed]" $3,500,000 but that it did not yet have knowledge whether "the banks [would] assert claims to those losses." (*Id.* 20:20-21:5.)  Williams testified that he understood the $3,500,000 figure would be "factored into calculating" his Guidelines sentence range and that these "loss amounts, to the extent they [had] not been recouped," would "be part of [his] restitution obligation to those banks." (*Id.* 21:6-16.)

The Court also advised Williams as to how his guilty plea would affect his recommended sentence under the federal Sentencing Guidelines.  The Court explained that the Guidelines are not mandatory and that the Court would consult the Guidelines as well as the factors listed in 18 U.S.C. § 3553 in determining Williams's sentence. (*Id.* 21:24-22:10.)  The Court further explained that given Williams's estimated offense level and criminal history score, the Guidelines ordinarily would have recommended a sentence of 87 to 108 months of custody. (*Id.* 22:13-23:18.)  The Court also explained, however, that the charging statute limited Williams's maximum sentence to 60

11

months. (*Id.* 23:19–22.) Williams testified that he understood the Guidelines calculations and that he had discussed them with Kushner. (*Id.* 23:23–24:2.)

After reviewing the potential penalties under the applicable statutes and the Guidelines, the Court confirmed that Williams understood his appellate and collateral attack waiver. Williams testified that he understood he was "giving up [his] right to bring an appeal regarding [his] sentence if [the Court] impose[d] a sentence of five years or less" and that he had discussed the waiver with Kushner. (*Id.* 25:17–23.) Williams further testified that he understood "if [he] receive[d] a sentence that [was] not what [he] hoped for or expect[ed]," he would not entitled to "withdraw [his] guilty plea." (*Id.* 26:17–22.)

Finally, Williams pleaded guilty to sole count in the Superseding Information. (*Id.* 27:11–13.) He testified that he was "making the plea of guilty voluntarily and of [his] own free will" and that nobody "threaten[ed] [him] or force[d] [him] to plead guilty." (*Id.* 27:14–19.) He further testified that "[o]ther than the agreement that [he] made with the [G]overnment," nobody made "any promise to [him] that caused [him] to plead guilty" or "any promise to [him] about what [his] sentence [would] be." (*Id.* 27:20–28:1.)

Williams allocuted that between "January 2012 and April

12

2016," he and others "agreed to file false documents with financial institutions in order to obtain money and property from those banks." (*Id.* 28:7-10, 28:20-22.)  He further allocuted that he knew the agreement was illegal and that the submissions contained false information that would make the banks likely to extend funds to Williams and his co-conspirators. (*Id.* 28:11-19, 28:23-29:2.)  Williams waived any objection to venue in the Eastern District of New York.  (*Id.* 29:3-30:5.)  Based on all the information Williams provided under oath and subject to penalty of perjury, the Court found a factual basis for Williams's guilty plea and accepted the plea. (*Id.* 30:17-22.)  The Court found that Williams was acting voluntarily and that he fully understood his rights and the consequences of his guilty plea.  (*Id.*)

### C.  Sentence

After Williams's guilty plea, the Probation Department prepared the pre-sentence investigation report (or "PSR").  (*See* ECF No. 31, PSR; *see also* ECF No. 39, Addendum to PSR.)[5]

Before Williams's sentencing, Kushner filed a detailed

---

[5] Though Williams does not explicitly cite it as the basis for any of the claims in his Section 2255 motion, he suggests in his "factual background" section that Kushner failed to review the PSR with him.  (*See* Mot. 46-48.) These allegations are contradicted by the testimony Williams gave under oath at his sentencing that he was able to discuss the PSR with Kushner.  (*See* Sent'g Tr. 14:2-4); *see Cisse v. United States*, 330 F. Supp. 2d 336, 343 (S.D.N.Y. 2004) (rejecting ineffective counsel claim in Section 2255 motion premised on attorney's alleged failure to review PSR with defendant, which was "directly contradicted" by defendant's sentencing hearing testimony).

sentencing submission on Williams's behalf, attaching Williams's
medical records and nineteen letters of support.  (ECF No. 43,
Sent'g Mem. of L. Amirouche ("Sent'g Ltr.").)  The memorandum
explained that Williams "firmly acknowledge[d] his misconduct"
but was "resolute in his commitment to make amends with his
victims" by agreeing to a forfeiture money judgment exceeding
$1,800,000.  (*Id.* 2.)  The memorandum also stressed Williams's
"otherwise clean criminal history" and argued that Williams's
"debilitating mental health issues . . . significantly impaired
his judgment and decision-making during the commission of the
offense."  (*Id.* 3.)  Finally, the Memorandum applied the
sentencing factors listed in 18 U.S.C. § 3553 to the instant
case, arguing that they supported a below-Guidelines sentence.
(*Id.* 4-8.)  Also before sentencing, the parties advised the
Court that they agreed to a restitution amount of $114,171.59.
(Order, Oct. 17, 2023; *see* ECF No. 44, Oct. 30, 2023, Ltr. from
D. Pitluck.)

     The Court sentenced Williams on November 3, 2023.  (ECF
No. 85-3, Nov. 3, 2023, Hr'g Tr. ("Sent'g Tr.").)  As he did at
the guilty plea hearing, Williams swore an oath to provide
truthful answers.  (*Id.* 2:21–3:2.)  Williams twice reiterated
his testimony from his guilty plea hearing that he was
"satisfied with [Kushner's] representation."  (*Id.* 7:7-8, 13:9-
11.)  He further testified that he was "able to review the

14

presentence report, the addenda by the probation department, the Government's submissions, and [Kushner's] submissions regarding [Williams's] sentencing." (*Id.* 13:19–13:23.) He also testified that he had no "difficulty understanding those submissions" and he was "able to discuss" them with Kushner. (*Id.* 13:24–14:4.) The Court offered Williams an opportunity to dispute or contest the validity of his guilty plea, but Williams declined to do so and affirmed that he was "ready now to be sentenced." (*Id.* 14:5–11.) Williams confirmed that his "answers to [the Court's] questions during [his] plea hearing [were] truthful." (*Id.* 14:18–20.) Williams also declined an opportunity to have a *Fatico* fact-finding hearing to resolve factual disputes relevant to the sentence. (*Id.* 17:7–12.)

Before imposing the sentence, the Court offered Williams an opportunity to give a statement. (*Id.* 17:13–18.) Williams stated that he stood before the Court "with a clear recognition of the wrong [he had] done." (*Id.* 17:25–18:4.) He said his crimes "were a result of poor judgment exacerbated by [his] battle with" mental illness and that he was "motivated by greed and the pressures of living in Miami Beach and Las Vegas." (*Id.* 18:5–6.) He continued, however, that he was "here to take full accountability" and that he "learned from [his] errors" and "committed [himself] to changes that [would] prevent such actions in the future." (*Id.* 18:11–16.)

15

The Court also permitted Kushner to give a statement on Williams' behalf. (*Id.* 28:15–18.)  Kushner stressed that Williams had been "trying to rectify" the results of his misconduct and that the "passage of time" supported a non-custodial sentence from a "specific deterrence" perspective. (*Id.* 28:19–29:20.)  Kushner further argued that Williams had displayed "extraordinary rehabilitation" since his arrest, citing the letters of support from Williams's friends and family.  (*Id.* 29:21–30:12.)  Finally, Kushner emphasized Williams's mental health history, explaining that he was not discussing it to provide an "excuse" for Williams's misconduct but rather to provide "context" as to Williams's struggles at the time of the misconduct.  (*Id.* 30:13–31:5.)

After hearing from Williams, Kushner, and the Government, the Court proceeded to calculate the recommended sentence under the advisory federal Sentencing Guidelines.  The Court found that Williams's total offense level was 29 and that his criminal history category was I, which would have resulted in a recommended sentencing range of 87 to 108 months of imprisonment but for the 60-month statutory maximum.  (*Id.* 52:4–20.)  The Court sentenced Williams to only twenty months of imprisonment, to be followed by three years of supervised release.  (*See id.* 57:15–71:16.)  The Court declined to impose a fine but imposed the mandatory $100 special assessment, ordered restitution in

the agreed amount of $114,171.59, and entered a forfeiture money
judgment in the agreed amount of $1,888,647.89.[6]  (*Id.* 71:17-
72:19.)  The Court entered the Judgment on November 7, 2023.
(ECF No. 52, Judgment.)

### D.    Post-Sentencing Proceedings

Williams appealed his sentence on November 10, 2023, (ECF
No. 54, Notice of Appeal), but later filed a motion to withdraw
the appeal, which the Second Circuit granted on March 19, 2024,
(ECF No. 23, Order, *United States v. Amirouche*, No. 23-7755
(2d Cir. Mar. 19, 2024)).

On December 28, 2023, Kushner filed a motion to extend
Williams's surrender date to March 29, 2024, (ECF No. 55,
Dec. 28, 2023, Ltr. from M. Kushner), which the Court granted,
(Order, Jan. 2, 2024).  Shortly before the extended surrender
date, however, another motion to extend the surrender date was
filed by Gordon Mehler and James Meehan, who stated that *they*
now represented Williams.  (ECF No. 57, Mar. 18, 2024, Ltr. from
G. Mehler.)  The Court denied the motion, explaining that it
would not consider filings from attorneys who had not entered
their appearances and that the reasons cited in the motion did
not support a further extension of Williams's surrender date.
(Order, Mar. 19, 2024.)  Williams then filed his own *pro se*

---

[6] Payment of restitution and forfeiture is a condition of Williams's
supervised release.  (*See* ECF No. 52, Judgment, at 5.)

motion to extend his surrender date "to allow [him] to work with [his] new counsel in preparing a comprehensive 2255 motion." (ECF No. 58, Mar. 25, 2024, Ltr. from L. Williams.)  The Court denied this motion as well, explaining that it would not consider Williams's *pro se* filings while he remained represented by counsel.  (Order, Mar. 26, 2024.)

Mehler and Meehan entered their appearances on March 26, 2024.  (ECF Nos. 60-61.)  The same day, however, Williams filed a notice stating that he had terminated Kushner, that Mehler and Meehan were "never authorized to represent" him, and that he was now proceeding *pro se*.  (ECF No. 59, Mar. 26, 2024, Ltr. from L. Williams.)  Later that day, Mehler and Meehan filed yet another request to extend Williams's surrender date, stating that "as of 9:00 p.m." that night, Williams had "again authorized [them] to file this revised request."  (ECF No. 62, Mar. 26, 2024, Ltr. from G. Mehler.)  Even later in the day, however, Williams filed another letter, this time stating that "all counsel, including [Kushner] and [Mehler], [were] terminated" and that he was proceeding *pro se*.  (ECF No. 64, Mar. 26, 2024, Ltr. from L. Williams.)

Faced with this barrage of inconsistent statements, the Court once again denied any further extension of Williams's surrender date and ordered Kushner, Mehler, and Meehan to file statements on the docket regarding the status of Williams's

18

representation.  (Order, Mar. 27, 2024.)  Kushner then confirmed

he was no longer representing Williams, (ECF No. 66, Mar. 28,

2024, Ltr. from M. Kushner), so the Court directed the clerk to

terminate him as counsel for Williams, (Order, Mar. 28, 2024).

Mehler and Meehan filed a letter stating that as of that moment,

they lacked "clarity on whether [they would] be representing"

Williams "moving forward."  (ECF No. 71, Mar. 29, 2024, Ltr.

from G. Mehler.)  After Williams unequivocally stated his desire

to terminate all counsel and proceed *pro se*, (ECF No. 72,

Apr. 5, 2024, Ltr. from L. Williams), the Court terminated

Mehler and Meehan as counsel as well, (Order, Apr. 5, 2024).

Meanwhile, Williams had filed two more *pro se* motions to

extend his surrender date, (ECF No. 69, Mar. 28, 2024, Ltr. from

L. Williams; ECF No. 70, Emergency Mot. Postponement Surrender

Date & Pet. for Writ of Habeas Corpus), which the Court denied,

(Order Apr. 2, 2024).  Finally, the Government filed a letter on

March 29, 2024, confirming that Williams had surrendered to BOP.

(ECF No. 68, Mar. 29, 2024, Ltr. from D. Pitluck.)

After he surrendered, Williams filed the instant motion

under 28 U.S.C. § 2255 to vacate his conviction.  (ECF No. 73,

Mem. Law Supp. Def.'s Am. Pet. Writ Habeas Corpus.)[7]  Williams

---

[7] Though Williams's March 29, 2024, emergency motion to further postpone his
surrender date purported to seek relief under 28 U.S.C. § 2255, (*see* ECF
No. 70, Emergency Mot. Postponement Surrender Date & Pet. for Writ of Habeas
Corpus), the Court deems the April 5, 2024, motion to supersede the March 29,
2024, motion.  Thus, Williams's claims are not barred by the restrictions on

also filed a motion for release pending the Court's adjudication of his Section 2255 motion, (ECF No. 75, Def.'s Emergency Mot. for Release to Home Confinement), which the Court denied, (ECF No. 80, May 15, 2024, Mem. & Order; *see also* Order, June 4, 2024 (denying motion to reconsider May 15, 2024, order)).  Over the next several months, Williams filed numerous ancillary motions seeking various forms of discovery and requesting the Court to take "judicial notice" of various facts.  (ECF Nos. 89-90, 92, 95, 98, 100-04, 106-07.)  The Court denied some of these motions, (Order, July 22, 2024; Order, July 29, 2024), and reserved decision on others, (Order, July 29, 2024; Order, Aug. 12, 2024; Order, Aug. 20, 2024; Order, Aug. 21, 2024; Order, Aug. 22, 2024; Order, Sept. 3, 2024).

Now that the Government has submitted its opposition to Williams's Section 2255 motion, (ECF No. 85, June 7, 2024, Ltr. from D. Pitluck ("Opp'n")), and Williams has filed his reply in support of the motion, (ECF No. 108, Reply to Opp'n to Mot. Vacate ("Reply")),[8] the motion is now fully submitted and ripe for adjudication.

---

successive motions set forth in 28 U.S.C. § 2255(h).

[8] To the extent Williams purports to raise additional claims in his reply, such claims are either barred by his Plea Agreement or waived.  *See Gribbin v. N.Y. State Unified Court Sys.*, 838 F. App'x 646, 648 n.1 (2d Cir. 2021) (mem.); *Farmer v. United States*, No. 15-cv-6287 (AJN), 2017 WL 3448014, at *3 (S.D.N.Y. Aug. 10, 2017) (explaining that *pro se* defendant waived arguments first raised in reply in support of Section 2255 motion).

**Legal Standard**

A person in federal custody may collaterally challenge his or her conviction or sentence under 28 U.S.C. § 2255 by filing a motion to vacate in the district court that imposed the sentence.  28 U.S.C. § 2255(a).  Relief is generally available only for a constitutional error, lack of jurisdiction, or a fundamental defect that inherently results in a miscarriage of justice.  *Nnebe v. United States*, 534 F.3d 87, 90 (2d Cir. 2008).

*Pro se* filings are held to less rigorous standards than counseled filings.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A *pro se* motion under Section 2255 is construed liberally to raise the strongest arguments it suggests.  *Waiters v. United States*, 472 F. Supp. 3d 7, 13 (E.D.N.Y. 2020).  Still, *pro se* litigants are not exempt from the applicable substantive and procedural law.  *Mejia v. Sup't, Elmira Corr. Facility*, 702 F. Supp. 3d 83, 93 (E.D.N.Y. 2023).

**Discussion**

Williams seeks to vacate his conviction on the ground that his attorney, Kushner, was constitutionally ineffective.[9]  (*See*

---

[9] In support of his motion, Williams submitted an affidavit from his "business associate," (*see* Mot. 10), Hadley Rose Staley, an attorney who apparently connected Williams with Kushner, (*see id.* Ex. A, Aff. of H. Staley.)  Staley opines based on information she heard secondhand from Williams that "Kushner's communication (or lack thereof) and approach to the substantive issues in the case resulted in [Williams] not receiving a fair chance to present his case and all the facts and circumstances that would have been probative" to the Court's decision.  (*Id.* ¶ 23.)  Staley is not "experienced

*generally* ECF No. 73, Mem. Law Supp. Def.'s Am. Pet. Writ Habeas Corpus ("Mot.").)  To the extent Williams's motion might be construed to raise any claim other than an ineffective counsel claim, (*see, e.g.*, Mot. 17–22 (argument in "factual background" section of motion that Williams is innocent)), any such claim is barred by Williams's collateral attack waiver, (*see* Plea Agreement ¶ 4; Plea Tr. 15:25–17:9, 25:17–23).

The Sixth Amendment to the federal Constitution guarantees a criminal defendant the right "to have the [a]ssistance of [c]ounsel for his [or her] defen[s]e."  *See* U.S. Const. amend. VI.  In *Strickland v. Washington*, the Supreme Court interpreted "assistance" to mean "effective" assistance.  466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  An attorney renders ineffective assistance if he or she (1) performs below objectively reasonable professional standards (2) in a way that prejudices the defendant.  *Farhane v. United States*, 77 F.4th 123, 126 (2d Cir. 2023).  Prejudice occurs only when there is a substantial likelihood that the result of the proceeding would have been different but for the attorney's deficient performance.  *Garner v. Lee*, 908 F.3d 845, 862 (2d Cir. 2018).

---

in criminal matters," (*id*. ¶ 15), and she has not been qualified as an expert on professional standards in this case.  Her affidavit – assuming it is genuine – is hearsay and irrelevant to the Court's disposition of Williams's Section 2255 motion.

The court need not address both elements of the *Strickland* inquiry if the defendant fails to establish one. *Id.* at 861. Further, the Court may address the two elements in either order. *Id.* The Second Circuit has instructed district courts to dispose of *Strickland* claims solely for lack of sufficient prejudice without "grad[ing] counsel's performance" when it is easier to do so. *See id.* (quoting *Mitchell v. Scully*, 746 F.2d 951, 954 (2d Cir. 1984)).

Under these governing standards, Kushner did not render ineffective assistance. To the contrary, in the face of overwhelming evidence of his client's guilt, (*see supra* 2-5), Kushner negotiated a plea agreement that reduced Williams's maximum sentencing exposure from over 360 months to only 60 months, (*see supra* 6-8). Then, even though the Guidelines recommended – and the Probation Department and Government each sought – the maximum sentence of 60 months, Kushner persuaded the Court to impose a sentence of only twenty months. (*See supra* 13-17.) Given the case against him, Williams was fortunate to have avoided a far lengthier sentence. As set forth below, each of Williams's ineffective counsel claims is meritless.

## I.   False Assurances

Williams first claims that Kushner was ineffective by falsely assuring him that he would receive a non-custodial

sentence, which Williams alleges induced him to plead guilty. (Mot. 73–76.)  In support, Williams attaches an email he sent to Kushner expressing gratitude that they were "looking at probation," (*id.* Ex. D), and an affidavit stating that Kushner "repeatedly promised [Williams] that if [Williams pleaded] guilty, [Williams] would receive no prison time," (*id.* Ex. E ¶ 10; *see also id.* Ex. E ¶¶ 18, 21, 29).  Williams's affidavit also states, however, that Kushner told him before the hearing that he could not "promise [him] anything."  (*Id.* Ex. E ¶ 11.)

This claim fails because Williams has not established that Kushner actually made any false assurances about Williams's sentence.  At his guilty plea hearing, Williams testified under oath and subject to penalty of perjury that "[o]ther than the agreement that [he] had made with the [G]overnment," nobody made "any promise to [him] that caused [him] to plead guilty" or "any promise to [him] about what [his] sentence [would] be."  (Plea Tr. 27:20–28:1.)  Williams's email to Kushner that they were "looking at" a non-custodial sentence, (Mot. Ex. D), is entirely consistent with Williams's sworn testimony at his guilty plea hearing that Kushner did not "promise" him a non-custodial sentence.  Moreover, Williams admits in his own affidavit that Kushner told him before the plea hearing that Kushner could not "promise [Williams] anything."  (*Id.* Ex. E ¶ 11.)

Williams also may not overcome the obstacle posed by his

24

own sworn guilty plea hearing testimony, (*see* Plea Tr. 27:20–
28:1), simply by making a broad, general statement contradicting
it, (*see id.* Ex. E ¶ 10 (stating that Kushner "repeatedly
promised" him a non-custodial sentence "if [he pleaded]
guilty,")).  Williams is far from the first convicted defendant
to come up with that idea.  As the Supreme Court recognized
decades ago, a convicted defendant generally "has everything to
gain and nothing to lose" from collaterally attacking a guilty
plea.  *See Blackledge v. Allison*, 431 U.S. 63, 71 (1977).  Thus,
"[s]olemn declarations in open court" made at a guilty plea
hearing "carry a strong presumption of verity," and contrary
allegations that are "unsupported by specifics" or "wholly
incredible" in light of the record are "subject to summary
dismissal."  *Id.* at 74.

Courts routinely summarily reject *Strickland* claims in
Section 2255 motions where the defendant, as Williams does here,
offers only broad, general allegations to contradict testimony
from his or her guilty plea hearing that he or she was not
induced to plead guilty by promises from an attorney as to
sentencing.  *See, e.g.*, *Brown v. United States*, No. 16-cr-297
(AMD), 2023 WL 4551682, at *6 (E.D.N.Y. July 14, 2023)
(defendant alleged attorney promised him specific maximum
sentence after testifying at guilty plea hearing that "no one
promised he would be getting a particular sentence"); *United*

*States v. Pagartanis*, No. 18-cr-374 (JMA), 2023 WL 4471947, at
*4 (E.D.N.Y. July 11, 2023) (defendant submitted affidavit
suggesting that attorney guaranteed Court would sentence him
within specific range after denying at guilty plea hearing that
"anyone made any promise to [him] as to what [his] sentence
[was] going to be"); *Jesus v. United States*, No. 13-cr-438
(KPF), 2016 WL 2742409, at *15 (S.D.N.Y. May 10, 2016)
(defendant attempted to contradict testimony from guilty plea
hearing that "no one had made him promises concerning his
sentence"); *Garafola v. United States*, 909 F. Supp. 2d 313, 325
(S.D.N.Y. 2012) (defendant submitted affidavit stating that
attorney promised defendant would "probably" receive a sentence
of parole, which contradicted plea agreement and defendant's
guilty plea hearing testimony); *Chabus v. United States*,
No. 05-cr-681 (CM), 2012 WL 601069, at *6 (S.D.N.Y. Feb. 23,
2012) (defendant submitted affidavit stating that attorney
"promised him probation if he entered [a] guilty plea" after
defendant testified at guilty plea hearing that "no one had made
any promises about his sentence"); *Brown v. United States*,
637 F. Supp. 2d. 212, 223 (S.D.N.Y. 2009) ("Had [defendant]
received any promise from counsel as to [his] sentences, he
should have said so when asked if any . . . promises influenced
him to plead guilty.").

Similarly here, the Court will rely on Williams's "sworn

26

statements, made in open court," that no promises as to
sentencing induced him to plead guilty, as the Court is
"entitled" to do, notwithstanding Williams's about-face in his
Section 2255 motion. *See United States v. Logan*,
845 F. Supp. 2d 499, 506 (E.D.N.Y. 2012) (quoting *United States
v. Hernandez*, 242 F.3d 110, 112 (2d Cir. 2001)). Williams's
bald allegation that Kushner "repeatedly promised" him a non-
custodial sentence, (*see* Mot. Ex. E ¶ 10), does not overcome the
strong presumption of verity that attaches to the testimony
Williams gave under oath at his guilty plea hearing.

Even if the Court were to assume that Williams's new
account of the facts is correct, however, his claim still would
fail because he has not shown that Kushner's alleged false
assurances prejudiced him. Where a defendant's ineffective
counsel claim is that "counsel has misled him [or her] as to the
possible sentence [that] might result from a plea of guilty,"
prejudice hinges on "whether the defendant was aware of actual
sentencing possibilities, and if not, whether accurate
information would have made any difference in his [or her]
decision to enter a plea." *Chhabra v. United States*, 720 F.3d
395, 408 (2d Cir. 2013) (quoting *United States v. Arteca*,
411 F.3d 315, 320 (2d Cir. 2005)). An "ineffective assistance
of counsel claim will not succeed when an attorney predicts an
incorrect sentence" if the defendant "was informed by the court

27

of the sentencing range he [or she] faced" and "knowingly and freely proceeded with the plea." *LaMarco v. United States*, 336 F. Supp. 3d 152, 170 (E.D.N.Y. 2018).

Here, regardless of whatever Kushner might have told him, Williams was well aware of his sentencing exposure before he pleaded guilty. Williams's Plea Agreement stated on its front page that Williams faced a "[m]aximum term of imprisonment" of "5 years." (*See* Plea Agreement ¶ 1.) The Plea Agreement further estimated that the "Guidelines range of imprisonment [was] 60 months" and that Williams "stipulate[d] to" that calculation. (*Id.* ¶ 2.) Then, at Williams's guilty plea hearing, the Court advised Williams that he "face[d] a maximum term of imprisonment of five years" and that the Sentencing Guidelines recommended a sentence of 60 months. (Plea Tr. 19:22–20:19, 23:19–22.) Williams testified under oath and subject to penalty of perjury that he understood the Guidelines calculations and discussed them with Kushner. (*Id.* 23:23–24:2.)

Thus, "even if [the] Court [were] convinced that [Kushner] misadvised [Williams] in some way regarding his potential sentence," any such "error was cured by the Court's thorough questioning of [Williams] throughout the plea allocution and the fact that the potential sentences were laid out in the Plea Agreement and in the allocution." *See LaMarco*, 336 F. Supp. 3d at 170. Accordingly, Williams cannot prevail on his claim that

his guilty plea was the product of false assurances from Kushner about what his sentence would be.

## II.  **Failure to Investigate and Communicate**

Williams next claims that Kushner was ineffective by failing to review discovery materials and failing to communicate with him about the case, which Williams argues rendered his plea not knowing and voluntary.  (Mot. 76-82.)

Williams's failure to investigate claim is meritless.  The very billing records that Williams attaches in support of this claim indicate that Kushner reviewed each of the Government's two discovery productions.  (*See, e.g.*, Mot. Ex. C, p. 3 (entry from April 21, 2021, one day after Government made first discovery production, for call regarding "evidence against Defendant"), p. 4 (entry from June 18, 2021, one day after Government made second discovery production, for "messages from Government re: new discovery").)  Williams thus offers "no proof, beyond his own self-serving and conclusory allegations, that [Kushner] failed to review discovery."  *See United States v. Peterson*, 896 F. Supp. 2d 305, 317 (S.D.N.Y. 2012).

Williams's failure to communicate claim is also meritless. An attorney's failure to communicate, by itself, does not render the attorney's performance deficient.  *Beck v. Conway*, No. 11-cv-60 (SJF), 2014 WL 774967, at *5 (E.D.N.Y. Feb. 25, 2014).  Here, the billing records show that Kushner spent ample

time communicating with Williams and his family about the case.
(*See, e.g.*, Mot. Ex. C, p. 2 (March 1, 2021, entry for "Email to
client"), p. 3 (March 18 and 19, 2021, entries for "emails with
client" and "phone call with client"), p. 4 (June 21, 2021,
entry for "phone calls with Larby and his father"), p. 6
(October 7 and 8, 2021, entries for "emails with client"), p. 7
(May 4, 2022, entry for "phone call/emails with client re: the
plea agreement").)  Further, Kushner kept Williams apprised of
an important development in the case – the Plea Agreement – as
evidenced by the fact that Williams signed it.

Even if Kushner's investigation and communication were
deficient, however, Williams has not established that such
deficiencies prejudiced him.  A defendant's admissions during a
plea proceeding "carry a strong presumption of verity" and
"create 'a formidable barrier' to challenging the validity of
[the] plea" later.  *United States v. Freeman*, 17 F.4th 255, 265
(2d Cir. 2021) (quoting *Allison*, 431 U.S. at 74).  The
defendant's "bald statements that simply contradict what he [or
she] said at [the] plea allocution" may be "rejected summarily."
*Id.* (quoting *United States v. Torres*, 129 F.3d 710, 715 (2d Cir.
1997)).  Where a Section 2255 motion raises an ineffective
counsel claim and the alleged prejudice is that the defendant's
"guilty plea was not knowing and voluntary," the court may
summarily reject the claim if the defendant's allegations are

30

"belied by the record of [the defendant's] plea agreement, plea allocution, and sentencing."  *Rodriguez v. United States*, 703 F. Supp. 2d 280, 282 (S.D.N.Y. 2010).

Here, the Plea Agreement and the transcripts of Williams's guilty plea hearing and sentencing conclusively establish that Williams's guilty plea was knowing and voluntary.  The Plea Agreement informed Williams of the statutory maximum sentence and correctly estimated the recommended sentence under the Guidelines.  (Plea Agreement ¶¶ 1-2.)[10]  At his guilty plea hearing, Williams testified under oath that he was "satisfied" with Kushner's representation and that he and Kushner had "sufficient time to review the charges, [Williams's] rights, and the consequences of [the] plea agreement."[11]  (Plea Tr. 8:8-10:13.)  Williams also testified that he had "an opportunity to review [his] plea agreement with" Kushner before signing it, that he understood the "terms of the agreement," and that he

---

[10] Williams is incorrect that there was a "last-minute modification of the [P]lea [A]greement to include the 'Sophisticated Means' enhancement." (*See* Mot. 78-79.)  The Plea Agreement simply contained a citation error that the parties jointly corrected on the record before Williams pleaded guilty. (*See* Plea Tr. 17:18-18:24, 22:21-23:2.)  Regardless, the Plea Agreement advised Williams that its Guidelines calculation was only an estimate that was not binding on the Court. (*See* Plea Agreement ¶¶ 2-3.)  Thus, no prejudice resulted from the citation error.  Williams's assertion that the sophisticated means enhancement somehow affected the statute of limitations, (*see* Mot. 24-26), is simply wrong.  The Sentencing Guidelines do not affect statutes of limitations.

[11] The fact that Williams's guilty plea hearing proceeded by video, (*see* Mot. 79-81), did not render Williams's guilty plea any less knowing or voluntary. Williams offers no explanation as to how proceeding by video prejudiced him other than a boilerplate statement that it "deprived him of the opportunity to fully participate in the proceedings and communicate effectively with his attorney," (*see* Mot. 15), and Williams never objected to proceeding by video.

31

"agree[d] to those terms."  (*Id.* 17:10-17, 19:2-14.)

The Court admonished Williams as to each right he would waive by pleading guilty, and Williams testified that he understood each waiver and still wished to plead guilty.  (*Id.* 14:1-17:9, 25:17-23, 26:17-22.)  The Court also advised Williams of the potential penalties he would face, both under the relevant statutes and under the Guidelines, as a result of pleading guilty.  (*Id.* 19:22-20:19, 21:6-16, 21:24-22:10, 22:13-24:2.)  Williams testified that he understood the penalties and that he had no questions for Kushner or for the Court before entering his guilty plea.  (*Id.* 27:1-3.)

Williams then pleaded guilty, testifying that he gave his plea "voluntarily and of [his] own free will."  (*Id.* 27:11-16.)  He further testified that nobody threatened or forced him to plead guilty and that nobody made any promises to him about his sentence.  (*Id.* 27:17-28:1.)  He then described in his own words how he committed the offense charged in the Superseding Information.  (*Id.* 28:2-30:15.)[12]  Only after this colloquy did the Court find Williams was acting knowingly and voluntarily and

---

[12] Williams's allocution was not in any way undermined by the fact that he read from an agreed-upon written statement.  (*See* Mot. 80.)  Before pleading guilty, Williams swore an oath to provide truthful answers, and Williams stated that he understood what the oath meant.  (Plea Tr. 2:24-3:16.)  The Court directed Williams to describe "in [his] own words" what he did in relation to the charge in the Superseding Indictment, (*id.* 28:2-6), not to read from his prepared statement.  If the prepared statement was inaccurate, Williams's oath obligated him to provide a truthful explanation rather than recite what was written in the prepared statement, regardless of his agreement with the Government.

that there was a factual basis for the plea.  (*Id.* 30:16-22.)
At his sentencing, again under oath, Williams reaffirmed that
the answers he gave during his guilty plea hearing were
truthful.  (Sent'g Tr. 14:18-20.)

Williams's Plea Agreement and his own prior testimony in
open court thus control over his new, self-serving position that
his plea was not knowing and voluntary.[13]  *See Rodriguez*,
703 F. Supp. 2d at 282 (denying Section 2255 motion premised on
ineffective counsel where the "plea agreement, plea
allocution[,] and sentencing . . . establish[ed] that
[defendant] was fully informed of the charges" and that
defendant "entered a plea voluntarily with advice of counsel,
with whom he stated he was satisfied").

Moreover, Williams's allegations do not suggest a
reasonable probability that he would have foregone a guilty plea
but for counsel's deficient performance, which is required to
establish *Strickland* prejudice in the guilty plea context.  *See*
*Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *Gonzalez v. United*
*States*, 722 F.3d 118, 130 (2d Cir. 2013).  A defendant's self-
serving statement that he or she would have rejected the plea

---

[13] To the extent Williams claims that his waiver of indictment was not knowing
and voluntary, that claim fails for substantially the same reason. (*See* Mot.
80 (suggesting that there was a "breakdown in the proper legal process" due
to the fact that "the waiver of indictment was signed after the plea
agreement").)  At his guilty plea hearing, Williams testified under oath that
he reviewed the waiver with Kushner, had sufficient time to ask Kushner about
the waiver procedure, and understood what the document meant when he signed
it.  (Plea Tr. 12:21-13:13.)

agreement does not suffice.  *See United States v. Nataniel*,
No. 15-cr-588 (MKB), 2019 WL 653137, at *8 (E.D.N.Y. Feb. 13,
2019).  Here, the evidence against Williams was overwhelming,
(*see generally* PSR), and the Plea Agreement reduced Williams's
sentencing exposure from 360 months to 60 months, (*see* 6–8).
Given the "considerable benefit" Williams obtained through the
Plea Agreement, Williams reasonably accepted it.  *See DeLeon v.
United States*, No. 00-cr-1236 (RPP), 2003 WL 21769836, at *6
(S.D.N.Y. July 30, 2003) (rejecting ineffective counsel claim
where "there was strong, irrefutable evidence against" defendant
and defendant "received a considerable benefit under the terms
of his plea agreement").

Because there is no reasonable probability that Williams
would not have pleaded guilty but for Kushner's allegedly
deficient performance, no prejudice would have resulted even if
Williams's allegations were correct.  *See Gonzalez*, 722 F.3d at
130.  Accordingly, Williams cannot prevail on the ground that
his guilty plea was not knowing and voluntary.[14]

### III. Mental Health Issues

Williams next argues that Kushner inadequately investigated

---

[14] Williams accuses Kushner of committing "perjury" at the guilty plea hearing
by affirming that he and Williams discussed the charges and penalties and
that Williams understood them.  (Mot. 68–70.)  If that were true, it would
mean that Williams also committed perjury, as he was under oath and made
substantially the same affirmations.  The Court's view is that neither
Kushner nor Williams committed perjury at the guilty plea hearing and that
they instead truthfully advised the Court that they discussed the charges and
penalties and that Williams understood both.

Williams's mental health issues and failed to present sufficient mitigating evidence regarding Williams's mental health at sentencing, which Williams alleges resulted in a harsher sentence.  (Mot. 82–83.)  This claim is meritless.  Kushner made Williams's mental health issues a key theme of his sentencing advocacy.  Kushner discussed Williams's mental health struggles at length in his sentencing submission, (*see* Sent'g Ltr. 3–8), gathered the relevant medical records, and submitted them to the Court under seal, (*see* ECF No. 42, Aug. 1, 2023, Ltr. from M. Kushner).  At sentencing, Kushner again stressed Williams's mental health as a reason to impose a below-Guidelines sentence. (Sent'g Tr. 30:13–18.)  Though Williams argues that Kushner failed to "conduct a competency evaluation," (Mot. 83), he has not cited a single case holding that an attorney is constitutionally required to request one.[15]

Regardless, Williams cannot show prejudice because the Court would not have imposed a lighter sentence had Kushner discussed Williams's mental health even more than he already did.  As the Court explained, it sentenced Williams significantly below the Guidelines in part due to Williams's mental health struggles.  (Sent'g Tr. 59:3–12, 60:2–7.)  But the

---

[15] Williams's letters from his doctors, who opine on Kushner's performance and the validity of Williams's plea, (*see* Mot. Ex. O) – assuming they are genuine – have no bearing on Williams's motion.  Whether a plea was knowing and voluntary is a legal question, not a medical question, and a medical doctor's opinion about an attorney's performance is irrelevant to a *Strickland* claim.

Court was required to consider other factors too, *see* 18 U.S.C.
§ 3553, many of which supported a higher sentence.  First, as
the Court noted, Williams's mental health issues did not prevent
him from thinking "creatively, deceptively, [and] in a planning
manner, to organize and direct a team of co-conspirators."
(Sent'g Tr. 35:5–10.)  Second, the Court could not overlook the
"very serious" nature of the offense, which involved "devis[ing]
and supervis[ing] a very sophisticated scheme" and taking
elaborate measures to conceal it, all "to enrich himself at the
expense of his victims."  (*Id.* 57:19–58:2.)  Third, the Court
had concerns about deterrence and protecting the public, as
Williams's settlement of a prior state consumer fraud
enforcement action did not deter him from committing the instant
offense.  (*Id.* 61:21–62:24.)  Finally, as the Court noted, the
average sentence length for a person convicted of crimes
governed by Guideline 2B1.1 who fell within Zone D of the
Sentencing Table was 24 months, and only 11.4% of those
sentences were non-custodial.  (*Id.* 64:10–21.)

In sum, the Court was already apprised of Williams's mental
health history, the Court imposed a sentence far below the
Guidelines and statutory maximum, and numerous other factors
favored a longer sentence.  Williams's motion identifies no
additional information about his mental health that would have
influenced the Court to reduce the sentence even further.  Thus,

36

because Williams has not shown a "reasonable probability" that the Court would have imposed "a lighter sentence" had Kushner further emphasized his mental health, Williams has not established prejudice. *See Khan v. United States*, No. 20-cv-945 (JSR) (JW), 2023 WL 11836947, at *22 (S.D.N.Y. Aug. 18, 2023), *R&R adopted*, 2024 WL 3219838 (S.D.N.Y. June 28, 2024).

## IV.   The Loss Amount

Williams next argues that Kushner was ineffective for failing to "investigate and challenge the loss amount" set forth in the PSR at sentencing.[16]  (Mot. 83–89.)  This claim fails because Kushner's sentencing advocacy regarding the loss amount was reasonable.  Williams already stipulated that the "[l]oss [was] in excess of $3,500,000" in his Plea Agreement.  (*See* Plea Agreement ¶ 2.)  Had Kushner reneged on that stipulation at sentencing, he may have caused a breach of the Plea Agreement

---

[16] The Court disagrees with the Government that Williams's collateral attack waiver bars this claim.  (*See* Opp'n 20.)  The Second Circuit has explained that an ineffective counsel claim survives an appellate and collateral attack waiver only when the claim concerns the "process by which [the defendant] agreed to plead guilty."  *Parisi v. United States*, 529 F.3d 134, 138 (2d Cir. 2008).  Thus, a defendant may not "circumvent[]" the waiver by framing arguments on the merits as ineffective counsel claims.  *See Cavounis v. United States*, No. 14-cv-4992 (VEC), 2015 WL 4522826, at *8 (S.D.N.Y. July 24, 2015).  Williams's plea agreement, however, is more generous and explicitly reserves his right to raise an "ineffective assistance of counsel" claim "in an appropriate forum."  (*See* Plea Agreement ¶ 4.)  Because the exception to Williams's collateral attack waiver is "not limited . . . to any particular species of ineffective counsel claim" and the Court must construe Williams's collateral attack waiver "strictly against the [G]overnment," *see Genovese v. United States*, No. 18-cr-183 (JMF), 2023 WL 2185699, at *2 n.3 (S.D.N.Y. Feb. 23, 2023) (quoting *United States v. Wilson*, 920 F.3d 155, 162 (2d Cir. 2019)), the Court concludes that Williams's collateral attack waiver does not bar his ineffective counsel claim regarding the loss amount and thus will proceed to consider the merits of that claim.

and allowed the Government to reinstate the charges with much
higher sentencing exposure.  (*See id.* ¶ 5); *Chestnut v. United
States*, No. 12-cr-837 (GBD), 2018 WL 1989617, at *3 (S.D.N.Y.
Jan. 19, 2018) (rejecting ineffective counsel claim in
Section 2255 motion premised on attorney's alleged failure to
object to loss amount at sentencing that defendant had
stipulated to in plea agreement).  Kushner cannot be "found
ineffective for failing to expose [Williams] to a considerably
higher sentence."  *See Chestnut*, 2018 WL 1989617, at *3.  If
Williams wished to challenge the Government's evidence, he could
have proceeded to trial instead of "plead[ing] guilty in order
to test whether [he would] get an acceptably lenient sentence"
and then attempting to argue the merits of his case in post-
conviction litigation.  *See LaMarco*, 336 F. Supp. 3d at 170
(quoting *United States v. Sweeney*, 878 F.2d 68, 69-70 (2d Cir.
1989)).

Regardless, even assuming that Kushner's advocacy as to the
loss amount was deficient and setting aside any consequences
that may have resulted from attempting to contradict his Plea
Agreement, Williams failed to show that any such deficiency
prejudiced him.  Williams's submissions fail to show that the
Court "would not have relied on the loss amount to which [he]
had already agreed – his counsel's hypothetical protestations
notwithstanding."  *Cavounis v. United States*, No. 12-cr-297

38

(VEC), 2015 WL 4522826, at *8 (S.D.N.Y. July 24, 2015)
(rejecting ineffective counsel claim in Section 2255 motion
premised on failure to object at sentencing to loss amount
stated in PSR where defendant already stipulated to that loss
amount).  They also fail to show that the Court would have
arrived at a loss amount of $550,000 – less than one sixth of
the $3,500,000 that Williams stipulated to in his Plea Agreement
– which is what would have been necessary to reduce the
applicable Guidelines range below the statutory maximum.  (*See*
Sent'g Tr. 52:4–5); U.S. Sent'g Guidelines Manual
§§ 2B1.1(b)(1), 5A (U.S. Sent'g Comm'n 2021).  Accordingly,
Williams cannot prevail on his ineffective counsel claim with
respect to the loss amount.

## V.   Statute of Limitations

Williams next argues that Kushner was ineffective for
failing to move to dismiss the charges as time barred.  (Mot.
89-91.)  This claim is frivolous.  A defendant may move before
trial to dismiss a charge based on a statute of limitations
defense only if the defense is "clear from the face" of the
charging instrument.  *United States v. Sampson*, 898 F.3d 270,
279 (2d Cir. 2018).  The Superseding Information to which
Williams pleaded guilty alleged a conspiracy running through
April 2016, (Superseding Information ¶ 1), and Williams was
charged on February 3, 2021, (Indictment), within the five-year

statute of limitations, *see* 18 U.S.C. § 371.  Kushner was not

ineffective for "fail[ing] to make a meritless argument."  *See*

*Guzman v. United States*, 363 F. Supp. 3d 396, 399 (S.D.N.Y.

2019) (quoting *United States v. Kirsh*, 54 F.3d 1062, 1071

(2d Cir. 1995)).

Williams's factual challenge to the dates specified in the

Superseding Information, (*see* Mot. 23-28, 89-91), is irrelevant

because he pleaded guilty.[17]  Williams admits that he

contemplated a statute of limitations defense before pleading

guilty, (*id.* 22), yet he still proceeded with the Plea Agreement

and obtained a considerable advantage by doing so.  As with

Williams's arguments regarding the loss amount, (*see supra* IV),

if Williams wished to test the Government's evidence, he could

have done so at trial instead of pleading guilty, seeing what

sentence he would get, and then litigating the merits for the

first time in post-conviction litigation.

The Court also cannot and will not overlook that Williams

submitted a reply brief with fake citations in an apparent

effort to lead the Court to believe that his frivolous argument

had merit.  The cases Williams cites are real, but the

---

[17] Though he does not explicitly cite it as a ground for relief, Williams in the "factual background" section of his motion frivolously accuses the Government of "prosecutorial misconduct" with respect to the statute of limitations.  (*See* Mot. 28-30.)  Nothing in any of Williams's submissions raises even the most remote suspicion that any prosecutorial misconduct might have occurred in this case.

quotations are not.  (*See* Reply 24.)  For example, Williams cites *United States v. Salmonese*, 352 F.3d 608, 614 (2d Cir. 2003), and proffers the quote that "the crucial date is the last overt act alleged," (Reply 24).  That quote does not appear in *Salmonese*, which in fact states precisely to the contrary that "the statute of limitations may be satisfied by proof of an overt act not explicitly listed in the indictment."  *See* 352 F.3d at 619 (quoting *United States v. Frank*, 156 F.3d 332, 339 (2d Cir. 1998)).  *Salmonese*'s holding remains good law. *See, e.g.*, *United States v. Ingarfield*, No. 20-cr-146 (RA), 2022 WL 16700068, at *2 (S.D.N.Y. Nov. 3, 2022) (citing *Salmonese* to explain that "the [G]overnment may rely on an unalleged overt act to satisfy the statute of limitations").

The Court might have been inclined to deem Williams's misquotation of *Salmonese* an innocent misunderstanding of its holding combined with some misplaced quotation marks had Williams not also misquoted three other cases in the same way and repeated his misrepresentation of their holdings several times in his reply brief.  (*See* Reply 24, 26, 31.)  The passages that Williams purports to quote simply do not appear in the cited cases, which materially differ from the instant case because they concern defendants convicted after jury trials and not after pleading guilty.  (*See* Reply 24); *United States v. Grimm*, 738 F.3d 498, 501 (2d Cir. 2013); *United States v. Spero*,

331 F.3d 57, 60 n.2 (2d Cir. 2003); *United States v. Ben Zvi*,
242 F.3d 89 (2d Cir. 2001).  Based on the Court's research, none
of these quotes appear in *any* published judicial decisions.  If
Williams were an attorney rather than a *pro se* litigant, the
Court would have referred him for discipline for this flagrant
dishonesty.

## VI.  Factual Basis

Finally, Williams claims that there was no factual basis
for his guilty plea because "the financial institutions involved
did not suffer any actual losses as a result of [his] alleged
conduct" and "there is no evidence to suggest that Mr. Williams
intended to cause losses to the financial institutions."[18]  (Mot.
91–96.)  But even assuming the truth of Williams's statements, a
conviction under 18 U.S.C. § 1344 requires "neither a showing of
ultimate financial loss nor a showing of intent to cause
financial loss." *United States v. Shaw*, 580 U.S. 63, 67 (2016).
Kushner was not ineffective for refusing to make a frivolous
argument to the contrary. *See Guzman*, 363 F. Supp. 3d at 399.

The Court adds one final note regarding Williams's "factual
basis" argument, in which Williams appears either to suggest

---

[18] The Court is aware that Williams barely even attempts to frame this claim
as an ineffective counsel claim and instead simply argues the merits while
adding a single cursory statement that Kushner was ineffective for failing to
make the argument.  (*See* Mot. 91–92.)  As explained above, however, (*see
supra* n.16), Williams's collateral attack waiver does not bar this claim
because the waiver is not unambiguously drafted to cover any ineffective
counsel claims.

that he is innocent or to justify his crimes on the ground that they enabled certain parties to make money.  At Williams's sentencing, he was placed under oath and then gave a heartfelt statement expressing remorse for his "greed" and promising to "take full accountability."  (*See* Sent'g Tr. 17:25–21:25.) Frankly, that was the part of Williams's statement that most influenced the Court to impose a below-Guidelines sentence.  The Court appreciated Williams's expression of remorse far more, for example, than his concerning revelation that he had formed a new company in a foreign country in his mother's name after he had just been convicted for running a scheme that involved forming companies in other people's names.  (*See id.* 11:12–16, 12:7–12.) Though Williams characterizes Kushner's emphasis on remorse as "fundamentally flawed," (*see* Mot. 62), it likely resulted in a lighter sentence than the one Williams would have received had Kushner deferred to him on their sentencing strategy.

Unfortunately, based on the positions Williams has taken in his Section 2255 motion, it appears that the "clear recognition" of his "horrible decisions" and willingness "to take full accountability" that he expressed – under oath – at sentencing, (*see* Sent'g Tr. 17:25–18:16), might not have been entirely genuine.  His motion, filed just five months after the sentence was imposed, justifies his crimes on the ground that "payment processors . . . made substantial profits," (Mot. 48), and he

43

characterizes Kushner's expressions of remorse on his behalf "damaging concessions and omissions." (*See* Mot. 62.) In his motion, Williams has tried – and failed – to undermine his attorney's advocacy, the Government's investigation, and his own strategic choices that he committed to under oath in open court. Ultimately, Williams's motion has only undermined the Court's confidence in the sincerity of his remorse.

## VII. Ancillary Issues

For the reasons below, the Court denies Williams's request for an evidentiary hearing and denies Williams's remaining pending ancillary motions.

### A. Hearing

A hearing is necessary only when the defendant establishes a "plausible" claim of ineffective assistance. *United States v. Hild*, 644 F. Supp. 3d 7, 34 (S.D.N.Y. 2022) (quoting *United States v. Tarricone*, 996 F.2d 1414, 1418 (2d Cir. 1993)). A district court has discretion to deny a Section 2255 premised on ineffective counsel without a hearing if the record itself provides a sufficient basis to deny the motion. *Id.*

Here, the undersigned judge presided over Williams's guilty plea hearing and sentencing hearing, reviewed all submissions related to those hearings, and personally observed Kushner's performance. Further, given the Court's conclusions above, additional factual development could not affect the Court's

44

disposition of any of Williams's claims.  Thus, the current record is sufficiently developed to resolve Williams's motion without an evidentiary hearing and the Court exercises its discretion to do so.  *See United States v. Logan*, 845 F. Supp. 2d 499, 519 (E.D.N.Y. 2012) (denying hearing on Section 2255 motion where court "had before it the indictment, the plea agreement," and "complete transcript[s] of the plea allocution and the sentencing proceeding," which "conclusively belie[d] [defendant's] allegations").

### B.   Motions

The Court denies Williams's motions seeking "judicial notice" of various facts.  (*See* ECF Nos. 95, 100–01, 103, 106–07.)  A district court may only take judicial notice of a fact that is "not subject to reasonable dispute" because either it is "generally known" within the court's "territorial jurisdiction" or it can be "accurately and readily determined from sources whose accuracy cannot be questioned.  Fed. R. Evid. 201(b). Williams's judicial notice motions all concern facts subject to reasonable dispute.  (*See, e.g.*, ECF No. 95 (seeking judicial notice of "prosecutorial misconduct" and essentially arguing that Williams is innocent); ECF No. 100 (seeking judicial notice of facts that occurred in another case and drawing analogies to Williams's case); ECF No. 101 (seeking judicial notice of facts that Williams suggests undermine the rationale the Court gave

for imposing the sentence); ECF No. 103 (seeking judicial notice
that the Government violated the Plea Agreement);  ECF No. 106
(seeking judicial notice that Kushner engaged in improper
billing practices); ECF No. 107 (seeking judicial notice that
Kushner was operating under a conflict of interest).)
Accordingly, the "facts" raised in these motions are not
properly subject to judicial notice and the motions are denied.

The Court also denies Williams's motion to compel
production of communications between Kushner and the Government.
(ECF No. 98.)  In a Section 2255 proceeding, discovery is
available only for good cause.  *United States v. Durrani*,
115 F. App'x 500, 503 (2d Cir. 2004); *United States v. LoCascio*,
502 F. Supp. 3d 708, 720 (E.D.N.Y. 2020).  Nothing in Williams's
motion raises any reasonable likelihood that the communications
between Kushner and the Government might contain any evidence
that could affect the Court's disposition of Williams's claims.
Accordingly, there is no good cause for discovery of those
communications and the motion is denied.

Finally, the Court denies the remainder of Williams's
August 20, 2024, motion to reconsider the Court's order denying
disclosure of grand jury materials.  (*See* ECF No. 104.)  The
Court previously denied reconsideration but reserved decision on
the various other issues Williams in the reconsideration motion.
(*See* Order, Aug. 22, 2024.)  Now having fully analyzed the

claims Williams raised in his Section 2255 motion, the Court finds that Williams's assertions in his August 20, 2024, motion of prosecutorial misconduct and due process violations are meritless and accordingly denies the remainder of that motion.

## Conclusion

For the reasons stated above, the Court respectfully denies Williams's Section 2255 motion to vacate his conviction, (ECF No. 73), and all pending ancillary motions, (ECF Nos. 95, 98, 100-01, 103-04, 106-07). Because Williams failed to make a substantial showing of the denial of a constitutional right, the Court denies a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2). The Court also certifies in accordance with 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and thus denies *in forma pauperis* status should Williams appeal. *See Coppedge v. United States*, 369 U.S. 438 (1962).

The Government is respectfully requested to serve a copy of this Memorandum and Order on Williams and to note service on the docket by September 17, 2024.

**So ordered.**

Dated:    September 13, 2024
          Brooklyn, New York

_____
**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York