Received Pro Se Office via Electronic Submission
March 10, 2025

Luke Williams
835 Woodbine Road
Highland Park, Illinois
March 10 2025

Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re: Amended Reply to Government's Opposition to Motion for Reconsideration**
**Case No.: 21-cr-00064 (KAM)**

Dear Judge Matsumoto:

I respectfully submit this amended version of my Reply to the Government's Opposition to my Motion for Reconsideration under Rule 59(e). Pursuant to the following rules and statutory provisions:

- Federal Rule of Criminal Procedure 36 (Clerical Error Correction)
- Federal Rule of Criminal Procedure 57(b) (Procedure When No Controlling Law)
- Federal Rule of Civil Procedure 5(d)(4) (Clerk Must Accept Filings)
- Federal Rule of Civil Procedure 15(a)(2) (Amendments With Permission)
- Federal Rule of Appellate Procedure 8(a)(1) (Stay Pending Appeal)
- Federal Rule of Appellate Procedure 10(e)(1) (Correction of Record)
- 28 U.S.C. § 2253(c) (Certificate of Appealability)
- Local Civil Rule 7.1 (Motion Practice)

**I CERTIFY AND STATE THE FOLLOWING:**

**PREVIOUSLY SUBMITTED:** This document was originally submitted on February 19, 2025, as confirmed by the Pro Se Portal confirmation receipt previously submitted to the Court as an exhibit to ECF No. 160.

**DOCKETING DISCREPANCY:** Despite the Court's March 6, 2025 Order erroneously stating that "all of Defendant's pro se submissions have been filed on the docket," this filing was not docketed.

**ADDITIONAL EXHIBITS:** I am now including supplemental exhibits that were not part of my original filing. These exhibits provide compelling evidence of statute of limitations violations, improper plea procedures, and jurisdictional defects that render my conviction constitutionally infirm.

**IMMINENT SUPPLEMENTAL FILING:** I will be filing a supplemental document to this Amended Reply that provides additional evidence and legal arguments supporting reconsideration.

**JURISDICTIONAL MATTERS:** I expressly preserve all arguments for appeal related to jurisdictional defects under 18 U.S.C. § 1344, Brady violations, ineffective assistance, improper plea allocution, statute of limitations violations, conflict of interest, and cumulative error.

**STAY REQUEST:** Pursuant to Fed. R. App. P. 8(a)(1), I request this Court stay enforcement of judgment pending potential appeal based on substantial questions that could result in vacatur, including documented violations of Rules 11 and 7(b), ineffective assistance, and jurisdictional defects.

**RECORD CORRECTION:** Under Fed. R. App. P. 10(e)(1), I move for correction of the record to accurately reflect my timely submissions that remain unprocessed.

**APPEALABILITY REQUEST:** I request certification under 28 U.S.C. § 2253(c) that appeal from denial would present substantial showing of denial of constitutional rights.

I respectfully request this submission be docketed with the original February 19, 2025 submission date in accordance with applicable Federal Rules and precedent.

Respectfully Submitted,

Luke Williams
Petitioner Pro Se

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. 21-CR-00064-KAM |
| LUKE ANDREW WILLIAMS, | ) | |
| f/k/a LARBY AMIROUCHE, | ) | |
| | ) | |
| Defendant. | ) | |

### AMENDED REPLY TO GOVERNMENT'S OPPOSITION TO MOTION FOR RECONSIDERATION UNDER RULE 59(e)

## INTRODUCTION

Mr. Williams expressly preserves for appeal all arguments raised in his original § 2255 Petition (ECF No. 73), Motion for Reconsideration (ECF No. 114), Reply to Government's Opposition, and all related filings and exhibits. This includes, but is not limited to: the Court's lack of subject matter jurisdiction due to the expired statute of limitations; the absence of FDIC-insured bank victims and actual loss; the ineffective assistance of counsel regarding false promises of non-incarceration; the government's prosecutorial misconduct in scripting the plea allocution; the involuntary and unknowing nature of the guilty plea; the constitutional violations that arose from counsel's actual conflict of interest; the Brady violations regarding withheld exculpatory evidence; and the cumulative effect of these constitutional violations on the fundamental fairness of the proceedings.

Mr. Williams respectfully and humbly requests that this Honorable Court reconsider its prior order denying his § 2255 motion in light of the profound constitutional violations and manifest injustice that the complete record now reveals. The government's opposition to Mr. Williams' motion for reconsideration is a masterclass in misdirection and mischaracterization, seeking to preserve a fundamentally unjust conviction obtained through a

pervasive pattern of constitutional violations. From the outset, the government misstates the applicable legal framework, relying on inapposite civil cases and non-binding out-of-circuit precedent to erect artificial barriers to merits review. This Court should reject these efforts to shield the government's misconduct from scrutiny and instead fulfill its constitutional duty to correct the profound miscarriage of justice that has occurred here.

## THE GOVERNMENT MISSTATES THE LEGAL FRAMEWORK AND STANDARD OF REVIEW

The government begins its opposition by asserting that "[u]nder Federal Rule of Civil Procedure 59(e), '[r]econsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" (Government' Opposition at 3, ECF No. 122, quoting *Diaz v. Bellnier*, 974 F. Supp. 2d 136, 142-43 (E.D.N.Y. 2013)). This framing is both legally and factually flawed.

As an initial matter, the government incorrectly cites Rule 59(e), which applies to motions to alter or amend a judgment in civil cases. See Fed. R. Civ. P. 59(e). In the context of a § 2255 proceeding, which is a hybrid civil-criminal action, the proper vehicle for seeking reconsideration is Rule 52(b) of the Federal Rules of Civil Procedure, which allows a court to amend its findings or make additional findings and amend the judgment accordingly.

The government's reliance on Rule 59(e) is not only technically incorrect, but it also suggests a misunderstanding of the standard of review applicable to motions for reconsideration in § 2255 proceedings. While Rule 59(e) is often described as an "extraordinary remedy," the standard for granting relief under Rule 52(b) is more flexible and less onerous. Rule 52(b) provides, in part: "On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly."

The Second Circuit has repeatedly held that reconsideration is appropriate where "the moving party can point to controlling decisions or data that the court overlooked." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Here, the Court overlooked both:

1. Controlling decisions (Bouchard, Heinz) requiring actual or intended FDIC-bank harm

2. Critical data (forensic proof that processors profited) negating any such harm

Under *Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1255 (2d Cir. 1992), reconsideration is justified by:

1. Clear error (finding jurisdiction without FDIC victim)

2. New evidence (forensic proof of processor profits)

3. Manifest injustice (conviction for legally impossible offense)

The Government's Opposition addresses none of these grounds.

Most importantly, the Second Circuit's decisions in *United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016) and *United States v. Heinz*, 790 F.3d 365 (2d Cir. 2015) establish that § 1344 requires proof of actual or intended harm to an FDIC-insured institution. The Government's Opposition never explains how these controlling authorities permit a bank fraud conviction where:

1. Payment processors, not banks, handled all transactions

2. Processors earned substantial fees and held massive reserves

3. No FDIC institution lost money or faced risk

4. The business model guaranteed processor profits

*Boumediene v. Bush*'s recognition that habeas corpus is a "vital instrument for the protection of individual liberty" has special force here, where the very power to prosecute under § 1344 is at issue 553 U.S. 723 (2008). When a defendant presents concrete evidence that no FDIC-insured

bank was defrauded—indeed, that every entity involved profited—procedural barriers cannot block review of this fundamental jurisdictional defect.

The government's attempt to impose a heightened standard of review is particularly inappropriate in the context of a § 2255 motion, which implicates fundamental constitutional rights. The government's reliance on Rule 59(e) and its characterization of reconsideration as an "extraordinary remedy" is both legally and factually flawed. This Court has a duty to ensure that Mr. Williams' constitutional rights are protected and should not hesitate to grant reconsideration where, as here, there is substantial evidence that the Court overlooked critical facts and misapplied the law.

## THE FATAL ABSENCE OF A SIGNED, CORRECTED PLEA AGREEMENT

The government's opposition does not dispute the incontrovertible fact that no corrected, initiated plea agreement was ever produced or signed by Mr. Williams following the plea hearing. Indeed, the trial transcript makes it clear that despite the Court's inquiry concerning any "last-minute modification" to include the "Sophisticated Means" enhancement, the judge stated, "Williams is incorrect that there was a 'last-minute modification of the [P]lea [A]greement to include the 'Sophisticated Means' enhancement.'" (Court's Memorandum and Order at footnote 10, ECF No. 109) Yet there is no further evidence – no corrected document, no written acceptance by Mr. Williams – that would indicate such a modification ever existed. As the record unequivocally shows, the absence of a properly executed plea agreement means the parties never reached the required mutual assent in writing. In effect, this lack of an agreed, signed document is not only a breach of fundamental contract principles but also a controlling datum that the Court overlooked in its decision. As the Supreme Court explained in *Mabry v. Johnson*, 467 U.S. 504, 507, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984), ""[a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which,

until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest."." Here, without a written, corrected, and initialed plea agreement, the factual basis required for a binding agreement is entirely lacking. Moreover, Federal Rule of Criminal Procedure 11 also requires that plea bargain modifications be promptly and duly documented, and the government's silence on this issue is, in effect, a tacit concession that the controlling rule was not met. This is a structural error that calls into question the entire validity of the plea and, consequently, the subsequent conviction.

### ABUSE OF DISCRETION UNDER RULE 59(e): THE OVERLOOKED FACTUAL CONTEXT AND THE NEED FOR AN EVIDENTIARY HEARING

In its opposition, the government asserts that Mr. Williams is "relitigating old issues." (Government Opposition at 3, ECF No. 122).  However, Rule 59(e) is expressly designed not as a vehicle to rehash matters previously decided but to correct clear factual errors and omissions in the record. As established in *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012), reconsideration is appropriate only when the moving party shows that the Court overlooked controlling data or precedent that might have reasonably altered its decision. ("the standard for granting [a Rule 59 motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked."). In this instance, new evidence – including detailed emails, texts, and expert declarations concerning Mr. Williams's deteriorated mental health and the problematic conduct of his defense counsel – has illuminated a systemic failure. The transcript from the plea hearing shows that when the Court inquired about any modification to the plea agreement, no corrected document or subsequent written acceptance was produced; yet the judge's own denial in the Opinion rests upon that nonexistence. This oversight in the record is not a mere repetition of previously litigated issues

but a critical and newly clarified factual matter that demonstrates the trial court's failure to

consider the controlling contract law requirements and the constitutional consequences that

follow. The government's reliance on a "finality" dictum is misplaced when juxtaposed with the

obligation to prevent manifest injustice, as repeatedly stressed in jurisdictional cases such as

*Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995). The new evidence compels a full

evidentiary hearing so that the Court may determine whether its previous decision would have

been different had the controlling data been considered.

### THE GOVERNMENT'S ROLE IN THE PLEA ALLOCUTION AND THE ABSENCE OF ACTUAL BANK LOSS

The chronology of events presents a disturbing picture. There is clear evidence in the plea

transcript that the plea was not the product of an honest, spontaneous admission but rather the

result of a late-stage, government-scripted allocution. For example, shortly before the plea

hearing, defense counsel transmitted a text message instructing Mr. Williams: "That's what the

Government wants us to say," effectively dictating the precise language that Mr. Williams would

recite concerning his conduct – specifically, that he "agreed to file false documents with

financial institutions in order to obtain money and property from those banks" with the alleged

conspiracy extending between 2012 and 2016 (Motion for Reconsideration at 10, ECF No. 114).

This scripted allocution was central to manufacturing a jurisdictional basis that would otherwise

not exist. Moreover, even though the Court in its denial stated, "Williams is incorrect that there

was a 'last-minute modification of the [P]lea [A]greement to include the 'Sophisticated Means'

enhancement'" (Court's Memorandum and Order at footnote 10, ECF No. 109), no evidence

contradicts Mr. Williams' reliance on that very statement – a reliance that precludes any alternate

theory on the material modification. As held in *United States v. Hogan*, 712 F.2d 757 (2d Cir.

1983), "a prosecutor as an officer of the court is sworn to ensure that justice is done, not simply

to obtain an indictment" even if that means foregoing a conviction. Here, by resorting to these crafty tactics, the prosecutor has not only manufactured the basis for federal jurisdiction but has also fundamentally tainted the entire plea process. Such conduct is a clear structural error because it undermines the integrity of the plea negotiation and deprives Mr. Williams of a truly knowing and voluntary admission of guilt. It subverts the adversarial process and renders the conviction an affront to due process.

## STRUCTURAL JURISDICTIONAL DEFECTS: THE TIME-BAR AND STATUTE OF LIMITATIONS

The government asserts that the indictment is "facially valid" because it alleges a conspiracy spanning from January 2012 to April 2016 and was filed on February 3, 2021. However, as the record itself unequivocally shows, the last alleged overt act occurred on or about April 21, 2015. By failing to produce a signed, corrected plea agreement and relying on oral statements that never materialized into mutually accepted, documented changes, the Court overlooked controlling data regarding the temporal foundation of the indictment. As established in United States v. Grady, 544 F.2d 598, 601–02 (2d Cir. 1976), a superseding indictment that relies on newly alleged overt acts cannot cure a time-bar that is facially apparent within the original charging instrument. In our case, the evidence is clear: the statute of limitations expired long before the indictment was even filed. Accordingly, language in the government's opposition suggesting that any purported challenge on this basis is old news must be excised, as it ignores the controlling fact that the jurisdictional defect is structural and not amenable to harmless-error analysis. This structural error, by its very nature, renders the entire proceeding void of proper federal jurisdiction.

## THE ABSENCE OF ACTUAL VICTIM LOSS AND A FUNDAMENTALLY FLAWED BASIS FOR THE BANKING FRAUD CHARGE

It is plain from the record—and particularly from the plea transcript—that no corrected or signed plea agreement verified any modified terms, and that, as the government itself inadvertently concedes, "we don't have an estimated restitution amount at this point because the victims in this case, the banks, have not provided loss affidavits" (Plea Transcript at 20, ECF No. 25). Moreover, during the sentencing hearing the prosecutor admitted, "we interviewed as many victims as we could… it was impossible to identify what was lost and what was actually provided to them" (Sentencing Transcript, p. 23, ECF No. 85-3). This language reveals that no FDIC-insured bank, which is an essential element under 18 U.S.C. § 1344, suffered any actual or even intended loss. In reality, the evidence shows that the alleged transactions were solely conducted through sophisticated payment processors that not only insulated the banks from any risk but actually profited substantially from the relationship—indeed, processors earned more than $375,000 in fees and maintained reserve funds amounting to nearly $1 million (see "Reserve Project" email in 2255 Petition at Exhibit R, ECF No. 73, Exhibit B to this Motion ). Thus, the government's characterization of the scheme as one of bank fraud is patently overbroad and unsupported by any factual basis, a conclusion that the Court's denial order, by failing to mention these evidentiary details, ignores. Any language in the government's opposition that suggests the mere absence of loss affidavits is "benign" must be removed, because it conflicts with the clear documentary evidence that no actual loss was incurred by any federally insured financial institution. This omission is central to the structural error in the prosecution, and thus it cannot be dismissed as a mere technicality.

## THE CUMULATIVE IMPACT OF STRUCTURAL AND CONSTITUTIONAL ERRORS DEMANDS RELIEF

Beyond the discrete errors discussed above, the cumulative effect of the numerous structural defects in these proceedings is overwhelmingly prejudicial. The absence of any signed, corrected plea agreement, the failure to remedy the time-bar and jurisdictional defect, and the manipulative prosecutorial tactics used to manufacture a "factual basis" for a guilty plea not only undermine the reliability and fairness of the record—they strike at the very heart of due process. Notably, the judge's own denial in the Opinion stated that "there is no reasonable probability that Williams would not have pleaded guilty but for Kushner's allegedly deficient performance" (Court Memorandum and Order at 34, ECF No. 109). Yet, this conclusion is rendered hollow by the overwhelming evidence that the plea process was fundamentally flawed. In the plea transcript, Mr. Williams was coached to state verbatim, "Together with others I agreed to file false documents with financial institutions in order to obtain money and property from those banks. The scheme took place between 2012 to 2016, Your Honor" (Plea Transcript at 28, ECF No. 25), a scripted allocution that masked the underlying absence of any mutually agreed contractual terms and delayed any proper review by counsel. The cumulative effect of these errors – from jurisdictional defects, to the lack of actual victim loss, to the artificial scripting of the plea – creates a structural breach of constitutional safeguards that cannot be remedied on a harmless-error basis. As the Second Circuit recognized in *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008), the aggregate impact of multiple errors—even if each error on its own might be considered "harmless"—can subvert the fairness of the entire proceeding. This Court must now take the extraordinary step of reconsidering its denial to correct these manifold, cumulative structural errors.

## PROCEDURAL AND SUBSTANTIVE VIOLATIONS DEMAND A FULL RECONSIDERATION AND RELIEF

Finally, the erroneous reliance by the government on procedural technicalities—as evidenced by its focus on allegedly old issues and failure to consider the new and controlling records—cannot excuse the structural infirmities that infected every stage of Mr. Williams' proceedings. As the government cites cases relying on Rule 59(e) in a narrow context, it is ignoring the very purpose of reconsideration: to correct manifest errors that affect not only an individual claim of ineffective assistance, but the entire framework of the trial stemming from constitutional and jurisdictional defects. For instance, the government contends that "the motion for reconsideration is not a vehicle for relitigating old issues" (Government Opposition at 3, ECF No. 122), yet it is precisely the failure to address the controlling data—the unsigned plea agreement, the unscripted allocution, and the evidence showing that the court overlooked the time-bar—that demands a fresh, full evidentiary hearing. The Court's previous order (Court Memorandum and Order at 23, ECF No. 109) purportedly "need not address both elements of the *Strickland* inquiry if the defendant fails to establish one" these claims; however, our record now demonstrates that it failed to incorporate key evidence such as the precise language of counsel's instructions ("That's what the Government wants us to say") and the clear admissions by the prosecutor on the plea transcript. These omissions are not merely technical oversights but structural errors that guarantee the outcome of the trial was fundamentally unfair. The government's opposition must therefore be rejected, and the supplemental record (including all communication records) must be fully reviewed to correct the manifest injustice.

## THE COURT ERRED IN FINDING MR. WILLIAMS' PLEA KNOWING AND VOLUNTARY

The Court erred in concluding that Mr. Williams' guilty plea was knowing and voluntary despite the overwhelming evidence presented in his 2255 petition demonstrating that his plea

was induced by his counsel's repeated false promises of non-incarceration. The Court improperly relied on selective quotes from the record while ignoring the full context and numerous instances where these promises were made, as detailed extensively in Mr. Williams' petition and supporting exhibits. This amounts to a structural error requiring reconsideration and vacatur of the guilty plea.

The Supreme Court has specifically held that "solemn declarations in open court" may be overcome by evidence that the plea was induced by:

1. Threats

2. Misrepresentations

3. False promises

4. Constitutional violations

See *Machibroda v. United States*, 368 U.S. 487, 493 (1962).

Here, the evidence overcoming the plea statements includes:

1. Contemporaneous Documentation:

    a. Text Messages Showing Script:

        May 5, 2022, 8:37 AM:

        Kushner: "That's what the Government wants us to say."

        Williams: "I will read 'Together with others I agreed...'"

        (Motion for Reconsideration at 10, ECF No. 114)

    b. Emails Confirming Promises:

      i. References to supervised release

      ii. Discussions of non-incarceration

      iii. Plans for future business

      iv. Reliance on counsel's assurances

2.  Third-Party Corroboration:

    a.  Hadley Staley's Affidavit:

> "In my recollection, when Mr. Kushner counseled [Mr. Williams] to enter a guilty plea, it was done with a promise of no jail time."

> (2255 Petition at Exhibit A, ECF No. 73)

    b.  Medical Providers' Confirmation:

> Dr. Fields: "Luke feels that he was deceived and poorly represented by his attorney Mr. Kushner who allegedly promised him from the beginning of his case in 2021 that there would be no incarceration."

> (2255 Petition at Exhibit O, ECF No. 73)

3.  Mental Health Evidence:

    a.  Dr. Smiley's Opinion:

> "The rapid and brief nature of the plea discussion, occurring in a 26-minute phone call without adequate preparatory engagement, is insufficient to ensure that Mr. Williams could make an informed decision, given his cognitive and overall mental health."

> (2255 Petition at Exhibit O, ECF No. 73)

    b.  Documented Impairments:

        a.  Bipolar disorder with psychotic features

        b.  ADHD affecting comprehension

        c.  Processing speed in 3rd percentile

        d.  Recent hospitalization

        e.  Cognitive limitations

4.  Constitutional Violations Affecting Plea:

    a.  Ineffective Assistance:

        i.  False promises

      ii.     Conflict of interest

     iii.     No investigation

     iv.     Abandoned defenses

      v.     Mental health ignored

   b.  Brady Violations:

       i.     Withheld evidence

      ii.     Payment processor profits

     iii.     No bank losses

     iv.     Exculpatory materials

      v.     Jurisdictional facts

5. Structural Defects:
   a.  Jurisdictional Issues:
       i.     Time-barred prosecution
      ii.     No FDIC victims
     iii.     Missing elements
     iv.     Improper venue
      v.     Subject matter jurisdiction

6. Due Process Violations:

       i.     Scripted allocution

      ii.     Rushed waiver

     iii.     Competency questions

     iv.     Brady violations

      v.     Prosecutorial misconduct

      The government attempts to downplay the significance of the last-minute modification to

the plea agreement to include a "Sophisticated Means" enhancement under U.S.S.G. §

2B1.1(b)(10)(C). (Plea Hearing at 18, ECF No. 25). But this ignores the critical point that this enhancement was not part of the original plea agreement that he signed, and he was never given an opportunity to review or object to its inclusion before pleading guilty. The fact that the enhancement was added on the record during the plea hearing, without any meaningful explanation or opportunity for Mr. Williams to consider its implications, only underscores the coercive and uninformed nature of the plea process.

The government's failure to address, let alone refute, this damning evidence of prosecutorial overreach and defense counsel's complicity in the scripted allocution speaks volumes. It lays bare the extent to which this guilty plea was the product of a tainted process, in which the truth was sacrificed for the sake of securing a conviction at all costs. No amount of generic recitations from the plea colloquy can overcome the fundamental absence of a legitimate factual basis for the plea or the shocking misconduct that led to its entry.

This Court has an independent duty to ensure that a guilty plea is supported by a sufficient factual basis and is the product of a knowing and voluntary decision by the defendant. See *United States v. Smith*, 160 F.3d 117, 121 (2d Cir. 1998) (citing Fed. R. Crim. P. 11(f)) ("Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea." (citing Fed. R. Crim. P. 11(f))). The record here falls woefully short on both counts. The government's attempt to paper over these deficiencies and shield its own misconduct from scrutiny cannot be countenanced. The integrity of the criminal justice system demands that this conviction be vacated and that Mr. Williams be given a fair opportunity to contest the charges against him, free from the taint of ineffective assistance and prosecutorial overreach.

## THE GOVERNMENT MISCHARACTERIZES THE RECORD AND CONTROLLING LAW ON THE STATUTE OF LIMITATIONS ISSUE

The government next argues that the Court properly rejected Mr. Williams' statute of limitations claim because "Motion for Reconsideration are focused on a substantive challenge to the statute of limitations for his indictment and superseding information, which are not a part of the Petition and not relevant to the Court's decision in the Motion for Reconsideration." (Government Opposition at 4, ECF No. 122). This argument mischaracterizes both the record and the controlling law.

As Mr. Williams explained in his motion for reconsideration, the original indictment in this case was filed on February 3, 2021, and charged a conspiracy spanning from January 2012 to April 2016. (Indictment at 3, ECF No. 1). However, the last overt act alleged in that indictment occurred on or about April 21, 2015, more than five years before the indictment was filed. (Superseding Information at 3, ECF No. 48). Under well-established Second Circuit precedent, this rendered the original indictment facially time-barred, and the superseding information filed in May 5, 2022 could not cure this defect. See *United States v. Grady*, 544 F.2d 598, 601-02 (2d Cir. 1976) ("Since the statute stops running with the bringing of the first indictment, a superseding indictment brought at any time while the first indictment is still validly pending, if and only if it does not broaden the charges made in the first indictment, cannot be barred by the statute of limitations.").

The government's manipulation of the charging process becomes even more apparent when comparing the overt acts alleged in the original indictment with those in the superseding information. The original indictment, filed February 3, 2021, listed four specific overt acts: (1) a March 19, 2013 email about merchant applications; (2) a June 17, 2013 email about login reset; (3) an October 9, 2013 email to register a phone number; and (4) an April 21, 2015 email about

foreign transactions. Notably, the last specific act occurred in April 2015, more than five years before the indictment was filed. Rather than add new overt acts within the limitations period, the superseding information actually reduced the number of specific acts, dropping the April 21, 2015 email while relying on a new August 4, 2015 text message as the last overt act. This strategic decision to allege fewer rather than more overt acts, while still claiming the conspiracy ran "through April 2016," reveals the government's awareness that it lacked any evidence of criminal conduct within the limitations period.

The government's own statements at critical stages of the prosecution further expose this jurisdictional defect. At the plea hearing, AUSA Pitluck admitted: "Your Honor, we don't have an estimated restitution amount at this point because the victims in this case, the banks, have not provided loss affidavits." (Plea Hearing Tr. at 20, ECF No. 25). Later, in a letter to the Court, the government hedged further: "The government has been working diligently...to ascertain the appropriate restitution amount if any..." [Government Letter, ECF No. 40] (emphasis added). By sentencing, AUSA Pitluck conceded: "We interviewed as many victims as we could... It was impossible to identify what was lost and what was actually provided to them." (Sentencing Tr. at 23, ECF No. 85-3). This progression reveals the government knew it lacked evidence of both timely criminal conduct and bank losses needed to invoke the 10-year statute under 18 U.S.C. § 3293(1).

The government's calculated attempt to salvage this time-barred prosecution through procedural manipulation rather than evidence violates fundamental principles of prosecutorial conduct. Rather than face dismissal of the facially time-barred indictment, the government: (1) obtained a waiver of indictment; (2) filed a superseding information with fewer overt acts but the same end date; (3) modified the plea agreement during the plea hearing itself to add an

enhancement that could potentially justify tolling; and (4) secured waivers through the plea agreement - all without curing the underlying jurisdictional defect. This strategic maneuvering is precisely the type of "prosecutorial manipulation" condemned by the Supreme Court in United States v. Marion, 404 U.S. 307, 324 (1971) ("the Due Process Clause may provide a basis for dismissing an indictment if the defense can show at trial that prosecutorial delay has prejudiced the right to a fair trial").

The Second Circuit has explicitly rejected such attempts to circumvent the statute of limitations through procedural devices rather than evidence. As held in United States v. Grady, 544 F.2d 598, 601-02 (2d Cir. 1976), "since the statute stops running with the bringing of the first indictment, a superseding indictment brought at any time while the first indictment is still validly pending, if and only if it does not broaden the charges made in the first indictment, cannot be barred by the statute of limitations." Here, the original indictment was not "validly pending" when the superseding information was filed because it was already time-barred. Moreover, by dropping one overt act while still claiming the same end date, the government impermissibly attempted to broaden the charges beyond the specific acts it could actually prove. As the Second Circuit held in United States v. Bouchard, 828 F.3d 116, 124 (2d Cir. 2016), the government must "establish that a federally insured bank ... was victimized or exposed to a risk of loss by the scheme to defraud." The government's failure to allege any specific acts within the limitations period, coupled with its admission that it could not prove actual bank losses, demonstrates that this prosecution was fundamentally defective from its inception.

The totality of the government's conduct - from its strategic reduction of overt acts to its misleading claims about bank losses to its procedural maneuvering to evade the statute of limitations - demonstrates "a pattern of conduct so egregious that it infects the trial with such

unfairness as to make the conviction a denial of due process". *People v. Estrada*, 63 Cal.App.4th 1090 (Cal. Ct. App. 1998). This misconduct is particularly egregious because it goes to the court's very power to hear the case. As the Supreme Court emphasized in *United States v. Hogan*, 712 F.2d 757 (2d Cir. 1983), "a prosecutor as an officer of the court is sworn to ensure that justice is done, not simply to obtain an indictment" Here, the government's manipulation of the charging process to obscure fatal jurisdictional defects represents the antithesis of this principle and requires vacatur of the conviction.

Moreover, Mr. Williams has provided a forensic accounting report as Exhibit A, which conclusively demonstrates that the alleged scheme did not cause any actual losses to financial institutions. The report shows that the payment processors involved in the transactions actually earned substantial profits rather than suffering any losses.

Additionally, the payment processing contracts and other payment processors, attached as Exhibit B, further prove that Mr. Williams' business relationships were with payment processors, not directly with FDIC-insured financial institutions. These contracts clearly establish that Applied Merchant Systems and other, not any banks, was the entity that onboarded Mr. Williams' companies and set the terms and conditions of the processing relationship and that they did not incur any loss at all.

The government's opposition to reconsideration (ECF No. 122) completely fails to address the fundamental defect in its prosecution: the complete absence of any actual or intended loss to FDIC-insured financial institutions. This is not merely a factual dispute about loss amounts; it is a jurisdictional challenge that goes to the very heart of federal bank fraud jurisdiction under 18 U.S.C. § 1344.

The evidence before this Court conclusively establishes three critical points:

1. First, the "Reserve Project" email (used to calculate restitution) dated October 9, 2013, definitively shows that the payment processors were holding $988,300.10 in reserves that rightfully belonged to Mr. Williams' companies. (2255 Petition at Exhibit R, ECF No. 73, Exhibit B to this Motion). Far from suffering losses, these processors earned substantial profits, collecting between 5-8% in discount rates plus additional fees on more than $3.7 million in processing volume. This resulted in processor earnings exceeding $375,000 during the relevant period.

2. Second, the payment processor contracts and statements, previously submitted as Exhibit B, prove that Mr. Williams' business relationships were exclusively with payment processors, not FDIC-insured banks and that there is no loss. These sophisticated processors:

   a. Knowingly engaged with high-risk merchants

   b. Set their own elevated fee structures

   c. Maintained substantial reserves

   d. Profited handsomely from the relationships

   e. Insulated banks from any direct involvement or risk

3. Third, the government's own statements at various stages of this prosecution reveal the absence of actual bank losses:

   a. At the plea hearing: "Your Honor, we don't have an estimated restitution amount at this point because the victims in this case, the banks, have not provided loss affidavits." (Plea Hearing Tr. at 20, ECF No. 25)

   b. In October 2023: "The government has been working diligently...to ascertain the appropriate restitution amount if any..." (ECF No. 40)

  c. At sentencing: "We interviewed as many victims as we could... It was impossible to identify what was lost and what was actually provided to them." (Sentencing Transcript, p. 23, ECF No. 85-3)

The Second Circuit has repeatedly held that actual or intended loss to financial institutions is an essential element of bank fraud under § 1344. See *United States v. Bouchard*, 828 F.3d 116, 124 (2d Cir. 2016) (government must "establish that a federally insured bank ... was victimized or exposed to a risk of loss by the scheme to defraud"). The mere fact that a scheme somehow touches upon banking relationships is insufficient; there must be proof that FDIC-insured institutions were actual or intended victims. *Id*. at 126-27.

The government's attempt to blur the distinction between payment processors and FDIC-insured banks is legally untenable and factually misleading. Recent Second Circuit precedent explicitly distinguishes between these entities for purposes of federal bank fraud jurisdiction:

In *United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016), the court emphasized that "when bank subsidiaries may be engaged in activities far afield of the core functions of our federal banking system, it is important (absent legislative direction to the contrary) to distinguish subsidiaries of banks from the banks themselves." *Id*. at 126. The court rejected the government's attempt to extend bank fraud jurisdiction to entities that, while connected to banks, were not themselves FDIC-insured institutions.

Similarly, in *United States v. Heinz*, 790 F.3d 365 (2d Cir. 2015), the court held that for bank fraud jurisdiction to attach based on fraud "affecting a financial institution," the effect must be "sufficiently direct." *Id*. at 367. The court explained that while § 1344 "broadly applies to any act of wire fraud that affects a financial institution," that effect must still be "sufficiently direct" to support federal jurisdiction

This distinction is particularly relevant here because:

1. The payment processors involved (Applied Merchant Systems, NETPAY, PowerPay, etc.) are sophisticated entities that:

    a. Set their own risk parameters

    b. Determined their own fee structures

    c. Maintained their own reserve requirements

    d. Made independent decisions about merchant relationships

    e. Insulated banks from direct involvement or risk

2. The processors' relationship with banks was governed by separate agreements that:

    a. Allocated risk to the processors

    b. Required processors to maintain reserves

    c. Protected banks from merchant-related losses

    d. Generated fee income for banks regardless of merchant conduct

3. The documentary evidence shows the processors:

    a. Earned over $375,000 in processing fees

    b. Held nearly $1 million in reserves

    c. Understood the nature of the business

    d. Profited from the relationships

    e. Suffered no actual losses

This evidence conclusively establishes that any alleged misrepresentations were directed at payment processors, not banks, and that no FDIC-insured institution suffered or was intended to suffer any loss. Under Bouchard and Heinz, this defeats federal bank fraud jurisdiction.

The government attempts to sidestep this clear authority by arguing that the superseding information was "facially valid" because it alleged a conspiracy running through April 2016. ECF No. 122 at 4. But this ignores the critical point that the original indictment was time-barred on its face, and the superseding information could not relate back to that invalid charging instrument. See *Grady*, 544 F.2d at 601-02. The fact that the superseding information alleged a broader timeframe for the conspiracy is irrelevant, as it was filed after the limitations period had already expired.

The government's reliance on *United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003), is misplaced, as that case involved a challenge to the sufficiency of the evidence at trial, not a facial challenge to the timeliness of the indictment. See ECF No. 114 at 40-41. The Court's acceptance of the government's flawed argument on this point reflects a fundamental misunderstanding of the controlling law and a failure to grapple with the jurisdictional nature of the statute of limitations defect.

Moreover, the government completely ignores Mr. Williams' argument that his counsel was ineffective for failing to raise the limitations defense, despite the clear expiration of the five-year period. See Motion For Reconsideration at 3-6, ECF No. 114. As the Court held in *People v. Turner*, 5 N.Y.3d 476 (N.Y. 2005), "failure to raise a defense as clear-cut and completely dispositive as a statute of limitations is difficult to reconcile with a defendant's constitutional right to the effective assistance of counsel" because "if appellate counsel had made the argument she should have made, defendant's conviction would have been reversed." Id. at 481.

The court in *Machibroda v. United States*, 368 U.S. 487 (1962), further held that such ineffective assistance is prejudicial because "a guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void." The government does not even

attempt to address this controlling authority or explain how counsel's failure to raise such a clear-cut defense could be considered reasonable under Strickland.

The government's selective and misleading portrayal of the record and the law on the statute of limitations issue is emblematic of its overall approach to this case. Rather than confronting the substantial evidence of ineffective assistance of counsel and the clear jurisdictional defect in the prosecution, the government resorts to mischaracterizations and evasions in an effort to preserve an unjust conviction. This Court should reject these tactics and grant reconsideration based on the actual facts and controlling law, which compel the conclusion that Mr. Williams' conviction was obtained in violation of the statute of limitations and his Sixth Amendment right to effective assistance of counsel.

Additionally, the Superseding Information clearly sets forth the charging period by stating:

"In or about and between January 2012 and April 2016, both dates being approximate and inclusive…"

This language is unambiguous and establishes that the Government's allegation regarding the conspiracy always encompassed a window ending in April 2016. The charge, as stated, is for conspiracy to commit bank fraud under Title 18, United States Code, Section 1344, whereby the defendant is accused of "execut[ing] a scheme and artifice to defraud one or more financial institutions…" Notice that nowhere does the charging document allege that any financial institution sustained losses; the mere allegation is that the defendant executed a scheme designed to defraud. Because the essential elements required to invoke an extended (ten-year) limitations period—namely, an allegation of loss to an FDIC-insured institution—are entirely absent, the only operative limitations period remains the statutory five-year period. The forensic accounting

report (Exhibit A) supports this conclusion by indicating that, while reserves were maintained by various payment processing entities, there is no documentation corroborating any loss by a bank. In short, the Superseding Information, by maintaining the fixed window "January 2012 and April 2016" and by charging bank fraud without alleging bank losses, confirms that an extended statute of limitations is inapplicable.

The controlling authority in *United States v. Grady*, 544 F.3d 598, 601–02 (2d Cir. 1976), unequivocally states that "since the statute stops running with the bringing of the first indictment, a superseding indictment brought at any time while the first indictment is still validly pending, if and only if it does not broaden the charges made in the first indictment, cannot be barred by the statute of limitations." The Superseding Information does not modify the substantive allegations of the original indictment but merely restates the charge over the fixed period ending in April 2016. It is immaterial that we raised Grady in response to the Government's arguments; the principle in Grady is immutable. Any attempt by the Government to shift the charging window by asserting that the conspiracy extended "through April 2016" necessarily broadens the charge beyond the original factual record, and such over broadening is not permitted to cure an untimely indictment. The immutable holding in Grady thereby dictates that the jurisdictional defect, rooted in the fixed charging period and the absence of any allegation of bank losses, remains unaffected by any post-indictment adjustments.

Finally, the substance of the charges remains identical in both the original indictment and the Superseding Information. The Government consistently alleges that the defendant conspired to commit bank fraud "contrary to Title 18, United States Code, Section 1344," and this charge is defined by its specific elements. Because the Government's allegations are substantively identical and the charging window remains "January 2012 to April 2016," a change in the

presentation—or any reference to the extended period—cannot cure the inherent jurisdictional defect. As explained in *Hansel v. United States*, 70 F.3d 6 (2d Cir. 1995), a guilty plea does not waive a time-bar; and here, every charge is based on facts that fall outside the limitations period. The immutable principles articulated in Grady and Hansel ensure that any attempt to rationalize or "salvage" the prosecution by citing an extended conspiracy window is legally ineffectual. Regardless of when Grady was duly raised in our response, its guidance remains binding, and the charge—being not only substantively uniform but also impervious to any technical correction— compels the conclusion that the Court lacks subject matter jurisdiction, necessitating vacatur of the conviction and dismissal of the indictment with prejudice.

      Furthermore, the Government's attempt to charge Mr. Williams twice for the same substantive offense—first in the original indictment and then, identically, in the Superseding Information—is a manifest example of duplicative charging designed to evade the time-bar, and it violates the fundamental principle that a defendant cannot be punished twice for conduct already adjudicated. As the Superseding Information plainly declares, the conspiracy occurred "in or about and between January 2012 and April 2016," and yet, when read in conjunction with the original indictment's explicit allegation that "On or about April 21, 2015, AMIROUCHE emailed four co-conspirators…" (Indictment at ¶ 32, ECF No. 1 ), it is evident that the Government is merely repackaging the same unaltered, time-barred factual basis. Moreover, the Plea Agreement (which alleges a loss in excess of $3,500,000—resulting, after all enhancements, in an apparent loss of approximately $6.5 million) addresses sentencing enhancements and does not transform the underlying charge; it does not, and cannot, establish a basis for an extended (ten-year) limitations period because the original indictment does not allege that any FDIC-insured bank suffered a loss. Thus, by attempting to duplicate the charge—bringing the identical

bank fraud allegation under the same statutory scheme—when all facts establish that the sole overt act occurred well before the limitations period expired, the Government is engaging in an infinitely manipulative process designed to avoid addressing the fatal jurisdictional defect, as mandated by Grady. Whether or not Grady was raised at a later stage is immaterial; its binding principle remains that a superseding indictment cannot cure an untimely charging instrument. Consequently, the duplicative charging of a substantively identical offense confirms that subject matter jurisdiction remains absent, and that the Government continues to evade the issue by re-litigating the same, time-barred conduct.

In addition to Grady (544 F.3d 598, 601–02 (2d Cir. 1976)), several circuits have clarified that the limitations period is fixed by the original charging instrument's factual predicate rather than by any later "extension" in a superseding indictment. For example, *in U.S. v. McMillan*, 600 F.3d 434 (5th Cir. 2010), the court noted that permitting a superseding indictment to "relate back" or extend the factual record would effectively expand the crime and expose the defendant to a new charge. Similarly, the same Court, has held that, "…as with the filing of a superseding indictment, a new indictment filed under § 3288 may not broaden or substantially enlarge the charges of the original indictment". These decisions underline the principle that it is not the mere charging window (for example, "January 2012 to April 2016") that controls but rather the immutable fact—in this instance, the last overt act—that fixes the applicable statute of limitations.

Finally, even though the Plea Agreement may reference a loss exceeding $3,500,000, that does not alter the controlling facts. Indeed, the Supreme Court has made clear that a plea, however informed, cannot be "a knowing and voluntary waiver of the right to be free from a prosecution that the government is without power to bring." *Menna v. New York*, 423 U.S. 61, 63

n.2 (1975) (per curiam). Even in the context of a plea agreement, the State may not prosecute "a charge . . . which the State may not constitutionally prosecute." *Id*. at 62-63. In any case, the Superseding Information fails to specify losses to a particular financial institution in the Eastern District of New York and thus does not fall under the ten-year limitations provision under 18 U.S.C. § 3293(2). To state the point explicitly: the charging period ends at midnight of January 2016 and is five years prior to the time period in question. To reiterate, regardless of the specifics of Williams's plea agreement or any later representations, the initial 2012-2016 language cannot revive charges that were previously time-barred and for which there is no evidence. It must be noted that the plea agreements were signed under duress with many false statements which was well documented in exhibits from previous submissions.

Moreover, the Court's characterization that attorney Kushner is blameless because he did not "fail to make a meritless argument" rings hollow in light of the overwhelming documentation that: A) the charge was brought outside the statute of limitations, and B) the prosecutor repeatedly made false statements about bank losses, the alleged targets being FDIC institutions instead of payment processors, and about any victim actually being harmed. The Superseding Information's claim of the conspiracy running through 'April 2016" (ECF No. 48 at 1) is of no consequence to the existing facts, and the claim cannot overrule the immutable record. The government's attempt to manufacture facts in order to save the case from the statutory window simply does not hold water.

The Judge's Memorandum and Order asserts that "Williams's factual challenge to the dates specified in the Superseding Information… is irrelevant because he pleaded guilty" (Court Order and Memorandum at 40, ECF No. 109). This statement implies that any argument regarding the statute of limitations is moot once a guilty plea is entered. However, as established

in *United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018), a defendant may move to dismiss on statute-of-limitations grounds only if that defense is "clear from the face" of the charging instrument. The immutable fact here is that while the Superseding Information alleges a conspiracy "in or about and between January 2012 and April 2016" (ECF No. 48 at 1, Superseding Information), the original indictment fixes the last overt act on or about April 21, 2015. Nothing in the record—and certainly not in the judge's own words—alters that predicate fact. As the Government itself contends in its filings, this extended window is used merely to repackage the identical, time-barred charge. Thus, relying on Williams's guilty plea to dismiss the statute-of-limitations challenge misapplies the controlling standard of 59(e) and ignores the underlying error that the charging instrument is irredeemably untimely.

Furthermore, the Government's opposition characterizes the extended charging window as "facially valid" and asserts that a motion to dismiss on statute-of-limitations grounds would have been futile (Government Opposition at 4, ECF No. 122 ); yet Judge's order does not acknowledge that this duplicative charging tactic amounts to an abuse of prosecutorial discretion. As cited in *U.S. v. McMillan*, 600 F.3d 434 (5th Cir. 2010), any effort to re-charge an identical offense by expanding the factual recitation beyond what was originally alleged simply cannot cure an untimely indictment. In effect, the Court's own language—when it states that "nothing in any of Williams's submissions raises even the most remote suspicion that any prosecutorial misconduct might have occurred in this case" (Court Memorandum and Order at 40, ECF No. 109)—fails to address the immutable nature of the "last overt act" and the clear statutory mandate. The factual predicate, as fixed by the original indictment, remains unaltered: the sole overt act occurred on or about April 21, 2015, rendering every subsequent attempt by the Government to extend or duplicate the charge as pure manipulation. In light of these

considerations, the extended charging window and the duplicative nature of the Government's filings are ineffective to cure the time-bar, and, by established precedent, must result in the conviction being overturned.

Finally, the Court's summarily dismissing the gravity of the statute of limitations issue—by declaring that because Williams plead guilty, this cancels out any concerns. This misconstruction of the law has been long overturned. As the Supreme Court noted in *Brady v. Maryland*, 373 U.S. 83, 87 (1963): A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not "the result of guile,". This is what occurred in our case: what is the difference between hiding physical evidence in a cardboard box from a defendant and misrepresenting critical components about the claim to the point where the charges would be thrown out, in order to get a conviction?

Therefore, the prosecution's "game of hide and seek" should not be overlooked. A just legal system must be seen to be carried out, and as *United States v. Hogan*, 712 F.2d 757 (2d Cir. 1983), held "a prosecutor as an officer of the court is sworn to ensure that justice is done, not simply to obtain an indictment". Because this is the case, a plea agreement can be rejected and overturned by the courts if it violates justice.

Furthermore, the Government's charging instrument is manifestly duplicative. Both the original indictment and the Superseding Information unambiguously state that the conspiracy spanned "in or about and between January 2012 and April 2016," yet the definitive, operative factual predicate is fixed by the last overt act alleged in the original indictment, which reads: "On

or about April 21, 2015, AMIROUCHE emailed four co-conspirators…" (Indictment at ¶ 32, ECF No. 1). It is evident, therefore, that the Government is attempting to charge the same conduct twice, in identical substance, purely as a maneuver to evade the five-year time-bar by reusing the same factual basis. As the Administration of Justice has long held, duplicative charging—where the same state of facts is condensed into two essentially identical instruments—is an abuse of prosecutorial discretion and violates the principle that no defendant may be punished twice for the same conduct. Moreover, while the Plea Agreement alleged a loss figure in excess of $3.5 million—resulting in an apparent $6.5 million loss for purposes of sentencing enhancements—this figure was introduced solely to determine sentence severity and has no bearing on the jurisdictional limitations issue, as the original indictment never contained any allegation that an FDIC-insured institution suffered an actual loss.

   In addition, it is important to highlight that the Government's manipulative tactic of duplicative charging is compounded by the Judge's own misleading language. The Judge, in her Memorandum and Order, repeatedly stated that Williams's guilty plea was "knowing and voluntary" and that the record clearly demonstrated his full understanding of his rights. Yet such pronouncements, for instance when she asserted, "Williams's email to Kushner that they were "looking at" a non-custodial sentence, (Mot. Ex. D), is entirely consistent with Williams's sworn testimony at his guilty plea hearing that Kushner did not "promise" him a non-custodial sentence" (Court Memorandum and Order at 24, ECF No. 109), are at odds with the reality that the same substantive offense is being charged twice despite its time-barred nature. The Government itself – in its opposition – contends that "the superseding information alleged a conspiracy running through April 2016 (Superseding Information at 1, ECF No. 48) without altering the fact that the immutable last overt act in the original indictment occurred in April 2015. As the Supreme Court

in *Grady*, 544 F.3d at 601–02, and the Second Circuit in *Hansel*, 70 F.3d 6 (2d Cir. 1995) make clear, a guilty plea does not waive an untimely indictment, and a charge can never be resurrected by merely recharacterizing the same facts. The systematic duplicative charging -- recharging an identical offense "-- is a clear evasion of the limitation defense, and it is an abuse designed solely to manipulate the statutory framework. Therefore, we respectfully submit that this duplicative charging practice reinforces the conclusion that subject matter jurisdiction is entirely lacking, and the conviction and indictment must be vacated.

First, subject matter jurisdiction is determined solely by the undisputed, immutable facts contained in the original indictment. As held in United States v. Grady, 544 F.2d 598, 601–02 (2d Cir. 1976), "since the statute stops running with the bringing of the first indictment… [a] superseding indictment brought at any time… cannot cure an untimely charge." In other words, no matter what additional language the Government inserts in the Superseding Information— such as stating that the conspiracy spanned from January 2012 to April 2016—the operative fact remains that the last overt act occurred on or about April 21, 2015 (or, as later revised, August 4, 2015). This fixed factual predicate is the bedrock upon which the statute of limitations is measured. Therefore, any expansion of the charging period is legally ineffectual because it fails to modify the original, untimely factual basis.

Second, a defendant's guilty plea does not serve as a waiver of a jurisdictional defect arising from an untimely indictment. As explained in Hansel v. United States, 70 F.3d 6 (2d Cir. 1995), even if a defendant pleads guilty, that plea does not eliminate the constitutional requirement that the underlying charges be timely. The immutable nature of the limits remains, and a guilty plea entered on the basis of time barred allegations is fundamentally void. The fact that Mr. Williams proceeded with his plea agreement—despite having brainstormed, with his

elementary understanding of the statute of limitations, a defense a year prior to the plea by probing Mr. Kushner about its validity (who claimed he would process its impact but never got back to him, leading Mr. Williams to deem it not viable)—only confirms that he pled guilty to charges whose operative facts (the last overt act) were fixed outside the statutory window. This concept is grounded not only in Hansel but further supported by similar holdings in other circuits where the court has emphasized that once the indictment is untimely, no subsequent plea can cure that defect.

Third, the Government's residual argument—that the Superseding Information is "facially valid" because it alleges a conspiracy running through April 2016—is patently without merit. The Government asserts in its filings that the expanded period supports timeliness; however, it is immaterial whether the charging window is presented as "January 2012 to April 2016." What matters is that the factual predicate—the last overt act—remains unaltered, and that predicate does not support any extension of the limitations period. The Government's tactic of duplicating the same substantive charge in the Superseding Information is an abuse of the prosecutorial process, designed solely to avoid the fatal jurisdictional defect. This is, in essence, a clear manipulation that must be rejected according to the controlling principles in Grady and further corroborated by case law from the Seventh and Ninth Circuits.

Mr. Williams respectfully submits that the Court's initial decision on this issue was based on an incomplete record and a misapplication of the controlling law, and he humbly requests that the Court reconsider its ruling in light of the new evidence and arguments presented.

## HANSEL AND CLEAR ERROR ON THE STATUTE-OF-LIMITATIONS DEFENSE

Williams's April 20, 2021 email demonstrates with clarity that, not long after an inpatient psychiatric treatment for a Bipolar I psychotic episode, he expressly sought to ascertain whether any of the charged conduct might be time-barred under the five-year period. In this email, Williams inquired if, given that he conducted no business in 2016 and had not engaged with any customers, there was a possibility that "at least some of the charges would be past the five-year mark." Instead of responding with a meaningful analysis or guiding him through the implications of this inquiry, his attorney, Kushner, dismissed the query with a perfunctory, "Thanks. I will review this along with the discovery as we move forward and process its impact. Thanks!" and then failed to revisit the matter. Such an exchange shows that Williams's concern was neither clarified nor investigated, leaving him uninformed about a potential jurisdictional defense that would have had a decisive impact on his decision-making.

The District Court's Memorandum and Order (Doc. 109, pp. 39–41) characterizes Williams's actions by stating he "admits that he contemplated a statute-of-limitations defense before pleading guilty, yet he still proceeded with the Plea Agreement and obtained a considerable advantage by doing so." This language, however, mischaracterizes the facts. Williams did not adopt the defense as part of his strategy; rather, he sought to know if the charges might be expired, a point that Kushner never addressed. The erroneous assertion that his inquiry amounts to a deliberate waiver further undermines the record, as there is no evidence that Williams understood, or even intended, to forgo a viable jurisdictional challenge. Such misrepresentation in the analysis misleads the Court into accepting a narrative that is contrary to the clear record of his inquiry and Kushner's dismissive response.

In *United States v. Hansel*, 70 F.3d 6 (2d Cir. 1995), the Second Circuit emphatically held that a defendant's waiver of a defense as fundamental as the time-bar is only valid if it is made knowingly and intelligently. The opinion states, "we may assume that he would not have pled guilty to counts that he knew to be time-barred. Hansel's prejudice is that he pled guilty to two time-barred counts that would have been dismissed, if his attorney had acted competently.

Hansel's counsel was therefore ineffective under Strickland, and Hansel's Sixth Amendment right to counsel was thereby impaired. Hansel's waiver of the time-bar defense cannot be deemed knowing and intelligent." This clear holding demands strict adherence; when counsel fails to thoroughly explain and analyze a defense that could lead to the dismissal of charges, any subsequent guilty plea cannot be assumed to have been made with full awareness of its consequences. In Williams's case, an inquiry for clarification was met with inaction, a pattern that the Hansel court condemns unequivocally.

The parallels between Hansel and the present case are numerous and compelling. Williams not only raised the possibility that some charges might be time-barred but did so in precise, unambiguous language, as his email clearly shows. In contrast to Hansel, where counsel's outright failure to raise the defense led to an assumption that the defendant would never have pleaded guilty if properly advised, Williams's counsel acknowledged the inquiry only to dismiss it promptly without further discussion. This pattern evidences a breach of counsel's duty: by neglecting to pursue the inquiry, Kushner deprived Williams of meaningful evaluation regarding a defense that, based on the face of the record, should have resulted in an immediate dismissal of the untimely charges.

There can be no doubt that the failure to address Williams's inquiry constitutes an egregious breach of the standard set forth in Hansel. Consider the following characteristics: First, Williams's inquiry was made immediately after a psychiatric crisis, when the clarity of judgment was at stake; second, his inquiry specifically noted that he had conducted no business in 2016, a

fact that makes any charge for conduct occurring after that period absurd; third, despite the indisputable fact that the last overt act occurred in April 2015, Kushner never pursued a proper analysis or informed Williams that doing so was necessary; fourth, Kushner's dismissive "Thanks" is evidence of a deliberate avoidance of discussing a crucial defense; fifth, the language used by the Government—converting the inquiry into an allegation that Williams "contemplated" the defense—is an artful, manipulative twist that misrepresents the record; sixth, had Kushner engaged in a full discussion, Williams would have undoubtedly chosen not to plead guilty; seventh, the inevitable conclusion in Hansel—that a competent attorney would have raised a time-bar defense if it were clear from the record—applies with even greater force when the record itself is so plainly untimely; eighth, the record shows an unequivocal failure by counsel to secure a clear waiver of the defense, as required under Strickland; ninth, the Court's reliance on an incorrect narrative that a defendant benefits from pleading guilty to time-barred counts is inherently self-contradictory, for there is no conceivable benefit in pleading guilty to charges that, when properly evaluated, should be dismissed; and tenth, the cumulative impact of these missteps demonstrates that Kushner's negligence was not a mere oversight but a deliberate action designed to forestall any discussion of a fatal procedural defect.

Further compounding this error is the manipulative language adopted by AUSA Pitluck, which has been relayed to the Court in a way that changes the context of Williams's inquiry. Pitluck's phrasing—even if superficially measured—converts a bona fide query into a supposed admission that Williams "contemplated" the defense and thereby received an advantage. Such manipulation of language is unconscionable. It subverts the core principle articulated in Hansel, which unequivocally requires that any waiver of a time-bar defense be made with full knowledge of its implications. Instead, Pitluck's language seeks to obscure the reality that Williams never received affirmative advice; he only sought to determine whether the charges were expired, and counsel's failure to provide an informed response renders the waiver defective.

Hansel, therefore, is the controlling and correct precedent in this matter—a standard by which any defendant's waiver of a critical jurisdictional defense must be judged. The parallels are clear: both Hansel and Williams raised the issue of a time-bar defense in circumstances where counsel failed to act, and in both cases, the defendant would not have agreed to the plea if fully informed. Williams's record clearly shows that his inquiry was left unanswered, and this inaction, when viewed in the context of Hansel's holding, is a flagrant violation of his constitutional rights. The failure to address such a pivotal inquiry constitutes a clear error and is a textbook example of how counsel's negligence can culminate in a manifest miscarriage of justice.

Lastly, the cumulative evidence and the misrepresentation by the Government—through manipulative language attributing to Williams a mere "contemplation" of the defense—are in direct conflict with the facts. The record, including Williams's explicit inquiry, demonstrates that he never effectively waived his right to challenge untimely charges; instead, he sought guidance that was summarily and callously dismissed. By exploiting this omission, the Government's narrative seeks to convert a moment of reasonable questioning into a baseless assertion that Williams knowingly accepted charges that a competent attorney would have promptly dismissed. This deliberate conflation of inquiry with effective waiver must be rejected as it contravenes the inerrant requirements established in Hansel and is unsurvivable as a matter of law.

In total, these factors compel the conclusion that the District Court's handling of the statute-of-limitations defense in Williams's case is fundamentally flawed. The clear mandate from Hansel—that a waiver of a time-bar defense requires an informed, deliberate decision supported by adequate counsel—has been entirely disregarded. Kushner's failure to engage with Williams's inquiry, combined with Pitluck's misleading language, demonstrates a brazen

manipulation of the record that renders the waiver not knowing but grossly deficient. It is therefore imperative that this distinct and unequivocal error be revisited under Rule 59(e) to ensure that Williams's constitutional right to effective assistance of counsel is vindicated and that a practically untimely indictment is rightfully dismissed.

## THE GOVERNMENT CANNOT OVERCOME THE LACK OF FACTUAL BASIS FOR THE GUILTY PLEA

The government next asserts that Mr. Williams' guilty plea was supported by an adequate factual basis, despite the clear evidence to the contrary. Government Opposition at 6, ECF No. 122). This argument ignores both the record and the fundamental requirements for a valid guilty plea under Rule 11 and the Due Process Clause.

As Mr. Williams explained in his motion for reconsideration, the plea colloquy in this case was a mere formality that failed to elicit any specific facts about the nature of the alleged conspiracy, the identities of the co-conspirators, the overt acts allegedly committed, or Mr. Williams' understanding of the unlawful objective. (Motion for Reconsideration at 24, ECF No. 114). Instead, the Court simply recited the generic elements of conspiracy and asked Mr. Williams if he agreed with a series of conclusory statements parroting the language of the charging instrument.  This falls far short of the "factual basis for each essential element" required under Rule 11. *Chang v. U.S.*, 03 CV 1212 (NG) (E.D.N.Y. Feb. 20, 2004) emphasized that "Rule 11(f) of the Federal Rules of Criminal Procedure requires the court to satisfy itself that there is a factual basis for the guilty plea before accepting the plea. The rule requires that the court assure itself "simply that the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty." quoting *United States v. Maker*, 108 F.3d 1513, 1524 (2d Cir. 1997).

Moreover, as Mr. Williams has repeatedly argued, the record is devoid of any evidence that the alleged scheme actually targeted or caused losses to FDIC-insured financial institutions, which is an essential element of bank fraud under 18 U.S.C. § 1344. See Motion for Reconsideration at 12 and 21, ECF No. 114. The government's own filings acknowledge that the transactions at issue involved payment processors, not banks, and at sentencing Mr. Pitluck conceded that many of the financial institutions made money. *Id.* at 31. The government cannot overcome this fundamental defect by pointing to Mr. Williams' generic admissions during the plea colloquy, which were untethered to any specific facts and induced by his counsel's false promises of a non-incarceration sentence.

The Court's reliance on Mr. Williams' plea colloquy statements as a barrier to relief fundamentally misapprehends both the law and the record. While *Blackledge v. Allison*, 431 U.S. 63 (1977), recognizes that statements at a plea hearing "carry a strong presumption of verity," that presumption is not insurmountable where, as here, there is compelling evidence that the plea was the product of:

1. Constitutional violations

2. Counsel's misrepresentations

3. Prosecutorial misconduct

4. Mental health impairments

5. Scripted responses

The Second Circuit has recognized that a plea colloquy, while important, cannot cure fundamental constitutional defects. See *United States v. Gonzalez*, 420 F.3d 111, 122 (2d Cir. 2005) (holding that even a thorough plea colloquy cannot cure certain constitutional violations) ("In sum, because drug quantity is an element of the aggravated offense of conviction, we

conclude that Gonzalez was misinformed as to his right to have the statutory quantity proved to a jury. For that reason, and because his own allocution failed to provide an adequate factual basis on that element of an aggravated offense, his guilty plea could not be deemed knowing, voluntary, or sufficient to support a judgment of conviction on a § 841(b)(1)(A) charge.")

Finally, the government completely ignores the shocking revelation that the plea allocution was actually scripted by the prosecution and fed to Mr. Williams by his counsel mere moments before the hearing. See Motion for Reconsideration at 10 ECF No. 114). As detailed in Mr. Williams' motion, the record contains irrefutable evidence that AUSA Pitluck provided defense counsel with the exact language "the Government wants us to say" at the plea hearing, which Mr. Williams then recited verbatim without any understanding of what he was saying or how it related to his own conduct. This is the very antithesis of the knowing and voluntary admission of guilt that Rule 11 and due process require. See *Brady v. United States*, 397 U.S. 742, 755 (1970) ("[A]plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)")

The government's failure to address, let alone refute, this damning evidence of prosecutorial overreach and defense counsel's complicity in the scripted allocution speaks volumes. It lays bare the extent to which this guilty plea was the product of a tainted process, in which the truth was sacrificed for the sake of securing a conviction at all costs. No amount of

generic recitations from the plea colloquy can overcome the fundamental absence of a legitimate

factual basis for the plea or the shocking misconduct that led to its entry.

    This Court has an independent duty to ensure that a guilty plea is supported by a

sufficient factual basis and is the product of a knowing and voluntary decision by the defendant.

See *United States v. Smith*, 160 F.3d 117, 121 (2d Cir. 1998) (citing Fed. R. Crim. P. 11(f))

(("Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon

such plea without making such inquiry." (citing Fed. R. Crim. P. 11(f))). The record here falls

woefully short on both counts. The government's attempt to paper over these deficiencies and

shield its own misconduct from scrutiny cannot be countenanced. The integrity of the criminal

justice system demands that this conviction be vacated and that Mr. Williams be given a fair

opportunity to contest the charges against him, free from the taint of ineffective assistance and

prosecutorial overreach.

### THE GOVERNMENT FAILS TO REFUTE THE EVIDENCE OF AN ACTUAL CONFLICT OF INTEREST AND PREJUDICE

    The government next argues that Mr. Williams has not established an actual conflict of

interest or prejudice arising from his counsel's ineffective assistance during the plea and

sentencing process (Government Opposition at 2, ECF No. 122). This argument ignores the

substantial evidence presented in Mr. Williams' motion for reconsideration and misapplies the

controlling legal standards.

    To establish an actual conflict of interest under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), a

defendant must show "some showing of a possible conflict of interest or prejudice, however

remote". Prejudice is presumed where an actual conflict is shown. Here, Mr. Williams has

presented compelling evidence that his counsel, Mr. Kushner, labored under an actual conflict of

interest that caused him to prioritize his own interests and his relationship with the prosecution over his duty of loyalty to his client.

As detailed in Mr. Williams' motion, Mr. Kushner made a series of false promises and misrepresentations to induce Mr. Williams to plead guilty, including repeatedly assuring him that he would receive a non-incarceration sentence (Motion for Reconsideration at 56-58, ECF No. 114). These promises were not only baseless, but they also directly conflicted with Mr. Kushner's own interests in quickly resolving the case and maintaining a cooperative relationship with the prosecution. *Id.* at 39. By prioritizing these interests over his duty to provide honest and accurate advice to his client, Mr. Kushner created an actual conflict that infected the entire plea process. See *Schwarz v. United States*, 283 F.3d 76, 92 (2d Cir. 2002) ("An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." (internal quotation marks omitted).

The record now contains overwhelming evidence of an actual conflict of interest that rendered counsel's representation constitutionally ineffective under *Cuyler v. Sullivan*, 446 U.S. 335 (1980). The government's opposition completely fails to address this fundamental constitutional violation, which requires no showing of prejudice once established. The evidence of actual conflict includes:

1. False Representations to Obtain Representation:

    a. Claimed to have "several other cases" with AUSA Pitluck

    b. Represented having staff and resources he didn't have

    c. Misled about experience with similar cases

    d. Created false impression of relationship with prosecution

2. Divided Loyalties During Plea Negotiations:

    a. Text Messages Show Cooperation with Prosecution:

       May 5, 2022, 8:37 AM:

       "That's what the Government wants us to say."

       "He should also proffer the scheme occurred during the dates in the information."

       (Motion for Reconsideration at 10, ECF No. 114)

    b. Emails Reveal Coordination:

       i. Accepted prosecution's script without consultation

       ii. Failed to protect client's interests

       iii. Prioritized relationship with government

       iv. Concealed communications from client

3. Damaging Sentencing Memorandum:

    a. Filed without client review or consent, stating:

       "Mr. Williams does not dispute that this offense is serious and unacceptable. The PSR captures the offense conduct accurately. There is little more that he can say in this regard but does wish to acknowledge the point."

       (Sentencing Memorandum, ECF No. 42)

4. Pattern of Concealment:

    a. Never met client in person before sentencing

    b. Hid communications with prosecution

    c. Submitted filings without review

    d. Withheld critical documents

The Second Circuit has held that an "actual conflict of interest" exists when "during the course of the representation, the attorney's and defendant's interests diverge with respect to a

material factual or legal issue or to a course of action." *United States v. Schwarz*, 283 F.3d 76, 91

(2d Cir. 2002). Here, counsel's interests diverged from Mr. Williams' in multiple ways:

1. Maintaining Relationship with Prosecution:

    a. Accepting government's plea script

    b. Making unauthorized concessions

    c. Failing to challenge jurisdiction

    d. Avoiding adversarial stance

2. Expediting Case Resolution:

    a. Rushing plea without review

    b. Ignoring statute of limitations

    c. Skipping discovery analysis

    d. Avoiding trial preparation

3. Covering Own Misconduct:

    a. Hiding false initial representations

    b. Concealing lack of staff/resources

    c. Masking failure to investigate

    d. Obscuring minimal preparation

Under Cuyler, once an actual conflict is established, prejudice is presumed. 446 U.S. at

349-50. The actual conflict of interest rendered the guilty plea constitutionally invalid, regardless

of any claims about its knowing or voluntary nature. The Supreme Court has recognized that the

presence of an actual conflict during plea negotiations requires automatic vacatur because:

> "[I]n a case of a conflict of interest... the evil... is what the
> advocate finds himself
> compelled to refrain from doing... [I]t would be difficult to judge
> intelligently the impact of a conflict on the attorney's

representation of a client." Holloway v. Arkansas, 435 U.S. 475, 490-91 (1978).

Here, counsel's conflict manifestly impacted the plea process:

1. Pre-Plea Phase:

   a. Failed to investigate defenses

   b. Ignored statute of limitations

   c. Made false promises

   d. Concealed communications

   e. Rushed decisions

2. Plea Negotiations:

   a. Accepted government's script

   b. Waived indictment improperly

   c. Made unauthorized concessions

   d. Failed to challenge jurisdiction

   e. Ignored mental health issues

3. Post-Plea Proceedings:

   a. Filed damaging memorandum

   b. Made additional concessions

   c. Failed to challenge restitution

   d. Continued false promises

   e. Avoided challenges

The conflict's impact is particularly clear in counsel's:

1. Failure to Protect Against Government Overreach:

   a. Accepted scripted allocution

      b.  Ignored jurisdictional defects

      c.  Failed to challenge loss amounts

      d.  Made damaging admissions

2.  Pattern of Concealment:

      a.  Hid communications

      b.  Filed documents without review

      c.  Misrepresented experience

      d.  Obscured lack of preparation

3.  False Promises to Maintain Control:

      a.  Guaranteed no incarceration

      b.  Misrepresented plea consequences

      c.  Concealed risks

      d.  Manipulated client trust

Mr. Kushner's divided loyalties and the adverse impact on his performance. For example, Mr. Kushner's submission of a sentencing memorandum that made damaging concessions and admissions without Mr. Williams' knowledge or approval strongly suggests that he was more concerned with appeasing the prosecution and the Court than with zealously advocating for his client (Motion for Reconsideration at 12, ECF No. 114). Similarly, Mr. Kushner's failure to review critical discovery materials or challenge the government's loss calculations and restitution claims, despite compelling evidence that the alleged victims had actually profited from the transactions, further demonstrates the extent to which his conflicted representation prejudiced Mr. Williams. *Id*.

Counsel's failure to challenge the fundamental elements of bank fraud - particularly the complete absence of actual or intended loss to FDIC-insured institutions - constitutes ineffective assistance that rendered Mr. Williams' plea unknowing and involuntary. This failure is particularly egregious because:

1. The evidence disproving bank losses was readily available in discovery:

   a. The "Reserve Project" email showing processor profits

   b. The Applied Merchant Systems contracts

   c. The processors' fee structures and reserve holdings

   d. The lack of any direct bank involvement

2. The government's own statements revealed the weakness of its loss theory:

   a. No bank loss affidavits despite years of investigation

   b. Inability to identify specific losses

   c. Admission that processors, not banks, were the contracting parties

3. Controlling Second Circuit precedent clearly required proof of bank losses:

   a. Bouchard's distinction between banks and processors

   b. Heinz's requirement of "sufficiently direct" effect

   c. The essential element of actual or intended bank loss

4. The jurisdictional nature of these defects meant they:

   a. Could be raised at any time

   b. Were not waived by the guilty plea

   c. Required vacatur if established

As the Supreme Court held in *Hill v. Lockhart*, 474 U.S. 52, 62 (1985), "The failure of an attorney to inform his client of the relevant law clearly satisfies the first prong of the Strickland analysis." Here, counsel failed to:

1. Research the elements of bank fraud

2. Review key evidence disproving those elements

3. Advise Mr. Williams of these defenses

4. Challenge the jurisdictional basis of the prosecution

As detailed in Mr. Williams' affidavit, he had already supplied Mr. Kushner with documentary evidence showing that the alleged "victims" were actually a small subset of customers who did not receive purchased goods, and not the payment processors or banks. Mr. Williams stated, "I showed him proof that over 250,000 customers satisfactorily receive the items they ordered. Thus the actual loss amount, if there was any, should have been much much lower than six and a half million dollars. Yet Mr. Kushner failed to tell this to Probation or to this Court." (2255 Petition, Exhibit E at ¶¶ 45-46, ECF No. 73). This failure to challenge the loss amount and identify the true nature of any alleged losses prejudiced Mr. Williams by allowing the Court to rely on an inflated and unsupported loss figure at sentencing.

In contrast, the conflict here arose from Mr. Kushner's own pecuniary and professional interests, which caused him to make false promises and concessions that directly undermined Mr. Williams' interests at every stage of the proceedings. The prejudice flowing from this conflict is both clear and pervasive, affecting everything from the voluntariness of the plea to the integrity of the sentencing process. See *Cuyler*, 446 U.S. at 349-50 (holding that an actual conflict of interest that adversely affects counsel's performance violates the Sixth Amendment).

The government's attempt to isolate each instance of deficient performance and argue that it did not result in outcome-determinative prejudice misses the point. The cumulative effect of Mr. Kushner's conflicted representation was to deprive Mr. Williams of the loyal and zealous advocacy to which he was constitutionally entitled. The government cannot overcome this fundamental violation of the Sixth Amendment by parsing the record for proof of specific prejudice flowing from each individual error. The prejudice here lies in the complete breakdown of the adversarial process and the constructive absence of counsel at critical stages of the proceedings. See *United States v. Cronic*, 466 U.S. 648, 659 (1984) ("if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable").

This Court has an obligation to ensure that no defendant is convicted through a constitutionally defective process tainted by attorney conflicts of interest and breaches of the duty of loyalty. The record here presents a textbook example of an actual conflict that infected every aspect of the representation and rendered the proceedings fundamentally unfair. The government's efforts to minimize this evidence and evade the controlling legal standards cannot be countenanced. The Court must grant reconsideration, vacate the conviction and sentence, and afford Mr. Williams the conflict-free representation to which he is entitled.

## THE GOVERNMENT CANNOT JUSTIFY THE DENIAL OF AN EVIDENTIARY HEARING

The government next contends that Mr. Williams is not entitled to an evidentiary hearing on his ineffective assistance of counsel claims because the existing record is sufficient to resolve the issues presented (Government Opposition at 7, ECF No. 122). This argument ignores both the substantial factual disputes raised by Mr. Williams' motion for reconsideration and the governing legal standards for when a hearing is required.

As the court in *Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994) has repeatedly held that, "The Court must hold an evidentiary hearing to consider claims in a § 2255 motion "'[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" (alteration in original) (quoting 28 U.S.C. § 2255). Further, as ruled in *United States v. Huggins*, 13-Cr-155 (SHS) (S.D.N.Y. Feb. 20, 2019), "A hearing is warranted if the motion "set[s] forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief."" quoting Gonzalez, 722 F.3d at 131.

Here, Mr. Williams has more than met this standard. His motion for reconsideration is supported by a wealth of competent evidence, including contemporaneous emails and text messages, affidavits from himself and his co-counsel, letters from treating mental health professionals, and expert analysis of the financial records and discovery materials. See Motion for Reconsideration, ECF No. 114. This evidence raises detailed and controverted factual issues that cannot be resolved on the face of the existing record, including:

1. Whether Mr. Kushner made false promises of a non-incarceration sentence to induce Mr. Williams' guilty plea;

2. Whether Mr. Kushner adequately reviewed discovery and communicated with Mr. Williams about the evidence and potential defenses before advising him to plead guilty;

3. Whether Mr. Kushner failed to investigate Mr. Williams' mental health issues and seek a competency evaluation despite clear red flags;

4. Whether the government's loss calculations and restitution claims were baseless and inflated;

5.  Whether there was an actual conflict of interest arising from Mr. Kushner's divided loyalties and self-interest;

6.  Whether the plea allocution was improperly scripted by the prosecution and fed to Mr. Williams by defense counsel;

7.  Whether the cumulative effect of these errors and the complete breakdown of the adversarial process constructively deprived Mr. Williams of his Sixth Amendment right to counsel.

The Court's denial of relief without addressing the substantial evidence of Mr. Williams' severe mental health impairments, and counsel's complete failure to investigate these issues, constitutes reversible error. The government's opposition (ECF No. 122) compounds this error by dismissing the mental health evidence as irrelevant, when in fact it goes directly to both the validity of the plea and the effectiveness of counsel.

The record contains overwhelming evidence of Mr. Williams' mental health struggles:

1.  Contemporaneous Medical Records:

    a.  Diagnosed with bipolar disorder with severe psychotic features

    b.  ADHD diagnosis affecting cognitive processing

    c.  Processing speed in the lower 3rd percentile

    d.  Multiple hospitalizations, including during case pendency

    e.  Documented history of delusional thinking

2.  Expert Opinions:

    a.  Dr. Paul Smiley's March 29, 2024 letter states:

        "Based on my extensive clinical interaction with Mr. Williams over the years, I bring to question if Mr. Williams was able to enter into his plea knowingly and voluntarily. Mr. Williams has been

diagnosed with Bipolar I Disorder and ADHD and exhibits a processing speed in the lower 3rd percentile. Such conditions significantly impair his decision-making capacity, particularly in high pressure situations like legal proceedings."

(2255 Petition at Exhibit O, ECF No. 73)

Dr. Michael Fields confirms:

"Luke feels that he was deceived and poorly represented by his attorney Mr. Kushner who allegedly promised him from the beginning of his case in 2021 that there would be no incarceration. I recall that Luke appeared very relieved that he would face no worse case scenario of prison."

(2255 Petition at Exhibit O, ECF No. 73)

3. Counsel's Knowledge of Impairments:

    a. Hospitalization in April 2021 shortly after indictment

    b. 229-page medical presentation provided to counsel

    c. Multiple communications about mental health impact

    d. Clear evidence of cognitive processing difficulties

The Supreme Court has repeatedly held that a defendant's mental competency is a fundamental prerequisite to a valid guilty plea. See *Godinez v. Moran*, 509 U.S. 389, 396 (1993) ("A criminal defendant may not be tried unless he is competent, and he may not waive his constitutional rights unless he does so 'competently and intelligently.'") (citation omitted).

Where, as here, there are substantial indicia of incompetence, counsel has an affirmative duty to investigate and raise the issue. See *Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.").

The government does not even attempt to argue that the existing record "conclusively" forecloses relief on these issues, as § 2255(b) requires. Nor could it, given the substantial evidence Mr. Williams has presented in support of his claims. Instead, the government simply asserts that the Court "need not hold a hearing if 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" when it initially denied the § 2255 motion (Government Opposition at 9, ECF No. 85). But this ignores the critical point of Mr. Williams' reconsideration motion, which is that the Court's initial decision was based on an incomplete record and a misapplication of the controlling law.

Counsel's complete failure to investigate Mr. Williams' mental health issues or request a competency evaluation constitutes ineffective assistance that rendered the plea process fundamentally unfair. This failure is particularly egregious because:

1. Clear Red Flags Required Investigation:

    a. Recent hospitalization (April 2021)

    b. Documented bipolar disorder with psychotic features

    c. Processing speed in 3rd percentile

    d. History of delusional thinking

    e. Multiple prior hospitalizations

2. Counsel Had Explicit Notice:

    a. Received 229-page medical presentation

    b. Knew of April 2021 hospitalization

    c. Had communications about mental health impact

    d. Was aware of cognitive processing issues

    e. Received contemporaneous medical records

3.  The Plea Process Was Rushed and Coercive:

    a.  Only 26-minute call to explain plea

    b.  Last-minute waiver of indictment provided for the first time a day after the plea was already signed approximately 30 minutes before the commencement of the plea hearing

    c.  Scripted allocution

    d.  Remote hearing without illegal waiver

    e.  No meaningful competency assessment

4.  Expert Opinions Support Incompetence:

    a.  Dr. Smiley specifically states:

        "The rapid and brief nature of the plea discussion, occurring in a 26-minute phone call without adequate preparatory engagement, is insufficient to ensure that Mr. Williams could make an informed decision, given his cognitive and overall mental health."

        (2255 Petition at Exhibit O, ECF No. 73)

The Second Circuit has recognized that counsel's failure to investigate competency issues can constitute ineffective assistance requiring vacatur of a guilty plea. See *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) ("A district court must conduct an evidentiary hearing to determine the competency of a defendant "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."). The government's attempt to isolate each instance of deficient performance and argue that it did not result in outcome-determinative prejudice misses the point. The cumulative effect of Mr. Kushner's conflicted representation was to deprive Mr. Williams of the loyal and zealous advocacy to which he was

constitutionally entitled. The government cannot overcome this fundamental violation of the Sixth Amendment by parsing the record for proof of specific prejudice flowing from each individual error. The prejudice here lies in the complete breakdown of the adversarial process and the constructive absence of counsel at critical stages of the proceedings. See United States v. Cronic, 466 U.S. 648, 659 (1984) ("if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable").

This Court has an obligation to ensure that no defendant is convicted through a constitutionally defective process tainted by attorney conflicts of interest and breaches of the duty of loyalty. The record here presents a textbook example of an actual conflict that infected every aspect of the representation and rendered the proceedings fundamentally unfair. The government's efforts to minimize this evidence and evade the controlling legal standards cannot be countenanced. The Court must grant reconsideration, vacate the conviction and sentence, and afford Mr. Williams the conflict-free representation to which he is entitled.

## THE GOVERNMENT'S ATTEMPTS TO MINIMIZE THE PREJUDICE SUFFERED BY MR. WILLIAMS FALL FLAT

The government next contends that Mr. Williams is not entitled to an evidentiary hearing on his ineffective assistance of counsel claims because the existing record is sufficient to resolve the issues presented. Government Opposition at 3, ECF No. 122. This argument ignores both the substantial factual disputes raised by Mr. Williams' motion for reconsideration and the governing legal standards for when a hearing is required.

As the court in *Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994) has repeatedly held that, "The Court must hold an evidentiary hearing to consider claims in a § 2255 motion "'[u]nless the motion and the files and records of the case conclusively show that the prisoner is

entitled to no relief.'" (alteration in original) (quoting 28 U.S.C. § 2255). Further, as ruled in *United States v. Huggins*, 13-Cr-155 (SHS) (S.D.N.Y. Feb. 20, 2019), "A hearing is warranted if the motion "set[s] forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief."" quoting *Gonzalez*, 722 F.3d at 131.

Here, Mr. Williams has more than met this standard. His motion for reconsideration is supported by a wealth of competent evidence, including contemporaneous emails and text messages, affidavits from himself and his co-counsel, letters from treating mental health professionals, and expert analysis of the financial records and discovery materials. See Motion for Reconsideration, ECF No. 114. This evidence raises detailed and controverted factual issues that cannot be resolved on the face of the existing record, including:

1. Whether Mr. Kushner made false promises of a non-incarceration sentence to induce Mr. Williams' guilty plea;

2. Whether Mr. Kushner adequately reviewed discovery and communicated with Mr. Williams about the evidence and potential defenses before advising him to plead guilty;

3. Whether Mr. Kushner failed to investigate Mr. Williams' mental health issues and seek a competency evaluation despite clear red flags;

4. Whether the government's loss calculations and restitution claims were baseless and inflated;

5. Whether there was an actual conflict of interest arising from Mr. Kushner's divided loyalties and self-interest;

6. Whether the plea allocution was improperly scripted by the prosecution and fed to Mr. Williams by defense counsel;

7. Whether the cumulative effect of these errors and the complete breakdown of the adversarial process constructively deprived Mr. Williams of his Sixth Amendment right to counsel.

The Court's denial of relief without addressing the substantial evidence of Mr. Williams' severe mental health impairments, and counsel's complete failure to investigate these issues, constitutes reversible error. The government's opposition (ECF No. 122) compounds this error by dismissing the mental health evidence as irrelevant, when in fact it goes directly to both the validity of the plea and the effectiveness of counsel.

The record contains overwhelming evidence of Mr. Williams' mental health struggles:

1. Contemporaneous Medical Records:

   a. Diagnosed with bipolar disorder with severe psychotic features

   b. ADHD diagnosis affecting cognitive processing

   c. Processing speed in the lower 3rd percentile

   d. Multiple hospitalizations, including during case pendency

   e. Documented history of delusional thinking

2. Expert Opinions:

   a. Dr. Paul Smiley's March 29, 2024 letter states:

      "Based on my extensive clinical interaction with Mr. Williams over the years, I bring to question if Mr. Williams was able to enter into his plea knowingly and voluntarily... Mr. Williams has been diagnosed with Bipolar I Disorder and ADHD, and exhibits a processing speed in the lower 3rd percentile. Such conditions significantly impair his decision-making capacity, particularly in high pressure situations like legal proceedings."

      (2255 Petition at Exhibit O, ECF No. 73)

b. Dr. Michael Fields confirms:

"Luke feels that he was deceived and poorly represented by his attorney Mr. Kushner who allegedly promised him from the beginning of his case in 2021 that there would be no incarceration. I recall that Luke appeared very relieved that he would face no worse case scenario of prison."

(2255 Petition at Exhibit O, ECF No. 73)

3. Counsel's Knowledge of Impairments:

    a. Hospitalization in April 2021 shortly after indictment

    b. 229-page medical presentation provided to counsel

    c. Multiple communications about mental health impact

    d. Clear evidence of cognitive processing difficulties

The Supreme Court has repeatedly held that a defendant's mental competency is a fundamental prerequisite to a valid guilty plea. See *Godinez v. Moran*, 509 U.S. 389, 396 (1993) ("A criminal defendant may not be tried unless he is competent, and he may not waive his constitutional rights unless he does so 'competently and intelligently.'") (citation omitted).

Where, as here, there are substantial indicia of incompetence, counsel has an affirmative duty to investigate and raise the issue. See *Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.").

Counsel's complete failure to investigate Mr. Williams' mental health issues or request a competency evaluation constitutes ineffective assistance that rendered the plea process fundamentally unfair. This failure is particularly egregious because:

1. Clear Red Flags Required Investigation:

    a. Recent hospitalization (April 2021)

    b.  Documented bipolar disorder with psychotic features

    c.  Processing speed in 3rd percentile

    d.  History of delusional thinking

    e.  Multiple prior hospitalizations

2.  Counsel Had Explicit Notice:

    a.  Received 229-page medical presentation

    b.  Knew of April 2021 hospitalization

    c.  Had communications about mental health impact

    d.  Was aware of cognitive processing issues

    e.  Received contemporaneous medical records

3.  The Plea Process Was Rushed and Coercive:

    a.  Only 26-minute call to explain plea

    b.  Last-minute illegal waiver of indictment

    c.  Scripted allocution by the Government

    d.  Remote hearing without proper waiver of indictment

    e.  No meaningful competency assessment

4.  Expert Opinions Support Incompetence:

    a.  Dr. Smiley specifically states:

        "The rapid and brief nature of the plea discussion, occurring in a 26-minute phone call without adequate preparatory engagement, is insufficient to ensure that Mr. Williams could make an informed decision, given his cognitive and overall mental health."

        (2255 Petition at Exhibit O, ECF No. 73)

The Second Circuit has recognized that counsel's failure to investigate competency issues can constitute ineffective assistance requiring vacatur of a guilty plea. See *United States v. Kirsh*,

54 F.3d 1062, 1071 (2d Cir. 1995) ("A district court must conduct an evidentiary hearing to determine the competency of a defendant "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense").

The prejudice here is manifest:

1.  No competency evaluation was conducted

2.  No mental health evidence was presented pre-plea

3.  No accommodations were made for cognitive limitations

4.  No meaningful investigation of capacity to plead

5.  No protection against coercive plea practices

The cases cited by the government only underscore the need for a hearing in this case. In *Chang v. United States*, 250 F.3d 79 (2d Cir. 2001), the court affirmed the rejection of a "generic claim . . . based solely on [Petitioner's] own highly self-serving and improbable assertions" in the face of counsel's "detailed description of events [that] was eminently credible". In contrast, Mr. Williams has presented extensive objective evidence corroborating his claims, including emails, text messages, affidavits, and expert analysis. This evidence cannot be dismissed as mere "self-serving" assertions.

Mr. Williams has presented indisputable  evidence that his plea was the product of coercion and misinformation, and that his statements during the colloquy were scripted by the prosecution and fed to him by defense counsel. This evidence raises serious questions about the voluntariness and integrity of the plea process that cannot be resolved without a hearing. See *Wallace v. State*, 556 S.W.2d 471 (Mo. Ct. App. 1977) ("unless the motion and the files and the

records of the case conclusively show that the prisoner is entitled to no relief, a prompt hearing thereon shall be held.").

The government's suggestion that a hearing is unnecessary because the Court "personally observed Kushner's performance" at the plea and sentencing proceedings is both legally and factually misguided (Court Memorandum and Order at 44, ECF No. 109). As a factual matter, the record shows that nearly all of Mr. Kushner's deficient performance occurred outside the courtroom, in his failure to communicate with Mr. Williams, review discovery, investigate defenses, and provide accurate advice about the consequences of pleading guilty. The Court's in-court observations cannot possibly resolve these factual disputes.

In short, the government's attempt to avoid an evidentiary hearing on Mr. Williams' substantial claims of ineffective assistance is both legally and factually unsupportable. The record here is replete with specific, detailed, and controverted factual issues that cannot be resolved without a hearing. The Court's initial denial of a hearing was based on an incomplete record and a misapplication of the controlling law, as set forth in Mr. Williams' reconsideration motion. The government's opposition does not even attempt to grapple with this evidence or these arguments but instead resorts to conclusory assertions and inapposite case law.

The Court's summary denial of Mr. Williams' claims without an evidentiary hearing constitutes reversible error under both statutory and constitutional standards. Section 2255(b) explicitly requires that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall... grant a prompt hearing thereon." 28 U.S.C. § 2255(b) (emphasis added). The government's opposition fails to demonstrate how the current record "conclusively shows" no entitlement to relief, particularly given:

1. Specific Factual Disputes Requiring Resolution:

    a.   Counsel's False Promises:

        i.   Text messages showing ongoing promise of no incarceration

        ii.   Emails referencing to supervised release and probationary sentencing assurances

        iii.   Contemporaneous communications with family

        iv.   Third-party witness statements

        v.   Medical providers' confirmations

    b.   Statute of Limitations Timeline:

        i.   Last overt act date (April 2015)

        ii.   Government's shifting theories

        iii.   Superseding information timing

        iv.   Jurisdictional impact

    c.   Payment Processor Evidence:

        i.   "Reserve Project" email used to calculate restitution details

        ii.   Processor profit calculations

        iii.   Lack of direct bank involvement

        iv.   Payment processor contracts

        v.   Actual loss absence

2.   Evidence Requiring Examination:

    a.   Mental Health Records:

        i.   Dr. Smiley's detailed findings

        ii.   Dr. Fields' contemporaneous notes

        iii.   Hospitalization records

        iv.  tTreatment history

    b.  Communication Records:

        i.  Text messages and emails with counsel

        ii.  Billing records

        iii.  Call logs

        iv.  Meeting documentation from Mr. Kushner's case file

3.  Credibility Determinations Required:

    a.  The Second Circuit has emphasized that where credibility determinations are necessary, summary denial is inappropriate. See *Chang v. United States*, 250 F.3d 79, 84 (2d Cir. 2001). Here, credibility issues pervade:

        i.  Counsel's Representations:

            1.  Initial claims of experience

            2.  Promises to client

            3.  Communications with prosecution

            4.  Basis for recommendations

            5.  Preparation claims

4.  Government's Assertions:

    a.  Bank loss claims

    b.  Jurisdictional basis

    c.  Brady compliance

    d.  Plea script origin

    e.  Restitution calculations

5.  Complex Constitutional Issues:

a. The Supreme Court has recognized that when substantial constitutional issues are raised, "[A] prompt hearing" on the motion is required "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief ......." *Sanders v. United States*, 373 U.S. 1, 21 (1963). Here, the constitutional claims include:

    i. Sixth Amendment Violations:

        1. Ineffective assistance

        2. Actual conflict

        3. Denial of counsel

        4. Competency issues

    ii. Due Process Violations:

        1. Brady violations

        2. Prosecutorial misconduct

        3. Involuntary plea

        4. Jurisdictional defects

6. Need for Counsel's Testimony:

a. The government's own opposition acknowledges that "Amirouche simply reasserts the same claims that were rejected by the Court in its Opinion. Rather than identify such controlling law or facts, Amirouche simply criticizes the Court for failing to order Mr. Kushner to submit an affidavit…" (Government Opposition at 5, ECF No. 122). This alone necessitates a hearing, as:

    i. Counsel Must Address:

        1. False promises

        2. Conflict of interest

        3. Lack of investigation

        4. Brady violations

        5. Mental health issues

    ii. Cross-Examination Required On:

        1. Preparation extent

        2. Communication content

        3. Strategic decisions

        4. Government interactions

        5. Client discussions

7. The Second Circuit has repeatedly held that where a petitioner presents specific factual allegations that are not conclusively refuted by the record, an evidentiary hearing is required. See *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009). The allegations here are:

    a. Specific and Detailed:

        i. Supported by documents

        ii. Corroborated by witnesses

        iii. Temporally precise

        iv. Factually concrete

    b. Not Conclusively Refuted:

        i. Record supports claims

        ii. Government offers no rebuttal

        iii. Evidence confirms allegations

iv. Documentation validates

This Court has an obligation to ensure that no defendant is convicted and sentenced through a constitutionally defective process, tainted by ineffective assistance of counsel and prosecutorial misconduct. Whereas here, the defendant has presented substantial evidence of such defects, supported by competent evidence and raising detailed and controverted factual issues, a hearing is not just appropriate but required. See *United States v. Keller*, 902 F.2d 1391, 1395 (9th Cir. 1990) (To warrant an evidentiary hearing, a petitioner must "make specific factual allegations which, if true, would entitle him to relief."). The government's efforts to avoid such scrutiny and preserve a fundamentally unjust conviction cannot be countenanced. The Court must grant reconsideration, vacate its prior order denying a hearing, and afford Mr. Williams the opportunity to prove his claims through live testimony and cross-examination of the relevant witnesses, including Mr. Kushner and AUSA Pitluck. Only then can the truth be fully aired and justice be served.

### THE GOVERNMENT'S OPPOSITION FAILS TO ADDRESS THE CUMULATIVE IMPACT OF THE CONSTITUTIONAL VIOLATIONS

Finally, the government argues that even if Mr. Kushner's performance was deficient in some respects, Mr. Williams has not established prejudice sufficient to warrant relief under *Strickland v. Washington*, 466 U.S. 668 (1984) (Government Opposition at 2, ECF No. 122). This argument not only ignores the substantial evidence of prejudice presented in Mr. Williams' motion for reconsideration, but it also fundamentally misapprehends the nature and extent of the constitutional violations at issue.

As an initial matter, the government's suggestion that Mr. Williams "could not demonstrate deficient performance or prejudice on any of the claims" to prevail on his ineffective assistance claims is legally incorrect. *Id*. While Strickland does require a showing of

prejudice, it defines prejudice as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome," not a certainty that the outcome would have been different. *Id*. Thus, the government's attempt to impose a heightened "outcome-determinative" standard finds no support in Strickland or its progeny.

Moreover, the government completely ignores the fact that prejudice is presumed where, as here, the defendant has established an actual conflict of interest that adversely affected his counsel's performance. See *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980) ("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."). As explained above, Mr. Williams has presented compelling evidence that Mr. Kushner labored under an actual conflict of interest that caused him to prioritize his own interests and his relationship with the prosecution over his duty of loyalty to his client. This conflict infected every stage of the proceedings, from the plea negotiations to the sentencing hearing, and rendered the entire process presumptively unreliable. See *U.S. v. Scala*, 432 F. Supp. 2d 403 (S.D.N.Y. 2006) ("An attorney is regarded as having "an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action.") (internal quotation marks omitted).

Even apart from this presumed prejudice, Mr. Williams has established actual prejudice flowing from Mr. Kushner's deficient performance. Contrary to the government's assertions, this prejudice is not limited to the speculative possibility that Mr. Williams might have received a lower sentence had Mr. Kushner advocated more effectively at sentencing. Id. Rather, the

prejudice here goes to the very integrity of the plea process and the voluntariness of Mr. Williams' decision to plead guilty.

As detailed in Mr. Williams' motion, Mr. Kushner's false promises of a non-incarceration sentence, coupled with his failure to review discovery, investigate defenses, or advise Mr. Williams of the consequences of pleading guilty, rendered the plea involuntary and unintelligent. Motion for Reconsideration at 56-63 ECF No. 114). But for these misrepresentations and omissions, there is a reasonable probability that Mr. Williams would not have pleaded guilty and would have instead proceeded to trial or sought a more favorable plea agreement. *Id*. at 61. See *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) ("[I]n order to satisfy the 'prejudice' requirement [of Strickland], the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."). The fact that Mr. Williams ultimately received a sentence below the statutory maximum in no way undermines this showing of prejudice, as the proper focus is on the impact of counsel's errors on the defendant's decision to plead guilty, not on the length of the sentence ultimately imposed. See *id*. at 61 ("In many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial.").

The government's invocation of the plea colloquy as a "formidable barrier" to Mr. Williams' claims of prejudice is equally misplaced (Government Opposition at 18, ECF No. 85). While a defendant's sworn statements at a plea hearing are entitled to a strong presumption of verity, that presumption may be overcome by compelling evidence that the plea was the product of ineffective assistance of counsel. See *Altman v. U.S.*, 94 Cr 454 (JGK) (S.D.N.Y. June 22, 2001) ("A claim that a guilty plea was involuntary due to ineffective assistance of

counsel must be evaluated under the two-part test set forth in *Strickland v. Washington*[.]"). Here, as explained above, Mr. Williams has presented overwhelming evidence that his plea was induced by Mr. Kushner's false promises and lack of adequate investigation and advice, and that his allocution was improperly scripted by the prosecution. This evidence is more than sufficient to overcome any presumption arising from the plea colloquy.

The government's opposition completely fails to address perhaps the most shocking constitutional violation in this case: the prosecutor's improper scripting of Mr. Williams' plea allocution, documented through contemporaneous text messages that the government cannot dispute. This conduct transforms the plea from a knowing and voluntary admission into a choreographed performance designed to manufacture federal jurisdiction where none existed.

The evidence of this improper scripting is irrefutable:

1.  Text Messages on Morning of Plea (May 5, 2022, 8:37 AM):

> Kushner: "Together with others he agreed to file false documents with financial institutions in order to obtain money and property from those banks. That's what the Government wants us to say. Can you let me know what's up? He should also proffer the scheme occurred during the dates in the information."

> Williams: "I'm on it now. I will read 'Together with others I agreed to file false documents with financial institutions in order to obtain money and property from those banks. The scheme took place between 2012-2016' Will they use this word allocution so I know that's when to say this"

> (Motion for Reconsideration at 10, ECF No. 114)

2.  At the plea hearing, Mr. Williams recited this government-authored script verbatim:

> "Together with others I agreed to file false documents with financial institutions in order to obtain money and property from those banks. The scheme took place between 2012 to 2016, Your Honor."

> (Plea Hearing Tr. at 28, ECF No. 25).

This scripting violates fundamental constitutional principles:

First, as the Second Circuit held in *United States v. Maher*, 108 F.3d 1513, 1524 (2d Cir. 1997), a plea allocution must establish "that the conduct which the defendant admits constitutes the offense charged" through "the defendant's own admissions." A scripted recitation of the government's preferred language does not satisfy this requirement.

Second, the Supreme Court has emphasized that the plea colloquy must demonstrate the defendant's actual understanding of the charge, not merely his ability to parrot statutory language. See *Bousley v. United States*, 523 U.S. 614, 618-19 (1998) ("A plea is not intelligent unless a defendant first receives real notice of the nature of the charge against him").

Third, the government's scripting here was particularly egregious because it was designed to obscure the jurisdictional defects in the prosecution by having Mr. Williams recite language about "financial institutions" when the actual conduct involved only payment processors. This type of manufactured allocution undermines the very purpose of Rule 11's factual basis requirement.

Finally, the government's attempt to downplay the prejudice flowing from Mr. Kushner's failure to raise the statute of limitations defense is unavailing. The government asserts that this claim is "factually incorrect" because the original indictment was timely, but it offers no response to Mr. Williams' well-supported arguments that (1) the original indictment was facially time-barred because the last overt act occurred more than five years before the indictment was filed; (2) the superseding information could not cure this defect because it impermissibly broadened the charges; and (3) defense counsel was ineffective for failing to raise this clear statute of limitations defense (Motion for Reconsideration, ECF No. 114 at 4-5, 13). The prejudice flowing from this deficient performance is manifest, as there is a reasonable probability that the charges would have been dismissed as time-barred had counsel raised the issue. See

*Hansel v. United States*, 70 F.3d 6, 8 (2d Cir. 1995) ("Hansel's counsel's failure to object to the time-barred counts is unaccountable in the circumstances and cannot "be considered sound trial strategy." In particular, counsel's decision cannot be justified by considerations related to the negotiation of a plea agreement, because Hansel pled without the benefit of one. Hansel's prejudice is that he pled guilty to two time-barred counts that would have been dismissed, if his attorney had acted competently. Hansel's counsel was therefore ineffective under Strickland, and Hansel's Sixth Amendment right to counsel was thereby impaired. Hansel's waiver of the time-bar defense cannot be deemed knowing and intelligent: we may assume that he would not have pled guilty to counts that he knew to be time-barred. Accordingly, we reverse Hansel's convictions on counts seven and eight of the indictment").

In sum, the government's attempts to minimize the prejudice suffered by Mr. Williams as a result of his counsel's deficient performance are both legally and factually unsupportable. Mr. Williams has established both presumed and actual prejudice flowing from Mr. Kushner's actual conflict of interest and his failure to provide adequate advice and advocacy at every critical stage of the proceedings. The government's selective and misleading portrayal of the record cannot overcome this compelling showing of prejudice. The Court must reject the government's invitation to disregard this evidence and instead grant reconsideration based on the clear constitutional violations that infected every aspect of Mr. Williams' case.

## THE GOVERNMENT'S RELIANCE ON PROCEDURAL TECHNICALITIES CANNOT OVERRIDE THE NEED FOR SUBSTANTIVE JUSTICE

Perhaps most troubling of all, the government's opposition completely fails to address the cumulative impact of the multiple constitutional violations that pervaded every stage of the proceedings against Mr. Williams. As detailed in his motion for reconsideration, these violations included not only the ineffective assistance of counsel discussed above, but also prosecutorial

misconduct in scripting the plea allocution, as well as jurisdictional defects arising from the expiration of the statute of limitations and the lack of any overt acts or victims in the Eastern District of New York (ECF No. 114). The cumulative effect of these errors was to render the entire proceedings fundamentally unfair and to undermine confidence in the validity of Mr. Williams' conviction and sentence.

The Second Circuit has long recognized that the cumulative impact of multiple constitutional errors can require reversal even if each error, standing alone, might be deemed harmless. See, e.g., *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008) ("the cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal of a conviction."); *United States v. Guglielmini*, 384 F.2d 602, 607 (2d Cir. 1967) ("holding that, even though not "any one of the errors committed during the trial would have required reversal of the convictions," "the total effect of the errors we have found was to cast such a serious doubt on the fairness of the trial that the convictions must be reversed."). This "cumulative error" doctrine is rooted in the fundamental principle that a criminal defendant is entitled not just to a fair trial, but to a trial whose fairness is beyond reproach. See *United States v. Cronic*, 466 U.S. 648, 656 (1984) ((prejudice presumed where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing").

Here, the government's opposition brief analyzes each of Mr. Williams' claims in isolation, without ever grappling with their combined effect on the integrity of the proceedings as a whole. This piecemeal approach is fundamentally misguided, as it fails to account for the way in which the multiple errors and deficiencies in this case built upon and compounded one another, creating a perfect storm of constitutional violations. For example, the prejudice flowing

from Mr. Kushner's false promises of a non-incarceration sentence was exacerbated by his failure to review discovery or investigate potential defenses, as well as by the prosecutor's improper scripting of the plea allocution. Similarly, the jurisdictional defects arising from the expiration of the statute of limitations and the lack of any overt acts in the Eastern District of New York were compounded by Mr. Kushner's failure to raise these issues.

When viewed in their totality, these errors and deficiencies rise to the level of structural error, affecting the very framework within which the proceedings were conducted. See *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991) (holding that "structural "defects in the constitution of the trial mechanism" that "defy analysis by harmless-error standards" and require automatic reversal).

The government's failure to address, let alone refute, the cumulative impact of the constitutional violations in this case is a glaring omission that undermines its entire opposition. By focusing solely on the trees, the government misses the forest – the fundamental unfairness and unreliability of the proceedings as a whole. This Court cannot turn a blind eye to this reality or allow the government's piecemeal approach to obscure the profound and pervasive constitutional defects that infected every stage of Mr. Williams' case.

The integrity of our criminal justice system depends on the scrupulous adherence to constitutional safeguards at every step of the process, from grand jury to sentencing. Where, as here, those safeguards have been systematically violated and the proceedings as a whole have been rendered fundamentally unfair, the Court has a duty to intervene and correct the injustice. The government's opposition, by ignoring the cumulative impact of the errors and deficiencies in this case, fails to come to grips with the magnitude of the problem or the necessity of the solution.

The cumulative impact of the constitutional violations established by the complete record - including all ancillary filings and recently uploaded exhibits (many seen for the first time due to technical issues)- demonstrates that this case presents exactly the type of fundamental miscarriage of justice that § 2255 was designed to remedy. The Second Circuit has recognized that even if individual errors might be deemed harmless in isolation, their combined effect can require reversal. See *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008) ("the cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal").

The complete record now shows multiple, compounding constitutional violations:

1. Jurisdictional Defects:

    a. Time-barred indictment (proven by original indictment)

    b. No FDIC-insured bank victims (proven by "Reserve Project" email)

    c. Lack of venue (proven by transaction records)

    d. No subject matter jurisdiction (proven by contracts)

2. Ineffective Assistance:

    a. False promises (proven by text messages)

    b. No discovery review (proven by billing records)

    c. Failed to raise time-bar (proven by correspondence)

    d. Ignored mental health (proven by medical records)

3. Due Process Violations:

    a. Scripted plea (proven by text messages)

    b. Rushed and illegal waiver (proven by timeline)

    c. No competency evaluation (proven by expert opinions)

      d.  Withheld Brady material (proven by disclosures)

4.  Structural Errors:

      a.  Lack of jurisdiction

      b.  Incompetence to plead

      c.  Denial of counsel

      d.  Involuntary plea

The Supreme Court has recognized that certain errors are "structural" in nature, affecting "the framework within which the trial proceeds." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Such errors:

1.  Defy harmless error analysis

2.  Require automatic reversal

3.  Cannot be waived

4.  Infect entire proceedings

The Court's obligation to consider the complete record, including all ancillary filings and exhibits, stems directly from 28 U.S.C. § 2255's mandate that the Court determine whether the "files and records of the case conclusively show that the prisoner is entitled to no relief." This obligation is particularly acute here, where technical filing issues initially prevented full presentation of critical evidence, and where multiple ancillary filings provide crucial supplemental support for the constitutional claims.

The complete record now includes:

1.  Previously Unavailable Evidence:

      a.  Technical Filing Issues Resolved:

            i.  Large exhibits now properly docketed

       ii.  System size limitations overcome

      iii.  Manual filing processes completed

      iv.  All evidence properly before Court

      v.  Complete record available

  b.  Critical Documentary Proof:

      i.  "Reserve Project" email and spreadsheet

      ii.  Applied Merchant Systems contracts

      iii.  Text messages with counsel

      iv.  Mental health records

      v.  Expert opinions

2.  Supplemental Legal Arguments:

  a.  Motion for Judicial Notices (ECF Nos. 95, 98, 100, 101, 103, 106):

      i.  Payment processor relationships

      ii.  Lack of bank losses

      iii.  Jurisdictional defects

      iv.  Brady violations

      v.  Structural errors

3.  Critical Legal Authority:

  a.  Supplemental Case Law:

      i.  Recent Second Circuit decisions

      ii.  Controlling Supreme Court precedent

      iii.  Parallel district court rulings

      iv.  Persuasive authority

     v.  Constitutional analysis

  b.  Additional Legal Arguments:

     i.  Jurisdictional challenges

     ii.  Constitutional claims

     iii.  Structural errors

     iv.  Due process violations

     v.  Ineffective assistance

The Seventh Circuit has emphasized that courts must consider the complete record in § 2255 proceedings: "the district court must review the state court trial record to determine whether the petitioner for federal habeas corpus relief had received the constitutionally required due process afforded by a full and fair hearing resulting in findings supported by the record,." *United States ex rel. Jones v. Franzen*, 676 F.2d 261 (7th Cir. 1982). This obligation extends to:

1. All Filed Materials:

  a.  Original petition

  b.  Supplemental motions

  c.  Supporting exhibits

  d.  Ancillary filings

  e.  Complete record

2. All Available Evidence:

  a.  Documentary proof

  b.  Expert opinions

  c.  Legal authority

  d.  Factual support

3.  All Constitutional Claims:

    a.  Ineffective assistance

    b.  Due process violations

    c.  Brady claims

    d.  Structural errors

    e.  Jurisdictional defects

The Supreme Court has long recognized that habeas proceedings require: "The Federal District Court must carefully scrutinize the state-court record in order to determine whether the factual determinations of the State Court are fairly supported by the record." *Townsend v. Sain*, 372 U.S. 293, 319 (1963). This principle applies with special force where:

1.  Technical Issues Prevented Filing:

    a.  System limitations

    b.  Size restrictions

    c.  Processing delays

    d.  Manual requirements

    e.  Electronic constraints

2.  Evidence Supports Constitutional Claims:

    a.  Actual conflict

    b.  Brady violations

    c.  Ineffective assistance

    d.  Due process

    e.  Structural errors

This Court must reject the government's invitation to disregard the forest for the trees. It must grant reconsideration based on the clear and compelling evidence of structural error and cumulative prejudice set forth in Mr. Williams' motion. And it must vacate his conviction and sentence to restore integrity to the proceedings and to vindicate the fundamental constitutional rights that were so thoroughly compromised in this case. Anything less would be to condone a miscarriage of justice and to erode public confidence in the fairness and legitimacy of our criminal justice system.

## THE GOVERNMENT'S RELIANCE ON PROCEDURAL TECHNICALITIES CANNOT OVERRIDE THE NEED FOR SUBSTANTIVE JUSTICE

Throughout its opposition, the government seeks to avoid a substantive reckoning with the profound constitutional violations in this case by invoking a series of procedural technicalities and artificial barriers to relief. It argues that Mr. Williams' claims are "baseless" and "already rejected," that his new evidence is "not properly before the Court," and that his arguments are "factually incorrect" or "legally improper." (Government Opposition at 3-5, 7-8, ECF No. 122). But these arguments elevate form over substance and procedure over justice. They reflect a myopic focus on the minutiae of the law, rather than its fundamental purposes and principles.

The Great Writ of habeas corpus, of which § 2255 is a statutory descendant, has always been marked by a flexibility and capacity for growth to meet new challenges and rectify manifest injustices. As Justice Oliver Wendell Holmes famously observed, habeas corpus "cuts through all forms and goes to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings, and although every form may have been preserved, opens the inquiry whether they have been more than an empty shell." *Frank v. Mangum*, 237 U.S. 309, 346

(1915) (Holmes, J., dissenting). This expansive and equitable nature of the writ is essential to its role as the ultimate safeguard of constitutional rights and liberties.

The government's approach in this case, by contrast, seeks to reduce § 2255 to a hollow formality – a narrow and rigid procedural maze that exalts technical compliance over substantive justice. This approach is antithetical to the spirit and purpose of the Great Writ. It is an attempt to immunize even the most egregious constitutional violations from judicial scrutiny and correction, simply because they have been artfully packaged in the guise of procedural regularity.

But this Court must not be fooled by such sophistry. It must not allow the government's incantation of procedural shibboleths to drown out the unmistakable cry of injustice that emanates from every page of this record. It must heed in Trop, where it is recognized that the safeguards of liberty "must draw their meaning from the evolving standards of decency that mark the progress of a maturing society,"356 U.S. at 101, 78 S. Ct. at 598.

The constitutional violations in this case are neither technical nor trivial. They go to the very heart of our system of justice and the integrity of the criminal process. They implicate the most basic and fundamental rights enshrined in our Constitution – the right to effective assistance of counsel, the right to due process of law, the right to a fair trial before an impartial tribunal. These are not mere abstractions or formalities, but the very lifeblood of our democracy and the essential bulwarks against tyranny and oppression.

When these rights are violated in such a flagrant and pervasive manner as occurred here, it is not enough for the government to offer legalistic excuses or to hide behind procedural barriers. It is not enough for the Court to avert its gaze or to retreat into the comfortable but ultimately empty formalism of rote denials and dismissals. Rather, it is the solemn duty of both

the prosecutor and the judge to confront the injustice head-on, to acknowledge the gravity of the constitutional breach, and to take whatever steps are necessary to rectify it.

This is the sacred obligation that the Constitution imposes on all of us who have sworn to uphold it. It is the non-negotiable demand of a free society founded on the rule of law and the inviolability of individual rights. And it is the inescapable responsibility of this Court in adjudicating Mr. Williams' motion for reconsideration.

The government's opposition, by seeking to evade this responsibility and to reduce these profound constitutional questions to a mere matter of procedural gamesmanship, does a grave disservice to the principles of justice and the rule of law. It is an abdication of the prosecutor's role as a minister of justice and a guardian of the Constitution. And it is an affront to the judicial oath to administer justice impartially and to protect and defend the Constitution against all enemies, foreign and domestic.

This Court must not be complicit in this abdication or this affront. It must not allow the government's procedural maneuverings to obscure the clear and compelling evidence of constitutional error and injustice in this case. It must not permit the narrow and rigid confines of procedural default to trump the broad and equitable mandate of substantive justice.

Instead, this Court must grant reconsideration and vacate Mr. Williams' conviction and sentence, not as an act of judicial activism or overreach, but as a necessary and proper exercise of its constitutional duty to safeguard the rights and liberties of all citizens. It must send a clear and unequivocal message that no conviction obtained in violation of the Constitution will be allowed to stand, no matter how cleverly it may be cloaked in the garb of procedural regularity.

For in the end, it is not only Mr. Williams' rights that hang in the balance, but the very legitimacy and integrity of our system of justice. It is not only his liberty that is at stake, but the

fundamental freedoms and values that define us as a nation. And it is not only his case that will be judged by history, but the fidelity and courage of this Court in discharging its sacred constitutional duty.

Let that judgment be one of vindication, not abdication. Let it be a testament to the enduring power and promise of the Great Writ, not a footnote to its decline and fall.

That is the challenge and the opportunity that this case presents. That is the burden and the privilege of the judicial oath. And that is the solemn responsibility that now rests on the shoulders of this Court. May it be equal to the task.

The government's opposition relies heavily on waiver arguments that fundamentally misapprehend both Supreme Court precedent and the nature of Mr. Williams' claims. As the Supreme Court has repeatedly held, certain defects cannot be waived, even by a counseled guilty plea:

1.  Non-Waivable Jurisdictional Defects: "[A] plea of guilty to a charge does not waive a claim that – judged on its face – the charge is one which the State may not constitutionally prosecute." *Menna v. New York*, 423 U.S. 61, 62-63 (1975). This principle applies to:

    a.  Statute of Limitations:

        i.   Jurisdictional in nature

        ii.  Cannot be waived

        iii. Voids prosecution

        iv.  Requires dismissal

        v.   Not cured by plea

    b.  Subject Matter Jurisdiction:

      i.   Missing essential elements

      ii.   No FDIC victims

      iii.  Lack of bank fraud

      iv.  No federal jurisdiction

      v.   Void ab initio

2.  Constitutional Violations Affecting Waiver:

   a.  The Supreme Court has recognized that certain constitutional violations render a plea waiver invalid:

      i.   Ineffective Assistance Claims:

         1.  "The right to counsel is the right to effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970). Here, counsel:

            a.  Made false promises

            b.  Harbored actual conflict

            c.  Failed to investigate

            d.  Ignored defenses

            e.  Misadvised client

      ii.  Brady Violations:

         1.  "Where the government's suppression of evidence amounts to a denial of due process, the prosecutor's good faith or lack of bad faith is irrelevant." *State v. Parker*, 198 S.W.3d 178 (Mo. Ct. App. 2006). The government:

            a.  Withheld evidence

      b. Concealed profits

      c. Hid relationships

      d. Masked timeline

      e. Suppressed exculpation

iii. Structural Errors Override Waiver: Certain errors are so fundamental that they:

    1. Affect framework of proceedings

    2. Cannot be waived

    3. Require automatic reversal

    4. Void conviction

    5. Mandate relief

    6. These include:

      a. Actual Conflict:

        i. Divided loyalties

        ii. False promises

        iii. Hidden communications

        iv. Unauthorized concessions

        v. Government cooperation

iv. Competency Issues:

    1. Mental illness

    2. Cognitive limitations

    3. No evaluation

    4. Rushed decisions

5.   Impaired understanding

3.   Preservation of IAC Claims:

a.   The plea agreement explicitly preserves: "the right to bring a claim of ineffective assistance of counsel  in an appropriate forum." (Plea Agreement ¶ 4, ECF No. 85-1). This preservation covers:

   i.   Pre-Plea Ineffectiveness:

   ii.   False promises

   iii.   Missing investigation

   iv.   Ignored defenses

   v.   Conflict of interest

   vi.   Brady violations

b.   Plea-Related Claims:

   i.   Involuntary plea

   ii.   Scripted allocution

   iii.   Rushed and constitutionally invalid waiver of indictment

   iv.   Missing competency

   v.   Jurisdictional defects

## THE GOVERNMENT'S ATTEMPT TO MINIMIZE THE STRUCTURAL AND SYSTEMIC ISSUES RAISED BY THIS CASE FALLS SHORT

Finally, it must be noted that the government's opposition fails to come to grips with the profound structural and systemic issues that Mr. Williams' case raises about the state of our criminal justice system. This is not an isolated or anomalous instance of a rogue prosecutor or a negligent defense attorney, but rather a troubling example of a much deeper and more pervasive

problem – the erosion of the adversarial process and the breakdown of the constitutional safeguards that are supposed to ensure the fairness and integrity of criminal proceedings.

As the Supreme Court has recognized, the Sixth Amendment right to effective assistance of counsel is not simply a personal right of the accused, but an essential structural safeguard that ensures the proper functioning of the adversarial system as a whole. See *Cronic,* 466 U.S. at 653-56 ("The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing."). When that right is violated, as it was here through Mr. Kushner's actual conflict of interest, false promises, and lack of meaningful advocacy, it undermines the very foundation of our system of justice and calls into question the reliability of the outcomes it produces.

Similarly, the prosecutorial misconduct in this case, including the improper scripting of the plea allocution, is not just a violation of Mr. Williams' individual rights, but an affront to the integrity of the criminal process and the ethical obligations of the prosecutor's office. As the Supreme Court has admonished, a prosecutor "may prosecute with earnestness and vigor" but "while he may strike hard blows, he is not at liberty to strike foul ones" *Berger v. United States*, 295 U.S. 78, 88 (1935). When a prosecutor crosses that line, as occurred here, it erodes public confidence in the fairness and legitimacy of the criminal justice system and undermines the rule of law.

The government's opposition to reconsideration completely fails to address the substantial evidence of prosecutorial misconduct that infected every stage of these proceedings. This misconduct goes far beyond mere technical violations - it strikes at the very heart of due process and the integrity of the judicial system. The record now contains irrefutable evidence of multiple, serious instances of prosecutorial overreach and misrepresentation:

1. False Statements About Bank Losses:

    a. To the Grand Jury (as evidenced by indictment):

        i. Claimed banks were direct victims

        ii. Alleged millions in losses

        iii. Mischaracterized payment processor relationships

        iv. Concealed processor profits

    b. At Plea Hearing:

        i. "Your Honor, we don't have an estimated restitution amount at this point because the victims in this case, the banks, have not provided loss affidavits... It's just a matter of whether the banks will assert claims to those losses." (Plea Hearing Tr. at 20-21, ECF No. 25)

    c. At Sentencing:

        i. "We interviewed as many victims as we could... It was impossible to identify what was lost and what was actually provided to them." (Sentencing Transcript, p. 23, ECF No. 85-3).

        ii. These statements were knowingly false because:

            1. The "Reserve Project" email showed processors profited

            2. No bank ever claimed actual losses

            3. Processors, not banks, were the contracting parties

            4. Banks earned fees on every transaction

2. Brady Violations: The government withheld critical exculpatory evidence including:

    a. Payment processor profits and reserves

    b. Evidence showing no direct bank relationships

    c.   Proof that processors knew business model

As the Supreme Court held in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the

suppression of evidence favorable to the accused violates due process "where the evidence is

material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution."

    1.   The evidence withheld here was plainly material as it:

        a.   Disproved essential elements

        b.   Negated federal jurisdiction

        c.   Showed lack of actual loss

        d.   Demonstrated processor knowledge

    2.   Improper Plea Scripting:

        a.   The text messages now in evidence prove the prosecutor authored Mr.

            Williams' plea allocution:

            May 5, 2022, 8:37 AM:

            Kushner: "Together with others he agreed to file false documents
            with financial institutions in order to obtain money and property
            from those banks. That's what the Government wants us to say."

            (Motion for Reconsideration at 10, ECF No. 114)

This scripting violates fundamental principles of due process and Rule 11. *See United

States v. Maher*, 108 F.3d 1513, 1524 (2d Cir. 1997) (plea allocution must reflect defendant's

own words and understanding).

The Second Circuit has emphasized that prosecutors have a "special role" in the criminal

justice system that requires them to seek justice, not merely convictions. *United States v.

Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) ("One of the most important responsibilities of the

United States Attorney and his senior deputies is ensuring that line attorneys are aware of the

special ethical responsibilities of prosecutors, and that they resist the temptation to overreach."). When prosecutors fail in this duty through: (1) Knowing false statements, (2) Brady violations (3) Manufactured evidence, and (4) Scripted pleas.

The entire proceeding is tainted. The prosecutorial misconduct documented above rises to the level of structural error requiring automatic reversal, regardless of any harmless error analysis. The Supreme Court has recognized that certain errors are so fundamental that they: (1) Affect the framework of the trial, (2) Defy analysis by harmless error standards, (3) Require automatic reversal. See *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991).

The misconduct here qualifies as structural error because:

1. It Undermined the Grand Jury Process: As the Second Circuit held in *United States v. Hogan*, 712 F.2d 757, 761-62 (2d Cir. 1983):

   "In summary, the incidents related are flagrant and unconscionable. Taking advantage of his special position of trust, the AUSA impaired the grand jury's integrity as an independent body. Thus, based on the particular facts of this case, we believe that the indictment below must be dismissed."

2. It Violated Brady's Constitutional Mandate: The Supreme Court has emphasized that Brady violations undermine "the confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985). Here, the withheld evidence about: (1) Payment processor profits (2) Lack of bank losses (3) Processor knowledge strikes at the very heart of the prosecution.

3. It Manufactured Federal Jurisdiction: The prosecutor's misrepresentations about bank losses were designed to create federal jurisdiction where none existed. This type of jurisdictional manipulation constitutes structural error.

4. It Corrupted the Plea Process: By scripting the allocution and withholding Brady material, the prosecution rendered the plea process fundamentally unfair. See

> *Machibroda v. United States*, 368 U.S. 487, 493 (1962) ("A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void.").

5. These structural and systemic issues are not mere abstractions or academic concerns, but have real and profound consequences for the lives of individuals like Mr. Williams who are caught up in the machinery of the criminal justice system. When the adversarial process breaks down and the constitutional safeguards are ignored, it is not just the defendant who suffers, but the very integrity and legitimacy of the system itself.

The government's attempt to minimize and compartmentalize these issues, to treat Mr. Williams' case as an isolated incident to be managed and contained, reflects a disturbing myopia and complacency. It suggests an unwillingness to confront the deeper malaise that infects our criminal justice system, and a reluctance to take on the difficult but necessary work of meaningful reform.

The government's opposition fundamentally misapprehends the prejudice analysis in three critical ways: (1) it ignores that certain errors require no showing of prejudice; (2) it disregards the substantial evidence of actual prejudice; and (3) it fails to consider the cumulative impact of multiple constitutional violations.

1. Presumed Prejudice for Structural Errors: The Supreme Court has identified certain constitutional violations that are so fundamental that prejudice is presumed:

   a. Actual Conflict of Interest: Under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), no showing of prejudice is required where counsel labored under an actual conflict. The evidence here establishes such conflict through:

      i. False initial representations

      ii. Divided loyalties

      iii. Unauthorized concessions

      iv. Government cooperation

      v. Hidden communications

b. Complete Denial of Counsel: Where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," prejudice is presumed. *United States v. Cronic*, 466 U.S. 648, 659 (1984). Here, counsel:

      i. Never reviewed discovery

      ii. Ignored statute of limitations

      iii. Accepted government's script

      iv. Made damaging admissions

      v. Abandoned defenses

c. Jurisdictional Defects: Time-bar and jurisdictional violations require no showing of prejudice because they:

      i. Deprive court of power to act

      ii. Cannot be waived

      iii. Affect framework of proceedings

      iv. Render judgment void

      v. Require automatic reversal

d. Actual Prejudice Demonstrated:

      i. Even if prejudice must be shown, the record contains overwhelming evidence that counsel's deficiencies affected the outcome:

      ii. Plea Decision Impact:

         1. False promises of no incarceration

      2.  Failure to raise time-bar

      3.  Ignored payment processor evidence

      4.  Concealed Brady material

      5.  Rushed uninformed decisions

iii.  Sentencing Consequences:

      1.  Unauthorized admissions

      2.  Uncontested loss amount

      3.  Missing mitigation

      4.  Mental health ignored

      5.  Damaging concessions

iv.  Specific Examples of Prejudice:

      1.  Statute of Limitations:

          a.  Last overt act April 2015

          b.  Indictment February 2021

          c.  Clear time-bar defense

          d.  Would have required dismissal

          e.  Counsel never raised

v.  Bank Fraud Elements:

      1.  No FDIC-insured victims

      2.  Payment processors profited

      3.  No actual losses

      4.  Missing essential elements

      5.  Jurisdictional failure

2.  Mental Health Issues:

    a.  Bipolar disorder

    b.  Recent hospitalization

    c.  Cognitive limitations

    d.  No competency evaluation

    e.  Rushed decisions

3.  Cumulative Impact Analysis: The Second Circuit requires courts to consider the combined effect of multiple errors:

> "[T]he cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal." United States v. Al-Moayad, 545 F.3d 139, 178 (2d Cir. 2008).

Here, the cumulative impact includes:

    d.  Constitutional Violations:

        i.  Ineffective assistance

        ii.  Due process violations

        iii.  Brady violations

        iv.  Structural errors

        v.  Jurisdictional defects

    e.  Procedural Defects:

        i.  Rushed plea

        ii.  Scripted allocution

        iii.  Missing investigation

        iv.  Inadequate counsel

        v.  No competency review

4.   Proper Prejudice Standard:

The Supreme Court has emphasized that prejudice requires only "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). This standard is met because:

    a.   Time-Bar Defense:

        i.   Would have required dismissal

        ii.   Clear statutory violation

        iii.   Jurisdictional defect

        iv.   No waiver possible

        v.   Automatic relief

    b.   Missing Elements:

        i.   No bank victims

        ii.   No actual losses

        iii.   No FDIC involvement

        iv.   No jurisdiction

        v.   Required acquittal

But this Court cannot indulge in such myopia or complacency. It cannot turn a blind eye to the profound structural and systemic problems that this case exposes or pretend that they can be addressed through piecemeal and ad hoc solutions. Rather, it must confront these issues head-on and use the power and authority of the bench to catalyze the kind of fundamental and far-reaching reforms that are necessary to restore the integrity and legitimacy of our criminal justice system.

This means not only granting reconsideration and vacating Mr. Williams' conviction and sentence but also using this case as an opportunity to send a clear and unequivocal message to prosecutors, defense attorneys, and the legal profession as a whole. It means reaffirming the central importance of the adversarial process and the constitutional safeguards that undergird it, and making clear that any violation of these principles will not be tolerated.

It means taking a hard and unflinching look at the systemic factors that contribute to such violations, from the crushing caseloads and inadequate resources of public defender offices, to the perverse incentives and lack of accountability in prosecutors' offices, to the inadequate training and oversight of the criminal defense bar. And it means using the bully pulpit of the judiciary to advocate for the kind of comprehensive and structural reforms that are necessary to address these issues at their root.

In short, this Court must not only do justice in this individual case, but also use it as a catalyst for broader and more systemic change. It must not only correct the specific constitutional violations that occurred here but also take steps to prevent their recurrence in future cases.

For in the end, the measure of a justice system is not how it treats the rich, the powerful, or the privileged, but how it treats the poorest, the most vulnerable, and the most marginalized among us. It is not how it looks on paper, but how it functions in practice. And it is not how it deals with the easy cases, but how it rises to the challenge of the hard ones.

Mr. Williams' case is a hard one. It is a case that exposes the fault lines and fissures in our criminal justice system, and that challenges us to confront some uncomfortable truths about the gap between our ideals and our reality. But it is also a case that presents an opportunity – an

opportunity to reaffirm our commitment to the rule of law, to the Constitution, and to the fundamental principles of justice and fairness that are the bedrock of our democracy.

This Court must seize that opportunity, not only for the sake of Mr. Williams, but for the sake of our entire system of justice. It must grant reconsideration, vacate the conviction and sentence, and send a resounding message that the Constitution is not a mere parchment barrier to be circumvented or ignored, but a living and breathing document that must be honored and enforced in every case, no matter how small or how large.

For in the end, it is not only Mr. Williams' liberty that hangs in the balance, but the very soul of our nation. It is not only his rights that are at stake, but the rights of every person who comes before our courts seeking justice and redress. And it is not only his case that will be judged by history, but the commitment and courage of this Court in discharging its sacred constitutional duty.

Let that judgment be one of conviction, not compromise. Let it be a testament to the enduring strength and vitality of our constitutional democracy, not a eulogy for its decline and decay. And let it be a clarion call to all who serve in the administration of justice – prosecutors, defense attorneys, and judges alike – to rededicate ourselves to the noble and sacred task of ensuring that every person, no matter how poor or powerless, receives the full measure of justice and dignity that the Constitution demands.

That is the challenge and the opportunity that this case presents. That is the burden and the privilege of the judicial oath. And that is the solemn responsibility that now rests on the shoulders of this Court.

Clarification Regarding Prior Filings


In our original Motion for Reconsideration under Rule 59(e), we inadvertently stated that the Court relied on *United States v. Broce*, 488 U.S. 563 (1989), and *United States v. Doyle*, 348 F.2d 715 (2d Cir. 1965), with respect to issues of ineffective assistance. We have reviewed the Court's Memorandum and Order and acknowledge that these cases were not, in fact, cited by the Court. This misstatement was inadvertent and does not affect the substantive arguments presented in our motion, which are firmly grounded in other controlling legal authorities. We apologize for any confusion this may have caused.

## CONCLUSION

For the foregoing reasons, Mr. Williams respectfully requests that this Court grant his motion for reconsideration, vacate his conviction and sentence, and either dismiss the indictment with prejudice or order a new trial. The government's opposition, while long on rhetoric and procedural gamesmanship, is woefully short on substance and utterly fails to come to grips with the profound constitutional violations that infected every stage of these proceedings.

The record before this Court is replete with evidence of ineffective assistance of counsel, prosecutorial misconduct, jurisdictional defects, and the complete breakdown of the adversarial process. This evidence, much of which was overlooked or given short shrift in the Court's initial decision, compels the conclusion that Mr. Williams' conviction was obtained in violation of his Fifth and Sixth Amendment rights and cannot be allowed to stand.

As indicated, the sentencing and plea acceptance in this case, marred by undisclosed time-bar issues, reliance on a superseding information after the statute lapsed, and a near-

complete failure of defense counsel to advocate fundamental rights, has effectively rendered. That is not hyperbole. The structural and jurisdictional defects, counsel's false assurances, and the overshadowing of the final overt-act date are the hallmarks of a fundamentally unfair proceeding.

The record before this Court demonstrates a systematic breakdown in the fundamental protections that the Constitution guarantees to all criminal defendants. The cumulative impact of the multiple constitutional violations has resulted in proceedings that failed to meet the basic requirements of due process and fundamental fairness. As the Supreme Court emphasized in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), "The principle . . . is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused". The constitutional deficiencies here include:

1. Systematic Breakdown of Adversarial Process:

    a.    Defense Counsel's Failures:

        i.    1 hour of discovery review before the plea and did not review discovery with client or uploaded the 2nd and 3rd rounds of Discovery

        ii.    False promises to induce plea

        iii.    Actual conflict of interest

        iv.    Abandonment of crucial defenses

        v.    Failure to investigate

    b.    Prosecution's Overreach:

        i.    Misrepresenting bank losses

        ii.    Withholding Brady material

        iii.    Scripting plea allocution

        iv.    Manufacturing jurisdiction

        v.    Pursuing time-barred charges

2.  Multiple Constitutional Violations:

    a.  Sixth Amendment:

        i.    Ineffective assistance

        ii.    Conflict of interest

        iii.    Denial of counsel

        iv.    Right to fair trial

        v.    Competency issues

    b.  Fifth Amendment:

        i.    Due process violations

        ii.    Brady violations

        iii.    Involuntary plea

        iv.    Jurisdictional defects

        v.    Fundamental unfairness

3.  Structural Defects Requiring Vacatur:

    a.  The Supreme Court has recognized that certain errors are so fundamental that they:

        i.    Affect the framework of the proceedings

        ii.    Defy harmless error analysis

        iii.    Require automatic reversal

    See *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991).

    b.  The violations here are structural because they:

    c.  Undermined Basic Guarantees:

        i.    Right to conflict-free counsel

        ii.   Right to competent representation

        iii.  Right to fair process

        iv.  Right to proper jurisdiction

        v.   Right to Brady material

    d.  Infected Entire Proceeding:

        i.    From indictment through sentencing

        ii.   Affected every critical stage

        iii.  Compromised fundamental rights

        iv.  Prevented fair adjudication

        v.   Destroyed reliability

4. Cumulative Impact Requires Relief:

As the Second Circuit has recognized, even if individual errors might be deemed harmless in isolation, their combined effect can require reversal where they render the proceedings fundamentally unfair. See *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008). Here, the cumulative effect of:

    a.  Time-barred prosecution

    b.  Ineffective counsel

    c.  Actual conflict

    d.  Brady violations

    e.  Prosecutorial overreach

    f.  Mental health issues

g.  Jurisdictional defects

Created proceedings that failed to meet constitutional minimums.

The Supreme Court has emphasized that "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). When that right is compromised by:

a.  Actual conflict

b.  False promises

c.  Failure to investigate

d.  Abandonment of defenses

The entire proceeding is constitutionally defective.

The government's attempts to minimize these constitutional violations, to dismiss them as mere technicalities or isolated incidents, reflect a disturbing indifference to the fundamental principles of due process and the rule of law. Its efforts to erect procedural barriers to the vindication of Mr. Williams' rights are nothing more than a transparent attempt to shield its own misconduct from judicial scrutiny and to preserve a conviction obtained through a pervasive pattern of constitutional violations.

This Court must not be a party to such efforts. It must not allow the government's procedural maneuverings to obscure the grave injustices that occurred here or to deter it from exercising its solemn duty to correct them. It must not permit the narrow confines of procedural default to trump the broad imperatives of substantive justice and fundamental fairness.

Instead, this Court must send a clear and unequivocal message that it will not tolerate the kind of misconduct and abuse of power that occurred in this case, and that it will not hesitate to use its equitable powers to remedy even the most egregious constitutional violations. It must

reaffirm the central role of the judiciary in safeguarding the rights and liberties of all citizens, and in holding the government to the highest standards of integrity and fairness.

In doing so, this Court will not only be doing justice in this individual case but also taking an important step towards restoring public confidence in the fairness and legitimacy of our criminal justice system. It will be sending a powerful message that the Constitution is not a mere parchment barrier to be circumvented or ignored, but a living and breathing document that must be honored and enforced in every case, no matter how small or how large.

This is the great challenge and opportunity that this case presents. It is a challenge that will require courage, conviction, and a steadfast commitment to the principles of justice and the rule of law. But it is also an opportunity to reaffirm the vital role of the judiciary in our constitutional system of checks and balances, and to ensure that the rights and liberties of all citizens are protected from government overreach and abuse of power.

Mr. Williams respectfully submits that this Court is equal to that challenge and will seize that opportunity. He has faith that this Court will not shrink from its constitutional duty, but will instead use its equitable powers to correct the manifest injustices that occurred here and to restore integrity to a system that has lost its way.

For the foregoing reasons, Mr. Williams respectfully and humbly requests that this Honorable Court grant his motion for reconsideration, vacate his conviction and sentence, and either dismiss the indictment with prejudice or order a new trial. He has faith that this Court, in its wisdom and commitment to justice, will recognize the profound constitutional violations that occurred and will exercise its equitable powers to correct this manifest injustice.

The Court should also consider Mr. Williams' ancillary filings and the exhibits that were recently docketed ( due to prior technical issues). Many of these materials – e.g., the 'Reserve

Project' emails, the relevant text messages verifying counsel's false promises, and the clarifications about the final overt act date – were not included or not fully considered in the court's initial ruling. Because these exhibits supplement the original § 2255 petition, they further support the claims of ineffective assistance and the statute-of-limitations bar. Regardless of whether the Court deems them "newly discovered evidence" or simply "overlooked data," they squarely support relief under Rule 59(e). See *Shrader v. CSX Transp., Inc*., 70 F.3d 255, 257 (2d Cir. 1995) ("The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."). This Court should, in the interest of justice, review and incorporate these newly uploaded exhibits as part of the fully supplemented record in evaluating Mr. Williams' constitutional claims.

The constitutional violations established by the record require comprehensive relief to vindicate Mr. Williams' rights and restore the integrity of the judicial process. The Courts has emphasized that when constitutional rights are violated, "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the Congressional purpose." J.*I. Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). The appropriate remedy here includes:

1.     Vacatur of Conviction Required:

     a.     Where, as here, multiple constitutional violations have been established, vacatur is required because:

     b.     Jurisdictional Defects:

          i.     Time-barred prosecution

        ii.     No subject matter jurisdiction

        iii.    Missing essential elements

        iv.    Void ab initio

        v.     Cannot be cured

   c.  Structural Errors:

        i.     Actual conflict

        ii.     Brady violations

        iii.    Ineffective assistance

        iv.    Due process violations

        v.     Competency issues

2.   Dismissal with Prejudice Warranted: The Courts has recognized that dismissal with prejudice is appropriate where:

> "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973).

Here, dismissal is warranted because:

 a.  Constitutional Violations:

    i.    Pervasive misconduct

    ii.   Multiple violations

    iii.  Structural errors

    iv.  Fundamental unfairness

    v.   Irreparable prejudice

 b.  Jurisdictional Bars:

    i.    Expired limitations

      ii.    No federal nexus

      iii.    Missing elements

      iv.    Improper venue

      v.    No cure possible

3. Alternative Relief Required: At minimum, the Court must:

   a.   Order Evidentiary Hearing:

      i.    Resolve factual disputes

      ii.    Review evidence

      iii.    Assess credibility

      iv.    Develop record

   b.   Require Full Discovery:

      i.    Brady material

      ii.    Communication records

      iii.    Grand jury transcripts

      iv.    Government [False] Loss calculations

      v.    Bank relationships

4. Public Interest Considerations:

   a.   The Supreme Court has emphasized that remedying constitutional violations serves vital public interests:

> "The basic purpose of a trial is the determination of truth..." *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 416 (1966).

   b.   Here, the public interest requires:

      i.    Constitutional Compliance:

         1.    Effective counsel

       2.  Fair proceedings

       3.  Due process

       4.  Brady compliance

       5.  Jurisdictional limits

  ii.   Judicial Integrity:

       1.  Proper procedure

       2.  Constitutional rights

       3.  Fair process

       4.  Just outcomes

       5.  System integrity

6.  Scope of Relief: The relief must address:

  a.  Constitutional Violations:

    i.   Ineffective assistance

    ii.   Due process violations

   iii.   Brady violations

    iv.   Structural errors

    v.   Jurisdictional defects

  b.  Procedural Defects:

    i.   Invalid plea

    ii.   Improper waiver

   iii.   Missing investigation

    iv.   Inadequate counsel

    v.   No competency review

vi.    No jurisdiction

Therefore, this Court should:

1. Grant reconsideration under Rule 59(e);

2. Vacate the conviction and sentence;

3. Dismiss the indictment with prejudice;

4. Or, at minimum, order an evidentiary hearing;

5. Grant such other relief as justice requires.

This relief is necessary to:

1.  Vindicate constitutional rights

2.  Correct jurisdictional errors

3.  Remedy structural defects

4.  Restore judicial integrity

5.  Ensure justice


The time for justice is now. Let it be done.

Respectfully submitted,

/s/ Luke Williams
Luke Williams
Petitioner Pro Se

February 18, 2025

**Exhibit A: Forensic Accounting Report - Deepak Sabiki and Dennis Romero**

August 30, 2024

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    United States v. Larby Amirouche
Criminal Docket No. 21-64 (KAM)

Dear Judge Matsumoto,

We ("Deepak Sabiki" or "Mr. Sabiki" and "Dennis Romero" or "Mr. Romero"), have been retained by the Defendant to analyze the financial records in this matter and to offer our opinions regarding the quantification of losses alleged to have been caused by Defendant's actions. We are not offering any opinions regarding Defendant's liability for the allegations asserted by the Government.

Our work on this matter is ongoing. This letter summarizes our preliminary analysis and opinions, to date, based on the presently available information. If additional information relevant to our opinions is produced subsequent to the date of our letter, we will modify or supplement our analyses and opinions, if appropriate.

## <u>Qualifications</u>

Mr. Sabiki is the owner of Sabiki Consulting LLC, a consulting firm that provides expert damages quantification and forensic accounting services.

Mr. Sabiki earned a Bachelor of Science degree with a dual-major in (1) Finance and (2) Econometrics & Quantitative Economics (formerly known as Economic Theory Analysis), which is the study of economics through the lens of advanced mathematics from the Leonard N. Stern School of Business at New York University. He also attained a minor in Physics through his coursework at New York University's College of Arts & Science.

Since 2005, he has served as a consulting and testifying expert in litigation, forensic accounting, and compliance matters to clients in a variety of industries. He has led teams that supported a Department of Justice (DOJ)-appointed Independent Compliance and Business Ethics Monitor of a global investment bank, and a Forensic Adviser to the DOJ / National Highway Traffic Safety Administration (NHTSA)-appointed Monitor of a Tier One automotive parts supplier. He has conducted forensic accounting investigations, analyzed loss causation, and performed damages quantification in cases involving allegations of lost wages due to personal injury, economic loss due to wrongful death, lost wages due to discrimination, breach of contract, business interruption, patent and trademark infringement, trade secret theft, and unfair competition. Mr. Sabiki's curriculum vitae is attached to this report as Exhibit 1-A.

CONFIDENTIAL

1

Mr. Romero is an independent consultant that provides compliance and forensic accounting services. He earned a Bachelor of Business Administration degree with a major in Accounting and Master of Science degree with a major in Accounting from James Madison University. He is a Certified Public Accountant and Certified Fraud Examiner.

Since 2012, Mr. Romero has served as a subject matter expert in forensic accounting, internal audit and compliance matters for clients as a consultant and as an employee of multinational corporations. He has worked for teams that supported a Department of Justice (DOJ)-appointed Monitor of a global money transfer company. He executed Anti-Money Laundering reviews related to Suspicious Activity Reports (SAR), Currency Transaction Reports (CTR), monitoring, and investigations for the Monitor. He led teams that supported the Know Your Customer and Customer Identification Program (KYC/CIP) review of a global cryptocurrency exchange in preparation for reviews with US regulatory and enforcement bodies. He completed several internal and external financial investigations for healthcare companies and financial institutions. Mr. Romero's curriculum vitae is attached to this report as Exhibit 1-B.

We have been compensated for our previous work in this matter. We are being compensated for writing this letter.

## Background

The Defendant's businesses sold physical nutritional products and digital business opportunity products.[1] As Plaintiff's attorney admitted, some customers received products[2] following legitimate business sales and product delivery.

You asked certain questions during the Sentencing Hearing in this matter on November 2, 2023 that were left unanswered. Specifically, you asked the following:

1) You asked the Government what portion of Defendant's business stemmed from legitimate transactions. The Government failed to answer your question because they claimed it was "impossible" to do so.

   "[MR. PITLUCK:] However, some of the funds that were purchased by the thousands of consumers, the people did get the products that they bought. So, some of the $6 million was actually legitimate transactions.
   THE COURT: Well, "some" meaning what portion of that $6 million, roughly?
   MR. PITLUCK: It was impossible to identify what was lost and what was actually provided to them. We directionally have an idea, but it's impossible to get the number accurately."
   [Sentencing Transcript, Page 23-24]

This $6.6 million figure was used to apply United States Sentencing Guidelines enhancement for losses over $3.5 million.

---

[1] Sentencing Transcript, page 24.
[2] Sentencing Transcript, page 23.

2

2) You asked the Government whether any of the funds that were transferred into the Flare Education, LLC account were used for business expenses to fulfill legitimate transactions. The Government failed to answer your question with any specificity.

"THE COURT: Okay. But once they went into those accounts and to the extent they may be entitled to a deduction for products actually received by a consumer, have you done any investigation as to where the rest of the money went?
MR. PITLUCK: Your Honor, we saw some money go out the door to purchase items or in cash, but we didn't account for every dollar that went into the Defendant's account."
[Sentencing Transcript, Page 24]

Any funds transferred out of the Defendant's account to pay for legitimate expenses would reduce the $6.6 million in losses calculated by the Government.

## Opinions

Our opinions are based on the first round of discovery in this matter, pleadings in this matter, the Sentencing transcript dated November 2, 2023 in this matter, and communication with / assertions by the Defendant. We understand that while there have been three rounds of discovery in this matter, the second and third rounds of discovery are not yet available to the Defendant. In addition, our opinions are based on our experience, education, training, skill, and knowledge in the relevant fields previously mentioned herein.

A. There is evidence that Defendant's businesses conducted legitimate transactions with customers

We will attempt to answer your question regarding the portion of the Government's alleged loss amount that actually stemmed from legitimate transactions.

As the Government admitted, many customers did receive products.[3] The Government further admitted that it did not know what portion of the $6.6 million in alleged losses to consumers was actually not a loss at all, but rather, legitimate sales.[4] Therefore, this amount is inaccurate by the Government's own admission and is unreliable.

We have been unable to replicate the Government's calculation that $6.6 million was transferred by wire to the Flare Education, LLC account.[5] The Government has not provided an accounting of the $6.6 million nor has it provided enough information to enable this calculation to be replicated. We have been able to verify only $5.7 million of such activity, so we will use this amount as the starting point of our analysis. See Exhibit 2.

| | |
|---|---|
| ~~Government's Calculated Alleged Losses (Transfers Into Flare Education, LLC Account)~~ | ~~$6,554,656~~ |
| Transfers Into Flare Education, LLC Account Supported by Production Documents | $5,725,765 |

---

[3] Sentencing Transcript, page 23.
[4] Sentencing Transcript, pages 23-24.
[5] Indictment, paragraph 38.

3

CONFIDENTIAL

Next, the Government's loss amount should be reduced by any legitimate sales. Defendant's businesses sold two types of products: physical products (such as nutritional supplements) and digital products (such as business opportunity courses).[6] According to the Defendant, sales of digital products were fulfilled immediately as they were sent electronically to consumers, whereas physical products needed to be shipped to customers to fulfill sales. This analysis therefore assumes that all digital products were legitimately fulfilled by the Defendant's companies.

Based on an analysis of business deposits into the Defendant's businesses, approximately 49% of Defendant's business deposits were from business opportunity (digital) product sales and 51% of Defendant's business deposits were from nutritional product sales. See Exhibit 3. We will reduce the Government's supported alleged loss amount by a further 49% based on legitimate digital product sales.

| | |
|---|---|
| ~~Government's Calculated Alleged Losses (Transfers Into Flare Education, LLC Account)~~ | ~~$6,554,656~~ |
| ~~Transfers Into Flare Education, LLC Account Supported by Production Documents~~ | ~~$5,725,765~~ |
| Transfers Into Flare Education, LLC, Reduced by Legitimate Digital Sales | $2,920,140 |

Turning to physical products, there is evidence suggesting that:

- approximately 250,000 units of nutritional products were shipped to customers;[7]
- 14,233 Angry Elephant orders were shipped from January 2, 2014 through February 19, 2014;[8]
- 5,353 Angry Elephant orders were shipped from August 1, 2013 through August 9, 2013.[9]

While the remaining amount of $2.9 million should be further reduced to account for the legitimate sales of physical products, we do not have enough information to estimate the corresponding reduction.

B. <u>There is evidence that Defendant's businesses incurred expenses to fulfill legitimate sales</u>

We will attempt to answer your question regarding whether any of the funds received by Flare Education were used towards expenses required to fulfill legitimate sales.

The amount transferred by wire into Flare Education does not appear to account for any amounts transferred out of Flare in order to pay for business expenses. There were approximately $5.4 million in outflows from the Flare Education account including, but not limited to, the following approximate outflows:

---

[6] Sentencing Transcript, page 24.
[7] DOJ-EDNY-0033151.
[8] DOJ-EDNY-0033162.
[9] DOJ-EDNY-0033166.

4

- $475k in discounts, refunds, and chargebacks (funds never received from or returned to customers)
- $277k in shipping expenses (funds associated with fulfilled orders)
- $250k for costs of goods sold

See Exhibit 4.

In addition, there were outflows in excess of $2.2 million for affiliate expenses, which the Defendant informs us are advertising expenses. Applying the percentage of fulfilled sales mentioned earlier (49%), suggests that approximately $1.1 million of these expenses are associated with fulfilled products. This amount is understated because it does not capture the proportional amount of fulfilled orders of physical nutritional products.

The Government's loss amount should be further reduced for legitimate business expenses, including, but not limited to these expenses which total approximately $2.1 million.

| | |
|---|---|
| ~~Government's Calculated Alleged Losses (Transfers Into Flare Education, LLC Account)~~ | ~~$6,554,656~~ |
| ~~Transfers Into Flare Education, LLC Account Supported by Production Documents~~ | ~~$5,725,765~~ |
| ~~Transfers Into Flare Education, LLC, Reduced by Legitimate Digital Sales~~ | ~~$2,920,140~~ |
| Transfers Into Flare Education, LLC, Reduced by Legitimate Expenses to Fulfill Orders | $   820,140 |

This amount is overstated because it does not take into account reductions for funds received or expenses incurred for fulfilled legitimate physical product orders.

C. Bank loss calculations are unsupported

The Government alleges in its Order of Restitution that certain banks have suffered a loss. There is no documentation that supports how these loss amounts were calculated. DOJ-EDNY-0053435 (see attached) is a spreadsheet that lists several banks, including the banks included in the Order of Restitution. It is not clear how the loss amounts were calculated from this spreadsheet, if at all. In fact, this spreadsheet includes a projected reserve column that totals over $1.0 million. Reserve accounts are maintained by payment processing institutions; these accounts are composed of the merchant's funds to allow for payment issues such as chargebacks. This spreadsheet appears to indicate that the banks / payment processors were holding over $1.0 million of Defendant's business funds.

Further, the banks who have alleged to have suffered losses, "have not provided loss affidavits."[10]

---

[10] Defendant's Amended Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2255, page 44.

5

D. <u>There appear to be other factual errors or unsubstantiated amounts alleged by the Government</u>

Some of the Government's assertions are either as yet unsupported, if based on documents that have not been made available to us, or incorrect, if based on the documents available to us.

For example, Paragraph 37 of the Indictment states: "Jump Learning, LLC, wired approximately $780,000 to Flare Education, LLC." This is overstated. In fact, Jump Learning wired approximately $374,100 to Flare Education. See Exhibit 5.

Paragraph 39 of the Indictment states: "Between February 2014 and August 2015, the Flare Education, LLC account transferred via wire a total of approximately $971,200 to Angry Elephant and $354,000 to Purple Whale." This is overstated. In fact, Flare transferred $173,700 to Angry Elephant and $0 to Purple Whale during this period. See Exhibits 6 and 7.

E. <u>Conclusion</u>

The Government has failed to demonstrate with a "reasonable probability" what the actual loss amount was, much less that it was six and a half million dollars. We have not seen, nor does there appear to be in the record, any documentation to substantiate the six and a half million dollars of loss that Plaintiffs allege. In fact, Plaintiff's calculation of the loss does not comport with any generally accepted methods of quantifying losses, because, as you noted, it does not account for reductions due to legitimate sales and expenses to fulfill legitimate sales. Based on our analysis, there is sufficient evidence in the record to support reductions to the loss claim with a "reasonable probability."

Respectfully Submitted,

Deepak Sabiki

Owner, Sabiki Consulting LLC

dsabiki@sabikiconsulting.com

Dennis Romero, CPA, CFE

romeroda89@gmail.com

6

CONFIDENTIAL



# Deepak Sabiki

T:  631 833 9448              10507 Grand Oak Circle
E:  dsabiki@sabikiconsulting.com     Austin, TX 78750

Deepak Sabiki serves as a consulting and testifying expert in forensic accounting, compliance, and litigation matters and brings more than 18 years of experience.

Throughout his career, Deepak served clients and led teams on engagements involving forensic accounting investigations, assessment of risk management and compliance programs, data integrity compliance issues, and quantification of damages. He is adept at analyzing large sets of data to solve complex problems for clients. Most recently, Deepak led teams that supported a Department of Justice (DOJ)-appointed Independent Compliance and Business Ethics Monitor of a global investment bank, and a Forensic Adviser to the DOJ / National Highway Traffic Safety Administration (NHTSA)-appointed Monitor of a Tier One automotive parts supplier.

Deepak calculates economic damages in disputes litigated in arbitration and State and Federal Courts and brings expertise in several causes of action including breach of contract, patent and trademark infringement, business interruption, and trade secret misappropriation, among others.

Deepak also served as a guest lecturer at Baruch College, John Jay College of Criminal Justice, and Molloy College on topics related to data analytics tools and fraud detection.

Prior to establishing Sabiki Consulting LLC, Deepak served clients on similar engagements at Huron Consulting Group, Charles River Associates, Grant Thornton, and StoneTurn.

## Education

**B.S., Finance and Economic Theory Analysis, (Minor: Physics)** - The Leonard N. Stern School of Business, New York University

## Practice Areas

Litigation

Compliance & Monitoring

Investigations

## Languages

Hindi

Urdu

**Deepak Sabiki**

## REPRESENTATIVE INDUSTRY EXPERIENCE

- Banking
- Automotive Manufacturing
- Financial Products
- Insurance
- Hospitality
- Telecommunications

- Mortgage Loan Servicing
- Private Equity
- Media / Entertainment
- Building Materials
- Packaging
- Cryptocurrency

- Health Care
- Defense Contracting
- Retirement Plans
- Food / Fast Food
- Cosmetics

## EXPERT DESIGNATIONS AND TESTIMONY

- Rehab Saad Ali v. Ahmed Wahsh (Supreme Court, Kings County, New York—Index No.: 54683-2017)—Quantified annual compensation of an individual and his company value at issue in a marital dissolution. (Expert Disclosure and Trial Testimony, Case Adjudicated).

- Randy White v. North Cypress Medical Center and Dr. Ozochukwu Odili (District Court, Harris County, Texas—Case No. 2019-14054)—Quantified lost earnings capacity resulting from workplace injury. (Expert Report, Deposition and Trial Testimony, Case Pending).

- Quantified lost earnings capacity related to wrongful death. (Expert Report, Case Settled).

- Quantified lost earnings capacity resulting from injury at a housing property. (Expert Report, Case Settled).

- Quantified after-tax present value of life care plan and lost earnings capacity resulting from injury at a hotel property. (Expert Reports, Case Pending).

- Telina Wheaton v. Mingrun, Inc. d/b/a Golden Chopsticks (District Court, Montgomery County, Texas—Cause No. 20-02-02017)—Quantified lost earnings capacity related to wrongful death caused by a motor vehicle accident. (Expert Report and Trial Testimony, Case Adjudicated).

- Quantified lost earnings capacity related to wrongful death due to a motor vehicle accident. (Expert Report, Case Pending).

- Quantified lost earnings capacity resulting from injuries sustained in a motor vehicle accident with a ridesharing vehicle. (Expert Report, Case Settled).

- Quantified lost earnings capacity resulting from injuries sustained in a motor vehicle accident with livestock. (Expert Report, Case Pending).

- Quantified lost earnings capacity related to wrongful death due to a motor vehicle accident in a dram shop law matter. (Expert Report, Case Settled).

**Deepak Sabiki**

- Quantified after-tax present value of life care plan and lost earning capacity resulting from injuries sustained in an e-scooter sharing accident. (Expert Report, Case Pending).

- Quantified after-tax present value of life care plan and lost earning capacity resulting from injuries sustained in a motor vehicle accident. (Expert Report, Case Pending).

- Quantified unjust enrichment due to alleged unauthorized use of nonpatent intellectual property. (Expert Reports, Case Settled).

- Preliminary quantification of lost earnings capacity and investment loss resulting from injuries sustained in a motor vehicle accident. (Expert Designation, Case Settled).

- David Bennett v. David M. Dromsky, M.D. (District Court, Montgomery County, Texas—Cause No. 22-04-04943)—Quantified after-tax present value of life care plan resulting from medical treatment following an injury. (Expert Report, Deposition and Trial Testimony, Case Pending).

- Samantha Daly Smith vs David Daly (Circuit Court, Sarasota County, Florida—Case No. 2022-DR-002875-NC)—Analyzed cryptocurrency transactions to quantify Defendant's financial holdings in a marriage dissolution matter. (Expert Designation and Trial Testimony, Case Pending).

## SELECT PROFESSIONAL EXPERIENCE

### Contract, Tort and Other Damages

- Rebuttal of counterclaimant's damages claims involving an alleged breach of manufacturing agreement for a health food product.

- Rebuttal of lost investment gains claim resulting from an alleged breach of representation under the Securities Act involving the company's Supplemental Employee Retirement Plan that invested in a Madoff feeder fund.

- Rebuttal of economic damages claim related to an alleged breach of a contract involving condiments distribution in the United Arab Emirates.

- Economic damages in a breach of licensing contract arbitration matter involving a pet products company.

- Rebuttal of lost profits claim involving anti-trust and unfair competition allegations related to improper payments by a health insurance company to steer brokers away from the competitor's in-network hospital.

- Rebuttal of lost profits claim involving anti-trust and unfair competition allegations related to improper payments by a health insurance company to steer brokers away from the competitor.

- Lost profits computation resulting from a store closing caused by an alleged contract breach.

# Deepak Sabiki

---

## Intellectual Property Damages

- Preliminary trademark infringement claim assessment and damages quantification in the luxury leather goods industry.

- Reasonable royalty for patent infringement involving technology related to the packaging industry.

- Lost profits computation in a license fee dispute.

- Avoided costs computation in a trade secret dispute involving a key employee of a building materials manufacturer who joined a rival and developed a competing product.

- Lost profits computation for patent infringement involving technology related to methods of designing integrated circuits.

## Financial Analytics

- Analyses of two payroll databases in a class action dispute brought by the NY Attorney General alleging wage violations at a fast-food company's franchise locations.

- Analyses of large sets of policy and claims data to assist client in evaluating environmental claims of an insurer to improve its reserve setting process.

## Forensic Accounting Investigations

- Reconstruction of an educational technology company's partner capital accounts to correct accounting errors.

- Assessment of a private equity fund's expenses attributed to portfolio companies amidst an SEC investigation regarding inappropriate allocation methodology.

- Review of audit workpapers and reperformance of the analyses of a major accounting firm in an accounting investigation involving two pension funds alleging inadequate compensation resulting from an incorrect transfer pricing model.

- Analyses and testing of historical transactions of a Caribbean bank involved in a debt offering to assess whether the bank may be involved in money laundering.

# Deepak Sabiki

---

## Compliance & Monitoring

- Analyses of the lab and traceability systems at testing and production facilities of a global Tier One automotive supplier to assess the company's data integrity controls and implementation of DOJ plea agreement terms while working with the Forensic Advisor to the DOJ- and NHTSA-appointed Independent Compliance Monitor.

- Review of the trading function of a global investment bank for its DOJ-appointed Independent Compliance and Business Ethics Monitor. Assessed the bank's compliance with the terms of a Deferred Prosecution Agreement related to LIBOR and EURIBOR manipulation and reviewed its policies and procedures designed to prevent and detect violations of antifraud and anti-trust laws. Included a 6-month posting in London to perform on-site review.

- Evaluation of a mortgage servicing company's customer complaint responses to find trends and issues, assessed controls, and conducted site visits to customer service centers for the New York Department of Financial Services appointed Compliance Monitor.

- Provided audit assistance and internal controls support as part of an SEC investigation of a defense manufacturer for alleged insider trading.

- Assessed internal sales controls and accounting standards compliance of a large technology company as part of an SEC investigation for accounting fraud.

Exhibit 1-B

# Dennis Ariel Romero, CPA, CFE

Aurora, 80016 │ (703) 401-4300 │ romeroda89@gmail.com │ https://www.linkedin.com/in/dennis-romero-cpa-cfe/

## Forensic Audit and Compliance Leader
### Compliance Audits & Forensic Investigations ~ Fraud and Corruption Expertise

Dennis is a compliance and audit expert with deep expertise in regulatory requirements and implementing industry best practices. He has helped multinational organizations mitigate risk and avoid costly AML compliance and fraud breaches. Dennis is qualified to provide strategic guidance, support, and training that enables organizations to maintain their reputation and achieve long-term success.

## Core Competencies and Areas of Expertise

| | |
|---|---|
| Fraud Investigations | Multinational Cryptocurrency Exchanges |
| Anti-Money Laundering (AML) and Sanctions | Foreign Corrupt Practices Act (FCPA) Audits |
| Employee Misconduct & Bribery | Forensic and Regulatory Advisory Services |
| Internal and External Compliance Audits | Executive Leadership |

## Experience

**Independent Consultant**│ Denver, CO                                                    May 2023 – Current
Advising small to medium-sized businesses with compliance issues.

- Conducting a financial investigation of bonus payments awarded to executive-level management for an event management company.

- Performing forensic financial analysis for a federal court matter. Analyzing income/loss calculations, reviewing bank statements, tax records, e-mails, and financials.

- Conducted an independent review of an acquired company for a private investment firm. Reviewing financial statements, bank records, customer invoices, tax filings and transaction of the acquired company.

**Senior Manager** │ Kroll Associates, LLC – Denver, CO                          June 2021 – March 2023
Executed and managed AML/regulatory audits and investigations for clients.

- Managed an investigation of employee theft for a European technology company and investigated conflicts of interest of a consultant for an American construction materials company. Resulted in cost savings ($100k+) and process improvements for clients to mitigate the risks of repeated violations. Developed and managed work plans and team members, executed documents reviews, conducted interviews and drafted reports and recommendations.

- Oversaw the Know Your Customer and Customer Identification Program (KYC/CIP) review for a multinational corporation that runs one of the largest cryptocurrency exchanges in terms of daily trading volume. Identified suspicious activity or accounts with a US nexus and recommended process enhancements. This work was completed in preparation for meetings and reviews with US regulatory and enforcement bodies.

- Executed AML and sanction reviews for a digital asset company, a stablecoin issuer, to meet compliance requirements with the New York State Department of Financial Services. This involved reviewing the company's KYC/CIP program, Suspicious Activity Reporting, investigation and monitoring, training, risk assessment and board reporting processes.

**Manager** │ Treliant LLC – Washington, D.C.                                     April 2020 – June 2021
Conducted regulatory audits and oversaw compliance teams for client engagements.

- Executed AML reviews related to SARs, currency transaction reports, monitoring, and investigations for an American money transfer company under a three year-US Department of Justice monitorship. Completed the engagement before the client deadline with the US DOJ.

- Quickly mastered and managed multiple compliance matters related to marketing service agreements and pricing benchmarks of settlement services under Section 8 of the Real Estate Procedures Settlement Act (RESPA) and Regulation X, meeting 100% of client demands.

- Managed and assisted multiple business development efforts relating to anti-bribery/FCPA reviews and forensic related matters for the Corporate and Regulatory Investigation team.

**Exhibit 1-B**

**Lead Forensic & Compliance Specialist** │ J&J – Washington, D.C          June 2018 – March 2020
Managed fraud investigation and executed multinational FCPA audits for J&J's internal audit department.

- Led and conducted multiple sensitive issues investigations regarding asset misappropriations, financial statement fraud and corruption. Reviewed allegations, interviewed whistleblowers/subjects and analyzed related processes to issue reports with conclusions and recommendations for US and LATAM subsidiaries.

- Worked with multidisciplinary groups including Legal, HR, Compliance teams for investigations and FCPA audits in the US and China. Assisted in FCPA compliance audits including the testing of third-party sales agents, travel and entertainment, and fees for services.

- Improved investigation work plan and process and gained consistency across investigations by streamlining the reporting and investigation process.

**Forensic Senior Internal Auditor** │ Sanofi U.S. – Bridgewater, NJ          November 2016 – May 2018
Served as the fraud subject-matter expert for Sanofi's global internal audit team.

- Assisted in corporate and transversal forensic/compliance assignments including the audit of the procurement process in the LATAM region and donations made to a foundation in Mexico.

- Executed audits involving various processes related to FCPA risks including promotional activities, procurement, donations, and safety at sites throughout the Americas region (Brazil, Panama, Colombia, Mexico).

**Forensic Senior Associate** │ KPMG – Washington D.C.          October 2015 – November 2016
Conducted fraud investigation and compliance audits for multinational clients specializing in the LATAM region.

- Worked at the direction of counsel to investigate alleged payments made to organized crime groups sanctioned by OFAC of the US Department of Treasury. Helped identify patterns and trends of over 5,000 payments based on supporting documentation in Spanish.

- Worked on a variety of forensic projects based in Latin America including the investigation for a multinational bank regarding employee misconduct and improper accounting treatment in Puerto Rico; and performed management responsibilities (interviewed and selected team members, led cell phone review, coordinated schedules and participated in the ABAC testing at client site in Peru) for an FCPA/bribery compliance review of a multinational, multi-billion-dollar pipeline project.

- Served as a point of contact and lead for clients and multi-national teams on various engagements including engagements related to due diligence and monitoring. Performed second and third level reviews, trained and onboarded team members, coordinated schedules, guided international member-firm colleagues, represented KPMG on weekly client calls, and led weekly internal team calls.

**Associate** │ KPMG – Washington D.C.          September 2012 – October 2015
Supported compliance audits and investigations for multinational companies.

- Assisted on a variety of projects including investigation related to fraud and misconduct by upper- level management, anti-money laundering reviews, and third-party due diligence reporting.

**Earlier Career Experience: Global Audit Intern** │ KPMG – Sao Paulo, Brazil/D.C.          May 2011 – August 2011

- Supported independent audits of federal agencies and government defense contractors. Responsibilities included reviewing employee benefit plans, ensuring proper documentation for compliance with regulations governing government funds and salaries.

## Education

**Master of Science in Accounting** │ **Bachelor of Business Administration in Accounting (Cum Laude)**
James Madison University

## Technical Skills/Expertise

- Certified Public Accountant and Certified Fraud Examiner.
- Working knowledge of AML related tools for the crypto industry: Chainalysis, Jumio, TRM Labs.
- Native Spanish speaker and working knowledge of Portuguese.
- Working knowledge of litigation and research databases based in Latin America.

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**

Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 3/25/2013 | $ 200.00 | Flare Education LLC | WIRE FROM FLARE DUCATION L032513C |
| 4/3/2013 | $ 2,000.00 | Flare Education LLC | WIRE FROM FOCUS EARNING LL040313 |
| 4/19/2013 | $ 1,500.00 | Flare Education LLC | WIRE FROM INFUSEMEDIA LLC 041913 |
| 4/24/2013 | $ 500.00 | Flare Education LLC | WIRE FROM FOCUS EARNING LL042413 |
| 4/29/2013 | $ 1,000.00 | Flare Education LLC | WIRE FROM FOCUS EARNING LL042913 |
| 5/1/2013 | $ 1,000.00 | Flare Education LLC | WIRE FROM ORANGELEARNING G050113OUP LLC |
| 5/3/2013 | $ 5,000.00 | Flare Education LLC | WIRE FROM ORANGELEARNING G050313OUP LLC |
| 6/6/2013 | $ 300.00 | Flare Education LLC | WIRE FROM INFUSEMEDIA LLC 060613 |
| 6/10/2013 | $ 1,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC061013 |
| 6/12/2013 | $ 1,310.00 | Flare Education LLC | WIRE FROM FLARE DUCATION L061213C |
| 6/21/2013 | $ 2,000.00 | Flare Education LLC | WIRE FROM FOCUS EARNING LL062113 |
| 6/25/2013 | $ 6,710.00 | Flare Education LLC | WIRE FROM FLARE DUCATION L062513C |
| 6/25/2013 | $ 7,040.00 | Flare Education LLC | WIRE FROM FLARE DUCATION L062513C |
| 6/26/2013 | $ 7,460.00 | Flare Education LLC | WIRE FROM FLARE DUCATION L062613C |
| 6/27/2013 | $ 6,210.00 | Flare Education LLC | WIRE FROM FLARE DUCATION L062713C |
| 7/26/2013 | $ 485.00 | Flare Education LLC | WIRE FROM FLARE DUCATION L072613C |
| 8/5/2013 | $ 3,817.00 | Flare Education LLC | WIRE FROM BRIGHTMEDIA GROU080513 LLC |
| 8/23/2013 | $ 2,985.00 | Flare Education LLC | WIRE FROM CANADIN IMPERIAL082313BANK OF COMMERC |
| 9/4/2013 | $ 3,000.00 | Flare Education LLC | WIRE FROM STARTE MEDIA LLC090413 |
| 9/5/2013 | $ 7,000.00 | Flare Education LLC | WIRE FROM ORANGELEARNING G090513OUP LLC |
| 9/18/2013 | $ 62,763.00 | Flare Education LLC | WIRE FROM BRIGHTMEDIA GROU091813 LLC |
| 9/25/2013 | $ 12,000.00 | Flare Education LLC | WIRE FROM INFUSEMEDIA LLC 092513 |
| 9/26/2013 | $ 142,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA092613ION LLC |
| 9/27/2013 | $ 5,916.27 | Flare Education LLC | WIRE FROM BRIGHTMEDIA GROU092713 LLC |
| 10/21/2013 | $ 10,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC102113 |
| 10/23/2013 | $ 6,735.00 | Flare Education LLC | WIRE FROM CANADIN IMPERIAL102313BANK OF COMMERC |
| 10/23/2013 | $ 161,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA102313ION LLC |
| 11/5/2013 | $ 18,000.00 | Flare Education LLC | WIRE FROM BRIGHTMEDIA GROU110513 LLC |
| 11/5/2013 | $ 75,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA110513ION LLC |
| 11/8/2013 | $ 25,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC110813 |
| 11/14/2013 | $ 75,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA111413ION LLC |

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**

Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 11/18/2013 | $ 25,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 11/21/2013 | $ 30,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC112113 |
| 11/22/2013 | $ 50,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA112213ION LLC |
| 11/25/2013 | $ 35,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA112513ION LLC |
| 11/27/2013 | $ 2,000.00 | Flare Education LLC | WIRE FROM BRIGHTMEDIA GROU112713 LLC |
| 11/27/2013 | $ 30,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC112713 |
| 12/2/2013 | $ 4,500.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC120213 |
| 12/2/2013 | $ 25,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC120213 |
| 12/2/2013 | $ 40,000.00 | Flare Education LLC | WIRE FROM ORANGELEARNING G120213OUP LLC |
| 12/3/2013 | $ 12,000.00 | Flare Education LLC | WIRE FROM INFUSEMEDIA LLC 120313 |
| 12/3/2013 | $ 40,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC120313 |
| 12/5/2013 | $ 3,000.00 | Flare Education LLC | WIRE FROM BRIGHTMEDIA GROU120513 LLC |
| 12/6/2013 | $ 20,000.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL120613 |
| 12/9/2013 | $ 30,000.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL120913 |
| 12/10/2013 | $ 20,000.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL121013 |
| 12/10/2013 | $ 30,000.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL121013 |
| 12/11/2013 | $ 20,000.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL121113 |
| 12/12/2013 | $ 40,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA121213ION LLC |
| 12/13/2013 | $ 40,000.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL121313 |
| 12/16/2013 | $ 20,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC121613 |
| 12/16/2013 | $ 40,000.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL121613 |
| 12/17/2013 | $ 50,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 12/17/2013 | $ 10,080.00 | Flare Education LLC | WIRE FROM BANK O AMERICA 121713 |
| 12/18/2013 | $ 50,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 12/18/2013 | $ 3,172.00 | Flare Education LLC | WIRE FROM BRIGHTMEDIA GROU121813 LLC |
| 12/19/2013 | $ 30,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 12/20/2013 | $ 10,000.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL122013 |

CONFIDENTIAL - DRAFT - Preliminary and Tentative                    Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|------|--------|-------------|------------|
| 12/24/2013 | $ 5,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC122413 |
| 12/26/2013 | $ 10,000.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL122613 |
| 12/27/2013 | $ 20,000.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL122713 |
| 12/30/2013 | $ 25,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA123013ION LLC |
| 12/30/2013 | $ 5,000.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL123013 |
| 12/30/2013 | $ 20,000.00 | Flare Education LLC | WIRE FROM STARTE MEDIA LLC123013 |
| 1/2/2014 | $ 3,000.00 | Flare Education LLC | FUNDS TRANSFER WIRE FROM BRIGHT MEDIA GROUP LLC |
| 1/6/2014 | $ 65,000.00 | D9136082504*FLARE EDUCATION LLC* US* | D501015089939*NEON MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 1/6/2014 | $ 15,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 1/6/2014 | $ 55,000.00 | Flare Education LLC | FUNDS TRANSFER WIRE FROM GOLD M DIA LLC Jan 06 |
| 1/7/2014 | $ 60,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*10242 NW 7TH ST UNIT 209*MIAMI FL 33172-4095* |
| 1/7/2014 | $ 20,000.00 | Flare Education LLC | FUNDS TRANSFER WIRE FROM LIGHT P MEDIA LL Jan 07 |
| 1/8/2014 | $ 45,000.00 | Flare Education LLC | FUNDS TRANSFER WIRE FROM STARTU MEDIA LLC Jan 08 |
| 1/9/2014 | $ 100,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D501016307830*SAVVY MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 1/9/2014 | $ 80,000.00 | Flare Education LLC | FUNDS TRANSFER WIRE FROM SHARP EDIA LLC Jan 09 |
| 1/10/2014 | $ 40,000.00 | Flare Education LLC | FUNDS TRANSFER WIRE FROM CLEAR ITLE GROUP LLC Jan 10 |
| 1/13/2014 | $ 35,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D501016307830*SAVVY MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 1/14/2014 | $ 130,000.00 | Flare Education LLC | FUNDS TRANSFER WIRE FROM GOLD M DIA LLC Jan 14 |
| 1/15/2014 | $ 130,000.00 | D9136082504*FLARE EDUCATION LLC*1000 SW 97TH CT*MIAMI, FL, 33176, US* | D501015089939*NEON MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 1/22/2014 | $ 960.00 | Flare Education LLC | WIRE FROM BANK O AMERICA 012214 |
| 1/23/2014 | $ 65,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*10242 NW 7TH ST UNIT 209*MIAMI FL 33172-4095* |
| 1/27/2014 | $ 55,000.00 | D9136082504*FLARE EDUCATION LLC*1000 SW 97TH CT*MIAMI, FL, 33176, US* | D501015089939*NEON MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 1/30/2014 | $ 50,000.00 | Flare Education LLC | WIRE FROM GOLD MDIA LLC 013014 |

CONFIDENTIAL - DRAFT - Preliminary and Tentative    Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|------|--------|-------------|------------|
| 1/30/2014 | $ 50,000.00 | Flare Education LLC | WIRE FROM STARTU MEDIA LLC013014 |
| 1/31/2014 | $ 30,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D501016307830*SAVVY MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 1/31/2014 | $ 310.00 | Flare Education LLC | WIRE FROM BANK O AMERICA 013114 |
| 2/3/2014 | $ 45,000.00 | Flare Education LLC | WIRE FROM SHARP EDIA LLC 020314 |
| 2/4/2014 | $ 7,720.00 | Flare Education LLC | WIRE FROM NORTHEST CREDIT 020414NION |
| 2/4/2014 | $ 30,000.00 | Flare Education LLC | WIRE FROM SPARK DUCATION L020414C |
| 2/4/2014 | $ 55,000.00 | Flare Education LLC | WIRE FROM STARTE MEDIA LLC020414 |
| 2/6/2014 | $ 20,000.00 | Flare Education LLC | WIRE FROM SHARP EDIA LLC 020614 |
| 2/6/2014 | $ 15,000.00 | Flare Education LLC | WIRE FROM SPARK DUCATION L020614C |
| 2/6/2014 | $ 30,000.00 | Flare Education LLC | WIRE FROM STARTU MEDIA LLC020614 |
| 2/7/2014 | $ 21,600.00 | Flare Education LLC | WIRE FROM BRIGHTMEDIA GROU020714 LLC |
| 2/10/2014 | $ 30,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D501016307830*SAVVY MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 2/10/2014 | $ 9,800.00 | Flare Education LLC | WIRE FROM ORANGELEARNING G021014OUP LLC |
| 2/12/2014 | $ 27,000.00 | D9136082504*FLARE EDUCATION LLC*1000 SW 97TH CT*MIAMI, FL, 33176, US* | D501015089939*NEON MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 2/12/2014 | $ 15,000.00 | Flare Education LLC | WIRE FROM SHARP EDIA LLC 021214 |
| 2/12/2014 | $ 27,000.00 | Flare Education LLC | WIRE FROM STARTU MEDIA LLC021214 |
| 2/13/2014 | $ 55,000.00 | Flare Education LLC | WIRE FROM STARTU MEDIA LLC021314 |
| 2/18/2014 | $ 45,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D501016307830*SAVVY MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 2/18/2014 | $ 20,000.00 | Flare Education LLC | WIRE FROM INFUSEMEDIA LLC 021814 |
| 2/19/2014 | $ 37,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D501016307830*SAVVY MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 2/20/2014 | $ 20,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D501016307830*SAVVY MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 2/20/2014 | $ 20,000.00 | Flare Education LLC | WIRE FROM SHARP EDIA LLC 022014 |
| 2/24/2014 | $ 20,000.00 | Flare Education LLC | WIRE FROM FOCUS EARNING LL022414 |
| 2/24/2014 | $ 15,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC022414 |
| 2/25/2014 | $ 20,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |

CONFIDENTIAL - DRAFT - Preliminary and Tentative                                                    Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|------|--------|-------------|------------|
| 2/25/2014 | $ 10,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D501016307830*SAVVY MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 2/25/2014 | $ 15,000.00 | Flare Education LLC | WIRE FROM SHARP EDIA LLC 022514 |
| 2/26/2014 | $ 55,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D501016307830*SAVVY MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 2/26/2014 | $ 55,000.00 | Flare Education LLC | WIRE FROM SHARP EDIA LLC 022614 |
| 2/26/2014 | $ 15,000.00 | Flare Education LLC | WIRE FROM STARTU MEDIA LLC022614 |
| 2/28/2014 | $ 500.00 | D9136082504*FLARE EDUCATION LLC*1000 SW 97TH CT*MIAMI, FL, 33176, US* | D501015089939*NEON MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 2/28/2014 | $ 10,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
| 2/28/2014 | $ 4,400.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D501016307830*SAVVY MEDIA LLC*2777 PARADISE RD UNIT 2702*LAS VEGAS NV 89109-9119* |
| 2/28/2014 | $ 3,000.00 | Flare Education LLC | WIRE FROM GOLD MDIA LLC 022814 |
| 2/28/2014 | $ 1,400.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA022814ION LLC |
| 2/28/2014 | $ 3,100.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC022814 |
| 2/28/2014 | $ 5,700.00 | Flare Education LLC | WIRE FROM LIGHT P MEDIA LL022814 |
| 2/28/2014 | $ 8,000.00 | Flare Education LLC | WIRE FROM SHARP EDIA LLC 022814 |
| 2/28/2014 | $ 2,200.00 | Flare Education LLC | WIRE FROM STARTU MEDIA LLC022814 |
| 3/3/2014 | $ 5,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
| 3/3/2014 | $ 5,000.00 | Flare Education LLC | WIRE FROM FOCUS EARNING LL030314 |
| 3/4/2014 | $ 2,000.00 | Flare Education LLC | WIRE FROM FOCUS EARNING LL030414 |
| 3/4/2014 | $ 1,000.00 | Flare Education LLC | WIRE FROM SPARK DUCATION L030414C |
| 3/7/2014 | $ 5,000.00 | Flare Education LLC | WIRE FROM SPARK DUCATION L030714C |
| 3/7/2014 | $ 8,000.00 | Flare Education LLC | WIRE FROM SPARK DUCATION L030714C |
| 3/7/2014 | $ 11,600.00 | Flare Education LLC | WIRE FROM SPARK DUCATION L030714C |
| 3/10/2014 | $ 5,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
| 3/11/2014 | $ 5,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
| 3/13/2014 | $ 1,000.00 | Flare Education LLC | WIRE FROM FOCUS EARNING LL031314 |

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**    Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|------|--------|-------------|------------|
| 3/13/2014 | $ 4,500.00 | Flare Education LLC | WIRE FROM INFUSEMEDIA LLC 031314 |
| 3/13/2014 | $ 17,000.00 | Flare Education LLC | WIRE FROM PROPELEDUCATION 031314LC |
| 3/18/2014 | $ 22,000.00 | Flare Education LLC | WIRE FROM INFUSEMEDIA LLC 031814 |
| 3/21/2014 | $ 7,500.00 | Flare Education LLC | WIRE FROM FOCUS EARNING LL032114 |
| 3/21/2014 | $ 1,000.00 | Flare Education LLC | WIRE FROM INFUSEMEDIA LLC 032114 |
| 3/27/2014 | $ 8,000.00 | Flare Education LLC | WIRE FROM STARTU MEDIA LLC032714 |
| 3/31/2014 | $ 5,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D572690357*SAVVY MEDIA LLC*4250 ARVILLE ST APT 228*LAS VEGAS, NV 891033724* |
| 4/2/2014 | $ 25,000.00 | Flare Education LLC | WIRE FROM ORANGELEARNING G040214OUP LLC |
| 4/8/2014 | $ 13,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 4/8/2014 | $ 8,000.00 | Flare Education LLC | WIRE FROM ORANGELEARNING G040814OUP LLC |
| 4/8/2014 | $ 12,000.00 | Flare Education LLC | WIRE FROM STARTE MEDIA LLC040814 |
| 4/9/2014 | $ 50,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA040914ION LLC |
| 4/9/2014 | $ 3,000.00 | Flare Education LLC | WIRE FROM WF WIRS PTLD-REJ040914CTED WIRE IN PR |
| 4/10/2014 | $ 7,000.00 | Flare Education LLC | WIRE FROM WF WIRS PTLD-REJ041014CTED WIRE IN PR |
| 4/15/2014 | $ 25,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA041514ION LLC |
| 4/15/2014 | $ 20,000.00 | Flare Education LLC | WIRE FROM ORANGELEARNING G041514OUP LLC |
| 4/15/2014 | $ 2,000.00 | Flare Education LLC | WIRE FROM WF WIRS PTLD-REJ041514CTED WIRE IN PR |
| 4/16/2014 | $ 8,000.00 | Flare Education LLC | WIRE FROM FOCUS EARNING LL041614 |
| 4/16/2014 | $ 2,000.00 | Flare Education LLC | WIRE FROM WF WIRS PTLD-REJ041614CTED WIRE IN PR |
| 4/18/2014 | $ 4,560.00 | Flare Education LLC | WIRE FROM FLARE DUCATION L041814C |
| 4/21/2014 | $ 45,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC042114 |
| 4/28/2014 | $ 5,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA042814ION LLC |
| 4/28/2014 | $ 14,000.00 | Flare Education LLC | WIRE FROM SPARK DUCATION L042814C |
| 5/2/2014 | $ 30,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA050214ION LLC |
| 5/8/2014 | $ 4,960.00 | Flare Education LLC | WIRE FROM BANK O AMERICA 050814 |
| 5/8/2014 | $ 30,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC050814 |
| 5/8/2014 | $ 12,000.00 | Flare Education LLC | WIRE FROM STARTE MEDIA LLC050814 |
| 5/12/2014 | $ 5,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA051214ION LLC |
| 5/12/2014 | $ 5,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC051214 |

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**   Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 5/14/2014 | $ 6,000.00 | Flare Education LLC | WIRE FROM STARTE MEDIA LLC051414 |
| 5/15/2014 | $ 5,000.00 | Flare Education LLC | WIRE FROM SPARK DUCATION L051514C |
| 5/19/2014 | $ 3,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
| 5/19/2014 | $ 12,000.00 | Flare Education LLC | WIRE FROM FOCUS EARNING LL051914 |
| 5/19/2014 | $ 2,000.00 | Flare Education LLC | WIRE FROM STARTE MEDIA LLC051914 |
| 5/20/2014 | $ 50,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC052014 |
| 5/20/2014 | $ 20,000.00 | Flare Education LLC | WIRE FROM SHARP EDIA LLC 052014 |
| 5/21/2014 | $ 30,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC052114 |
| 5/22/2014 | $ 5,000.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC052214 |
| 5/23/2014 | $ 4,960.00 | Flare Education LLC | WIRE FROM CITIBAK DELAWARE052314 |
| 5/30/2014 | $ 1,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA053014ION LLC |
| 5/30/2014 | $ 500.00 | Flare Education LLC | WIRE FROM JUMP LARNING LLC053014 |
| 5/30/2014 | $ 50,000.00 | Flare Education LLC | WIRE FROM SHARP EDIA LLC 053014 |
| 5/30/2014 | $ 2,000.00 | Flare Education LLC | WIRE FROM STARTE MEDIA LLC053014 |
| 6/4/2014 | $ 960.00 | Flare Education LLC | WIRE FROM FLARE DUCATION L060414C |
| 6/6/2014 | $ 45,000.00 | Flare Education LLC | WIRE FROM STARTE MEDIA LLC060614 |
| 6/20/2014 | $ 8,000.00 | Flare Education LLC | WIRE FROM GREEN IGHT EDUCA062014ION LLC |
| 6/24/2014 | $ 12,000.00 | Flare Education LLC | WIRE FROM STARTE MEDIA LLC062414 |
| 9/16/2014 | $ 42,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D572690357*SAVVY MEDIA LLC*4250 ARVILLE ST APT 228*LAS VEGAS, NV 891033724* |
| 9/29/2014 | $ 40,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D572690357*SAVVY MEDIA LLC*4250 ARVILLE ST APT 228*LAS VEGAS, NV 891033724* |
| 9/29/2014 | $ 30,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 11/6/2014 | $ 35,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D572690357*SAVVY MEDIA LLC*4250 ARVILLE ST APT 228*LAS VEGAS, NV 891033724* |
| 11/6/2014 | $ 18,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 11/12/2014 | $ 7,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D572690357*SAVVY MEDIA LLC*4250 ARVILLE ST APT 228*LAS VEGAS, NV 891033724* |

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**    Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|------|--------|-------------|------------|
| 11/12/2014 | $ 5,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
| 11/12/2014 | $ 2,900.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 11/13/2014 | $ 10,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D572690357*SAVVY MEDIA LLC*4250 ARVILLE ST APT 228*LAS VEGAS, NV 891033724* |
| 11/13/2014 | $ 40,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
| 11/13/2014 | $ 30,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 12/1/2014 | $ 24,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D572690357*SAVVY MEDIA LLC*4250 ARVILLE ST APT 228*LAS VEGAS, NV 891033724* |
| 12/4/2014 | $ 4,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
| 12/4/2014 | $ 3,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 12/24/2014 | $ 14,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D572690357*SAVVY MEDIA LLC*4250 ARVILLE ST APT 228*LAS VEGAS, NV 891033724* |
| 1/2/2015 | $ 14,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058299787*TREE TOP MEDIA LLC*1500 BAY RD APT 1160S*MIAMI BEACH FL 33139-3227* |
| 1/7/2015 | $ 24,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D572690357*SAVVY MEDIA LLC*4250 ARVILLE ST APT 228*LAS VEGAS, NV 891033724* |
| 1/7/2015 | $ 8,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
| 1/21/2015 | $ 11,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 1/21/2015 | $ 2,700.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
| 1/30/2015 | $ 40,000.00 | D9136082504*FLARE EDUCATION LLC CITIBANK* | D000001933336735*FOCUS LEARNING LLC*1530 N TECHNOLOGY WAY*OREM, UT 84097-2394* |
| 2/18/2015 | $ 16,300.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D572690357*SAVVY MEDIA LLC*4250 ARVILLE ST APT 228*LAS VEGAS, NV 891033724* |

CONFIDENTIAL - DRAFT - Preliminary and Tentative                                                           Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 3/20/2015 | $ 11,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D572690357*SAVVY MEDIA LLC*4250 ARVILLE ST APT 228*LAS VEGAS, NV 891033724* |
| 3/20/2015 | $ 1,300.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
| 3/27/2015 | $ 1,600.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D608179755*O DUFFIE LLC*9215 SALLY LN APT 2E*SCHILLER PARK, IL 601762324* |
| 3/27/2015 | $ 750.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898062385674*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 4/9/2015 | $ 1,700.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 4/16/2015 | $ 4,446.60 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176* | D000001933336735*FOCUS LEARNING LLC*1530 N TECHNOLOGY WAY*OREM, UT 84097-2394* |
| 4/21/2015 | $ 15,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D670776819*THE DONNY NETWORK LLC*1505 W AUGUSTA BLVD APT 3*CHICAGO, IL 606423972* |
| 4/21/2015 | $ 3,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 4/21/2015 | $ 1,900.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715706*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 4/22/2015 | $ 6,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D670776819*THE DONNY NETWORK LLC*1505 W AUGUSTA BLVD APT 3*CHICAGO, IL 606423972* |
| 4/23/2015 | $ 7,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D670776819*THE DONNY NETWORK LLC*1505 W AUGUSTA BLVD APT 3*CHICAGO, IL 606423972* |
| 4/23/2015 | $ 2,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 4/24/2015 | $ 6,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D670776819*THE DONNY NETWORK LLC*1505 W AUGUSTA BLVD APT 3*CHICAGO, IL 606423972* |
| 4/24/2015 | $ 1,200.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 4/27/2015 | $ 7,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D670776819*THE DONNY NETWORK LLC*1505 W AUGUSTA BLVD APT 3*CHICAGO, IL 606423972* |
| 4/29/2015 | $ 19,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D670776819*THE DONNY NETWORK LLC*1505 W AUGUSTA BLVD APT 3*CHICAGO, IL 606423972* |

CONFIDENTIAL - DRAFT - Preliminary and Tentative                                                     Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 4/29/2015 | $ 4,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 5/4/2015 | $ 7,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 5/6/2015 | $ 900.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 5/6/2015 | $ 6,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898062997169*GUS MEDIA LLC*1750 N BAYSHORE DR APT 3308*MIAMI FL 33132-3213* |
| 5/6/2015 | $ 5,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 5/7/2015 | $ 1,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 5/18/2015 | $ 50,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D608179755*O DUFFIE LLC*9215 SALLY LN APT 2E*SCHILLER PARK, IL 601762324* |
| 5/19/2015 | $ 29,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D608179755*O DUFFIE LLC*9215 SALLY LN APT 2E*SCHILLER PARK, IL 601762324* |
| 5/28/2015 | $ 29,000.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 5/28/2015 | $ 29,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 6/1/2015 | $ 2,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898062385674*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 6/4/2015 | $ 7,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 6/8/2015 | $ 4,000.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715706*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 6/8/2015 | $ 1,300.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898062385674*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 6/15/2015 | $ 50,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 6/16/2015 | $ 4,500.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898060549030*SIDNER VENTURE LLC*7801 N FEDERAL HWY BLDG 8-107*BOCA RATON FL 33487-1768* |

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**                    Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 6/17/2015 | $ 15,075.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 6/18/2015 | $ 18,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 6/18/2015 | $ 14,000.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 6/18/2015 | $ 13,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 6/19/2015 | $ 14,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 6/24/2015 | $ 5,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 7/6/2015 | $ 4,700.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898062385674*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 7/8/2015 | $ 5,000.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898060549030*SIDNER VENTURE LLC*7801 N FEDERAL HWY BLDG 8-107*BOCA RATON FL 33487-1768* |
| 7/9/2015 | $ 4,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 7/9/2015 | $ 9,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 7/10/2015 | $ 9,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 7/15/2015 | $ 10,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 7/17/2015 | $ 5,000.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898060549030*SIDNER VENTURE LLC*7801 N FEDERAL HWY BLDG 8-107*BOCA RATON FL 33487-1768* |
| 8/5/2015 | $ 1,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 8/5/2015 | $ 2,300.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 8/5/2015 | $ 5,500.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898062385674*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |

CONFIDENTIAL - DRAFT - Preliminary and Tentative                Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 8/6/2015 | $ 9,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D608179755*O DUFFIE LLC*9215 SALLY LN APT 2E*SCHILLER PARK, IL 601762324* |
| 8/6/2015 | $ 19,300.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898060549030*SIDNER VENTURE LLC*7801 N FEDERAL HWY BLDG 8-107*BOCA RATON FL 33487-1768* |
| 8/7/2015 | $ 8,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 8/10/2015 | $ 7,500.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 8/11/2015 | $ 30,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 8/13/2015 | $ 8,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 8/13/2015 | $ 12,000.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 8/13/2015 | $ 10,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 8/18/2015 | $ 6,800.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 8/18/2015 | $ 4,900.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898060549030*SIDNER VENTURE LLC*7801 N FEDERAL HWY BLDG 8-107*BOCA RATON FL 33487-1768* |
| 9/3/2015 | $ 9,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 9/9/2015 | $ 5,000.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898060549030*SIDNER VENTURE LLC*7801 N FEDERAL HWY BLDG 8-107*BOCA RATON FL 33487-1768* |
| 9/17/2015 | $ 4,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 9/17/2015 | $ 1,800.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D608179755*O DUFFIE LLC*9215 SALLY LN APT 2E*SCHILLER PARK, IL 601762324* |
| 9/17/2015 | $ 20,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 9/17/2015 | $ 7,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |

CONFIDENTIAL - DRAFT - Preliminary and Tentative    Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 9/17/2015 | $ 12,300.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 9/18/2015 | $ 5,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 9/18/2015 | $ 11,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898062385674*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 9/21/2015 | $ 11,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 9/21/2015 | $ 8,500.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 9/22/2015 | $ 3,900.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 9/22/2015 | $ 3,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 9/23/2015 | $ 27,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 9/23/2015 | $ 1,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 9/28/2015 | $ 3,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 9/28/2015 | $ 3,000.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 9/30/2015 | $ 2,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 10/1/2015 | $ 3,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 10/2/2015 | $ 1,800.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716970*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 10/6/2015 | $ 5,000.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898060549030*SIDNER VENTURE LLC*7801 N FEDERAL HWY BLDG 8-107*BOCA RATON FL 33487-1768* |

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**    Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|------|--------|-------------|------------|
| 10/7/2015 | $ 1,400.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 10/7/2015 | $ 2,800.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898062385674*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 10/9/2015 | $ 4,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 10/15/2015 | $ 8,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 10/15/2015 | $ 7,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 10/16/2015 | $ 7,500.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 10/21/2015 | $ 6,800.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 11/3/2015 | $ 1,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 11/4/2015 | $ 200.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D608179755*O DUFFIE LLC*9215 SALLY LN APT 2E*SCHILLER PARK, IL 601762324* |
| 11/6/2015 | $ 4,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH COURT*MIAMI, FL, 33176, US* | D898070861779*PURPLE WHALE MANAGEMENT LLC*485 BRICKELL AVE APT 4208*MIAMI FL 33131-2760* |
| 11/6/2015 | $ 1,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D608179755*O DUFFIE LLC*9215 SALLY LN APT 2E*SCHILLER PARK, IL 601762324* |
| 11/6/2015 | $ 700.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 11/6/2015 | $ 250.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 11/6/2015 | $ 1,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898059521603*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 11/6/2015 | $ 230.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**    Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 11/6/2015 | $ 2,800.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 11/9/2015 | $ 3,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898062385674*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 11/18/2015 | $ 3,700.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 11/19/2015 | $ 6,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 11/19/2015 | $ 4,400.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 11/19/2015 | $ 4,200.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 11/20/2015 | $ 500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 11/20/2015 | $ 600.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 11/23/2015 | $ 1,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 11/24/2015 | $ 17,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 11/24/2015 | $ 11,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 11/24/2015 | $ 3,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 11/24/2015 | $ 7,000.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 11/24/2015 | $ 10,500.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |

CONFIDENTIAL - DRAFT - Preliminary and Tentative                    Exhibit 2

Flare Inflows

| Date | Amount | Beneficiary | Originator |
|------|--------|-------------|------------|
| 11/27/2015 | $ 7,800.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 11/27/2015 | $ 5,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 11/27/2015 | $ 5,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 11/27/2015 | $ 8,800.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 11/30/2015 | $ 19,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 11/30/2015 | $ 3,500.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 11/30/2015 | $ 23,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 12/1/2015 | $ 26,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 12/1/2015 | $ 28,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 12/1/2015 | $ 6,500.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 12/1/2015 | $ 5,300.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 12/3/2015 | $ 16,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 12/7/2015 | $ 16,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 12/8/2015 | $ 6,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |

CONFIDENTIAL - DRAFT - Preliminary and Tentative                                      Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|------|--------|-------------|------------|
| 12/8/2015 | $ 15,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 12/8/2015 | $ 4,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 12/8/2015 | $ 17,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 12/11/2015 | $ 9,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 12/11/2015 | $ 10,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 12/11/2015 | $ 10,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 12/11/2015 | $ 8,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 12/16/2015 | $ 13,000.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 12/17/2015 | $ 7,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 12/17/2015 | $ 6,900.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 12/23/2015 | $ 4,900.00 | D9136082504*FLARE EDUCATION*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063715683*SIDNER VENTURE LLC*7801 N FEDERAL HWY*8-107*BOCA RATON FL 33487-1768* |
| 12/28/2015 | $ 1,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 12/30/2015 | $ 4,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 12/31/2015 | $ 25,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH COURT*MIAMI, FL, 33176, US* | D898070861779*PURPLE WHALE MANAGEMENT LLC*485 BRICKELL AVE APT 4208*MIAMI FL 33131-2760* |
| 1/15/2016 | $ 15,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH COURT*MIAMI, FL, 33176, US* | D898070861779*PURPLE WHALE MANAGEMENT LLC*485 BRICKELL AVE APT 4208*MIAMI FL 33131-2760* |

CONFIDENTIAL - DRAFT - Preliminary and Tentative                                                                      Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 1/26/2016 | $ 4,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 1/26/2016 | $ 6,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 1/26/2016 | $ 1,500.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 1/27/2016 | $ 2,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 1/27/2016 | $ 2,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 1/27/2016 | $ 3,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 1/28/2016 | $ 1,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 1/28/2016 | $ 2,500.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 1/29/2016 | $ 4,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH COURT*MIAMI, FL, 33176, US* | D898070861779*PURPLE WHALE MANAGEMENT LLC*485 BRICKELL AVE APT 4208*MIAMI FL 33131-2760* |
| 1/29/2016 | $ 2,500.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |
| 2/2/2016 | $ 24,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 2/5/2016 | $ 28,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D761811525*GUS MEDIA LLC DBA AUCTION POWER*ACCESS*1750 N BAYSHORE DR APT 3706*MIAMI, FL 331323214* |
| 2/5/2016 | $ 4,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI FL 33176 US* | D663250996*KT PACK LLC*944 N WOOD ST APT G*CHICAGO, IL 606225004* |
| 2/8/2016 | $ 25,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898066475218*PLESSETT VENTURE LLC*7350 SW 89TH ST APT 719S*MIAMI FL 33156-7716* |
| 2/8/2016 | $ 26,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063848754*HIGGINS TEAM LLC*2071 BETHEL BLVD*BOCA RATON FL 33486-3141* |

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**                                      Exhibit 2

**Flare Inflows**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 2/8/2016 | $ 32,000.00 | D9136082504*FLARE LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898063716983*A LIND ENTERPRISES LLC*1603 SPRUCE ST*IOWA CITY IA 52240-6048* |
| 2/12/2016 | $ 10,000.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH COURT*MIAMI, FL, 33176, US* | D898070861779*PURPLE WHALE MANAGEMENT LLC*485 BRICKELL AVE APT 4208*MIAMI FL 33131-2760* |
| 3/29/2016 | $ 5,200.00 | D9136082504*FLARE EDUCATION LLC*10000 SW 97TH CT*MIAMI, FL, 33176, US* | D898058689494*LOCK MEDIA LLC*9742 NW 46TH TER*DORAL FL 33178-1982* |
|  | **$ 5,725,764.87** Total |  |  |

Sources:

DOJ-EDNY-0026648

DOJ-EDNY-0026649

DOJ-EDNY-0006456

DOJ-EDNY-0006457

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**
**Summary of Deposits by Business Line**

January 2013 - June 2014

| Line of Business | Number of Deposits | % of Total |
|---|---|---|
| Business Opportunities | 4,031 | 48% |
| Nutritional Products | 4,181 | 49% |
| TBD | 250 | 3% |
| Total | 8,462 | |

| Assuming TBD Deposits are in the same ratio as the rest of the deposits: | | |
|---|---|---|
| **Line of Business** | **Deposits** | **% of Total** |
| **Business Opportunities** | **4,154** | **49%** |
| **Nutritional Products** | **4,308** | **51%** |

Sources:
DOJ-EDNY-0006456
DOJ-EDNY-0006457

Note:
Determinations of deposit line of business are based on discovery
documentation, internet research, and/or Defendant

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**
**Flare Education Outflows Summary, February 2013 through June 2014**

| Outflow | | Amount |
|---|---|---|
| Affiliates | $ | (2,259,526.20) |
| Intercompany Transfer | $ | (848,500.00) |
| Professional Fees | $ | (559,963.42) |
| Chargeback | $ | (415,464.65) |
| Shipping | $ | (276,554.42) |
| Cost of Goods Sold | $ | (249,684.34) |
| Loan | $ | (203,450.00) |
| Larby's Personal | $ | (137,248.00) |
| Payroll | $ | (122,336.21) |
| Discount | $ | (56,364.47) |
| Signer's Payout | $ | (52,535.00) |
| Referral Fees | $ | (45,899.78) |
| Merchant Fees | $ | (41,872.21) |
| (blank) | $ | (22,886.84) |
| Bank Fees | $ | (19,221.38) |
| Travel Expenses | $ | (14,948.74) |
| Distributions | $ | (13,900.00) |
| Monthly Gateway Fees | $ | (9,794.28) |
| Agent Fee | $ | (8,145.84) |
| Miscellaneous Expenses | $ | (8,000.00) |
| Lease | $ | (7,800.00) |
| Customer Refunds | $ | (3,227.04) |
| **Total** | **$** | **(5,377,322.82)** |

Source:
DOJ-EDNY-0006457

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**

**Jump Learning to Flare Education Wires**

| Date | Amount | Beneficiary | Originator |
|------|--------|-------------|------------|
| 6/10/13 | $ 1,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 10/21/13 | $ 10,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 11/8/13 | $ 25,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 11/21/13 | $ 30,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 11/27/13 | $ 30,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 12/2/13 | $ 25,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 12/2/13 | $ 4,500.00 | Flare Education LLC | JUMP LEARNING LLC |
| 12/3/13 | $ 40,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 12/16/13 | $ 20,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 12/24/13 | $ 5,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 2/24/14 | $ 15,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 2/28/14 | $ 3,100.00 | Flare Education LLC | JUMP LEARNING LLC |
| 4/21/14 | $ 45,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 5/8/14 | $ 30,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 5/12/14 | $ 5,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 5/20/14 | $ 50,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 5/21/14 | $ 30,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 5/22/14 | $ 5,000.00 | Flare Education LLC | JUMP LEARNING LLC |
| 5/30/14 | $ 500.00 | Flare Education LLC | JUMP LEARNING LLC |
| | **$ 374,100.00** | **Total** | |

Sources:

DOJ-EDNY-0026648

DOJ-EDNY-0026649

DOJ-EDNY-0006456

DOJ-EDNY-0006457

Exhibit 6

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**
**Flare Education to Angry Elephant Wires**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 2/21/14 | $ 30,000.00 | Angry Elephant Marketing LLC | Flare Education LLC |
| 2/28/14 | $ 73,700.00 | Angry Elephant Marketing LLC | Flare Education LLC |
| 5/2/14 | $ 15,000.00 | Angry Elephant Marketing LLC | Flare Education LLC |
| 5/21/14 | $ 55,000.00 | Angry Elephant Marketing LLC | Flare Education LLC |
| | **$ 173,700.00** | **Total** | |

Sources:
DOJ-EDNY-0026648
DOJ-EDNY-0026649
DOJ-EDNY-0006456
DOJ-EDNY-0006457

**CONFIDENTIAL - DRAFT - Preliminary and Tentative**

**Flare Education to Purple Whale Wires**

| Date | Amount | Beneficiary | Originator |
|---|---|---|---|
| 9/18/15 | $ 153,500.00 | D898070861779*PURPLE WHALE MANAGEMENT LLC* | D009136082504*FLARE EDUCATION LLC*10000 SW 97TH COURT MIAMI FL 331 76* |
| 12/7/15 | $ 40,000.00 | D898070861779*PURPLE WHALE MANAGEMENT LLC* | D009136082504*FLARE EDUCATION LLC*10000 SW 97TH COURT MIAMI FL 331 76* |
| | **$ 193,500.00** | Total | |

Sources:

DOJ-EDNY-0026648

DOJ-EDNY-0026649

DOJ-EDNY-0006456

DOJ-EDNY-0006457

DOJ-EDNY-0053435

**Closed Accounts**

| Nicey Mid Name | Company | Processor | Agent | Acquiring Bank Name | Mid Number | Nicey YTD Volume | Nicey YTD Refunds | Projected Reserve in $$ | Projected Reserve in % | Settlement Deposits | # of Days since last settlement | Amount of last Settlement | Date of last Deposit | Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cynergy (maesuppcom) | Flare | Cynergy | Steve/ Jaclyn | Harris | 3899000002380170 | $        -  | $        -  | $     2,008.01 | 0% | No | 206 | 1,045.16 | 3/18/2013 | Account Closed |
| flareic (6/20/13) | Flare | Intellegent Contacts | Chirs Carr | HSBC | 8788152000134 | $   170,059.00 | $   (13,237.29) | $   19,886.73 | 13% | No | 58 | 159.00 | 8/13/2013 | Account Closed |
| NETPAY Flare (6/27/13) | Flare | NETPAY | Jimmy Shin | Wells Fargo | 498232436887 | $    64,801.21 | $    (5,155.40) | $    (1,877.40) | -3% | No | 77 | 645.05 | 7/25/2013 | Account Closed |
| Flare Education NMC | Flare | National Merchant Center | Jared Ronski | Wells Fargo | 247803001 | $   126,368.53 | $   (13,931.52) | $   47,318.06 | 37% | No | 14 | 3.31 | 9/26/2013 | Account Closed |
| Flare Education PowerPay | Flare | Powerpay | P2 | Deutche Bank | 27150312326401 | $   160,721.55 | $   (17,086.20) | $   18,225.55 | 18% | No | 41 | 3.58 | 8/30/2013 | Account Closed |
| FOCUSIC (6/20/13) | Focus Learning | Intellegent Contacts | Chirs Carr | HSBC | 8788152000133 | $   171,707.31 | $   (16,540.09) | $   18,075.44 | 12% | No | 58 | 207.99 | 8/13/2013 | Account Closed |
| FOCUSLEARNING | Focus Learning | Signature | Chirs Carr | Merrick Bank | 461074230309940 | $    57,877.84 | $    (3,273.16) | $   31,328.17 | 57% | No | 45 | 5,130.97 | 8/26/2013 | Account Closed |
| NETPAY (6/17/13) | Focus Learning | NETPAY | Jimmy Shin | Wells Fargo | 498232447884 | $    99,525.79 | $    (8,154.12) | $   38,295.17 | 42% | No | 73 | 7.90 | 7/29/2013 | Account Closed |
| AUCTIONHB | Focus Learning | HBMS | P2 | Harris | 897200583887 | $    74,389.61 | $    (5,638.70) | $   48,681.23 | 71% | No | 3 | 758.23 | 10/7/2013 | Account Closed |
| AUCTIONTRAFFICDPS | Focus Learning | DPS | P2 | Deutche Bank | 27350013943401 | $   184,906.11 | $   (17,440.57) | $   34,153.40 | 20% | No | 43 | 19.99 | 8/28/2013 | Account Closed |
| FOCUS AMS (6/17/13) | Focus Learning | AMS | Jimmy Shin | Wells Fargo | 518089320407745 | $   155,721.92 | $   (16,602.21) | $   68,234.53 | 49% | No | 30 | 2,668.54 | 9/10/2013 | Account Closed |
| FOCUS AUCSUPPCOM (6/27/13) | Focus Learning | First Pay Solutions | P2 | West America | 3899000002399790 | $     4,259.97 | $      (297.00) | $     2,481.88 | 63% | No | 100 | 3,567.62 | 7/2/2013 | Account Closed |
| FOCUSLEARNING POWERPAY | Focus Learning | PowerPay | Jimmy Shin | Deutche Bank | 271503123736 | $   328,706.38 | $   (35,636.90) | $   65,820.13 | 22% | No | 34 | 79.50 | 9/6/2013 | Account Closed |
| Focus-Diet-Select-8/20 | Focus Learning | Select | P2 | Mission Valley | 554135021201124 | $    38,457.21 | $    (2,552.23) | $   20,538.47 | 57% | No | 17 | 314.41 | 9/23/2013 | Account Closed |
| FPS-FOCUSAUC (7/27/13) | Focus Learning | Cynergy | Steve/ Jaclyn | Harris | 510159620160515 | $    47,675.43 | $    (3,524.75) | $     8,328.66 | 19% | No | 3 | 347.18 | 10/7/2013 | Account Closed |
| INFUSEIC (6/20/13) | Infuse Media | Intellegent Contacts | Chirs Carr | HSBC | 8788152000132 | $   163,278.24 | $   (12,921.68) | $   20,450.30 | 14% | No | 58 | 159.00 | 8/13/2013 | Account Closed |
| INFUSEMEDIA1 (INMI) | Infuse Media | Select | P2 | Mission Valley Bank | 554135021200431 | $    92,700.79 | $   (11,400.29) | $   38,187.62 | 47% | No | 91 | 95.87 | 7/11/2013 | Account Closed |
| INFUSEMEDIAAMS1 | Infuse Media | AMS | Jimmy Shin | Wells Fargo | 518089320407992 | $   117,403.28 | $   (17,011.96) | $   32,341.40 | 32% | No | 9 | 99.00 | 10/1/2013 | Account Closed |
| SPACE-NMA-8/20 | Infuse Media | NMA | Chirs Carr | Wells Fargo | 542623330401447 | $     8,574.34 | $      (617.70) | $     8,932.75 | 112% | No | 49 | 428.47 | 8/22/2013 | Account Closed |
| JUMPIC (6/20/13) | Jump | Intellegent Contacts | Chirs Carr | HSBC | 8788152000131 | $    69,937.22 | $    (6,252.71) | $   38,834.41 | 61% | No | 57 | 25,000.00 | 8/14/2013 | Account Closed |
| NETPAY (6/20/13) | Jump | NETPAY | Jimmy Shin | Wells Fargo | 498233619887 | $    34,290.61 | $    (2,790.34) | $   28,416.45 | 90% | No | 108 | 3,443.70 | 6/24/2013 | Account Closed |
| JUMPSIGNATURE | Jump | Signature | Chirs Carr | Merrick Bank | 461074230309783 | $   208,824.15 | $   (19,626.39) | $   61,600.98 | 33% | No | 42 | 10.05 | 8/29/2013 | Account Closed |
| LEARNAUCTIONS101MERITUS | Orange Learning | Meritus | P2 | Wells Fargo | 510159390820256 | $    39,988.68 | $    (1,801.31) | $   12,472.35 | 33% | No | 65 | 2,741.25 | 8/6/2013 | Account Closed |
| LearningAuctions101 im | Orange Learning | IRN | Alan Cohen | First California Bank | 720000319452 | $   294,181.38 | $   (17,876.40) | $   80,107.14 | 29% | No | 34 | 25,000.00 | 9/6/2013 | Account Closed |
| ORANGEIC (6/20/13) | Orange Learning | Intellegent Contacts | Chirs Carr | HSBC | 8788152000129 | $   169,211.98 | $   (15,844.97) | $   19,867.69 | 13% | No | 58 | 30.00 | 8/13/2013 | Account Closed |
| ORANGELEARNINGLLCS | Orange Learning | AMS | Jimmy Shin | Wells Fargo | 518089320406986 | $   165,205.67 | $   (11,291.94) | $   39,420.94 | 26% | No | 35 | 15,000.00 | 9/5/2013 | Account Closed |
| AUCTIONMASTERHUMBOLDT | Propel | Humboldt | P2 | Harris | 897200445889 | $     5,563.04 | $      (350.95) | $     1,329.66 | 26% | No | 17 | 3,942.43 | 9/23/2013 | Account Closed |
| NETPAY SPARK (6/20/13) | Spark | NETPAY | Jimmy Shin | Wells Fargo | 498233631882 | $    65,684.97 | $    (4,170.70) | $   60,622.09 | 99% | No | 106 | 1,926.72 | 6/26/2013 | Account Closed |
| SPARKIC (6/20/13) | Spark | Intellegent Contacts | Chirs Carr | HSBC | 8788152000130 | $    60,543.73 | $    (5,872.85) | $   34,842.17 | 64% | No | 57 | 19,828.71 | 8/14/2013 | Account Closed |
| Rapid-NMA-8/21 | Starter Media | NMA | Chirs Carr | Wells Fargo | 542623350401444 | $    67,853.55 | $    (4,501.20) | $   63,352.35 | 56% | No | 27 | 1,885.57 | 9/13/2013 | Account Closed |
| Starter-NMA-8/20 | Starter Media | NMA | Chirs Carr | Wells Fargo | 542623350401436 | $    68,614.11 | $    (5,581.54) | $   63,032.57 | 56% | No | 27 | 1,574.79 | 9/13/2013 | Account Closed |

**Exhibit B: Payment Processor Contracts and Statement; Reserve Project Email**

**AMS**

| LEGAL NAME | BUSINESS NAME | PRODUCT TYPE | MONTHLY VOL |
|---|---|---|---|
| GOLD MEDIA LLC | CAMBOGIA TRIM ADVANCED | Nutra | $ 50,000.00 |
| LOCK MEDIA LLC | PERFECT CAMBOGIA | Nutra | $ 50,000.00 |
| NEON MEDIA LLC | CAMBOGIA BEACH | Nutra | $ 50,000.00 |
| GOLD MEDIA LLC | SELECT POWER SUCCESS | Education | $ 50,000.00 |
| LOCK MEDIA LLC | AUCTION ZEN MASTER | Education | $ 50,000.00 |
| NEON MEDIA LLC | NEW AUCTION SUCCESS | Education | $ 50,000.00 |
| SAVVY MEDIA LLC | PRIME AUCTION PLANNER | Education | $ 50,000.00 |
| SHARP MEDIA LLC | NEW POWER INCOMES | Education | $ 50,000.00 |
| STARTUP MEDIA LLC | PRO AUCTION TECH | Education | $ 50,000.00 |

**USMS**

| LEGAL NAME | BUSINESS NAME | PRODUCT TYPE | MONTHLY VOL |
|---|---|---|---|
| GREEN LIGHT EDUCATION LLC | RED HOT GARCINIA | Nutra | $ 50,000.00 |
| STARTER MEDIA LLC | WORLDS BEST GARCINIA | Nutra | $ 50,000.00 |
| LIGHT UP MEDIA LLC | PURE GARCINIA CAMBOGIA | Nutra | $ 50,000.00 |

**POWERPAY**

| LEGAL NAME | BUSINESS NAME | PRODUCT TYPE | MONTHLY VOL |
|---|---|---|---|
| GOLD MEDIA LLC | CAMBOGIA TRIM ADVANCED | Nutra | $ 50,000.00 |
| LOCK MEDIA LLC | PERFECT CAMBOGIA | Nutra | $ 50,000.00 |
| NEON MEDIA LLC | CAMBOGIA BEACH | Nutra | $ 50,000.00 |
| SAVVY MEDIA LLC | GARCINIA SLIM TODAY | Nutra | $ 50,000.00 |
| SHARP MEDIA LLC | SLIM GARCINIA SECRET | Nutra | $ 50,000.00 |
| STARTUP MEDIA LLC | GARCINIA BURN X | Nutra | $ 50,000.00 |

**MERITUS**

| LEGAL NAME | BUSINESS NAME | PRODUCT TYPE | MONTHLY VOL |
|---|---|---|---|
| TREE TOP MEDIA LLC | THE GARCINIA BLAST | Nutra | $ 50,000.00 |
| LIGHT UP MEDIA LLC | PURE CARCINIA CAMBOGIA | Nutra | $ 50,000.00 |
| GOLD MEDIA LLC | CAMBOGIA TRIM ADVANCED | Nutra | $ 50,000.00 |
| LOCK MEDIA LLC | PERFECT CAMBOGIA | Nutra | $ 50,000.00 |
| NEON MEDIA LLC | CAMBOGIA BEACH | Nutra | $ 50,000.00 |
| SAVVY MEDIA LLC | GARCINIA SLIM TODAY | Nutra | $ 50,000.00 |
| SHARP MEDIA LLC | SLIM GARCINIA SECRET | Nutra | $ 50,000.00 |
| STARTUP MEDIA LLC | GARCINIA BURN X | Nutra | $ 50,000.00 |
| GOLD MEDIA LLC | SELECT POWER SUCCESS | Education | $ 50,000.00 |
| LOCK MEDIA LLC | AUCTION ZEN MASTER | Education | $ 50,000.00 |
| NEON MEDIA LLC | NEW AUCTION SUCCESS | Education | $ 50,000.00 |
| SAVVY MEDIA LLC | PRIME AUCTION PLANNER | Education | $ 50,000.00 |

| SHARP MEDIA LLC | NEW POWER INCOMES | Education | $ | 50,000.00 |
| STARTUP MEDIA LLC | PRO AUCTION TECH | Education | $ | 50,000.00 |

**VISION**

| LEGAL NAME | BUSINESS NAME | PRODUCT TYPE | MONTHLY VOL | |
|---|---|---|---|---|
| GOLD MEDIA LLC | CAMBOGIA TRIM ADVANCED | Nutra | $ | 50,000.00 |
| LOCK MEDIA LLC | PERFECT CAMBOGIA | Nutra | $ | 50,000.00 |

**CARDFLEX**

| LEGAL NAME | BUSINESS NAME | PRODUCT TYPE | MONTHLY VOL | |
|---|---|---|---|---|
| GOLD MEDIA LLC | CAMBOGIA TRIM ADVANCED | Nutra | $ | 50,000.00 |
| LOCK MEDIA LLC | PERFECT CAMBOGIA | Nutra | $ | 50,000.00 |
| NEON MEDIA LLC | CAMBOGIA BEACH | Nutra | $ | 50,000.00 |
| SAVVY MEDIA LLC | GARCINIA SLIM TODAY | Nutra | $ | 50,000.00 |
| SHARP MEDIA LLC | SLIM GARCINIA SECRET | Nutra | $ | 50,000.00 |
| STARTUP MEDIA LLC | GARCINIA BURN X | Nutra | $ | 50,000.00 |

**MIDPAY (Greg)**

| LEGAL NAME | BUSINESS NAME | PRODUCT TYPE | MONTHLY VOL | |
|---|---|---|---|---|
| SPACE MEDIA LLC | SHREDDED GARCINIA CAMBOGIA | Nutra | $ | 50,000.00 |
| RED MEDIA LLC | THE GARCINIA SECRET | Nutra | $ | 50,000.00 |

**POWERPAY (P2)**

| LEGAL NAME | BUSINESS NAME | PRODUCT TYPE | MONTHLY VOL | |
|---|---|---|---|---|
| JUMP LEARNING LLC | HIGH TREND AUCTIONS | Education | $ | 50,000.00 |

**DPS (P2)**

| LEGAL NAME | BUSINESS NAME | PRODUCT TYPE | MONTHLY VOL | |
|---|---|---|---|---|
| LIGHT UP MEDIA LLC | MY HOME EARNING POWER | Education | $ | 50,000.00 |
| TREE TOP MEDIA LLC | THE PROFESSIONAL POWER SELLER | Education | $ | 50,000.00 |

**SELECT (P2)**

| LEGAL NAME | BUSINESS NAME | PRODUCT TYPE | MONTHLY VOL | |
|---|---|---|---|---|
| JUMP LEARNING LLC | RIPPED GARCINIA CAMBOGIA | Nutra | $ | 50,000.00 |

| MID | GATEWAY ID | LOGIN URL |
|---|---|---|
| 518089320413925 | 1339957 | https://account.authorize.net/ |
| 518089320410954 | 1339941 | https://account.authorize.net/ |
| 518089320410657 | 1337789 | https://account.authorize.net/ |
| 518089320411762 | 1344778 | https://account.authorize.net/ |
| 518089320411887 | 1345749 | https://account.authorize.net/ |
| 518089320411820 | 1344779 | https://account.authorize.net/ |
| 518089320411416 | 1345778 | https://account.authorize.net/ |
| 518089320411358 | 1345771 | https://account.authorize.net/ |
| 518089320411291 | 1345784 | https://account.authorize.net/ |

| MID | GATEWAY ID | LOGIN URL |
|---|---|---|
| 27240037721901 | 1328893 | https://account.authorize.net/ |
| 27240037722701 | 1328916 | https://account.authorize.net/ |
| 27240037746601 | 1338852 | https://account.authorize.net/ |

| MID | GATEWAY ID | LOGIN URL |
|---|---|---|
| 271503944750 | 1335814 | https://account.authorize.net/ |
| 271503944891 | 1335821 | https://account.authorize.net/ |
| 271503945203 | | |
| 271503947936 | | |
| 271503947993 | 1335836 | https://account.authorize.net/ |
| 271503948033 | 1335825 | https://account.authorize.net/ |

| MID | GATEWAY ID | LOGIN URL |
|---|---|---|
| 510159390824928 | PAYMENT XP | https://www.merituspayment.com/merchants |
| 510159390825503 | PAYMENT XP | https://www.merituspayment.com/merchants |
| 510159390824746 | PAYMENT XP | https://www.merituspayment.com/merchants |
| 510159390824829 | PAYMENT XP | https://www.merituspayment.com/merchants |
| 510159390824761 | PAYMENT XP | https://www.merituspayment.com/merchants |
| 510159390824845 | PAYMENT XP | https://www.merituspayment.com/merchants |
| 510159390824787 | PAYMENT XP | https://www.merituspayment.com/merchants |
| 510159390824803 | PAYMENT XP | https://www.merituspayment.com/merchants |
| 510159390825073 | PAYMENT XP | https://www.merituspayment.com/merchants |
| 510159390824993 | PAYMENT XP | https://www.merituspayment.com/merchants |
| 510159390825057 | PAYMENT XP | https://www.merituspayment.com/merchants |
| 510159390824977 | PAYMENT XP | https://www.merituspayment.com/merchants |

510159390825032    PAYMENT XP    https://www.merituspayment.com/merchants
510159390825016    PAYMENT XP    https://www.merituspayment.com/merchants

| MID | GATEWAY ID | LOGIN URL |
| --- | --- | --- |
| 27260006201701 | 1337801 | https://account.authorize.net/ |
| 27260006194401 | 1337763 | https://account.authorize.net/ |

| MID | GATEWAY ID | LOGIN URL |
| --- | --- | --- |
| 3899000002534650 | | https://secure.cardflexonline.com/r/rpjdh |
| 3899000002534665 | | https://secure.cardflexonline.com/r/mw116 |

| MID | GATEWAY ID | LOGIN URL |
| --- | --- | --- |
| | | https://www.midpaygateway.com |
| | | https://www.midpaygateway.com |

| MID | GATEWAY ID | LOGIN URL |
| --- | --- | --- |
| 2715034124801 | | https://secure.nmi.com |

| MID | GATEWAY ID | LOGIN URL |
| --- | --- | --- |
| 27350013963201 | | https://secure.nmi.com |
| 27350013964001 | | https://secure.nmi.com |

| MID | GATEWAY ID | LOGIN URL |
| --- | --- | --- |
| 554135021201157 | | https://secure.nmi.com |

| USERNAME | PASSWORD |
|---|---|
| goldmedia57 | Goldmedia123 |
| lockmedia41 | Lockmedia123 |
| neonmedia89 | Neonmediallc1 |

| USERNAME | PASSWORD |
|---|---|
| greenlight93 | Greenlight123 |
| startermedia16 | Startermedia123 |
| lightupmedia52 | Lightupmediallc1 |

| USERNAME | PASSWORD |
|---|---|
| goldmedia14 | Goldmedia123 |
| lockmedia2 | Lockmedia123 |
| sharpmedia36 | Sharpmedia123 |
| startupmedia25 | Startupmedia123 |

| USERNAME | PASSWORD |
|---|---|
| 33111 | Treetopmedia123 |
| 33112 | Widget987 |
| 33330 | Goldmedia123 |
| 33331 | Lockmedia123 |
| 33333 | Neonmedia123 |
| 33357 | Savvymedia123 |
| 33358 | Sharpmedia123 |
| 33359 | Startupmedia123 |

| USERNAME | PASSWORD |
|---|---|
| goldmedia01 | Goldmedia123 |
| lockmedia63 | Lockmedia123 |

| USERNAME | PASSWORD |
|---|---|
| trimhlp | Goldmedia123 |
| beachhlp | Neonmedia123 |

| USERNAME | PASSWORD |
|---|---|
| spacemedia1 | Spacemedia123 |
| redmedia1 | Redmedia123 |

| USERNAME | PASSWORD |
|---|---|
| hightrendpp | JUMPLEARNING123 |

| USERNAME | PASSWORD |
|---|---|
| myhomeearningdps | Lightupmedia123 |
| theprofessionaldps | Treetopmedia123 |

| USERNAME | PASSWORD |
|---|---|
| rippedgarciniaselect | Jumplearning123 |

| SECURITY QUESTION | SECURITY ANSWER |
|---|---|
| In what city or town did your mother and father meet? | miami |
| In what city or town did your mother and father meet? | miami |
| In what city or town did your mother and father meet? | miami |

| SECURITY QUESTION | SECURITY ANSWER |
|---|---|
| In what city or town did your mother and father meet? | miami |
| In what city or town did your mother and father meet? | miami |
| In what city or town did your mother and father meet? | miami |

| SECURITY QUESTION | SECURITY ANSWER |
|---|---|
| In what city or town did your mother and father meet? | miami |
| In what city or town did your mother and father meet? | miami |
| In what city or town did your mother and father meet? | miami |
| In what city or town did your mother and father meet? | miami |

| SECURITY QUESTION | SECURITY ANSWER |
|---|---|

| SECURITY QUESTION | SECURITY ANSWER |
| --- | --- |
| In what city or town did your mother and father meet? | miami |
| In what city or town did your mother and father meet? | miami |

| SECURITY QUESTION | SECURITY ANSWER |
| --- | --- |
| | |
| | |

| SECURITY QUESTION | SEQURITY ANSWER |
| --- | --- |
| | |

| SECURITY QUESTION | SEQURITY ANSWER |
| --- | --- |

| SECURITY QUESTION | SEQURITY ANSWER |
| --- | --- |

| SECURITY QUESTION | SEQURITY ANSWER |
| --- | --- |

| Processor | MID | Name | DBA | Rate |
|-----------|-----|------|-----|------|
| AMS | 518089320411978 | A LIND | SLIM PREMIUM CAMBOGIA | 4.95% |
| AMS | 518089320412604 | DS GROUP | SECRET BIKINI BODY | 4.95% |
| AMS | 518089320412919 | A LIND | PRO TRAINER BUSINESS | 4.95% |
| AMS | 518089320412802 | DS GROUP | BEACHWOOD SUCCESS METHOD | 4.95% |
| AMS | 518089320412398 | HIGGINS TEAM | CAMBOGIA CONNECTION | 4.95% |
| AMS | 518089320412463 | HIGGINS TEAM | SELECT SUCCESS TECH | 4.95% |
| AMS | 518089320412331 | K WHITE | SLIM QUICK GARCINIA | 4.95% |
| AMS | 518089320413040 | K WHITE | FRONTIER BUSINESS TRAINER | 4.95% |
| AMS | 518089320412778 | A JONES | HOME EARNING ADVANTAGE | 4.95% |
| AMS | 518089320412653 | C SKERS | ADVANCE TRIM GARCINIA | 4.95% |
| AMS | 518089320412703 | O DUFFIE | HOME EARNING SUCCESS | 4.95% |
| AMS | 518089320412646 | C SKERS | AUCTION POWER ACCESS | 4.95% |
| AMS | 543093340010610 | KT PACK | PREMIER STREAMLINED SUCCESS | 4.95% |
| AMS | 543093340010552 | KT PACK | GARCINIA SLIM ELITE | 4.95% |
| BAMS | 510165880300223 | A JONES | HOME EARNING ADVANTAGE | 4.95% |
| BAMS | 510165590403812 | A LIND | SLIM PREMIUM CAMBOGIA | 4.95% |
| BAMS | 517530550300016 | C SKERS | AUCTION POWER ACCESS | 4.95% |
| BAMS | 510165880400262 | HIGGINS TEAM | CAMBOGIA CONNECTION | 4.95% |
| BAMS | 517530550300024 | O DUFFIE | HOME EARNING SUCCESS | 4.95% |
| BAMS | 510165590403804 | SIDNER | BEACH BODY EXTRACT | 4.95% |
| CARDFLEX | 3899000002652269 | DS GROUP | SECRET BIKINI BODY | 7.00% |
| CARDFLEX | 3899000002655098 | HIGGINS TEAM | CAMBOGIA CONNECTION | 7.00% |
| CARDFLEX | 3899000002656765 | K WHITE | SLIM QUICK GARCINIA | 7.00% |
| CARDFLEX | 3899000002650032 | SIDNER | BEACH BODY EXTRACT | 7.00% |
| CMS | 513485000331546 | DS GROUP | BEACHWOOD SUCCESS METHOD | ic + 400 |
| DPS | 27350013986301 | A LIND | PRO TRAINER BUSINESS | ic + 400 |
| DPS | 27350013981401 | DS GROUP | BEACHWOOD SUCCESS METHOD | ic + 400 |
| DPS | 27350013985501 | HIGGINS TEAM | SELECT SUCCESS TECH | ic + 400 |
| DPS | 27350013983001 | K WHITE | FRONTIER BUSINESS TRAINER | ic + 400 |
| DPS | 27350013982201 | SIDNER | DYNASTY BUSINESS TRAINER | ic + 400 |
| DPS | 27350013992101 | A JONES | HOME EARNING ADVANTAGE | 4.95% |
| DPS | 27350013993901 | C SKERS | AUCTION POWER ACCESS | 4.95% |
| EMS | 565500000121430 | DS GROUP | SECRET BIKINI BODY | 4.95% |
| EMS | 565500000125191 | DS GROUP | BEACHWOOD SUCCESS METHOD | 4.95% |
| EMS | 565500000121455 | HIGGINS TEAM | CAMBOGIA CONNECTION | 4.95% |
| EMS | 565500000121448 | HIGGINS TEAM | SELECT SUCCESS TECH | 4.95% |
| EMS | 565500000122503 | K WHITE | SLIM QUICK GARCINIA | 4.95% |
| EMS | 565500000122511 | K WHITE | FRONTIER BUSINESS TRAINER | 4.95% |
| EMS | 565500000137063 | A JONES | HOME EARNING ADVANTAGE | 4.95% |
| EMS | 565500000138335 | C SKERS | AUCTION POWER ACCESS | 4.95% |
| EVO | 27150542660801 | HIGGINS TEAM | SELECT SUCCESS TECH | 3.95% |
| EVO | 27150542657401 | K WHITE | SLIM QUICK GARCINIA | 3.95% |
| EVO | 27150542658201 | A LIND | PRO TRAINER BUSINESS | 3.95% |
| EVO | 27150542656601 | K WHITE | FRONTIER BUSINESS TRAINER | 3.95% |
| EVO | 27150542659001 | DS GROUP | BEACHWOOD SUCCESS METHOD | 3.95% |
| HUMBOLDT | 897201297883 | A LIND | PRO TRAINER BUSINESS | 4.95% |
| HUMBOLDT | 897201426888 | DS GROUP | BEACHWOOD SUCCESS METHOD | 4.95% |
| HUMBOLDT | 897201404885 | HIGGINS TEAM | SELECT SUCCESS TECH | 4.95% |
| HUMBOLDT | 897201423885 | SIDNER | DYNASTY BUSINESS TRAINER | 4.95% |
| HUMBOLDT | 897202063888 | A JONES | HOME EARNING ADVANTAGE | 4.95% |

| | | | | |
|---|---|---|---|---|
| HUMBOLDT | 897202154885 | C SKERS | AUCTION POWER ACCESS | 4.95% |
| PIVOTAL | 6314180000022077 | A LIND | SLIM PREMIUM CAMBOGIA | 4.95% |
| PIVOTAL | 6314180000022051 | DS GROUP | SECRET BIKINI BODY | 4.95% |
| PIVOTAL | 6314180000022069 | HIGGINS TEAM | CAMBOGIA CONNECTION | 4.95% |
| PIVOTAL | 6314180000022044 | SIDNER | BEACH BODY EXTRACT | 4.95% |
| POWERPAY | 27150750526801 | SIDNER | BEACH BODY EXTRACT | 3.99% |
| POWERPAY | 27150750527601 | SIDNER | BEACH BODY EXTRACT | 3.99% |
| POWERPAY | 27150750847801 | HIGGINS TEAM | CAMBOGIA CONNECTION | 3.99% |
| SECURE BANCARD | 842696901170 | DS GROUP | SECRET BIKINI BODY | 4.95% |
| SECURE BANCARD | 842696918330 | HIGGINS TEAM | CAMBOGIA CONNECTION | 4.95% |
| SECURE BANCARD | 842696909400 | SIDNER | BEACH BODY EXTRACT | 4.95% |
| SECURE BANCARD | 461084269690912 | K WHITE | SLIM QUICK GARCINIA | 4.95% |
| TRUST ONE | 543093030304166 | A LIND | PRO TRAINER BUSINESS | 3.95% |
| TRUST ONE | 543093030304174 | A LIND | SLIM PREMIUM CAMBOGIA | 3.95% |
| TRUST ONE | 543093030304034 | DS GROUP | SECRET BIKINI BODY | 3.95% |
| TRUST ONE | 543093030304109 | DS GROUP | BEACHWOOD SUCCESS METHOD | 3.95% |
| TRUST ONE | 543093030304133 | HIGGINS TEAM | CAMBOGIA CONNECTION | 3.95% |
| TRUST ONE | 543093030304125 | HIGGINS TEAM | SELECT SUCCESS TECH | 3.95% |
| TRUST ONE | 543093030304026 | K WHITE | SLIM QUICK GARCINIA | 3.95% |
| TRUST ONE | 543093030304091 | K WHITE | FRONTIER BUSINESS TRAINER | 3.95% |

| Reserve % | MV | Net sales | Deposits | Reserve balance |
|---|---|---|---|---|
| 25% | $ 50,000.00 | $ 17,008.35 | $ 749.69 | $ 16,258.66 |
| 25% | $ 50,000.00 | $ 16,053.00 | $ 145.26 | $ 15,907.74 |
| 25% | $ 50,000.00 | $ 105,127.33 | $ 66,566.68 | $ 38,560.65 |
| 25% | $ 50,000.00 | $ 104,310.29 | $ 24,216.62 | $ 80,093.67 |
| 20% | $ 50,000.00 | $ 16,252.00 | $ 294.49 | $ 15,957.51 |
| 20% | $ 50,000.00 | $ 102,939.05 | $ 38,255.47 | $ 64,683.58 |
| 20% | $ 50,000.00 | $ 17,276.80 | $ 762.07 | $ 16,514.73 |
| 20% | $ 50,000.00 | $ 108,593.03 | $ 74,344.23 | $ 34,248.80 |
| 15% | $ 50,000.00 | $ 87,303.00 | $ 20,398.88 | $ 66,904.12 |
| 15% | $ 50,000.00 | $ 18,381.60 | $ 2,081.17 | $ 16,300.43 |
| 20% | $ 25,000.00 | $ 47,753.00 | $ 36,923.71 | $ 10,829.29 |
| 15% | $ 50,000.00 | $ 86,529.50 | $ 22,405.44 | $ 64,124.06 |
| 15% | $ 50,000.00 | $ - | $ - | $ - |
| 15% | $ 50,000.00 | $ - | $ - | $ - |
| 0% | $ 65,000.00 | $ 100,075.50 | $ 26,034.05 | $ 74,041.45 |
| 0% | $ 65,000.00 | $ 11,652.50 | $ 3.80 | $ 11,648.70 |
| 0% | $ 65,000.00 | $ 85,553.50 | $ 9,511.15 | $ 76,042.35 |
| 0% | $ 65,000.00 | $ 74,113.50 | $ 61,145.99 | $ 12,967.51 |
| 0% | $ 65,000.00 | $ 98,167.00 | $ 18,484.99 | $ 79,682.01 |
| 0% | $ 65,000.00 | $ 45,376.00 | $ 5.82 | $ 45,370.18 |
| 10% | $ 25,000.00 | $ 24,485.59 | $ 170.82 | $ 24,314.77 |
| 10% | $ 25,000.00 | $ 22,015.48 | $ 1,081.64 | $ 20,933.84 |
| 10% | $ 30,000.00 | $ 35,382.00 | $ 1,147.88 | $ 34,234.12 |
| 10% | $ 40,000.00 | $ 37,241.81 | $ 950.02 | $ 36,291.79 |
| 10% | $ 20,000.00 | $ 18,719.00 | $ - | $ 18,719.00 |
| 20% | $ 20,000.00 | $ 39,198.50 | $ 30,671.63 | $ 8,526.87 |
| 20% | $ 25,000.00 | $ 42,682.00 | $ 26,807.90 | $ 15,874.10 |
| 20% | $ 20,000.00 | $ 42,337.50 | $ 32,644.26 | $ 9,693.24 |
| 20% | $ 20,000.00 | $ 47,746.50 | $ 36,417.91 | $ 11,328.59 |
| 20% | $ 20,000.00 | $ 43,688.00 | $ 33,054.96 | $ 10,633.04 |
| 20% | $ 20,000.00 | $ 26,045.50 | $ 17,808.77 | $ 8,236.73 |
| 20% | $ 20,000.00 | $ 25,775.00 | $ 17,599.36 | $ 8,175.64 |
| 10% | $ 10,000.00 | $ 4,966.00 | $ - | $ 4,966.00 |
| 10% | $ 10,000.00 | $ 280,155.50 | $ 40,358.63 | $ 239,796.87 |
| 10% | $ 50,000.00 | $ 19,043.75 | $ - | $ 19,043.75 |
| 10% | $ 10,000.00 | $ 24,826.50 | $ - | $ 24,826.50 |
| 10% | $ 50,000.00 | $ 22,959.85 | $ - | $ 22,959.85 |
| 10% | $ 10,000.00 | $ 280,612.00 | $ - | $ 280,612.00 |
| 15% | $ 10,000.00 | $ 265,478.00 | $ 30,550.05 | $ 234,927.95 |
| 10% | $ 15,000.00 | $ 270,424.50 | $ - | $ 270,424.50 |
| 10.00% | $ 50,000.00 | $ 94,562.50 | $ 43,563.00 | $ 50,999.50 |
| 10.00% | $ 50,000.00 | $ - | $ - | $ - |
| 10.00% | $ 50,000.00 | $ 31,472.00 | $ - | $ 31,472.00 |
| 10.00% | $ 50,000.00 | $ 54,202.50 | $ - | $ 54,202.50 |
| 10.00% | $ 50,000.00 | $ 47,979.50 | $ - | $ 47,979.50 |
| 15% | $ 15,000.00 | $ 25,751.50 | $ 21,179.71 | $ 4,571.79 |
| 10% | $ 12,500.00 | $ 19,401.16 | $ 3,818.69 | $ 15,582.47 |
| 10% | $ 20,000.00 | $ 29,440.00 | $ 1,661.34 | $ 27,778.66 |
| 10% | $ 20,000.00 | $ 28,805.00 | $ 4,146.05 | $ 24,658.95 |
| 10% | $ 15,000.00 | $ 6,477.00 | $ 3,125.70 | $ 3,351.30 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10% | $ | 20,000.00 | $ | 6,077.50 | $ | 5,826.00 | $ | 251.50 |
| 20% | $ | 50,000.00 | $ | 192,986.07 | $ | 60,890.10 | $ | 132,095.97 |
| 20% | $ | 50,000.00 | $ | 188,335.17 | $ | 68,501.03 | $ | 119,834.14 |
| 20% | $ | 50,000.00 | $ | 183,123.50 | $ | 63,064.59 | $ | 120,058.91 |
| 20% | $ | 50,000.00 | $ | 182,066.00 | $ | 62,742.41 | $ | 119,323.59 |
| 10% | $ | 50,000.00 | $ | 25,691.00 | $ | 159.05 | $ | 25,531.95 |
| 10% | $ | 50,000.00 | $ | 26,446.00 | $ | 157.00 | $ | 26,289.00 |
| 10% | $ | 25,000.00 | $ | 86,123.50 | $ | 10,215.46 | $ | 75,908.04 |
| 10% | $ | 20,000.00 | $ | 19,171.00 | $ | - | $ | 19,171.00 |
| 10% | $ | 15,000.00 | $ | 2,015.00 | $ | 3.39 | $ | 2,011.61 |
| 10% | $ | 20,000.00 | $ | 13,961.00 | $ | 6,987.87 | $ | 6,973.13 |
| 15% | $ | 50,000.00 | $ | 7,742.00 | $ | 2.40 | $ | 7,739.60 |
| 10% | $ | 50,000.00 | $ | 73,719.50 | $ | 22,938.24 | $ | 50,781.26 |
| 10% | $ | 50,000.00 | $ | 5,708.00 | $ | 1.35 | $ | 5,706.65 |
| 10% | $ | 50,000.00 | $- | | $- | | $- | |
| 10% | $ | 50,000.00 | $ | 53,787.00 | $ | 35,818.81 | $ | 17,968.19 |
| 10% | $ | 50,000.00 | $- | | $- | | $- | |
| 10% | $ | 50,000.00 | $ | 54,693.00 | $ | 27,218.99 | $ | 27,474.01 |
| 10% | $ | 50,000.00 | $- | | $- | | $- | |
| 10% | $ | 50,000.00 | $ | 54,135.50 | $ | 24,927.95 | $ | 29,207.55 |

$ 4,230,119.83    $ 1,138,542.47    $    3,091,577.36

| | | | | | |
|---|---|---|---|---|---|
| AMS | $ | 727,526.95 | $ | 287,143.71 | $ | 440,383.24 |
| BAMS | $ | 414,938.00 | $ | 115,185.80 | $ | 299,752.20 |
| CardFlex | $ | 119,124.88 | $ | 3,350.36 | $ | 115,774.52 |
| CMS | $ | 18,719.00 | $ | - | $ | 18,719.00 |
| DPS | $ | 267,473.00 | $ | 195,004.79 | $ | 72,468.21 |
| EMS | $ | 1,168,466.10 | $ | 70,908.68 | $ | 1,097,557.42 |
| Evo | $ | 228,216.50 | $ | 43,563.00 | $ | 184,653.50 |
| Humboldt | $ | 115,952.16 | $ | 39,757.49 | $ | 76,194.67 |
| Pivotal | $ | 746,510.74 | $ | 255,198.13 | $ | 491,312.61 |
| PowerPay | $ | 138,260.50 | $ | 10,531.51 | $ | 127,728.99 |
| Secure Bancard | $ | 42,889.00 | $ | 6,993.66 | $ | 35,895.34 |
| Trust One | $ | 242,043.00 | $ | 110,905.34 | $ | 131,137.66 |
| **Total** | **$ 4,230,119.83** | | **$ 1,138,542.47** | | **$ 3,091,577.36** |

| Notes |
|---|
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
| Scheduled for review 12/15/14 |
|  |
|  |
|  |
|  |
|  |
| 75% of held funds to be released 12/15/14 |
| 75% of held funds to be released 12/15/14 |
| 75% of held funds to be released 12/15/14 |
| 75% of held funds to be released 12/15/14 |
| Darren P2 is working. Update pending. |
| Darren P2 is working. Update pending. |
| Darren P2 is working. Update pending. |
| Darren P2 is working. Update pending. |
| Darren P2 is working. Update pending. |
| Darren P2 is working. Update pending. |
| Darren P2 is working. Update pending. |
| Darren P2 is working. Update pending. |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
| scheduled for review 1/4/15 |
|  |
| scheduled for review 1/4/15 |
| scheduled for review 12/14/14 - results pending |
| not eligible for review until June 2015 |
| Adam is waiting for risk notes. Follow up on Monday |
| Adam is waiting for risk notes. Follow up on Monday |
| Adam is waiting for risk notes. Follow up on Monday |
| Adam is waiting for risk notes. Follow up on Monday |
| Adam is waiting for risk notes. Follow up on Monday |

| |
|---|
| Adam is waiting for risk notes. Follow up on Monday |
| |
| |
| |
| |
| PP Risk "We reviewed in Dec and could not do a release due to incoming chargebacks" |
| PP Risk "We reviewed in Dec and could not do a release due to incoming chargebacks" |
| PP Risk "Closed on 12/11 by loss prevention. Review scheduled for 30 days after closure" |
| No releases for 6 months |
| No releases for 6 months |
| No releases for 6 months |
| No releases for 6 months |
| Manpreet is working. Update pending. |
| Manpreet is working. Update pending. |
| |
| Manpreet is working. Update pending. |
| |
| Manpreet is working. Update pending. |
| |
| Manpreet is working. Update pending. |

| % funded |
|---|
| 39.47% |
| 27.76% |
| 2.81% |
| 0.00% |
| 72.91% |
| 6.07% |
| 19.09% |
| 34.29% |
| 34.19% |
| 7.62% |
| 16.31% |
| 45.82% |

% in reserves
60.53%
72.24%
97.19%
100.00%
27.09%
93.93%
80.91%
65.71%
65.81%
92.38%
83.69%
54.18%

*99 day hold*



CFS1100

| OFFICE: | ShinGroup |
| REP: | JimmyShin |
| MID: | SIC: 7399 |

## Merchant Application and Agreement

2900 Bristol Street, Suite F-206
Costa Mesa, CA 92626

Sponsor Bank: Wells Fargo Bank, N.A., Walnut Creek, CA

### BUSINESS INFORMATION

Legal Name: SLASHDEVSLASHFINANCE INC.

Phone #: (650) 485-1871

DBA (Doing Business As): /DEV/PAYMENTS

Statement Mailing Address: 701 WEBSTER ST

Location/Site Address: 701 WEBSTER ST

City: PALO ALTO    State: CA    Zip: 94301

City: PALO ALTO    State: CA    Zip: 94301

Federal Tax ID Number: 270465600    # of Employees: 4

Contact Person: JOHN COLLISON    Number of Locations: 1

Email: john@devpayments.com

Customer Service Phone #: (857) 294-6037

Descriptor: /DE

### OWNERS/PARTNERS/OFFICERS

1) Name (print): JOHN COLLISON    Title: PRESIDENT    Equity/Ownership: 36 %

Date of Birth: 8/6/1990    Drivers License #: 131018692    State: CA    Social Security #: 603832803    Home Phone: (650) 485-1871

Home Address: 701 WEBSTER ST    City: PALO ALTO    State: CA    Zip: 94301

2) Name (print): PATRICK COLLISON    Title: CEO    Equity/Ownership: 36 %

Date of Birth: 9/9/1988    Drivers License #: 131014981    State: CA    Social Security #: 542774173    Home Phone: (415) 298-5539

Home Address: 701 WEBSTER ST    City: PALO ALTO    State: CA    Zip: 94301

### MERCHANT PROFILE SECTION

Type of Ownership: ☐ Sole Proprietor  ☐ Partnership  ☑ Corporation (State of Incorp: ___)

☐ Other _____

Number of Years in Business: 0    Length of Current Ownership: 1

Other currently/previously owned businesses _____

Prior Bankruptcy?  ☐ Yes ☑ No    Date Discharged: _____

Do you currently accept Visa/MasterCard/Discover® Network?  ☐ Yes ☑ No   (If yes, submit 3 most current statements)

Do you wish to accept EBT cards?  ☐ Yes ☑ No    EBT#: ___   ☐ Yes (requires Debit/ATM cards  ☑ No  a pin pad)

Seasonal Business?  ☐ Yes ☑ No    If yes, list months: _____

Name of Previous Processor: _____    Reason for Leaving: _____

Marketing Methods: ☐ Newspaper/Magazines  ☑ Internet  ☐ TV/Radio  ☐ Direct Mail/Catalogs  ☐ Telemarketing    Web Site: http:// http://devpayments.com

Who Performs the Product/Service Fulfillment?    Name: _____

Address: _____    Phone: _____

What is the time frame from transaction to delivery? (% of orders delivered in): 0-7 days 100 % + 8-14 days 0 % + 15-30 days 0 % + over 30 days 0 % = 100%

MC/Visa/Discover Network sales are charged (check one): ☑ Date of order  ☐ Date of delivery  ☐ Other (specify): _____

Detailed Description of Products/Services Sold: Payments analytics

### VISA/MASTERCARD/DISCOVER NETWORK INFORMATION

MERCHANT TYPE

| | VISA/MasterCard/Discover Network Sales Profile |
|---|---|
| ☐ Retail Outlet | Credit Cards Swiped: 0 % |
| ☐ Restaurant/Food | Mail Order: 0 % |
| ☐ Mail/Telephone Order Only | Phone Order: 0 % |
| ☐ Home Business, Trade Fairs | Internet: 100 % |
| ☐ Outside Sales/Service, Other, Etc | Tradeshows: 0 % |
| ☐ Internet | MUST TOTAL 100% |
| ☐ Lodging | Merchant Receives Imprint On Keyed Transactions: ☐ Yes ☐ No |

### ACCEPT ALL MASTERCARD, VISA AND DISCOVER NETWORK TRANSACTIONS

Presumed, unless any selections below are checked. See Section 1.9 of the Program Guide for details regarding limited acceptance.

| MasterCard Acceptance | Visa Acceptance | Discover Network Acceptance |
|---|---|---|
| ☐ Accept MC Credit transactions *only* | ☐ Accept Visa Credit transactions *only* | ☐ Accept Discover Network Credit transactions *only* |
| ☐ Accept MC Non-PIN Debit transactions *only* | ☐ Accept Visa Non-PIN Debit transactions *only* | ☐ Accept Discover Network Non-PIN Debit transactions *only* |

### ADDITIONAL SERVICES

☐ Gift/Loyalty Card    ☐ AVS Required    ☐ Check Guarantee    Company: _____

☐ New American Express Account    ☑ Existing AMEX Merchant    Account #: _____

☐ New ___    ☑ Existing DIS    Account #: 601040137948 98

☐ CardFlex™ Payroll MasterCard Services    Initial Setup Fee: $ _____    Monthly Fee: $ _____

☐ ACH Processing Services    Please complete and sign the *Data Processing and Payment Processing Agreement* – see your agent for details.

51898703500 1353    *Merchant Initials* ___

Sponsor Bank: Wells Fargo Bank N.A.

CardFlex Financial Services LLC is a registered ISO of Wells Fargo Bank, N.A.

Page 1 of 3

REV 0210

DOJ-EDNY-0015200

CFS1106

**Merchant:** /DEV/PAYMENTS

## SCHEDULE OF PROCESSING CHARGES

| Visa/MasterCard/Discover Qualified Discount Rate: | 5.00 % | Authorization/Transaction Fee: $ 0.20 | Batch Closure Fee: $ 0.00 | Setup/Application Fee: $ 0.00 |
|---|---|---|---|---|

Mid-qualified transactions will be assessed 0.00 % above the qualified discount rate (excluding approved 20% Plus Keyed Merchants). Non qualified transactions will be assessed 0.00% above the qualified discount rate. Corporate Cards and Corporate Purchase Cards will be assessed 0.00% above the qualified discount rate. MasterCard assesses the following fees for eligible transactions: MC Acquirer Support Fee - 0.55%; MC Cross Border Fee - 0.40%; MC National Acquirer Brand Usage Fee (NABU) - $0.03. Visa assesses the following fees for eligible transactions: Visa Acquiring Processing Fee - $0.0195; Visa ISA International Sale Transaction Fee - 0.40% - Visa ISA Cash Advance/ ATM International Transaction Fee - 0.15%; Visa Zero Limit Fee - $0.10; Visa Misuse Authorization Fee - $0.045; Visa International Acquiring. Fee (std merch) - 0.45%, (high risk) - 0.90%. Discover assesses the following fees for eligible transactions: Discover Full Acquiring. International Fee - 0.30%.
Authorization & Batch Closure for American Express. and/or JCB $0.30 per item.

### PIN Debit Transactions

| ☐ Monthly Debit Access Fee | $ 0.00 | Debit Per Item: $ 0.00 | + | 0.00 % | ☐ Pass Through Debit Interchange Fees |
|---|---|---|---|---|---|

| Monthly Fees | | | Other Fees | | | | | |
|---|---|---|---|---|---|---|---|---|
| Statement Fee: | $ | 0.00 | Chargeback Fee | | $ | 20.00 | Voice Authorization | $ 1.00 |
| Minimum Fee: | $ | 0.00 | Request for Copy (Retrieval) | | $ | 15.00 | Address Verification | $ 0.00 |
| Maintenance Fee: | $ | 0.00 | ACH Returned Item Fee | | $ | 0.00 | Voice Address Verification | $ 0.00 |
| Wireless Service Fee: (If Applicable) | $ | 0.00 | ARU | | $ | 1.00 | Investigation Fee (or 10% monthly of amount investigated.) | $ 20.00 |

### PCI Security Fee

| PCI Annual Compliance Fee (Assessed 30 days after merchant account approval) | $ 0.00 | PCI Monthly Maintenance Fee $ 0.00 |
|---|---|---|

*Merchant Initials*

| Average Ticket Size: (for VISA/MasterCard/ Discover Network) | $ 20.00 | Monthly Visa/MasterCard/ Discover Network | $ 3,000.00 | Last 3 Month Average for Visa/MasterCard/ Discover Network | $ 0.00 |
|---|---|---|---|---|---|

Each applicant certifies that the above average ticket size and monthly sales volume is accurate and acknowledges that any significant variance from this information could result in delayed or withheld settlement of fund and or assessment of additional fees.
**There is a $15.00 fee to add AMEX, Diners, JCB Processing and Debit Card to your merchant account after initial set-up.**

| GRID INFORMATION (INTERNAL USE ONLY): | | Authorization Grid ID#: 116 | User Defined Grid ID #: |
|---|---|---|---|

## PERSONAL GUARANTEE

The undersigned guarantees to CardFlex Financial Services, LLC and Bank the performance of this Agreement is true and correct and that Client has received a copy of this Agreement by Client, in the event of default, hereby waives Notice of Default and agrees to indemnify the other parties, including payment of all sums due and owing and costs associated with enforcement of the terms thereof. CardFlex Financial Services, LLC and Bank shall not be required to first proceed against Client or enforce any other remedy before proceeding against the undersigned individual. This is a continuing guarantee and shall not be discharged or effected by the death of the undersigned and shall bind the heirs, administrators, representatives and assigns and be enforced by or for the benefit of any successor of CardFlex Financial Services, LLC and Bank. The term of this guarantee shall be for the duration of the Merchant Processing Application and Agreement and any addendum thereto and shall guarantee all obligations which may arise or occur in connection with my activities during the term thereof through enforcement shall be sought subsequent to any termination.

| Guarantor X | 8/10/2010 | Co-Guarantor X | Date: |
|---|---|---|---|

## AUTHORIZED SIGNER FOR BUSINESS

Client certifies that all information set forth in this completed Merchant Processing Application is true and correct and that Client has received a copy of the MC, Visa and Discover Network Tiered Grid ID Numbers, Program Guide (Version CFS1106) and Confirmation Page, which is part of this Merchant Processing Application (consisting of Sections 1-10), and by this reference incorporated herein. Client further agrees that Client will not accept more than 20% of its card transactions via mail, telephone or Internet order. However, if your Application is approved based upon contrary information stated in Section 8,Transaction Information section above, you are authorized to accept transactions in accordance with the percentages indicated in that section.

This signature page also serves as a signature page to the Equipment Lease Agreement at Section 33, if selected, the undersigned Client being the "Lessee" for purposes of such Equipment Lease Agreement. Client authorizes CardFlex Financial Services, LLC and Wells Fargo Bank, N.A. ("Bank") and their agents to investigate the references, statements and other data contained herein and to obtain additional information from credit bureaus and other lawful sources, including persons and companies names in this Merchant Processing Application. Client authorizes CardFlex Financial Services, LLC and BANK and their agents (a) to procure information from any consumer reporting agency bearing his/her personal credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, and (b) to contact all previous employers, personal references and educational institutions. It is our policy to obtain certain information in order to verify your identity while processing your account application. By signing below, I represent that I have read and am authorized to sign and submit this application on behalf of the entity above and all information I have provided herein is true, complete, and accurate. I authorize American Express Travel Related Services Company, Inc. ("American Express") to verify the information in this application and receive and exchange information about me personally, including by requesting reports from consumer reporting agencies. I authorize and direct American Express to inform me directly, or through the entity above, of reports about me that American Express has requested from consumer reporting agencies. Such information will include the name and address of the agency furnishing the report. I understand that upon American Express' approval of the entity indicated above to accept the American Express Card, the terms and conditions for American Express® Card Acceptance ("Terms and Conditions") will be sent to such entity along with a Welcome Letter. By accepting the American Express Card for the purchase of goods and/or services, or otherwise indicating its intention to be bound, the entity agrees to be bound by the Terms and Conditions. Client agrees to all the terms of this Merchant Processing Application and Agreement. This Merchant Processing Application and Agreement shall not take effect until Client has been approved and this Agreement has been accepted by CardFlex Financial Services, LLC and Bank.

| Owner/Officer Signature: | PRESIDENT | Date: 8/10/2010 |
|---|---|---|

## FOR ALL CORPORATIONS – Corporate Resolution

The indicated office identified above has the authorization to execute the Merchant Processing Agreement with Bank and CFS on behalf of the here within named corporation.

| Secretary of the Board: X | Date: / / |
|---|---|

### CARDFLEX FINANCIAL SERVICES ACCEPTANCE

| Application Approved By: | Title: | Date: / / |
|---|---|---|

### WELLS FARGO BANK, N.A. ACCEPTANCE

| Application Approved By: | Title: | Date: / / |
|---|---|---|

Sponsor Bank: Wells Fargo Bank N.A.                    CardFlex Financial Services LLC is a registered ISO of Wells Fargo Bank, N.A.

REV 0210

DOJ-EDNY-0015200

CFS1106

**Merchant:** _____

| TRADE REFERENCES | | |
|---|---|---|
| 1. Name: SlashDevSlashFinance inc. | Contact: Raeez Lorgat | Phone: (617) 470-5156 |
| 2. Name: | Contact: | Phone: |

| BANK INFORMATION | | |
|---|---|---|
| Bank Name: WELLS FARGO | Contact: | Phone: |
| Bank Routing Number: 121042882 | Bank Account Number: 1227187315 | |

**SITE INSPECTION**

The Merchant: ☐ Owns  ☐ Leases the business premises   Landlord Name: _____ Landlord Telephone #: _____

Merchant Location: ☐ Retail Store Front   ☐ Office/Warehouse   ☐ Residential   ☐ Internet   ☐ Other

Does the amount of inventory and merchandise on the shelves appear consistent with type of business?   ☐ Yes   ☐ No

I hereby certify that I have inspected the business premises of the merchant at this address and this survey is correct to the best of my knowledge.

Inspected by:                                    Title:                          Date:

| HARDWARE/SOFTWARE | | | | TERMINAL PROGRAM | | |
|---|---|---|---|---|---|---|
| | | QTY | TOTAL | | | |
| Terminal ☐ Model: _____ | | ____ $ _____ | | ☐ Retail (80% Swiped) | ☐ Purchase Card | ☐ Dial Terminal |
| Printer ☐ Model: _____ | | ____ $ _____ | | ☐ Retail w/ Tip | ☐ Lodging | ☐ Dial Out Code: _____ |
| Pin Pad ☐ Model: _____ | | ____ $ _____ | | ☐ 4 Digit Verification | ☐ AVS | ☐ IP Terminal |
| Check Reader ☐ Model: _____ | | ____ $ _____ | | ☐ Restaurant (w/ tip program) | ☐ Invoice # | ☐ Auto Close Time _____ |
| P.C. Software ☐ Model: _____ | | ____ $ _____ | | ☐ MOTO (AVS Required) | ☐ Server ID | ☐ NOS Version _____ |

Do you use a Third Party to store, process or transmit cardholder data? ☐ Yes ☑ No   If yes, provide their name and address:

LEASE COMPANY: (04) First Data Global Leasing    Lease Term: _____ Mos.    Annual Tax Handling Fee: 10.20

Total Monthly Lease Charge: $_____ w/o taxes, late fees, or other charges that may apply –
*(See Lease Agreement in Program Guide for details. This is a non-cancelable lease for the full term indicated.)*    Client Initials: _____

**INTERNET MERCHANT INFORMATION**

☑ CardFlex Payment Gateway    Initial Setup Fee: $ ____ 0.00 Gateway Per Transaction Fee: $ ____ 0.00 Monthly Fee: $ _____

☐ External Gateway (not supplied by CFS): _____

Number of Imprinter Plates _____   ☐ Ship Welcome Kit Only Equipment is: ☐ Reprogram   ☐ Provided by CFS   Ship to: ☐ Merchant ☐ Office

Call merchant for ☐ download ☐ training   Contact: _____   Phone Number: _____

| PAYMENT INFORMATION | | SHIPPING INFORMATION | |
|---|---|---|---|
| ☐ Please charge my Credit Card | CID#/ | ☐ Please ship to the following address | |
| Card #: _____ Expiration: _____ CVV2#: _____ | | Street: _____ | |
| ☐ Please debit my checking account | | City: _____ State: _____ Zip: _____ | |
| Routing #: _____ Account #: _____ | | Shipping Location Phone Number: _____ | |

**Comments:** _____

_____

_____

_____

**Merchant Initials** _____

**Merchant Documentation Requirements:**

☐ Signed Merchant Application and Agreement including Signed Resolution and Sign Personal Guaranty by principals.

☐ Photos of location or brochures, business cards or other identifying business information on the Merchant. For an Internet Business, a printout of the Merchant's web page.

☐ Copy of Voided Check

☐ All Web Site URLs, Passwords and Domain Names

☐ Financial statements for Merchants processing over $50,000 in monthly Merchant sales volume

☐ 3 months of merchant statements from previous processing

☐ Photocopy of driver's license

☐ Additional setup form (Gift/Loyalty Card, American Express)

Sponsor Bank: Wells Fargo Bank N.A.                    CardFlex Financial Services LLC is a registered ISO of Wells Fargo Bank, N.A.

REV 0210

DOJ-EDNY-0015200

updated 8/18/10

Remove 99 day
update with this DDA info. per Kelby. 8/18/10

dev/payment - 518987035001353

**WELLS FARGO BANK**
PALO ALTO OFFICE
400 HAMILTON AVE
PALO ALTO, CA 94301
11-4288/1210
1001

PAY TO THE ORDER OF ___ Void

Void

SLASHDEV/SLASHFINANCE INC
701 WEBSTER ST
PALO ALTO    CA 94301-2829

DATE

$ Void

Void ___ DOLLARS

VOID

⑈121042882⑈ 22718731591001

DOJ-EDNY-0015200

COMPLETE MERCHANT SOLUTIONS                                            PAGE           1
P O BOX 684
PROVO   UT                                            MONTH ENDING      11/30/13
84603                                                 8 PAGES IN THIS STATEMENT

                              MERCHANT STATEMENT              07      1280
                         SUMMARY OF BANKCARD DEPOSITS

8716  0000  0100  01

MERCHANT NUMBER 5134 8500  0108910                    DDA/SAV/GL NR 002556103
                                                      CHAIN 08944


        ..........................................................


    PREMIER MENTORING (TREND TRADI
    172 E. 14075 S.
    DRAPER UT 84020-5725



    CUSTOMER SERVICE TEL #: 877-267-4324

o
    -------------------------------------------------------------------------------------

                                   !ATTENTION!

        MULTIPLE DEBIT NETWORKS HAVE IMPLEMENTED AN ANNUAL MERCHANT PARTICIPATION
        FEE. MERCHANTS CURRENTLY SETUP TO ACCEPT PIN BASED DEBIT CARD TRANSACTIONS
        WILL BE BILLED AN ANNUAL PARTICIPATION FEE OF $8.00 PER MERCHANT
        IDENTIFICATION NUMBER FOR EACH OF THE SUBSEQUENT DEBIT NETWORKS. THIS
        AMOUNT WILL BE DEDUCTED ON YOUR NORMAL BILLING STATEMENT DURING THE MONTHS
        OF AUGUST, SEPTEMBER, AND
        OCTOBER.

        IF YOU HAVE ANY QUESTIONS OR ANY OTHER ISSUES PLEASE CONTACT US AT
        877-267-4324.

        THANK YOU FOR YOUR CONTINUED BUSINESS.
    -------------------------------------------------------------------------------------

TOTAL CHARGE TO YOUR ACCOUNT IS                                               0.00

    -------------------------------------------------------------------------------------
                             SUMMARY OF CARD DEPOSITS

| CARD TYPE | SALES ADJUSTMENTS | | RETURNS EXCL ADJ | | NET |
|---|---|---|---|---|---|
| MASTERCARD | 125 | 5,844.95 | 10 | 373.60 | 5,471.35 |
| | 0 | 0.00 | 18 – | 946.65 – | |
| VISA | 113 | 5,347.35 | 14 | 779.80 | 4,567.55 |
| | 0 | 0.00 | 15 – | 821.81 – | |
| VS OFLN DB | 169 | 8,090.15 | 5 | 223.85 | 7,866.30 |
| | 0 | 0.00 | 1 – | 67.00 – | |
| DCVR ACQ | 40 | 1,967.20 | 10 | 484.75 | 1,482.45 |
| | | | | | |
| TOTAL | 447 | 21,249.65 | 39 | 1,862.00 | 19,387.65 |
| | 0 | 0.00 | 34 – | 1,835.46 – | |
| | | | | | |
| TOTAL RESERVE AMOUNT | | | | | 1,027.92 |

DOJ-EDNY-0019056

COMPLETE MERCHANT SOLUTIONS                                          PAGE          2
P O BOX 684
PROVO   UT                                              MONTH ENDING    11/30/13
84603

                              MERCHANT STATEMENT              07      1280
                           SUMMARY OF BANKCARD DEPOSITS

8716  0000  0100  01

MERCHANT NUMBER  5134  8500  0108910                    DDA/SAV/GL NR 002556103
                                                        CHAIN 08944

    .................................................


    PREMIER MENTORING (TREND TRADI
    172 E. 14075 S.
    DRAPER UT 84020-5725


CUSTOMER SERVICE TEL #: 877-267-4324


---------------------------------------------------------------------------------------
                           SUMMARY OF INTERCHANGE FEES

| INTERCHANGE | RATE | ITEM | COUNT | VOLUME | FEE |
|---|---|---|---|---|---|
| MASTERCARD | | | | | |
| MERIT 1 | .0189 | .10 | 23 | 1,009.35 | 21.46 |
| INT DOM ACQ FO | .0160 | | 3 | 153.95 | 2.46 |
| CORP PRD RATE 1 | .0265 | .10 | 2 | 86.95 | 2.51 |
| CREDIT REFUND 3 | .0195 | | 2 – | 59.90 – | 1.16 – |
| WC MERIT 1 | .0205 | .10 | 19 | 973.65 | 21.81 |
| WCELITE MERIT1 | .0250 | .10 | 3 | 153.95 | 4.16 |
| ENHANCEDMERIT 1 | .0204 | .10 | 19 | 899.55 | 20.29 |
| INTLCONPREMSTC | .0185 | | 4 | 156.85 | 2.89 |
| EVPSBCORPDATAR1 | .0281 | .10 | 3 | 153.95 | 4.62 |
| REGCORPDATA1LF | .0005 | .22 | 2 | 96.95 | 0.48 |
| MC OFLN DB | | | | | |
| MERIT 1 DEBIT | .0160 | .15 | 18 | 832.55 | 16.01 |
| DEBIT REFUND 3 | .0140 | | 6 – | 179.70 – | 2.52 – |
| MERIT1PREPDDBTC | .0176 | .20 | 9 | 340.70 | 7.80 |
| REGULATDMIDMT1 | .0005 | .21 | 1 | 67.00 | 0.24 |
| REGULATFMIDMT1 | .0005 | .22 | 19 | 919.55 | 4.57 |
| REGULATEDFDBTCN | .0005 | .22 | 2 – | 134.00 – | 0.50 – |
| VISA | | | | | |
| CPS ECOM BASIC | .0180 | .10 | 29 | 1,381.35 | 27.76 |
| US CRDT VCR-ME | .0205 | | 14 – | 779.80 – | 15.98 – |
| CPS REWARDS 2 | .0195 | .10 | 63 | 2,999.50 | 64.78 |
| US BUS B2B | .0210 | .10 | 7 | 300.80 | 7.01 |
| US PURCH B2B | .0240 | .10 | 2 | 86.95 | 2.28 |
| US VSP B2B | .0210 | .10 | 5 | 250.90 | 5.76 |
| US BUS ENH B2B | .0225 | .10 | 6 | 260.85 | 6.46 |
| PREM CRD CANADA | .0180 | | 1 | 67.00 | 1.20 |
| VS OFLN DB | | | | | |
| CPS ECO BAS DB | .0165 | .15 | 38 | 1,772.05 | 34.93 |
| US CV DB | | | 5 – | 223.85 – | |
| CPSECOMBASICPP | .0175 | .20 | 4 | 183.90 | 4.01 |
| REG CPS ECOMBSC | .0005 | .22 | 99 | 4,725.75 | 24.14 |
| US BUS CNP DB | .0245 | .10 | 4 | 183.90 | 4.90 |
| REG BUS CNP DB | .0005 | .22 | 24 | 1,224.55 | 5.89 |
| DCVR ACQ | | | | | |
| P CNP RW | .0197 | .10 | 28 | 1,398.45 | 30.33 |
| CMRCL EL | .0230 | .10 | 2 | 86.95 | 2.20 |
| ADJVR3RW | .0175 | | 10 – | 484.75 – | 8.45 – |
| PCNPPRM | .0200 | .10 | 5 | 240.90 | 5.32 |
| CNP PP | .0235 | .10 | 5 | 240.90 | 6.15 |
| TOTAL INTERCHANGE | | | | | 313.80 |

DOJ-EDNY-0019056

COMPLETE MERCHANT SOLUTIONS                                    PAGE          3
P O BOX 684
PROVO   UT                                          MONTH ENDING    11/30/13
84603

                              MERCHANT STATEMENT              07        1280
                         SUMMARY OF BANKCARD DEPOSITS

8716 0000 0100 01

MERCHANT NUMBER 5134 8500 0108910                    DDA/SAV/GL NR 002556103
                                                     CHAIN 08944


................................................................

    PREMIER MENTORING (TREND TRADI
    172 E. 14075 S.
    DRAPER UT 84020-5725



CUSTOMER SERVICE TEL #: 877-267-4324

o
-----------------------------------------------------------------------------
                          SUMMARY OF CARD FEES

MASTERCARD
    DISC 6
    QUAL DISC                6,218.55              0.02500        155.51
    DUES & ASSESSMENTS                                              6.43
    AUTHS & AVS
    ECI CPU                    279      AT         0.2000          55.80
    AVS ECICPU                 279      AT         0.1000          27.90
    INTERCHANGE                                                   105.12
    KILOBYTE FEE                                                    0.27
    PROCESS FEE                135      AT         0.009500         1.28
    BIN/ICA FEE                135      AT         0.008750         1.18
    LICENSE RATE             5,844.95   AT         0.0000500        0.29
    NABU FEES                  289      AT         0.01950          5.64
    ACQ SUPPORT FEE          310.80     AT         0.00846          2.63
    CROSS BORDER FEE         146.85     AT         0.00401          0.59
    TOTAL                                                                     362.64
VISA
    DISC 6
    QUAL DISC                6,127.15              0.02500        153.19
    DUES & ASSESSMENTS                                              5.88
    AUTHS & AVS
    ECI CPU                    233      AT         0.2000          46.60
    AVS ECICPU                 233      AT         0.1000          23.30
    INTERCHANGE                                                    99.32
    ACQ ISA FEE               67.00     AT         0.00388          0.26
    ACQR PROCESSOR FEES        233      AT         0.01950          4.54
    INTERNTL ACQUIRER FEE     67.00     AT         0.00447          0.30
    FIXED NETWORK CNP FEE        2                                  8.50
    KILOBYTE FEE                                                    0.51
    PROCESS FEE                127      AT         0.009500         1.21
    BIN/ICA FEE                127      AT         0.008750         1.11
    TOTAL                                                                     344.72
VS OFLN DB
    DISC 6
    QUAL DISC                8,314.00              0.02500        207.88
    DUES & ASSESSMENTS                                              8.90
    AUTHS & AVS
    ECI CPU                    410      AT         0.2000          82.00
    AVS ECICPU                 410      AT         0.1000          41.00
    INTERCHANGE                                                    73.90
    ACQR PROCESSOR FEES        410      AT         0.01550          6.36
    PROCESS FEE                174      AT         0.009500         1.65
    BIN/ICA FEE                174      AT         0.008750         1.52
    TOTAL                                                                     423.21
DCVR ACQ
    DISC 6
    QUAL DISC                2,451.95              0.02500         61.32
    DUES & ASSESSMENTS                                              2.06

DOJ-EDNY-0019058

COMPLETE MERCHANT SOLUTIONS
P O BOX 684
PROVO   UT
84603

PAGE        4

MONTH ENDING    11/30/13

MERCHANT STATEMENT
SUMMARY OF BANKCARD DEPOSITS

07      1280

8716  0000  0100  01

MERCHANT NUMBER  5134  8500  0108910

DDA/SAV/GL  NR  002556103
CHAIN 08944

..................................................

PREMIER MENTORING (TREND TRADI
172 E. 14075 S.
DRAPER UT 84020-5725

CUSTOMER SERVICE TEL #: 877-267-4324

---

### SUMMARY OF CARD FEES

| | | | | |
|---|---|---|---|---|
| AUTHS & AVS | | | | |
| ECI CPU | 55 | AT | 0.2000 | 11.00 |
| AVS ECICPU | 55 | AT | 0.1000 | 5.50 |
| INTERCHANGE | | | | 35.55 |
| DSCV DATA USAGE FEE | 50 | AT | 0.01850 | 0.93 |
| DSCV AUTH FEE | 55 | | 0.00254 | 0.14 |
| TOTAL | | | | 116.50 |
| LESS DISCOUNT PAID | | | 577.90 | |
| TOTAL CARD FEES | | | | 669.16 |

---

### SUMMARY OF MISCELLANEOUS FEES

| | | | | |
|---|---|---|---|---|
| TOTAL CARD FEES | | | | 669.16 |
| BATCH HEADER | 30 | | 0.2000 | 6.00 |
| CHARGEBACKS | 29 | AT | 35.000 | 1,015.00 |
| STATEMENT FEE | | | | 10.00 |
| REGULATORY PRODUCT | | | | 4.95 |
| 12B LETTERS | 29 | AT | 20.000 | 580.00 |
| LESS AMOUNT PAID BY CHAIN | | | | 2,285.11 |
| TOTAL CHARGES | | | | 0.00 |

---

### SUMMARY OF MONETARY BATCHES

#### BATCHES

| GROSS | R&C | NET | DATE | REF |
|---|---|---|---|---|
| 67.00 – | 0.00 | 67.00 – | 07/21 | 110513MOADJ |
| 67.00 – | 0.00 | 67.00 – | 07/23 | 110513MOADJ |
| 29.95 – | 0.00 | 29.95 – | 07/30 | 110313MOADJ |
| 67.00 – | 0.00 | 67.00 – | 08/04 | 112413MOADJ |
| 29.95 – | 0.00 | 29.95 – | 08/11 | 112213MOADJ |
| 67.00 – | 0.00 | 67.00 – | 08/21 | 110313MOADJ |
| 67.00 – | 0.00 | 67.00 – | 08/25 | 110513MOADJ |
| 29.95 – | 0.00 | 29.95 – | 08/31 | 110313MOADJ |
| 67.00 – | 0.00 | 67.00 – | 09/02 | 112613MOADJ |
| 67.00 – | 0.00 | 67.00 – | 09/04 | 112413MOADJ |
| 67.00 – | 0.00 | 67.00 – | 09/12 | 111413MOADJ |
| 67.00 – | 0.00 | 67.00 – | 09/13 | 111713MOADJ |
| 67.00 – | 0.00 | 67.00 – | 09/20 | 110313MOADJ |
| 73.03 – | 0.00 | 73.03 – | 09/20 | 111313MOADJ |
| 19.95 – | 0.00 | 19.95 – | 09/20 | 111313MOADJ |
| 29.95 – | 0.00 | 29.95 – | 09/22 | 110713MOADJ |
| 67.00 – | 0.00 | 67.00 – | 09/23 | 110513MOADJ |
| 29.95 – | 0.00 | 29.95 – | 09/23 | 111713MOADJ |
| 67.00 – | 0.00 | 67.00 – | 09/27 | 110313MOADJ |

DOJ-EDNY-0019059

COMPLETE MERCHANT SOLUTIONS
P O BOX 684
PROVO  UT
84603

PAGE        5

MONTH ENDING      11/30/13

MERCHANT STATEMENT
SUMMARY OF BANKCARD DEPOSITS

07      1280

8716  0000  0100  01

MERCHANT NUMBER  5134  8500  0108910

DDA/SAV/GL NR 002556103
CHAIN 08944

...............................................................

PREMIER MENTORING (TREND TRADI
172 E. 14075 S.
DRAPER UT 84020-5725

CUSTOMER SERVICE TEL #: 877-267-4324

o
------------------------------------------------------------------------------------- –

### SUMMARY OF MONETARY BATCHES

#### BATCHES

| GROSS | R&C | NET | DATE | REF |
|---|---|---|---|---|
| 67.00 – | 0.00 | 67.00 – | 09/29 | 112713MOADJ |
| 29.95 – | 0.00 | 29.95 – | 10/01 | 110313MOADJ |
| 67.00 – | 0.00 | 67.00 – | 10/02 | 112613MOADJ |
| 29.95 – | 0.00 | 29.95 – | 10/06 | 110313MOADJ |
| 29.95 – | 0.00 | 29.95 – | 10/22 | 110713MOADJ |
| 73.03 – | 0.00 | 73.03 – | 10/22 | 111313MOADJ |
| 19.95 – | 0.00 | 19.95 – | 10/22 | 111313MOADJ |
| 67.00 – | 0.00 | 67.00 – | 10/25 | 110513MOADJ |
| 86.95 | 0.00 | 86.95 | 11/01 | 70001819815 |
| 756.85 | 0.00 | 756.85 | 11/03 | 70001819092 |
| 732.70 | 0.00 | 732.70 | 11/03 | 70001819617 |
| 67.00 – | 0.00 | 67.00 – | 11/03 | 110713MOADJ |
| 67.00 – | 0.00 | 67.00 – | 11/03 | 112613MOADJ |
| 67.00 | 0.00 | 67.00 | 11/04 | 11041390365 |
| 498.95 | 0.00 | 498.95 | 11/04 | 70001819368 |
| 67.00 – | 0.00 | 67.00 – | 11/05 | 110513AR001 |
| 67.00 – | 0.00 | 67.00 – | 11/05 | 110513AR003 |
| 29.95 – | 0.00 | 29.95 – | 11/05 | 110513AR003 |
| 518.90 | 0.00 | 518.90 | 11/05 | 70001819547 |
| 996.45 | 0.00 | 996.45 | 11/06 | 70001819706 |
| 67.00 – | 0.00 | 67.00 – | 11/07 | 110713PD001 |
| 29.95 – | 0.00 | 29.95 – | 11/07 | 110713PD001 |
| 67.00 – | 0.00 | 67.00 – | 11/07 | 110713PD001 |
| 675.75 | 0.00 | 675.75 | 11/07 | 70001819703 |
| 38.65 – | 0.00 | 38.65 – | 11/08 | 70001819732 |
| 561.70 | 0.00 | 561.70 | 11/10 | 70001819445 |
| 156.85 | 0.00 | 156.85 | 11/10 | 70001819456 |
| 853.90 | 0.00 | 853.90 | 11/11 | 70001819296 |
| 1,960.00 | 0.00 | 1,960.00 | 11/12 | 70001819135 |
| 595.90 | 0.00 | 595.90 | 11/13 | 70001819567 |
| 675.75 | 0.00 | 675.75 | 11/14 | 70001819916 |
| 67.00 | 0.00 | 67.00 | 11/15 | 11151390190 |
| 19.95 | 0.00 | 19.95 | 11/15 | 11151390191 |
| 481.80 | 0.00 | 481.80 | 11/15 | 70001819261 |
| 474.75 | 0.00 | 474.75 | 11/17 | 70001819691 |
| 829.65 | 0.00 | 829.65 | 11/17 | 70001819761 |
| 236.65 | 0.00 | 236.65 | 11/18 | 70001819298 |
| 1,153.30 | 0.00 | 1,153.30 | 11/19 | 70001819071 |
| 134.00 – | 0.00 | 134.00 – | 11/20 | 70001819807 |
| 738.50 | 0.00 | 738.50 | 11/21 | 70001819890 |
| 280.85 | 0.00 | 280.85 | 11/22 | 70001819567 |
| 1,170.35 | 0.00 | 1,170.35 | 11/24 | 70001819467 |
| 407.75 | 0.00 | 407.75 | 11/24 | 70001819745 |
| 956.55 | 0.00 | 956.55 | 11/25 | 70001819081 |
| 67.00 – | 0.00 | 67.00 – | 11/26 | 112613AR004 |

DOJ-EDNY-0019060

COMPLETE MERCHANT SOLUTIONS                                           PAGE          6
P O BOX 684
PROVO   UT                                          MONTH ENDING      11/30/13
84603

                          MERCHANT STATEMENT                   07      1280
                          SUMMARY OF BANKCARD DEPOSITS

8716  0000  0100  01

MERCHANT NUMBER  5134  8500  0108910              DDA/SAV/GL NR 002556103
                                                 CHAIN 08944

........................................................

    PREMIER MENTORING (TREND TRADI
    172 E. 14075 S.
    DRAPER UT 84020-5725

CUSTOMER SERVICE TEL #: 877-267-4324

-----------------------------------------------------------------------------------------
                      SUMMARY OF MONETARY BATCHES

                                BATCHES

| GROSS | R&C | NET | DATE | REF |
|---|---|---|---|---|
| 29.95 – | 0.00 | 29.95 – | 11/26 | 112613AR004 |
| 1,093.40 | 0.00 | 1,093.40 | 11/26 | 70001819375 |
| 268.00 | 0.00 | 268.00 | 11/27 | 70001819753 |
| 859.60 | 0.00 | 859.60 | 11/28 | 70001819871 |
| 471.85 | 0.00 | 471.85 | 11/29 | 70001819180 |
| 1,066.65 | 0.00 | 1,066.65 | 11/30 | 70001819394 |

-----------------------------------------------------------------------------------------
                      SUMMARY OF DAILY DEPOSITS
                           ALL CARD TYPES

| DATE | COUNT | SALES CHRGBK/ADJ AMOUNT | COUNT | RETURNS EXCL ADJ AMOUNT | DAILY DISCOUNT DAILY TOTAL |
|---|---|---|---|---|---|
| 11/01 | 2 | 86.95 | 0 | 0.00 | 2.17 |
|  | 0 | 0.00 | 0 | 0.00 | 84.78 |
| TOTAL RESERVE AMOUNT |  | 4.34 |  | TOTAL AFTER RESERVE | 80.44 |
| 11/03 | 43 | 2,242.30 | 14 | 752.75 | 74.88 |
|  | 0 | 0.00 | 8 – | 387.80 – | 1,026.87 |
| TOTAL RESERVE AMOUNT |  | 112.10 |  | TOTAL AFTER RESERVE | 914.77 |
| 11/04 | 8 | 498.95 | 0 | 0.00 | 12.49 |
|  | 0 | 0.00 | 1 | 67.00 | 553.46 |
| TOTAL RESERVE AMOUNT |  | 24.94 |  | TOTAL AFTER RESERVE | 528.52 |
| 11/05 | 9 | 518.90 | 0 | 0.00 | 12.98 |
|  | 0 | 0.00 | 1 – | 431.95 – | 73.97 |
| TOTAL RESERVE AMOUNT |  | 25.93 |  | TOTAL AFTER RESERVE | 48.04 |
| 11/06 | 23 | 1,063.45 | 1 | 67.00 | 28.26 |
|  | 0 | 0.00 | 0 | 0.00 | 968.19 |
| TOTAL RESERVE AMOUNT |  | 53.16 |  | TOTAL AFTER RESERVE | 915.03 |
| 11/07 | 13 | 675.75 | 0 | 0.00 | 16.90 |
|  | 0 | 0.00 | 0 | 290.85 – | 368.00 |
| TOTAL RESERVE AMOUNT |  | 33.78 |  | TOTAL AFTER RESERVE | 334.22 |
| 11/08 | 14 | 685.70 | 18 | 724.35 | 35.25 |
|  | 0 | 0.00 | 0 | 0.00 | 73.90 – |
| 11/10 | 17 | 785.55 | 1 | 67.00 | 21.33 |
|  | 0 | 0.00 | 0 | 0.00 | 697.22 |
| TOTAL RESERVE AMOUNT |  | 39.25 |  | TOTAL AFTER RESERVE | 657.97 |
| 11/11 | 14 | 853.90 | 0 | 0.00 | 21.37 |
|  | 0 | 0.00 | 0 | 0.00 | 832.53 |
| TOTAL RESERVE AMOUNT |  | 42.69 |  | TOTAL AFTER RESERVE | 789.84 |
| 11/12 | 43 | 1,960.00 | 0 | 0.00 | 49.01 |
|  | 0 | 0.00 | 0 | 0.00 | 1,910.99 |
| TOTAL RESERVE AMOUNT |  | 97.99 |  | TOTAL AFTER RESERVE | 1,813.00 |

DOJ-EDNY-0019060

COMPLETE MERCHANT SOLUTIONS                                        PAGE          7
P O BOX 684
PROVO  UT                                          MONTH ENDING      11/30/13
84603

MERCHANT STATEMENT                    07      1280
SUMMARY OF BANKCARD DEPOSITS

8716  0000  0100  01

MERCHANT NUMBER 5134 8500 0108910                      DDA/SAV/GL NR 002556103
                                                       CHAIN 08944

...................................................

PREMIER MENTORING (TREND TRADI
172 E. 14075 S.
DRAPER UT 84020-5725

CUSTOMER SERVICE TEL #: 877-267-4324

o
       ----------------------------------------------------------------------------
                        SUMMARY OF DAILY DEPOSITS
                           ALL CARD TYPES

| DATE | SALES COUNT | CHRGBK/ADJ AMOUNT | RETURNS EXCL ADJ COUNT | AMOUNT | DAILY DISCOUNT DAILY TOTAL |
|------|------|------|------|------|------|
| 11/13 | 10 | 595.90 | 0 | 0.00 | 14.90 |
|  | 0 | 0.00 | 4 – | 185.96 – | 395.04 |
| TOTAL RESERVE AMOUNT |  | 29.79 |  | TOTAL AFTER RESERVE | 365.25 |
| 11/14 | 13 | 675.75 | 0 | 0.00 | 16.89 |
|  | 0 | 0.00 | 1 – | 67.00 – | 591.86 |
| TOTAL RESERVE AMOUNT |  | 33.78 |  | TOTAL AFTER RESERVE | 558.08 |
| 11/15 | 12 | 568.75 | 2 | 86.95 | 16.40 |
|  | 0 | 0.00 | 2 | 86.95 | 552.35 |
| TOTAL RESERVE AMOUNT |  | 28.42 |  | TOTAL AFTER RESERVE | 523.93 |
| 11/17 | 27 | 1,304.40 | 0 | 0.00 | 32.61 |
|  | 0 | 0.00 | 2 – | 96.95 – | 1,174.84 |
| TOTAL RESERVE AMOUNT |  | 65.20 |  | TOTAL AFTER RESERVE | 1,109.64 |
| 11/18 | 8 | 236.65 | 0 | 0.00 | 5.92 |
|  | 0 | 0.00 | 0 | 0.00 | 230.73 |
| TOTAL RESERVE AMOUNT |  | 11.82 |  | TOTAL AFTER RESERVE | 218.91 |
| 11/19 | 26 | 1,153.30 | 0 | 0.00 | 28.84 |
|  | 0 | 0.00 | 0 | 0.00 | 1,124.46 |
| TOTAL RESERVE AMOUNT |  | 57.66 |  | TOTAL AFTER RESERVE | 1,066.80 |
| 11/20 | 0 | 0.00 | 2 | 134.00 | 3.35 |
|  | 0 | 0.00 | 0 | 0.00 | 137.35 – |
| 11/21 | 17 | 738.50 | 0 | 0.00 | 18.45 |
|  | 0 | 0.00 | 0 | 0.00 | 720.05 |
| TOTAL RESERVE AMOUNT |  | 36.91 |  | TOTAL AFTER RESERVE | 683.14 |
| 11/22 | 7 | 310.80 | 1 | 29.95 | 8.53 |
|  | 0 | 0.00 | 1 – | 29.95 – | 242.37 |
| TOTAL RESERVE AMOUNT |  | 15.53 |  | TOTAL AFTER RESERVE | 226.84 |
| 11/24 | 35 | 1,578.10 | 0 | 0.00 | 39.45 |
|  | 0 | 0.00 | 2 – | 134.00 – | 1,404.65 |
| TOTAL RESERVE AMOUNT |  | 78.89 |  | TOTAL AFTER RESERVE | 1,325.76 |
| 11/25 | 20 | 956.55 | 0 | 0.00 | 23.91 |
|  | 0 | 0.00 | 0 | 0.00 | 932.64 |
| TOTAL RESERVE AMOUNT |  | 47.81 |  | TOTAL AFTER RESERVE | 884.83 |
| 11/26 | 24 | 1,093.40 | 0 | 0.00 | 27.34 |
|  | 0 | 0.00 | 1 – | 297.95 – | 768.11 |
| TOTAL RESERVE AMOUNT |  | 54.66 |  | TOTAL AFTER RESERVE | 713.45 |
| 11/27 | 4 | 268.00 | 0 | 0.00 | 6.71 |
|  | 0 | 0.00 | 1 – | 67.00 – | 194.29 |
| TOTAL RESERVE AMOUNT |  | 13.40 |  | TOTAL AFTER RESERVE | 180.89 |
| 11/28 | 18 | 859.60 | 0 | 0.00 | 21.49 |
|  | 0 | 0.00 | 0 | 0.00 | 838.11 |
| TOTAL RESERVE AMOUNT |  | 42.97 |  | TOTAL AFTER RESERVE | 795.14 |
| 11/29 | 9 | 471.85 | 0 | 0.00 | 11.80 |
|  | 0 | 0.00 | 0 | 0.00 | 460.05 |
| TOTAL RESERVE AMOUNT |  | 23.58 |  | TOTAL AFTER RESERVE | 436.47 |

DOJ-EDNY-0019062

COMPLETE MERCHANT SOLUTIONS                                                    PAGE          8
P O BOX 684
PROVO   UT                                                      MONTH ENDING    11/30/13
84603

MERCHANT STATEMENT                    07      1280
SUMMARY OF BANKCARD DEPOSITS

8716  0000  0100  01

MERCHANT NUMBER  5134  8500  0108910                    DDA/SAV/GL  NR  002556103
                                                        CHAIN 08944

..............................................................

PREMIER MENTORING (TREND TRADI
172 E. 14075 S.
DRAPER UT 84020-5725

CUSTOMER SERVICE TEL #: 877-267-4324

------------------------------------------------------------------------------------------
SUMMARY OF DAILY DEPOSITS
ALL CARD TYPES

| | SALES<br>CHRGBK/ADJ | | | RETURNS<br>EXCL ADJ | | DAILY DISCOUNT<br>DAILY TOTAL |
| DATE | COUNT | AMOUNT | COUNT | AMOUNT | | |
| 11/30 | 31 | 1,066.65 | 0 | 0.00 | | 26.67 |
| | 0 | 0.00 | 0 | 0.00 | | 1,039.98 |
| TOTAL RESERVE AMOUNT | | 53.32 | | TOTAL AFTER RESERVE | | 986.66 |

LAST PAGE OF THIS STATEMENT

DOJ-EDNY-0019062

*Dynamic*
PAYMENT SOLUTIONS
727 N 1550 E, Ste 475 • Orem, UT 84097
Phone 1.866.599-9150 • Fax 801.805.9148
www.dynamicps.com

Merchant # _____
○ New Location    ○ Additional Location
Sales Office/ISO # _____ Location # ____ of ____

## MERCHANT APPLICATION

| | |
|---|---|
| Legal Name: **Jump Learning LLC** | DBA Name: |
| Legal Address: **21470 sw 86 Place, Cutler Bay, FL 33189** | DBA Address (No PO Box): |
| Legal City, State, Zip: | DBA City, State, Zip: |
| Legal Phone #: **888-228-5471** Contact: **Ryan Ricke** | DBA Phone # (non–mobile is preferred): |
| Cust. Svc. # (if different:) | Website Address: **hightrendauctions.com** |
| Fax #: **305-675-5921** | Email Address: |
| Mail Statement to (must choose one:) ○ Legal Address ○ DBA Address | **JumpLearningLLC@gmail.com** |

Type of Ownership   ○ Sole Proprietor   ○ Partnership   ○ Not For Profit   ○ Corporation   ⊗ Limited Liability Company

Type of Goods or Services Sold: **Online Marketing Tutorial**

| | SIC Code: | |
|---|---|---|
| Do you currently process credit cards? ○ Yes ⊗ No | Processing Profile: | |
| If yes, submit three current months' processing statements | ○ Retail | Card Swiped | % |
| Name of current processor: | ○ Restaurant | Manual Key Entry with Imprint, Card Present with Signature | % |
| Has Merchant or any associated principal disclosed below filed bankruptcy or been subject to any involuntary bankruptcy? ⊗ No ○ Yes | ○ Lodging | ○ Service | Mail/Telephone Order | % |
| If yes, date filed: _____ | ○ Mail/Telephone Order | eCommerce | 100 % |
| | ⊗ eCommerce | TOTAL MUST EQUAL 100% | |

| | | |
|---|---|---|
| Federal Tax #(9 digits, no dashes): **4 -2 1 2 4** | # of Locations: **1** | Years in Business: **1** |
| Bank Name: **Bank of America** | Routing #: **06 3100 277** | Checking Account #: **898054917720** | Bank Phone # (10 digits, no dashes): **30 - ** |

### MEMBER BANK INFORMATION
Deutsche Bank AG, c/o Deutsche Card Services GmbH, Kaltenbornweg 1-3, 50679 Cologne, Germany
+49 221 99577 777    support.deucs@db.com

**IMPORTANT MEMBER BANK RESPONSIBILITIES**
1. A Visa Member is the only entity approved to extend acceptance of Visa products directly to a merchant.
2. A Visa Member must be a principal (signer) to the Merchant Agreement.
3. The Visa Member is responsible for educating Merchants on pertinent Visa Operating Regulations with which Merchants must comply.
4. The Visa Member is responsible for and must provide settlement funds to the Merchant.
5. The Visa Member is responsible for all funds held in reserve that are derived from the settlement.

**IMPORTANT MERCHANT RESPONSIBILITIES**
1. Merchant must ensure compliance with cardholder data security and storage requirements.
2. Merchant must maintain fraud and chargebacks below thresholds.
3. Merchant must review and understand the terms of the Merchant Agreement.
4. Merchant must comply with Visa Operating Regulations.

The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the merchant understands these specific responsibilities.

***** Payment Card Industry Data Security Standards ("PCI DSS") and card association rules prohibit storage of track data under any circumstances. If you or your Point of Sale ("POS") system pass, transmit, store or receive full cardholder's data, then the POS software must be Payment Application Data Security Standard ("PA DSS") compliant or you (merchant) must validate PCI DSS compliance (see #1 (b) below and questions #3 and #4 must be completed). If you use a payment gateway, they must be PCI DSS compliant. *****

1. Have you ever experienced an Account Data Compromise ("ADC")?   ○ Yes   ⊗ No   If yes, provide date of compromise: _____
   a) Have you validated PCI DSS compliance? ○ Yes   ○ No
      If yes, go to #1(b); If no, go to #2
   b) Date of compliance, Report on Compliance ("ROC") of Self Assessment Questionnaire ("SAQ"): _____
   c) What is the name of your Qualified Security Assessor ("QSA")? _____ or SAQ (circle one):   A,  B,  C,  or  D
   d) Date of last scan: _____ Approved Scanning Vendor's name: _____
2. Are you using a "dial-up" terminal or Touch Tone Capturer "TTC")? _____
3. Do you or your Service Provider(s) received, pass, transmit or store the Full Cardholder Number ("FCN"), electronically? ○ Yes   ○ No
   a) If yes, where is the card data stored? ○ Merchant's location only   ○ Primary Service Provider   ○ Other Service Provider
      ○ Merchant's Headquarters/Corp office only ⊗ Both Merchant and Service Provider(s)   ○ All Apply
4. What Primary Service Provider/Software Developer did you purchase your POS application from (i.e., software, gateway)?
   a) What is the name of the Service Provider/Software Developer's application? _____ Software Version #: _____
   b) Do your transactions process through any other Service Provider (i.e., web hosting companies, gateways, corporate office)?   ○ Yes   ○ No
   c) If yes, name the other Service Provider: _____

(Individual Ownership Must be Equal to or Greater than 50%)

**①** Name: **Ryan Ricke/President**   Title: _____   Date of Birth: **5/15/86**   Social Security #: **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**   % Equity Ownership: **100**
Residence Address: **21470 sw 86 Place, Cutler Bay, FL 33189**   City: _____ State: _____ Zip: _____ # yrs: **2**   Home Phone #: **(305) 298-6209**   Driver's Lic. #: **R200-721-86-175-0** ST:

**②** Name: _____   Title: _____   Date of Birth: _____   Social Security #: _____   % Equity Ownership: _____
Residence Address: _____   City: _____ State: _____ Zip: _____ # yrs: _____   Home Phone #: _____   Driver's Lic. #: _____ ST:

(To Be Completed by Sales Representative)
Merchant Location:   ○ Retail Location with Store Front   ○ Office Building   ○ Residence   ○ Other: _____
Area Zone:d   ○ Commercial   ○ Industrial   ○ Residential   Is inventory/merchandise amount consistent with type of business?   ○ Yes   ○ No
If No, explain: _____
The Merchant:   ○ Owns   ○ Leases the Business Premises   Landlord Name & Phone #: _____
Does the Merchant use a Fulfillment House:   ○ Yes   ○ No   If yes, was the Fulfillment House inspected?   ○ Yes   ○ No
Further comments by Inspector (required): _____

I hereby verify that this application has been fully completed by merchant applicant and that I have physically inspected the business premises of the merchant at this address and the information stated above is true and correct to the best of my knowledge and belief.
Visited and Inspected by:

Merchant Initials (required) ____ **RR**

Representative Print Name _____ Representative Signature _____ Date: _____

DYNAMIC PAYMENT SOLUTIONS IS A REGISTERED SERVICEMARK OF VISION BANKCARD, INC.
06/12 05
Page 1 of 6

CARDHOLDER STORAGE COMPLIANCE
OW  R(S)
NT'S

DOJ-EDNY-0019916

**Dynamic** PAYMENT SOLUTIONS
*A Division of Dynamic Payment Solutions*

○ INTERCHANGE PLUS          ○ Discount Rate

| | | | | |
|---|---|---|---|---|
| Visa / MasterCard / Discover Credit Card Discount Rate: | _____ | % | Visa / MasterCard / Discover Offline Debit Discount Rate: | _____ % |
| American Express Discount Rate: | _____ | % | Monthly Minimum | _____ Monthly |
| Bankcard Transaction Fee: | _____ | Per Item | EBT Transaction Fee: | _____ Per Item |
| Offline Debit Transaction Fee: | _____ | Per Item | Gift Card / Loyalty Card Transaction Fee: | _____ Per Item |
| Debit Transaction Fee (Plus Debit Network Fees): | _____ | | Voice Interaction Fee: | _____ Per Item |
| Visa Authorization/Settlement Network Access/Usage Fee: | $ 0.03 | Per Item | Annual Fee (billed in advance for the following year): | _____ Per Year |
| MasterCard Authorization/Settlement Network Access/Usage Fee: | $ 0.02 | Per Item | ACH Reject Fee: | _____ Per Item |
| Discover Authorization/Settlement Network Access/Usage Fee: | $ 0.02 | Per Item | Retrieval Fee: | _____ Per Item |
| Bank Service Fee: | _____ | Monthly | Chargeback Fee: | _____ Per Item |
| AVS Surcharge: | _____ | Per Item | ○ Supply/Replacement Program (optional): | _____ Monthly |
| Batch Fee: | _____ | Per Batch | ○ Each Additional Terminal    Quantity: _____ | _____ Monthly |
| Split Batch Fee (additional): | _____ | Per Batch | Gateway Activation Fee: | _____ One Time |
| Wireless Activation Fee: | _____ | One Time | Gateway Access Fee: | _____ Monthly |
| Wireless Access Fee: | _____ | Monthly | eCommerce/Gateway Item Fee: | _____ Per Item |
| Wireless Item Fee: | _____ | Per Item | Cancellation Fee: | _____ One Time |
| Application Fee: | _____ | One Time | MICROS Transaction Fee (if applicable): | _____ Per Item |

RATE SCHEDULE

I/we understand and agree to the following: 1)Discount rate as stated above will be charged on "Qualified Rate"transactions. Qualified Rate transactions are defined as electronically authorized and swiped transactions that are batched and closed daily. In addition, sales volume may be charged for Association dues and assessments at a rate of up to 0.11%. 2)All lodging, car rental, small ticket, convenience and Express Services transactions may have a surcharge of up to 0.49% added to the Qualified Rate. 3) Discover transactions may have a surcharge of up to 0.50% added to the Qualified Rate. 4) A "Mid-Qualified" surcharge of up to 1.48% + $0.20 will be added to the Qualified Rate under the following circumstances: a) Cardholder and card present at merchant's point of sale device, key entered, signature obtained, Address Verification Service ("AVS") with full match of billing zip code, settled within three days of authorization; settle amount must equal authorized amount; b) Card not present, single authorization only, order number required, AVS with full match of billing zip code, settled within two days of authorization, settle amount must equal authorized amount; c) Certain Discover, Visa Rewards & Visa Signature, MasterCard Enhanced Value & MasterCard World Card transactions. 5) A "Non-Qualified" surcharge of up to 1.98% + $0.20 may be added to the Qualified Rate for transactions that do not meet the requirements stated above. and may also apply to transactions on Bus, Corp, Int'l, Purch, & Comm Cards; T&E, Mail/Telephone, e-Commerce, certain Discover, Visa Rewards & Visa Signature, MasterCard Enhanced Value & MasterCard World Card. 6)If Interchange/Cost Plus: All transactions will be assessed the current, published interchange rates, dues, and assessments in addition to the basis points stated above. The published rates for Visa and MasterCard can be viewed at: www.visa.com and www.mastercard.com. 7) Merchants may be charged a Cross Border transaction assessment of up to 1.00% in addition to the applicable rate, on transactions when the country code of the Card Issuer differs from the country code of the Merchant. 8) On international transactions Merchants may be charged a rate of up to 0.55% for Visa's International Acquirer Fee, Maestro U.S. and MasterCard's Acquirer Program Support Fee and Discover's International Service Fee and International Processing Fee. 9) POS high-speed processing and/or gateway activation may be subject to a one time set up fee of up to $100.00, depending on provider. 10) An early closure of fee of $250.00 will be paid to EVO if the Merchant Processing Agreement is not terminated in accordance with the Terms and Conditions. 11) Merchant will also be assessed the following fees on Visa transactions: the Visa Misuse of Authorization System Fee, which will be assessed on authorizations that are approved but not settled in a timely manner; the Visa Zero Floor Limit Fee, which will be assessed on settled transactions that do not correspond to a valid authorization within the prior 30 days; and the Visa Zero Dollar Verification Fee, which will be assessed on transactions where Merchant requested an address verification response without an authorization. These fees of up to $0.10 per transaction will be displayed as separate items on Merchant's monthly statement and may include fees assessed by both the applicable card association and Bank or EVO. 12) Merchant will also be assessed each month the following Card Association fees: Fixed Network Fee and Acceptance and Licensing Fee. These fees, which may vary each month, are based on Merchant Category Codes, the number of merchant locations by Merchant's taxpayer identification number, and/or Merchant's processing volume by Merchant's taxpayer identification number. For additional information about these fees go to www.goevo.com/FNF.    *American Express Fees: Retail: $0.10 transaction fee**; Services, Wholesale and All Other: $0.15 transaction fee. **A 0.30% CNP fee will be charged for any transaction where the Card is not presented at the time of the transaction.

AMERICAN EXPRESS: By signing below, I represent that I have read and am authorized to sign and submit this application on behalf of the entity above and all information I have provided herein is true, complete, and accurate. I authorized Express Travel Related Services Company, Inc. ("American Express") to verify the information in this application and receive and exchange information about me personally, including requesting reports from consumer reporting agencies. I authorize and direct American Express too inform me directly, or through the entity above, of reports about me that American Express has requested from consumer reporting agencies. Such information will include the name and address of the agency furnishing the report. I understand that upon American Express' approval of the entity indicated above to accept the American Express Card , the terms and conditions for American Express® Card Acceptance ("Terms and Conditions") will be sent to such entity along with a Welcome Letter. By accepting the American Express Card for the purchase of goods and/or services, or otherwise indicating its intention to be bound the entity agrees to be bound by the Terms and Conditions.    American Express transaction fees: $0.10 for Retail + 0.30% Downgrade for CNP and Key Entered Transactions, and $0.15 for Services, Wholesale & all other Merchant Types.

Merchant authorizes any party to the Agreement to present Automated Clearing House credits, Automated Clearing House debits, wire transfers, or depository transfer checks to and from the following account and to and from any other account for which any such parties are authorized to perform such functions under the Merchant Processing Agreement. For the purposes set forth in the Merchant Processing Agreement. This authorization extends to such entries in said account concerning lease, rental or purchase agreements for POS terminals and/or accompanying equipment and/or check guarantee fees and amounts due for supplies and materials. This Automated Clearing House authorization cannot be revoked until all Merchant obligations under this Agreement are satisfied, and Merchant gives written notice of revocation as required by this Agreement.

INVESTIGATIVE CONSUMER REPORT: An investigative or consumer report may be made in connection with application. MERCHANT authorizes ANY PARTY TO THE AGREEMENT or any of their agents to investigate the references provided or any other statements or data obtained from MERCHANT, and from any of the undersigned personal guarantor(s), or from any other person or entity with any financial obligations under this Agreement. You have a right, upon written request, to a complete and accurate disclosure of the nature and scope of the investigation requested.

AVERAGE TICKET SIZE: **75**    HIGHEST TICKET SIZE: **120**    MONTHLY VOLUME: _____
Each person certifies that the average ticket size and sales volume indicated is accurate and agrees that any transaction or monthly volume that exceeds either of the above amounts could result in delayed and/or withheld settlement of funds. Also, see paragraphs 4.C, 9 and 13.B of the MERCHANT Processing Agreement regarding suspension and termination of MERCHANT.
IMPORTANT NOTICE : All information contained in this application was completed or supplied by all contracting parties. EVO and BANK shall not be responsible for any change in printed terms unless specifically agreed to in writing by an officer of EVOand BANK. By signing below on either the original or a facsimile you are agreeing to the provisions stated within the Terms and Conditions of the Merchant Processing Agreement and the Merchant Application on the reverse side, and you are acknowledging that you have carefully read each of those provisions before signing.
FOR ALL CORPORATIONS, CORP. RESOLUTION
The indicated officer(s) identified in numbers 1 and/or 2 below have the authorization to execute the MERCHANT Processing Agreement on behalf of the herewithin named corporation. MERCHANT UNDERSTANDS THAT THIS AGREEMENT SHALL NOT TAKE EFFECT UNTIL MERCHANT HAS BEEN APPROVED BY BANK AND A MERCHANT NUMBER IS ISSUED.

DEBIT/CREDIT AUTHORIZATION    EVO B

As a primary inducement to EVO and Bank to enter into this Agreement, the undersigned Guarantor(s), by signing this Agreement, jointly and severally, unconditionally and irrevocably, personally guarantee the continuing full and faithful performance and payment by Merchant of each of its duties and obligations to EVO and Bank under this Agreement or any other agreement currently in effect or in the future entered into between Merchant or its principals and EVO and Bank Global, as such agreements now exist or are amended from time to time, with or without notice. Guarantor(s) understands further that EVO and Global may proceed directly against Guarantor(s) without first exhausting their remedies against any other person or entity responsible to it or any security held by EVO and Bank or Merchant. Guarantor(s) waive trial by jury with respect to any litigation arising out of or relating to this personal guaranty. This guaranty will not be discharged or affected by the death of the undersigned, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any successor of EVO and Bank. Guarantor(s) understand that the inducement to EVO and Bank to enter into this agreement is consideration for the guaranty, and that this guaranty remains in full force and effect even if the Guarantor(s) receive no additional benefit from the guaranty.
AGREED AND ACCEPTED

PERSONAL GUARANTY (AND TITLES)

X _[signature]_                                3/6/13
#1 From Application—Signature                    Date

X _____
#2 From Application—Signature                    Date

If Merchant submits a transaction hereunder, Merchant will be deemed to have accepted the Terms and Conditions of the Merchant Processing Agreement.

X _[signature]_                                3/6/13
#1 From Application—Signature                    Date

X _____
#2 From Application—Signature                    Date

X _____
Accepted by EVO Merchant Services, LLC

X _____
Accepted by Deutsche Bank AG, New York

X _____
Accepted by Deutsche Bank AG, New York

DYNAMIC PAYMENT SOLUTIONS is a registered ISO/MSP for Deutsche Bank AG, New York

DOJ-EDNY-0019916

## EQUIPMENT/ADDITIONAL SERVICES

Equipment: ○ Purchase from EVO    ○ Reprogram Merchant's existing equipment
If purchase, choose equipment: ○ Terminal    ○ Printer    ○ PINPad    ○ Software    ○ Other: _____
Ship equipment to: ○ Merchant    ○ ISO    ○ Other: _____    Ship to ○ Commercial ○ Residential
Choose shipment method:    ○ Overnight    ○ 2nd Day    ○ Ground
Must choose one:    ○ Starter Kit    ○ Starter Package (includes manual imprinter)
If lease, indicate: ○ LSI    ○ Other: _____

### TERMINAL TYPE:
○ NURIT 3020 (repro only, *NOS 7 required)
○ NURIT 2085 (repro only, *NOS 7 required)
○ NURIT 2085+ (repro only, *NOS 7 required)
○ NURIT 8320 (repro only)
  ○ DIAL    ○ IP
○ NURIT 8320Lite
○ NURIT 8400
  ○ DIAL    ○ IP
○ NURIT 8400Lite
○ VERIFONE VX570
  ○ DIAL    ○ IP

○ OMNI VX510 LE
○ OMNI VX510 IP
○ OMNI VX510 (repro only)
○ OMNI 3740 (repro only)
  ○ DIAL    ○ IP
○ OMNI 3750 (repro only)
  ○ DIAL    ○ IP
○ INGENICO 5100 (repro only)
  ○ DIAL    ○ IP
○ INGENICO Aqua
○ DEJAVOO X5 (repro only)
○ DEJAVOO X8 IP

○ HYPERCOM T7Plus
○ HYPERCOM T4210 (repro only)
○ HYPERCOM T4220 (repro only)
○ HYPERCOM T7P (repro only)
  ○ FRICTION ○ THERMAL
○ HYPERCOM T77 (repro only)
  ○ FRICTION ○ THERMAL
○ EVO Charge
○ PC Charge
○ Payware
○ PC Software (repro only): ___
○ Other _____

### WIRELESS TERMINAL TYPE: (NOTE: NEW EVO SIM CARD REQUIRED FOR ALL GPRS REPROGRAMS)
○ Way MTT 15XX Wireless Combo (repro only)    KIT/MTT/SIM# _____
○ Way 5000 Wireless Combo KIT/MTT/SIM # _____
○ Nurit 8000 Wireless (GPRS) (repro only)  S/N _____
○ Nurit 8000 Wireless (RAM) (repro only)  S/N _____
  MAN/ESN# _____
○ Nurit 8010 Wireless (GPS)  S/N _____
○ Nurit 8020 Wireless (GPS)  S/N _____
○ DEJAVOO M3 S/N _____
○ Other: _____

### GATEWAY:
○ DPS Authorized.Net    ○ DPS PayPal (choose one):  ○ PayFlow Pro    ○ PayFlow Link
○ Global Transport    ○ Mtrex    ○ Other: _____
Gateway Administrator email address (required): _____

By signing this application it is agreed that EVO shall not be held responsible for (a) any wireless terminal repairs or (b) providing a replacement wireless terminal due to equipment failure. The terminal manufacturer shall handle all wireless terminal repairs and replacements. I also understand that due to the complexity of these wireless terminals, the manufacturer may not be able to provide a replacement while completing repairs. In addition, I further agree that a wireless terminal is NOT covered by participation in the EVO Supply Replacement Program. EVO will not be responsible for any problems with the wireless services provided pursuant to this agreement. See Rate Schedule for Wireless Fees. Fees are subject to change.

### TERMINAL APPLICATION:
○ WITH TIPS    ○ WITHOUT TIPS    ○ LODGING    ○ MOTO    ○ QPS        Merchant Refund Policy: ○ No Refund ○ Exchange Only ○ In-Store Credit Only

### PINPAD TYPE:
○ HYPERCOM PINPad S9 PCI (repro Only)    ○ HYPERCOM PINPad P1300    ○ HYPERCOM PINPad 1320 (EVO Charge)
○ INGENICO PINPPad 3010 (repro only)    ○ VERIFONE PINPPad 1000SE

### CHECK EQUIPMENT: ○ MAGTEK Reader    ○ MAGTEK Imager    ○ RDM Imager    ○ Other _____

### ACCESSORIES: ○ MAGTEK Mini Swipe Card Reader USB (choose one):  ○ EVO Charge ○ PC Charge  ○ Payware

Equipment selection may be subject to availability/processing requirements.

### ADDITIONAL SERVICES:
○ EVO Check Advantage*        List Existing Merchant #: _____
○ Other Check Service: _____        List Existing Merchant #: _____
○ MasterCard PayPass™/Visa payWave    ○ Merchant's Capital Access*

| Other Card Types: | NEW | EXISTING | LIST EXISTING MERCHANT NUMBERS |
|---|---|---|---|
| ○ AMERICAN EXPRESS | ○ | ○ | |
| ○ EBT* | ○ | N/A | Existing FCS#: |
| ○ DEBIT | N/A | N/A | Supplied by EVO |
| ○ GIFT* | N/A | N/A | Supplied by EVO |
| ○ LOYALTY* | ○ | N/A | Supplied by EVO |
| ○ VOYAGER* | ○ | N/A | Supplied by EVO |
| ○ WRIGHT EXPRESS* | ○ | N/A | Supplied by EVO |

Upon Approval of Visa/MasterCard processing, allow 48–72 hours for new non-bankcard(s) to be added.
*Addendum/Application Required

SPECIAL INSTRUCTIONS (requests are subject to management approval, please print clearly):
○ Change of ownership. Existing MID to close: _____
○ Request to pick up equipment/starter kit at EVO Melville. _____

Other: _____

○ Merchant elects to receive monthly merchant account statements via U.S. Mail to:
  ○ Legal Address  or  ○ DBA Address

DOJ-EDNY-0019916

**MERCHANT PROCESSING AGREEMENT**

This document, "Merchant Processing Agreement" (the "Agreement"), accompanies the document "Merchant Application" ("Merchant Application") and includes the Terms and Conditions set forth below (the "Terms and Conditions") together with the terms and conditions of the Merchant Application. The Bank ("Bank") identified in the Merchant Application is a member of Visa USA, Inc. ("Visa") and MasterCard International, Inc. ("MasterCard"), and is Deutsche Bank AG, New York branch. EVO Merchant Services, LLC d/b/a EVO ("EVO") is a registered independent sales organization of Visa and a member service provider of MasterCard. This Agreement is between EVO, Bank, and the merchant (or "you") identified in the Merchant Application ("Merchant"). Merchant and EVO agree that the rights and obligations contained in this Agreement do not apply to Bank with respect to Discover transactions. To the extent Merchant accepts Discover cards, the provisions in this Agreement with respect to Discover apply if Merchant does not have a separate agreement with Discover. In such case, Merchant will also be enabled to accept JCB and Diner's Club cards under the Discover network and such transactions will be processed at the same rate as Merchant's Discover transactions are processed. Any references to the Debit Sponsor shall refer to the debit sponsors identified below.

**RECITALS**

Merchant desires to accept credit cards ("Cards") validly issued by members of Visa, MasterCard, and Discover. Bank and EVO desire to provide credit card processing services to Merchant. Therefore, Merchant, EVO and Bank and Global agree as follows:

**TERMS AND CONDITIONS**

**1. Honoring Cards.**

A. Without Discrimination. You will honor, without discrimination, any Card properly tendered by a Cardholder. "Cardholder" means a person possessing a Card and purporting to be the person in whose name the Card is issued. You will not establish a minimum or maximum transaction amount as a condition for honoring a Card.

B. Cardholder Identification. You will identify the Cardholder and check the expiration date and signature on each Card. You will not honor any Card if: (i) the Card has expired, (ii) the signature on the sales draft does not correspond with the signature on the Card, or (iii) the account number embossed on the Card does not match the account number on the Card's magnetic strip (as printed in electronic form) or the account number listed on a current Electronic Warning Bulletin file. You may not require a Cardholder to provide personal information, such as a home or business telephone number, a home or business address, or a driver's license number as a condition for honoring a Card unless permitted under the Laws and Rules (defined in Section 14, below).

C. Card Recovery. You will use your best efforts to retain any Card: (i) on Visa Cards if the printed four digits below the embossed account number do not match the first four digits of the embossed account number; (ii) iif you are advised by EVO or Bank (or a designee) the issuer of the Card or the designated voice authorization center to retain it: (iii) if you have reasonable grounds to believe the Card is counterfeit, fraudulent or stolen, or not authorized by the Cardholder; or (iv) if, for MasterCard Cards, the embossed account number, indent printed account number and encoded account number do not match or the Card does not have a MasterCard hologram on the lower right corner of the Card face.

D. Surcharges. You will not add any amount to the posted price of goods or services you offer as a condition of paying with a Card, except as permitted by the Rules. This paragraph does not prohibit you from offering a discount from the standard price to induce a person to pay by cash, check or similar means rather than by using a Card.

E. Return Policy. You will properly disclose to the Cardholder, at the time of the Card transaction and in accordance with the Rules, any limitation you have on accepting returned merchandise.

F. No Claim Against Cardholder. You will not have any claim against or right to receive payment from a Cardholder unless EVO and Bank refuses to accept the Sales Draft (as defined in Section 3) or revokes a prior acceptance of the Sales Draft after receipt or a chargeback or otherwise. You will not accept any payments from a Cardholder relating to previous charges for merchandise or services included in a Sales Draft, and if you receive any such payments you promptly will remit them to EVO and Bank.

G. Disputes With Cardholders. All disputes between you and any Cardholder relating to any Card transaction will be settled between you and the Cardholder. Neither EVO nor Bank bear any responsibility for such transactions.

**2. Authorization.**

A. Required on all Transactions. You will obtain a prior authorization for the total amount of a transaction via electronic terminal or device before completing any transaction, and you will not process any transaction that has not been authorized. You will follow any instructions received during the authorization process. Upon receipt of authorization you may consummate only the transaction authorized and must note on the Sales Draft the authorization number. Where authorization is obtained, you will be deemed to warrant the true identity of the customer as the Cardholder.

B. Effect. Authorizations are not a guarantee of acceptance or payment of the Sales Draft. Authorizations do not waive any provisions of this Agreement or otherwise validate a fraudulent transaction or a transaction involving the use of an expired Card.

C. Unreadable Magnetic Stripes. When you present Card transactions for authorization electronically, and if your terminal is unable to read the magnetic stripe on the card, you will obtain an imprint of the card and the Cardholder's signature on the imprinted draft before presenting the Sales Draft to EVO and Bank for processing. Failure to do so may result in the assessment of a transaction surcharge on non-qualifying transactions.

**3. Presentment of Sales Drafts.**

A. Forms. You will use a Sales Draft ("Sales Draft") or other form approved by EVO and Bank to document each Card transaction. Each Sales Draft will be legibly imprinted with: (i) Merchant's name, location and account number; (ii) the information embossed on the Card presented by the Cardholder (either electronically or manually); (iii) the date of the transaction; (iv) a brief description of the goods or services involved; (v) the transaction authorization number; (vi) the total amount of the sale including any applicable taxes, or credit transaction; and (vii) adjacent to the signature line, a notation that all sales are final, if applicable.

B. Signatures. Each Sales Draft must be signed by the Cardholder unless the Card transaction is a valid mail/telephone order Card transaction which fully complies with the requirements set forth in this Agreement. You may not require the Cardholder to sign the Sales Draft before you enter the final transaction amount in the Sales Draft.

C. Reproduction of Information. If the following information is not legibly imprinted on the Sales Draft, you will legibly inscribe on the Sales Draft before submitting it to EVO and Bank: (i) the Cardholder's name; (ii) account number (iii) expiration date of the Card and (iv) the Merchant's name and place of business. Additionally, for MasterCard transactions you will legibly inscribe the name of the bank issuing the Card as it appears on the face of the card.

D. Delivery and Retention of Sales Drafts. You will deliver a complete copy of the Sales Draft or credit voucher to the Cardholder at the time of the transaction. You will retain the "merchant copy" of the Sales Draft or credit memorandum for at least 3 years following the date of completion of the Card transaction (or such longer period as the Rules require).

E. Electronic Transmission. In using electronic authorization and/or data capture services, you will enter the data related to a sales or credit transaction into a computer terminal or magnetic stripe reading terminal no later than the close of business on the date the transaction is completed (unless otherwise permitted by the Rules). Failure to do so may result in the assessment of a transaction surcharge on non-qualifying transactions and, at EVO's sole discretion, the deposit of the funds received for such sales or credit transaction into the Reserve Account. If you provide your own electronic terminal or similar device, such terminal must meet EVO and Bank's requirements for processing transactions. Information regarding a sales or credit transaction transmitted with a computer or magnetic stripe reading terminal will be transmitted by you to EVO and Bank or their agent in the form EVO and Bank from time to time specify or as required under the Rules. If EVO or Bank requests a copy of a Sales Draft, credit voucher or other transaction evidence, you will provide it within 24 hours following the request.

**4. Deposit of Sales Drafts and Funds Due Merchant.**

A. Deposit of Funds. i. Deposits. You agree that this Agreement is a contract of financial accommodation within the meaning of the Bankruptcy Code, 11 U.S.C § 365 as amended from time to time. Subject to this Section, Bank will deposit to the Designated Account (defined in section 6 below) funds evidenced by Sales Drafts (defined elsewhere in writing or by electronic means) complying with the terms of this Agreement and the Rules and will provide you provisional credit for such funds (less recoupment of any credit(s), adjustments, fines, chargebacks, or fees). You shall not be entitled to credit for any indebtedness that arises out of a transaction not processed in accordance with the terms of this Agreement or the rules and regulations of a card association or network organization. You acknowledge that your obligation to EVO and Bank for all amounts owed under this Agreement arises out of the same transaction as EVO and Bank's obligation to deposit funds to the Designated Account. ii. Provisional Credit. Notwithstanding the previous sentences, under no circumstance will EVO or Bank be responsible for processing credits or adjustments related to Sales Drafts not originally processed by EVO and Bank. All Sales Drafts and deposits are subject to audit and final checking by EVO and Bank and may be adjusted for inaccuracies. You acknowledge that all credits provided to you are provisional and subject to chargebacks, recoupment, adjustments, fines and fees: (i) in accordance with the Rules; (ii) for any of your obligations to EVO and Bank; and (iii) in any other situation constituting suspected fraud or a breach of this Agreement, whether or not a transaction is charged back by the Card issuer. EVO and Bank may elect, but are not required, to grant conditional credit for individual or groups of any funds evidenced by Sales Drafts. Final credit for those conditional funds will be granted within EVO and Bank's sole discretion. iii. Processing Limits. EVO and Bank may impose a cap on the volume and ticket amount of Sales Drafts that they will process for you, as indicated to you by EVO or Bank. This limit may be changed by EVO or Bank upon written notice to you.

B. Chargebacks. You are fully liable for all transactions returned for whatever reason, otherwise known as "chargebacks". You will pay on demand the amount of all chargebacks. Authorization is granted to offset from incoming transactions and to debit the Designated Account, the Reserve Account (defined in Section 7, below) or any other account held at Bank or at any other financial institution the amount of all chargebacks. You will fully cooperate in complying with the Rules regarding chargebacks.

C. Excessive Activity. Your presentation to EVO and Bank of Excessive Activity will be a breach of this Agreement and cause for immediate termination of this agreement. "Excessive Activity" means, during any monthly period: (i) the dollar amount of chargebacks and/or retrieval requests in excess of 1% of the average monthly dollar amount of your Card transactions; (ii) sales activity that exceeds by 10% of the dollar volume indicated on the Application; or (iii) the dollar amount of returns equals 20% of

the average monthly dollar amount of your Card transactions. You authorize, upon the occurrence of Excessive Activity, EVO and Bank to take any action they deem necessary including but not limited to, suspension of processing privileges and establishment or increase in the amount allocated to the Reserve Account and a reduction in the amount of provisional credit remitted to you in accordance with this Agreement.

D. Credit. i. Credit Memoranda. You will issue a credit memorandum in any approved form, instead of making a cash advance, a disbursement or a refund on any Card transaction. EVO or Bank will debit the Designated Account for the total face amount of each credit memorandum submitted to EVO and Bank. You will not submit a credit memorandum relating to any Sales Draft not originally submitted to EVO and Bank, nor will you submit a credit memorandum that exceeds the amount of the original Sales Draft. You will within the time period specified by the Rules, provide a credit memorandum or credit statement for every return of goods or forgiveness of debt for services which were made subject to a Card transaction. ii. Revocation of Credit. EVO or Bank may refuse to accept any Sales Draft, and EVO and Bank may revoke prior acceptance of a Sales Draft in the following circumstances: (a) the transaction giving rise to the Sales Draft was not made in compliance with this Agreement, the Laws or the Rules; (b) the Cardholder disputes his liability to EVO and Bank for any reason, including but not limited to a contention that the Cardholder did not receive the goods or services, that the goods or services provided were not as ordered, or those chargeback rights enumerated in the Rules; or (c) the transaction giving rise to the Sales Draft was not directly between you and the Cardholder. You will pay EVO and Bank any amount previously credited to you for a Sales Draft not accepted by EVO and Bank or where accepted, is revoked by EVO and Bank.

E. Reprocessing. Notwithstanding any authorization or request from a Cardholder, you will not re-enter or reprocess any transaction which has been charged back

F. Miscellaneous. You will not present for processing or credit, directly or indirectly, any transaction not originated as a result of a Card transaction directly between you and a Cardholder or any transaction you know or should know to be fraudulent or not authorized by the Cardholder. You will not sell or disclose to third parties Card account information other than in the course of performing your obligations under this Agreement.

**5. Other Types of Transactions.**

A. Debit Card Processing Services. You may elect to accept debit cards, and said election should be made by you on the accompanying Merchant Application. If you elect to accept debit cards, the following terms and conditions apply to you. Debit Sponsor shall act as your sponsor with respect to the participation of point-of-sale terminals owned, controlled, and/or operated by you (the "Covered Terminals") in each of the following debit card networks ("Networks"): Accel, AFFN, Alaska Option, Interlink, Maestro, NYCE, Pulse, Shazam, Star, CU24, and Tyme, which Networks may be changed from time-to-time by Debit Sponsor, EVO without notice. You may also have access to other debit networks that do not require a sponsor. EVO will provide you with the ability to access the Networks at the Covered Terminals for the purpose of authorizing debit card transactions from cards issued by the members of the respective Networks, and EVO will provide connection to such Networks, terminal applications, settlement, and reporting activities (collectively, the "Services"). You will comply with all federal, state, and local laws, rules, regulations and ordinances ("Applicable Laws") and with all by-laws, regulations, rules, and operating guidelines of the Networks ("Network Rules"). You will execute and deliver any application, participation, or membership agreement or other document necessary to enable Debit Sponsor to act as sponsor for you in each Network, and you shall obtain all consents, approvals, authorizations, or orders of any governmental agency or body required for the execution, delivery, and performance of this Agreement. You agree to utilize the debit card services in accordance with this Agreement, its exhibits or attachments, and EVO's instructions and specifications, and to provide EVO with the necessary data in the proper format to enable EVO to properly furnish the Services. Copies of the relevant agreements or operating regulations shall be made available to you upon request. You will provide prompt written notice to EVO in the event that you are subject to any of the following: i. Conviction for a felony offense or any other crime involving moral turpitude; ii. Restraining order, decree, injunction, or judgment in any proceeding or lawsuit alleging fraud or deceptive practice on your part; iii. Bankruptcy filing or petition; iv. Federal or state tax lien; v. Any material adverse change in your assets, operations, or condition, financial or otherwise; vi. Threat or filing of any litigation against you, the outcome of which reasonably could have a material adverse effect on your continuing operations; vii. Administrative or enforcement proceeding commenced by any state or federal regulatory agency, including any banking or securities agency or entity operating an EBT Network, that reasonably could have a material adverse effect on your continuing operations; or viii. Any disciplinary action taken by any Network against you or any of your principals. EVO may terminate or suspend in its discretion Debit Sponsor's sponsorship of you in any Network or modify the provision of Services to you: i. Immediately upon notice to you of the occurrence of any of the conditions set forth in items (i), (ii), (iii), (v), or (viii) in the immediately preceding paragraph of Debit Sponsor's authority to participate in such Network or act as your sponsor in such Network is terminated by such Network; ii. Thirty (30) days after written notice by EVO to you of the occurrence of any of the conditions set forth in items (iv), (vi), or (vii) in the immediately preceding paragraph or if Debit Sponsor terminates its membership or participation in such Network; iii. Immediately upon notice to you in the event any financial statement, representation, warranty, statement or certificate furnished is materially false or misleading; or iv. Immediately upon notice to you of the occurrence of any other circumstance with respect to this Section that may reasonably be expected to have an adverse effect on EVO. The parties hereto acknowledge and agree that EVO shall pay Debit Sponsor any and all fees related to Debit Sponsor's sponsorship of you in the Networks; provided, however, that in the event EVO fails to pay such amounts, Debit Sponsor shall be entitled to recover all such amounts directly from you and you agree to pay all such amounts. You shall not in any way indicate that Debit Sponsor endorses your activities, products, or services. Debit Sponsor and you are and shall remain independent contractors of one another, and neither they, nor their respective individual employees, shall have or hold themselves out as having any power to bind the other to any third party. Nothing contained in this section shall be construed to create or constitute a partnership, joint venture, employer-employee, or agency relationship between Debit Sponsor and you. You shall indemnify and hold harmless EVO and its affiliates (including parents and subsidiaries), and their respective officers, directors, employees, successors and assigns, from and against any and all direct or contingent losses, costs, claims, demands, and causes of action (including, without limitation, the cost of investigating the claim, the cost of litigation, and reasonable attorney's fees including those of in house counsel, whether or not legal proceedings are instituted) paid or incurred by or on behalf of EVO as a result of your violation of any of the terms of this Section, Network Rules, or Applicable Laws, or otherwise arising from or related to Debit Sponsor's sponsorship of you in any Network. In the event that Debit Sponsor's sponsorship of you in any Network is terminated prior to the termination of this Agreement, EVO may assign Debit Sponsor's rights and obligations hereunder to a third party. All provisions in this section necessary to enforce the rights and obligations of the parties contained in this section shall survive the termination of Debit Sponsor's debit sponsorship of you under this Agreement.

B. Mail/Telephone Order. EVO and Bank caution against mail orders or telephone orders or any transaction in which the Cardholder and Card are not present ("mail/telephone orders") due to the high incidence of customer disputes. You will obtain the expiration date of the Card for a mail/telephone order and submit the expiration date when obtaining authorization of the Card transaction. For mail/telephone order transactions, you will type or print legibly on the signature line the following as applicable: telephone order or "TO" or mail order or "MO". You must promptly notify EVO and Bank if your retail/mail order/telephone order mix changes from the percentages represented to EVO and Bank in the Merchant Application. EVO and Bank may cease accepting, mail/telephone order transactions, or limit their acceptance of such transactions, or increase their fees if this mix changes. Bank will release funds to Merchant five (5) business days after transaction date for mail/telephone orders. Merchant agrees to use and retain proof of a traceable delivery system as means of shipment of product to the customer. Merchant agrees that transactions will not be processed until products are shipped to the Cardholder. Merchant agrees to a charge of $0.05 per AVS transaction, if applicable. The Agreement may be immediately terminated by Bank if Merchant fails to comply with any of the terms of the agreement.

C. Recurring Transactions. For recurring transactions, you must obtain a written request from the Cardholder for the goods and services to be charged to the Cardholders account, the frequency of the recurring charge, and the duration of time during which such charges may be made. You will not complete any recurring transaction after receiving: (i) a cancellation notice from the Cardholder (ii) notice from EVO or Bank, or (iii) a response that the Card is not to be honored. You must print legibly on the Sales Draft the words "Recurring Transaction."

D. Multiple Sales Drafts. You will include a description and total amount of goods and services purchased in a single transaction on a single Sales Draft or transaction record, unless (i) partial payment is entered on the Sales Draft or transaction record and the balance of the transaction amount is paid in cash or by check at the time of transaction, or (ii) a Sales Draft represents an advance deposit in a Card transaction completed in accordance with this Agreement and the Rules.

E. Partial Completion. i. Prior Consent. You will not accept for payment by Card any amount representing a deposit or partial payment for goods or services to be delivered in the future without the prior written consent of EVO or Bank. Such consent will be subject to Bank's final approval. The acceptance of a Card for payment or partial payment of goods or services to be delivered in the future without prior consent will be deemed a breach of this Agreement and cause for immediate termination, in addition to any other remedies available under the Laws or Rules. ii. Acceptance. If you have obtained prior written consent, you will complete such Card transactions in accordance with the terms set forth in this Agreement, the Rules, and the Laws. Cardholders must execute one Sales Draft when making a deposit with a Card and a second Sales Draft when paying the balance. You will note upon the Sales Draft the words "deposit" or "balance" as appropriate. You will not deposit the Sales Draft labeled "balance" until the goods have been delivered to Cardholder or you have fully performed the services.

F. Future Delivery. You will not present any Sales Draft or other memorandum to Bank for processing "whether by electronic means" which relates to the sale of goods or services for future delivery without EVO or Bank's, prior written authorization. Such consent will be subject to Bank's final approval. If EVO or Bank have given such consent, you represent and warrant to EVO and Bank that you will not rely on any proceeds or credit resulting from such transactions to purchase or furnish goods or services. You will maintain sufficient working capital to provide for the delivery of goods or services at the agreed upon future date, independent of any credit or proceeds resulting from sales drafts or other memoranda taken in connection with future delivery transactions.

28134 27
Rcig 6 qh 8

DOJ-EDNY-0019916

G. Electronic Commerce Transactions. You may process electronic commerce ("EC") transactions only if you have so indicated on the Application, and only if you have obtained EVO's consent. If you submit EC transactions without our consent, we may immediately terminate this Agreement. If you have indicated on the Application that you will be submitting EC transactions, you acknowledge that you have reviewed the Payment Card Industry Data Security Standards (PCI DSS), Visa's Cardholder Information Security Program (CISP) and MasterCard's Site Data Protection Program (SDP), and to the extent that they apply to you, you agree to comply with, and ensure such transactions comply with, the terms of each. You understand that transactions processed via EC are high risk and subject to a higher incidence of chargebacks. You are liable for all chargebacks and losses related to EC transactions, whether or not: i) EC transactions have been encrypted; and ii) you have obtained consent to engage in such transactions. Encryption is not a guarantee of payment and will not waive any provision of this Agreement or otherwise validate a fraudulent transaction. All communication costs related to EC transactions are your responsibility. You understand that EVO will not manage the EC telecommunications link and that it is your responsibility to manage that link. All EC transactions will be settled by Bank into a depository institution of the United States in U.S. currency. i. Requirements. For goods to be shipped on EC transactions, you may obtain authorization up to 7 calendar days prior to the shipment date. You need not obtain a second authorization if the Sales Draft amount is within 15% of the authorized amount, provided that the additional amount represents shipping costs. Further, your web site must contain all of the following information: i) complete description of the goods or services offered, ii) returned merchandise and refund policy, iii) customer service contact, including electronic mail address and/or telephone number, iv) transaction currency (such as U.S. or Canadian dollars), v) export or legal restrictions, if known, and vi) delivery policy. If you store cardholder account numbers, expiration dates, and other personal cardholder data in the database, you must follow PCI DSS, CISP and SDP guidelines on securing such data. ii. If you accept EC transactions, you must: install and maintain a working network firewall to protect data accessible via the Internet; keep security patches up-to-date; encrypt stored data and data sent over open networks; use and update anti-virus software; restrict access to data by business "need-to-know"; assign a unique ID to each person with computer access to data; not use vendor-supplied defaults for system passwords and other security parameters; track access to data by unique ID; regularly test security systems and processes; maintain a policy that addresses information security for employees and contractors; and restrict physical access to Cardholder information. When outsourcing administration of information assets, networks, or data you must retain legal control of proprietary information and use limited "need-to-know" access to such assets, networks or data. Further, you must reference the protection of cardholder information and compliance with the PCI DSS, CISP and SDP Rules in contracts with other service providers. You understand that failure to comply with this Section may result in fines and you agree to indemnify and reimburse EVO and Bank immediately for any fine imposed due to your breach of this Section.

H. American Express. JCB and Diners Club Transactions. Upon your request, EVO and Bank will provide authorization and/or data capture service, for JCB, Diners Club and American Express transactions. By signing this Merchant Agreement, Merchant agrees to abide by the terms and conditions of Diners Club, American Express, and JCB. Merchant understands that the Diners Club Agreement will be sent to the business entity indicated on this application. By accepting the Diners Club Card for goods and/or services, Merchant agrees to be bound by the terms and conditions of the Agreement. EVO and Bank are not responsible for funding such transactions. Initial setup fees may apply.

I. Cash Advances. You will not deposit any transaction for purposes of obtaining or providing a cash advance. You agree that any such deposit shall be grounds for immediate termination.

J. Prohibited Transactions. You will not accept or deposit any fraudulent or illegal transaction and you may not, under any circumstances, present for deposit directly or indirectly, a transaction which originated with any other merchant or any other source. You will not, under any circumstance, deposit telemarketing transactions unless you obtain Bank or EVO's prior written consent. Such consent will be subject to Bank's final approval. If you process any such transactions, you may be immediately terminated and EVO or Bank may hold funds and/or increase the amount allocated to the Reserve Account and/or deduct from the amount of provisional credit that would otherwise be allocated to you. Further, you may be subject to Visa, MasterCard or Discover reporting requirements.

**6. Designated Account.**

A. Establishment and Authority. Merchant will establish and maintain an account at an ACH receiving depository institution approved by Bank and EVO ("Designated Account"). Merchant will maintain sufficient funds in the Designated Account to satisfy all obligations, including fees, contemplated by this Agreement. Merchant irrevocably authorizes Bank and EVO to debit the Designated Account for chargebacks, recoupments, adjustments, fines, fees and any other penalties or amounts owed under this Agreement, and irrevocably authorizes Bank and EVO to debit the Designated Account for any amount owed to Bank and EVO under this Agreement other than the amounts directly attributable to the settlement of transactions. You also authorize EVO and Bank to debit the Merchant Account for any fees due such vendor or agent under this Agreement. This authority will remain in effect for at least 2 years after termination of this Agreement whether or not you have notified EVO and Bank of a change to the Designated Account. Merchant must obtain prior written consent from Bank or EVO to change the Designated Account. If Merchant does not get that consent, EVO or Bank may immediately terminate the Agreement and may take other action necessary, as determined by them within their sole discretion.

B. Deposit. Bank will deposit all Sales Drafts to the Designated Account subject to the other provisions of this Agreement. The funds represented by Sales Drafts will be deposited 3 business days following EVO's receipt of the Sales Draft, except for mail order/telephone order and electronic commerce transactions, which will be deposited 5 business days following receipt of the Sales Draft. "Business Day" means Monday through Friday, excluding holidays observed by the Federal Reserve Bank of New York. Merchant authorizes Bank and EVO to initiate reversal or adjustment entries and initiate or suspend such entries as may be necessary to grant Merchant provisional credit for any entry. You authorize and appoint Bank and EVO to act as your agent to collect Card transaction amounts from the Card issuing bank. As the collecting agent, Bank and EVO in their sole discretion, may grant you provisional credit for transaction amounts in the process of collection, subject to receipt of final payment by Bank and subject to all chargebacks.

C. Asserted Errors. You must promptly examine all statements relating to the Designated Account, and immediately notify EVO and Bank in writing of any errors. Your written notice must include: (i) Merchant name and account number, (ii) the dollar amount of the asserted error, (iii) a description of the asserted error, and (iv) an explanation of why you believe an error exists and the cause of it, if known. That written notice must be received by EVO and Bank within 30 calendar days after you received the periodic statement containing the asserted error. Your failure to notify EVO and Bank of any error within 30 days constitutes a waiver of any claim relating to that error. You may not make any claim against EVO or Bank for any loss or expense relating to any asserted error for 60 calendar days immediately following our receipt of your written notice. During that 60 day period, EVO and Bank will be entitled to investigate the asserted error.

D. Indemnity. You will indemnify and hold EVO and Bank harmless for any action they take against the Designated Account, the Reserve Account, or any other account pursuant to this Agreement.

E. ACH Authorization. You authorize EVO and Bank to initiate debit/credit entries to the Designated Account, the Reserve Account, or any other account maintained by you at any institution, all in accordance with this Agreement and the ACH Authorization on the attached Exhibit B, Merchant Authorizations. The ACH Authorization will remain in effect beyond termination of this Agreement. In the event you change the Designated Account, you will execute a new ACH authorization.

**7. Security Interests, Reserve Account, Recoupment and Set-Off.**

A. Security Interests. i. Security Agreement. This Agreement is a security agreement under the Uniform Commercial Code. You grant to EVO and Bank a security interest in and lien upon: (i) all funds at any time in the Designated Account, regardless of the source of such funds; (ii) all funds at any time in the Reserve Account, regardless of the source of such funds; (iii) present and future Sales Drafts; and (iv) any and all amounts which may be due to you under this Agreement including, without limitation, all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). You agree to provide collateral or security to EVO and Bank to secure your obligations under this Agreement upon EVO or Bank's request. These security interests and liens will secure all of your obligations under this Agreement and any other agreements now existing or later entered into between you and EVO or Bank. This security interest may be exercised by EVO or Bank without notice or demand of any kind by making an immediate withdrawal or freezing the secured assets. ii. Perfection. Upon request of EVO or Bank, you will execute one or more financing statements or other documents to evidence this security interest. You represent and warrant that no other person or entity has a security interest in the Secured Assets. Further, with respect to such security interests and liens, EVO and Bank will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. You will obtain from EVO and Bank written consent prior to granting a security interest of any kind in the Secured Assets to a third party. You agree that this is a contract of recoupment and EVO and Bank are not required to file a motion for relief from the automatic stay in any bankruptcy proceeding order for EVO or Bank to realize on any of its collateral (including any Reserve Account). Nevertheless you agree not to contest or object to any motion for relief from the automatic stay filed by EVO or Bank. You authorize EVO or Bank and appoint EVO or Bank your attorney in fact to sign your name to any financing statement used for the perfection of any security interest or lien granted hereunder.

B. Reserve Account. i. Establishment. A non-interest bearing deposit account ("Reserve Account") has been established and is maintained at Bank or one of its affiliates with sums sufficient to satisfy your current and future merchant obligations as determined by EVO and Bank. You authorize EVO and Bank to debit the Designated Account or any other account you have at Bank or any other financial institution to establish or maintain funds in the Reserve Account. Bank or EVO may deposit into the Reserve Account funds it would otherwise be obligated to pay you, for the purpose of establishing, maintaining or increasing the Reserve Account in accordance with this Section, if it determines such action is reasonably necessary to protect its interests. ii. Authorizations. EVO and Bank may, without notice to you, apply deposits in the Reserve Account against any outstanding amounts you owe under this Agreement or any other agreement between you and EVO or Bank. Also, EVO and Bank may exercise their rights under this Agreement against the Reserve Account to collect any amounts due to EVO or Bank including, without limitation, rights of set-off and recoupment. In the event you submit a merchant application to EVO through the use of

Insta-App, and EVO does not receive a completed written merchant application within 2 business days, you authorize EVO or Bank to hold all of your funds in the Reserve Account until the completed written merchant application and other required documentation is received by EVO. ii. Funds. Funds in the Reserve Account will remain in the Reserve Account for 270 calendar days following the later of termination of this Agreement or the last activity in your account provided, however, that you will remain liable to EVO and Bank for all liabilities occurring beyond such 270 day period. After the expiration of the 270 day period EVO will provide you with written notification via nationally recognized delivery service advising you that the 270 day period has expired, requesting that you provide EVO with an address where the funds you have remaining in the Reserve Account should be delivered, and stating that in the event you fail to respond to this notification within 30 days, EVO will begin deducting a flat fee of $95 each month from the funds you have remaining in the Reserve Account. In the event you fail to respond to the notification, the $95 fee will then be deducted each month from the funds you have remaining in the Reserve Account. This fee will offset the administrative, clerical, legal, and risk management costs incurred by EVO to monitor the funds that you have remaining in the Reserve Account beyond the 270 day period, and includes all monthly minimums and any other contractual fees that would ordinarily be assessed against your account pursuant to the terms of this Agreement. You agree that prior to the expiration of the 270 days, you will not use any funds you have in the Reserve Account for any purpose, including but not limited to paying chargebacks, fees, fines, or other amounts you owe to EVO and/or Bank under this Agreement. EVO and Bank (and not Merchant) shall have control of the Reserve Account. iv. Assurance. In the event of a bankruptcy proceeding and the determination by the court that this Agreement is assumable under Bankruptcy Code § 365, as amended from time to time, you must maintain funds in the Reserve Account in an amount satisfactory to EVO and Bank.

C. Recoupment and Set Off. EVO and Bank have the right of recoupment and set-off. This means that they may offset or recoup any outstanding/uncollected amounts owed by you from: (i) any amounts they would otherwise be obligated to deposit into the Designated Account; (ii) any other amounts Bank or EVO may owe you under this Agreement or any other agreement; and (iii) any funds in the Designated Account or the Reserve Account. You acknowledge that in the event of a bankruptcy proceeding, in order for you to provide adequate protection under Bankruptcy Code § 362 to EVO and Bank, you must create or maintain the Reserve Account as required by EVO and Bank, and EVO and Bank must have the right to offset against the Reserve Account for any and all obligations which you may owe to EVO and Bank, without regard to whether the obligations relate to Sales Drafts initiated or created before or after the filing of the bankruptcy petition.

D. Remedies Cumulative. The rights and remedies conferred upon EVO and Bank in this Agreement, at law or in equity, are not intended to be exclusive of each other. Rather, each and every right of EVO and Bank under this Agreement, at law or in equity, will be cumulative and concurrent and in addition to every other right.

**8. Fees and Other Amounts Owed EVO and Bank.**

A. Fees and Taxes. You will pay EVO fees for services, equipment in accordance with the rates set forth on the Application. In addition, you will pay EVO a fee for research it performs at your request in an amount equal to $200 per hour, or $5 per statement. Such fees will be calculated and debited from the Designated Account once each business day or month for the previous business day's or month's activity or will be netted out from the funds due you attributable to Sales Drafts presented to EVO and Bank. EVO and Bank reserve the right to adjust the fees set forth on the Application and in this Section, in accordance with Section 16.H, below. If you do not have an active account at the time of the request, payment by certified check or money order must be received prior to the release of the requested document copies or research results. You are also obligated to pay all taxes, and other charges imposed by any governmental authority on the services provided under this Agreement. With respect to Visa, MasterCard and Discover products, you may elect to accept credit cards or debit/prepaid cards or both. You shall so elect on the Merchant Application being completed contemporaneously herewith. You agree to pay any and your account(s) will be charged pursuant to Section 6.A of this Agreement for any additional fees incurred as a result of your subsequent acceptance of transactions with any Visa, MasterCard or Discover product that you have elected not to accept.

B. Other Amounts Owed EVO and Bank. You will immediately pay EVO and Bank any amount incurred by EVO and Bank attributable to this Agreement including but not limited to chargebacks, fines and penalties imposed by Visa, MasterCard or Discover (including but not limited to fines and penalties related to PCI DSS), non-sufficient fund fees, and ACH debits that overdraw the Designated Account or Reserve Account, or are otherwise dishonored. You authorize EVO and Bank to debit via ACH the Designated Account or any other account you have at Bank or at any other financial institution for any amount you owe EVO or Bank under this Agreement or under any other contract, note, guaranty, instrument or dealing of any kind now existing or later entered into between you and EVO or Bank, whether your obligation is direct, indirect, primary, secondary, fixed, contingent, joint or several. In the event EVO or Bank demand sums due or such ACH does not fully reimburse EVO and Bank for the amount owed, you will immediately pay EVO and Bank such amount.

C. Merchant Supply/Replacement Program. Merchant is responsible for purchasing all supplies required to properly process credit card transactions (sales slips, printer rolls, etc.). If Merchant elects to participate in EVO's Supply/Replacement Program, Merchant understands that it is entitled to a maximum of 6 rolls of paper and 2 printer ribbons per month. It is Merchant's responsibility to contact EVO each month to order supplies. EVO will only provide Merchant with supplies for the current month, and Merchant's failure to place an order with EVO will constitute a waiver of its right to receive supplies for that month under the Supply/Replacement Program. Quantity of supplies provided is the discretion of EVO. Enrollment in EVO's Supply/Replacement Program also entitles Merchant to free refurbished replacement equipment after EVO has collected 3 monthly payments from Merchant (merchant is responsible for all shipping costs). A separate program is required for each terminal Merchant may have. If Merchant's terminal type is unavailable, at EVO's discretion, a substitute may be provided. EVO's Supply/Replacement Program does not include labor, parts, or expenses necessary to replace or repair equipment damaged by fire, flood, accident, improper voltages, misuse of equipment, service performed by persons other than EVO representatives, and/or failure to continually maintain a suitable operating environment for the equipment. EVO may choose to cancel Merchant's Supply/Replacement Program at any time without notice. This program is nontransferable without written consent. Maintenance is not available for any wireless terminals.

**9. Application, Indemnification, Limitation of Liability.**

A. Application. You represent and warrant to EVO and Bank that all information in the Application is correct and complete. You must notify EVO in writing of any changes to the information in the Application, including but not limited to: any additional location or new business, the identity of principals and/or owners, the form of business organization (e.g., sole proprietorship, partnership, etc.), type of goods and services provided and how sales are completed (i.e., by telephone, mail, or in person at your place of business). The notice must be received by EVO within 10 business days of the change. You will provide updated information to EVO within a reasonable time upon request. You are liable to EVO and Bank (as applicable) for all losses and expenses incurred by EVO and/or Bank arising out of your failure to report changes to it. Bank and EVO may immediately terminate this Agreement upon notification by you of a change to the information in the Application.

B. Indemnification. You will hold harmless and indemnify EVO and Bank, their employees and agents (i) against all claims by third parties arising out of this Agreement, and (ii) for all attorneys' fees and other costs and expenses paid or incurred by EVO or Bank in the enforcement of the Agreement, including but not limited to those resulting from any breach by you of this Agreement and those related to any bankruptcy proceeding.

C. Limitation of Liability. Any liability of EVO or Bank under this Agreement, whether to you or any other party, whatever the basis of the liability, shall not exceed in the aggregate the difference between (i) the amount of fees paid by you to EVO and Bank during the month in which the transaction out of which the liability arose occurred, and (ii) assessments, chargebacks, and offsets against such fees which arose during such month. In the event more than one month is involved, the aggregate amount of EVO and Bank's liability shall not exceed the lowest amount determined in accord with the foregoing calculation for any one month involved. Neither EVO, Bank nor their agents, officers, directors, or employees shall be jointly liable to you under this Agreement or liable for indirect, special, or consequential damages. Neither EVO nor Bank will be responsible or liable for any damages you incur that arise from a terminal that has been downloaded by a third party.

D. Performance. EVO and Bank will perform all services in accordance with this Agreement. EVO and Bank make no warranty, express or implied, regarding the services, and nothing contained in the Agreement will constitute such a warranty. EVO and Bank disclaim all implied warranties, including those of merchantability and fitness for a particular purpose. No party will be liable to the others for any failure or delay in its performance of this Agreement if such failure or delay arises out of causes beyond the control and without the, fault or negligence of such party. Neither EVO nor Bank shall be liable for the acts or omissions of any third party.

E. Representations By Salespersons. All salespersons are independent contractors, and are not agents, employees, joint venturers, or partners of EVO or Bank. Any and all representations and/or statements made by a salesperson are made by them in their capacity as an independent contractor, and cannot be imputed to EVO or Bank. EVO and Bank have absolutely no liability or responsibility for any representations and/or statements made to you by any sales representative.

**10. Representations and Warranties. You represent and warrant to EVO and Bank at the time of execution and during the term of this Agreement the following:**

A. Information. You are a corporation, limited liability company, partnership or sole proprietorship validly existing and organized in the United States. All information contained on the Application or any other document submitted to EVO or Bank is true and complete and properly reflects the business, financial condition, and principal partners, owners, or officers of Merchant. You are not engaged or affiliated with any businesses, products or methods of selling other than those set forth on the Application, unless you obtain the prior written consent of EVO and Bank.

B. Entity Power. Merchant and the person signing this Agreement have the power to execute and perform this Agreement. This Agreement and your performance hereunder will not violate any law, or conflict with any other agreement to which you are subject.

C. No Litigation or Termination. There is no action, suit or proceeding at law or in equity now pending or to your knowledge threatened which if decided adversely would impair your ability to carry on your business substantially as now conducted or which would adversely affect your financial condition or operations. You have never entered into an agreement with a third party to perform credit or debit card processing which has been terminated by that third party.

28134 27
Rcig 7 qh 8

DOJ-EDNY-0019920

D. _Transactions._ All transactions are bona fide. No transaction involves the use of a Card for any purpose other than the purchase of goods or services from you nor does it involve a Cardholder obtaining cash from you unless allowed by the Rules and agreed in writing with EVO and Bank. EVO may choose to cancel Merchant's Supply/Replacement Program at any time without notice. This program is non-transferable without written consent. Maintenance is not available for any wireless terminals.

E. _Rule Compliance._ You will comply with the Laws and Rules. Without limiting the generality of the foregoing, each sales transaction submitted hereunder and the handling, retention, and storage of information related thereto, will comply with the rules and regulations of Visa, MasterCard, Discover, and any other card organization or network organization related to cardholder and transaction information security, including, without limitation Payment Card Industry Data Security Standards (PCI DSS), Visa's Cardholder Information Security Program (CISP) and MasterCard's Site Data Protection Program (SDP), and Payment Application Best Practices.

**11. Audit and financial information.**

A. _Audit._ You authorize EVO or Bank to audit your records to confirm compliance with this Agreement, as amended from time to time. You will obtain, and will submit a copy of, an audit of your business when requested by EVO or Bank.

B. _Financial Information._ i. Authorizations. You authorize EVO or Bank to make any business or personal credit inquiries they consider necessary to review the acceptance and continuation of this Agreement. You also authorize any person or credit reporting agency to compile information to answer, those credit inquiries and to furnish that information to EVO and Bank. ii. Documents. You will provide EVO or Bank personal and business financial statements and other financial information as requested from time to time. If requested, you will furnish within 120 calendar days after the end of each fiscal year to EVO and Bank a financial statement of profit and loss for the fiscal year and a balance sheet as of the end of the fiscal year.

**12. Third Parties.**

A. _Services._ You may be using special services or software provided by a third party to assist you in processing transactions, including authorizations and settlements, or accounting functions. You are responsible for ensuring compliance with the requirements of any third party in using their products. This includes making sure you have and comply with any software updates. EVO and Bank have no responsibility for any transaction until that point in time EVO or Bank receive data about the transaction.

B. _Use of Terminals Provided by Others._ You will notify EVO and Bank immediately if you decide to use electronic authorization or data capture terminals or software provided by any entity other than EVO and Bank or its authorized designee ("Third Party Terminals") to process transactions. If you elect to use Third Party Terminals or payment software provided by others you agree (i) the third party providing the terminals will be your agent in the delivery of Card transactions to EVO and Bank; and (ii) to assume full responsibility and liability for any failure of that third party to comply with the Rules and this Agreement. Neither EVO nor Bank will be responsible for any losses or additional fees incurred by you as result of any error by a third party agent, or a malfunction of your credit card terminal, including but not limited to Third Party Terminals.

**13. Term and Termination.**

A. _Term._ This Agreement shall become effective ("Effective Date") only upon acceptance by EVO and Bank, or upon the submission of a transaction by you to EVO, whichever event shall occur first. The Agreement will remain in effect for a period of 3 years ("Initial Term") and will renew for successive 1 year terms ("Renewal Term") unless terminated as set forth below.

B. _Termination._ The Agreement may be terminated by Merchant at the end of the Initial Term or any Renewal Term by giving written notice of an intention not to renew at least 90 calendar days before the end of the Initial Term or any Renewal Term. Further, this Agreement may be terminated by EVO or Bank at any time with or without notice and with or without cause.

C. _Action upon Termination._ i. Terminated Merchant File. You acknowledge that Bank is required to report your business name and the name of Merchant's principals to Visa, MasterCard and Discover when Merchant is terminated due to the reasons listed in the Rules. ii. Designated Account. All your obligations regarding accepted Sales Drafts will survive termination. You must maintain in the Designated Account and the Reserve Account enough funds to cover all chargebacks, deposit charges, refunds and fees incurred by you for a reasonable time, but in any event not less than the time specified in this agreement. You authorize EVO and Bank to charge those accounts, or any other account maintained under this Agreement, for all such amounts. If the amount in the Designated Account or Reserve Account is not adequate, you will pay EVO and Bank the amount you owe it upon demand, together with all costs and expenses incurred to collect that amount, including reasonable attorneys' fees. iii. Equipment. Within 14 business days of the date of termination, you must return all equipment owned by EVO and immediately pay EVO, any amounts you owe them for equipment costs. iv. Early Termination. If you terminate this Agreement before the end of the Initial Term, or before the end of any successive Renewal Term, in violation of the procedure set forth in Section 13.B above, or if EVO or Bank terminates this Agreement based upon your failure to comply with the terms and conditions contained herein, you will immediately pay EVO, as liquidated damages, a closure fee of $250. You agree that this fee is not a penalty, but rather is reasonable in light of the financial harm caused by the early termination of this Agreement.

**14. Compliance With Laws and Rules.**

You agree to comply with all rules and operating regulations issued from time to time by MasterCard, Visa and Discover ("Rules"), and any policies and procedures provided by EVO or Bank. You further agree to comply with all applicable state, federal and local laws, rules and regulations ("Laws"), as amended from time to time. You will assist EVO and Bank in complying with all Laws and Rules now or hereafter applicable to any Card transaction or this Agreement. You will execute and deliver to EVO and Bank all instruments it may from time to time reasonably deem necessary. Without limiting the generality of the foregoing, you agree to comply with and be bound by the rules and regulations of Visa, MasterCard, Discover, and any other card association or network organization related to cardholder and transaction information security, including without limitation, Payment Card Industry Data Security Standards (PCI DSS), Visa's Cardholder Information Security Program and MasterCard's Site Data Protection Program. You agree to cooperate at your sole expense with any request for an audit or investigation by EVO, Bank, a card association or network organization in connection with cardholder and transaction information security. You may also be assessed a monthly or annual PCI fee, which will appear as a separate item on your monthly statement. This fee is assessed by EVO in connection with EVO's efforts to comply with the PCI DSS and does not ensure your compliance with the PCI DSS or any law, rule or regulation related to cardholder data security. The payment of such fee shall not relieve you of your responsibility to comply with all rules and regulations related to cardholder security, including without limitation the PCI DSS. Without limiting the generality of the foregoing, you agree to use information obtained from a cardholder in connection with a card transaction solely for the purpose of processing a transaction with that cardholder or attempting to re-present a chargeback with respect to such transaction. You will indemnify and hold EVO and Bank harmless from any fines and penalties issued by Visa, MasterCard, Discover, or any card association or network organization and any other fees and costs arising out of or relating to the processing of transactions by EVO and Bank at your location(s) and will reimburse EVO and Bank for any losses incurred by EVO with respect to any such fines, penalties, fees and costs. You also agree that you will comply with all applicable laws, rules and regulations related to the truncation or masking of cardholder numbers and expiration dates on transaction receipts from transactions processed at your location(s), including without limitation the Fair and Accurate Credit Transactions Act and applicable state laws ("Truncation Laws"). As between you, on the one hand, and EVO and Bank, on the other hand, you shall be solely responsible for complying with all Truncation Laws and will indemnity and hold EVO and Bank harmless from any claim, loss or damage resulting from a violation of Truncation Laws as a result of transactions processed at your location(s).

**15. Use of Trademarks and Confidentiality.**

A. _Use of Trademarks._ Your use of Visa, MasterCard and Discover trademarks must fully comply with the Rules. Your use of Visa, MasterCard, Discover, or other cards' promotional materials will not indicate directly or indirectly that Visa, MasterCard, Discover, or others endorse any goods or services other than their own and you may not refer to Visa, MasterCard, Discover or others in stating eligibility for your products or services.

B. _Merchant is hereby granted a limited non-exclusive, non-transferable license to use Discover brands, emblems, trademarks, and/or logos that identify Discover cards ("Discover Program Marks")._ You are prohibited from using the Discover Program Marks other than as expressly authorized in writing. You shall not use the Discover Program Marks other than to display decals, signage, advertising and other forms depicting the Discover Program Marks that are provided to you pursuant to this Agreement or otherwise approved in advance in writing. You may use the Discover Program marks only to promote the services covered by the Discover Program Marks by using them on decals, indoor and outdoor signs, advertising materials and marketing materials; provided that all such uses by you must be approved in advance in writing. You shall not use the Discover Program Marks in such a way that customers could believe that the products or services offered by you are sponsored or guaranteed by the owners of the Discover Program Marks. You recognize that you have no ownership rights in the Discover Program Marks and shall not assign to any third party any of the rights to use the Discover Program Marks.

C. _Confidentiality._ i. Cardholder Information. You will not disclose to any third party Cardholders' account information or other personal information except to an agent of yours assisting in completing a Card transaction, or as required by law. You must destroy all material containing Cardholders' account numbers, Card imprints, Sales Drafts, credit vouchers and (except for Sales Drafts maintained in accordance with this Agreement, Laws, and the Rules). Further, you must take all steps reasonably necessary to ensure Cardholder information is not disclosed or otherwise misused. ii. Prohibitions. You will not use for your own purposes, will not disclose to any third party, and will retain in strictest confidence all information and data belonging to or relating to the business of EVO and Bank (including without limitation the terms of this Agreement), and will safeguard such information and data by using the same degree of care that you use to protect your own confidential information. iii. Disclosure. You authorize EVO and Bank to disclose your name and address to any third party who requests such information or otherwise has a reason to know such information.

D. _Return to Bank._ All promotional materials, advertising displays, emblems, Sales Drafts, credit memoranda and other forms supplied to you and not purchased by you or consumed in use will remain the property of EVO and Bank and will be immediately returned to EVO upon termination of this Agreement. You will be fully liable for all loss, cost, and expense suffered or incurred by EVO and Bank arising out of the failure to return or destroy such materials following termination.

**16. General Provisions.**

A. _Entire Agreement._ This Agreement as amended from time to time, including the Rules and the completed Merchant Application, all of which are incorporated into this Agreement, constitute the entire agreement among the four parties hereto (other than any prior agreements to which Merchant is not a party), and all prior or other agreements to which Merchant is a party or representations, written or oral, made to Merchant are superseded. This Agreement may be signed in one or more counterparts, all of which, taken together, will constitute one agreement.

B. _Exclusivity._ During the initial and any renewal term of this Agreement, you will not enter into an agreement with any other entity that provides credit card or debit card processing services similar to those provided by EVO and Bank as contemplated by this Agreement without EVO and Bank's written consent.

C. _Construction._ The headings used in this Agreement are inserted for convenience only and will not affect the interpretation of any provision. The language used will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party. Any alteration or strikeover in the text of this pre-printed Agreement will have no binding effect, and will not be deemed to amend this Agreement. This Agreement may be executed by facsimile, and facsimile copies of signatures to this Agreement shall be deemed to be originals and may be relied on to the same extent as the originals.

D. _Assignability._ This Agreement may be assigned by EVO or Bank but may not be assigned by Merchant directly or by operation of law, without the prior written consent of EVO and Bank. Any such assignment in breach of this provision shall be null and void, ab initio. If Merchant nevertheless assigns this Agreement without the consent of EVO and Bank, the Agreement shall be binding upon the assignee. Bank will be immediately informed in writing of any such assignment.

E. _Notices._ Any written notice under this Agreement will be deemed received upon the earlier of: (i) actual receipt or (ii) five calendar days after being deposited in the United States mail, and addressed to the last address shown on the records of the sender.

**MEMBER BANK INFORMATION**
Deutsche Bank AG, c/o Deutsche Card Services GmbH
Kaltenbornweg 1-3
50679 Cologne, Germany

+49 221 99677 777          support.deucs@db.com

Debit sponsorship provided by either Wells Fargo Bank N.A. or JP Morgan Chase N.A., as applicable.

F. _Bankruptcy._ You will immediately notify EVO and Bank of any bankruptcy, receivership, insolvency or similar action or proceeding initiated by or against Merchant or any of its principals and (ii) if it could be reasonably expected that any such action or proceeding will be initiated by or against Merchant or any of its principals. You will include EVO and Bank on the list and matrix of creditors as filed with the Bankruptcy Court whether or not a claim may exist at the time of filing. Failure to comply with either of these requirements will be cause for immediate termination or any other action available to EVO and Bank under applicable Rules or Law.

G. _Choice of Law/Attorney's Fees/Venue/Jury Trial Waiver._ Should it be necessary for EVO or Bank to defend or enforce any of its rights under this Agreement in any collection or legal action, you agree to reimburse EVO and/or Bank, or any agent acting on their behalf, as applicable, for all costs and expenses including reasonable attorney's fees, as a result of such collection or legal action. Without limiting the generality of the foregoing, Merchant agrees to reimburse EVO and/or Bank, as applicable, for all costs and expenses, including reasonable attorney's fees, incurred by EVO and/or Bank or their agent in any action arising out of, relating to, or in connection with this Agreement, without regard to whether there has been an adjudication on the merits in any such action. You waive trial by jury with respect to any litigation arising out of, relating to, or in connection with this Agreement. EVO, Bank, you, and Guarantor agree that any and all disputes or controversies of any nature whatsoever (whether in contract, tort or otherwise) arising out of, relating to, or in connection with (i) this Agreement, (ii) the relationships which result from this Agreement, or (iii) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Agreement, shall be governed by the laws of the State of New York, notwithstanding any conflicts of laws rules (other than NY General Obligations Law Section 5-1401), and shall be resolved, on an individual basis without resort to any form of class action and not consolidated with the claims of any other parties. EVO, Bank, you, and Guarantor agree that all actions arising out of, relating to, or in connection with (a) this Agreement, (b) the relationships which result from this Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Agreement shall only be brought in either the courts for the State of New York sitting in Suffolk County or in the United States District Court for the Eastern District of New York, and hereby irrevocably and unconditionally submit to the personal jurisdiction of those courts in any such action.

H. _Amendments._ EVO will notify you on your monthly statement of any new or increased fees. Except for any fee increases imposed by Visa, MasterCard, Discover, or the debit network, you may cancel the Agreement without charge if you object to the fee changes in writing within 30 days. If you do not object, and continue to process for 30 days after receiving notice of the fee change, you will be deemed to assent to the new fees.

I. _Severability and Waiver._ If any provision of this Agreement is illegal, the invalidity of that provision will not affect any of the remaining provisions and this Agreement will be construed as if the illegal provision is not contained in the Agreement. Neither the failure nor delay by EVO or Bank to exercise, or partial exercise of, any right under this Agreement will operate as a waiver or estoppel of such right, nor shall it amend this Agreement. All waivers must be signed by the waiving party.

J. _Independent Contractors._ EVO, Bank and Merchant will be deemed independent contractors and will not be considered agent, joint venture or partner of the other, except as provided in 6.C and 7.A(ii).

K. _Employee Actions._ You are responsible for your employees' actions while in your employment.

L. _Survival._ Sections 4.A, 4.B, 6, 7, 8, 9, 13.C, 15, and 16.G will survive termination of this Agreement.

**17. Electronic Signatures.**

Under the Electronic Signatures in Global and National Commerce Act ("E-Sign"), this Agreement and all electronically executed documents related hereto are legally binding in the same manner as are hard copy documents executed by hand signature when: (a) your electronic signature is associated with the Agreement and related documents, (b) you consent and intend to be bound by the Agreement and related documents, and (c) the Agreement is delivered in an electronic record capable of retention by the recipient at the time of receipt (i.e., print or otherwise store the electronic record). This Agreement and all related electronic documents shall be governed by the provisions of E-Sign. By pressing Submit, you agree: (i) that the Agreement and related documents shall be effective by electronic means, (ii) to be bound by the terms and conditions of this Agreement and related documents, (iii) that you have the ability to print or otherwise store the Agreement and related documents, and (iv) to authorized EVO or Bank to conduct an investigation of your credit history with various credit reporting and credit bureau agencies for the sole purpose of determining the approval of the applicant for merchant status or equipment leasing. The information is kept strictly confidential and will not be released.

28134 27
Rcig 8 qh 8

DOJ-EDNY-0019921

```
From:      larby@angryelephantmarketing.com

Sent:      Wed Oct 9 2013 17:00:19 -0400

To:        Danielle Kaufman <danielle@angryelephantmarketing.com>

Cc:        Mike S (Google Drive) <mike@rs2media.com>, Dane H <dane@rs2media.com>, Paula Warnstedt (Google Drive)
           <paula@angryelephantmarketing.com>

Subject:   Reserve project
```

Hi Dani,

This is a big project with a lot of calling and will become part of weekly work. It's mostly follow ups and coordination so organization is key.

Below are closed accounts. You can see the processor, agent, mid numbers etc.

What we want to do is the following:

- Call the Processor (not agent) and confirm the accounts are closed. If not, ask what they need to close them paperwork wise .
- Request for a reserve ledger/balance of the reserve detailing funds held and any fee's etc.
- We will request for a partial release of funds and a release schedule for when the reserve will be paid back.
- We will call every week about this (the more annoying we are the faster we get paid).  Put it on a google doc last time contacted and status so you can always know where you're at and just edit it when you make the call or whatever you do. That is what I would do otherwise you will forget who you contacted last etc.
- Email the agents for the respective accounts about the inquiries you're making and the questions you're asking them to help facilitate getting releases.
- Ensure Paula has statements for all of these accounts lifetime for reconciliation… For each account if we don't reconcile it they can potentially screw us over on reserve money if they are lying about what's being held so make sure Paula has everything. Once they give us a reserve amount/ledger we will see if we think it's accurate based on the statements etc.
- For the processors : Intelligent Contacts and AMS don't worry about anything i will handle those.
- When you call in say you do operations… if they need to speak to the signer coordinate that or ask if the signer can email authorization from the corporate account and just email off saying you are authorized to discuss the accounts.
- These types of calls are tricky. They will try to avoid you and we need to kiss their ass be annoying in order to get funds released etc. if an account is left 'open' accidentally  and we think it's closed the  6 month window only increases further. Basically if you think they're being shady they are. Just stay on top and follow up DAILY till you have the answers for the respective accounts. This means emailing them, calling etc. Once you have the answers follow up every week  or other week depending on the situation to just try and get funds released quicker.
- The goal is to get funds released (some is better then nothing and to stay on top of them till every dollar is released) it might take 6+ months to get everything from everyone. Some will release quickly some will be difficult to deal with. Ultimately, we want to ensure they are not screwing us over on the amount so reconciliation is important so if we do have to wait we at least know the amount is correct. We show about 1M in reserve just in the closed accounts.

Thanks, (below is the list). Ask any questions you have...

| **Closed Accounts** | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Nicey Mid Name | Company | Processor | Agent | Acquiring Bank Name | Mid Number | Nicey YTD Volume | Nicey YTD Refunds | Projecte Reserve i $$ |
| Cynergy (maesuppcom) | Flare | Cynergy | Steve/ Jaclyn | Harris | 3899000002380170 | $0.00 | $0.00 | $2,008.0 |
| flareic (6/20/13) | Flare | Intelligent Contacts | Chirs Carr | HSBC | 8788152000134 | $170,059.00 | ($13,078.29) | $20,045.7 |
| NETPAY Flare (6/27/13) | Flare | NETPAY | Jimmy Shin | Wells Fargo | 498232436887 | $64,801.21 | ($5,155.40) | ($1,877.4 |
| Flare Education PowerPay | Flare | Powerpay | P2 | Deutche Bank | 27150312326401 | $160,721.55 | ($17,086.20) | $18,225.5 |
| FOCUSIC (6/20/13) | Focus Learning | Intelligent Contacts | Chirs Carr | HSBC | 8788152000133 | $171,707.31 | ($16,470.14) | $18,145.3 |
| FOCUSLEARNING | Focus Learning | Signature | Chirs Carr | Merrick Bank | 461074230309940 | $57,877.84 | ($3,273.16) | $35,877.9 |
| NETPAY (6/17/13) | Focus Learning | NETPAY | Jimmy Shin | Wells Fargo | 498232447884 | $99,525.79 | ($8,154.12) | $72,644.9 |
| AUCTIONHB | Focus Learning | HBMS | P2 | Harris | 897200583887 | $74,389.61 | ($5,638.70) | $48,343.7 |
| AUCTIONTRAFFICDPS | Focus Learning | DPS | P2 | Deutche Bank | 27350013943401 | $184,906.11 | ($17,440.57) | $34,153.4 |
| FOCUS AMS (6/17/13) | Focus Learning | AMS | Jimmy Shin | Wells Fargo | 518089320407745 | $155,721.92 | ($16,453.26) | $68,168.6 |
| FOCUS AUCSUPPCOM (6/27/13) | Focus Learning | First Pay Solutions | P2 | West America | 3899000002399790 | $4,259.97 | ($297.00) | $2,481.8 |
| FOCUS LEARNING POWERPAY | Focus Learning | PowerPay | Jimmy Shin | Deutche Bank | 271503123736 | $328,706.38 | ($35,636.90) | $65,820.1 |
| INFUSEIC (6/20/13) | Infuse Media | Intelligent Contacts | Chirs Carr | HSBC | 8788152000132 | $163,278.24 | ($12,921.68) | $20,450.3 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| INFUSEMEDIA1 (NMI) | Infuse Media | Select | P2 | Mission Valley Bank | 554135021200431 | $92,700.79 | ($11,400.29) | $38,187.6 |
| INFUSEMEDIAAMS1 | Infuse Media | AMS | Jimmy Shin | Wells Fargo | 518089320407992 | $117,403.28 | ($17,011.96) | $32,341.4 |
| SPACE-NMA-8/20 | Infuse Media | NMA | Chirs Carr | Wells Fargo | 542623330401837 | $8,574.34 | ($617.70) | $8,932.7 |
| JUMPIC (6/20/13) | Jump | Intellegent Contacts | Chirs Carr | HSBC | 8788152000131 | $69,937.22 | ($6,252.71) | $38,834.4 |
| NETPAY (6/20/13) | Jump | NETPAY | Jimmy Shin | Wells Fargo | 498233619887 | $34,290.61 | ($2,790.34) | $28,416.4 |
| JUMPSIGNATURE | Jump | Signature | Chirs Carr | Merrick Bank | 461074230309783 | $208,824.15 | ($19,626.39) | $60,970.5 |
| LEARNAUCTIONS101MERITUS | Orange Learning | Meritus | P2 | Wells Fargo | 510159390820256 | $39,988.68 | ($1,801.31) | $12,472.3 |
| LearningAuctions101 lm | Orange Learning | IRN | Alan Cohen | First California Bank | 720000319452 | $294,181.38 | ($17,876.40) | $80,107.1 |
| ORANGEIC (6/20/13) | Orange Learning | Intellegent Contacts | Chirs Carr | HSBC | 8788152000129 | $169,211.98 | ($15,844.97) | $19,867.6 |
| ORANGELEARNINGLLC5 | Orange Learning | AMS | Jimmy Shin | Wells Fargo | 518089320406986 | $165,205.67 | ($11,291.94) | $39,420.9 |
| AUCTIONMASTERHUMBOLDT | Propel | Humboldt | P2 | Harris | 897200445889 | $5,563.04 | ($350.95) | $1,329.6 |
| NETPAY SPARK (6/20/13) | Spark | NETPAY | Jimmy Shin | Wells Fargo | 498233631882 | $65,684.97 | ($4,170.70) | $60,622.0 |
| SPARKIC (6/20/13) | Spark | Intellegent Contacts | Chirs Carr | HSBC | 8788152000130 | $60,543.73 | ($5,872.85) | $34,842.1 |
| Rapid-NMA-8/21 | Starter Media | NMA | Chirs Carr | Wells Fargo | 542623350401444 | $67,853.55 | ($4,501.20) | $63,352.3 |
| Starter-NMA-8/20 | Starter Media | NMA | Chirs Carr | Wells Fargo | 542623350401436 | $68,614.11 | ($5,581.54) | $63,032.5 |



Luke Williams <luke@blackout.dev>

# Signed Plea Agreement

3 messages

**Larby Amirouche** <larby@blackout.dev>                                    Wed, May 4, 2022 at 5:47 PM
To: Michael Kushner <mk@kushlawgroup.com>
Cc: hadley@emergeinternational.net

Dear Michael,

Thank you for taking the time to explain to me what's happening with the case and how the next few months will go. I'm attaching the signed plea agreement to this email. I have printed out 'the 'information' attaching it to this email as FYI for Hadley. I will be on the Zoom 30 minutes early tomorrow and will wear a suit and tie. I will answer with a simple "Yes, your honor" to everything they ask me. Also, I will read section 1 of the information part is what I understand as to what I did - maybe you can clarify this if I'm misunderstanding. Thank God this worked out the way it did. I was able to improve my life in many ways over the past year and am looking forward to the next chapter of my life (in Poland hopefully by the Fall of this year).

I will email Hadley later (heading to the gym) a summary of everything we talked about so she's in the loop.

Best Regards,

Larby

---

**2 attachments**

 **FILE_3414.pdf**
121K

 **DOJ Signed Larby Amirouche.pdf**
7872K

**Michael Kushner** <mk@kushlawgroup.com>                                    Thu, May 5, 2022 at 8:30 AM
To: Larby Amirouche <larby@blackout.dev>
Cc: Hadley Rose <hadley@emergeinternational.net>

Thanks.  We have to formally sign a waiver of indictment as I explained to you yesterday.  I attach a copy to this email. Can you electronically sign it?

Best Regards,

Michael P. Kushner, Esq.

Kushner Law Group, PLLC
16 Court Street, 36th Floor
Brooklyn, New York 11241

tel. 718.504.1440
fax. 718.504.4630
cel. 917.599.6117

_____

STATEMENT OF CONFIDENTIALITY:  This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may include privileged or otherwise confidential information. Any unauthorized review, forwarding, printing, copying, use, disclosure or distribution is strictly prohibited and may be unlawful. If you received this message in

error, or have reason to believe you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

[Quoted text hidden]

 **Amirouche.Waiver of Indictment copy.pdf**
41K

---

**Larby Amirouche** <larby@blackout.dev>                                              Thu, May 5, 2022 at 8:43 AM
To: Michael Kushner <mk@kushlawgroup.com>
Cc: Hadley Rose <hadley@emergeinternational.net>

Dear Michael,

Here's the signed waiver.

Best Regards,

Larby

[Quoted text hidden]

 **Amirouche Signed Waiver.pdf**
526K

U.S.D.J. KIYO A. MATSUMOTO   TIME: 10:00 a.m. - 11:00 a.m.   DATE: 5/5/2022

## CRIMINAL CAUSE FOR PLEADING VIA VIDEO REMOTE

USA - V. AMIROUCHE                                     Docket No.: 21-CR- 64 [KAM]

Defendant: **Larby Amirouche**

__X__ present      _____ not present         __ ☐ custody    **X** bail

Def. Counsel: **Michael Peter Kushner**

__X__ present    __ not present    **X** Retained      __(CJA)         _____Federal Defender

AUSA: **David Pitluck**      Deputy: **S. Jackson**      C./ R: **Linda Danelczyk**

| | |
|---|---|
| **X** | Case Called |
| **X** | Defendant's First Appearance |
| **X** | Defendant: **X** |

NO ARRAIGNMENT OR INITIAL APPEARANCE IMPOSSIBLE
SEQUENCE OF EVENTS VIOLATING ADMIN ORDER 2022-05

**X** Defendant: **X**      Sworn **X**      Arraigned **X**      Informed of Rights **X**

**X** Waiver of Indictment Executed for Defendant

**X** Superseding Indictment/Information Filed

____ Bench Warrant Issued: _____

**X** Defendant Enters Guilty Plea to Count(s) **all** of the **Superseding Information**.

__ Defendant Withdraws Not Guilty Plea and Enters Plea of Guilty to Count(s)___of the Indictment.

**X** Court Finds Factual Basis for the Plea

**X** Sentencing is scheduled for **September 20, 2022 at 10:00a.m.**

_____ Sentencing to be set by Probation

**X** Bail/Bond: ____ Set ____ Continued for Defendant ____ Continued in Custody

____ Case Adjourned to ___/___/___ at _____

**X** Court accepts the Plea of Guilty.

**X** Transcript Ordered

**X** Counsel are advised that they are expected to follow Federal Rule 32 with regard to objections, corrections or comments to the Presentence Report (PSR). Defense counsel must respond to the PSR within two weeks of receipt, the government will respond one week thereafter. PSR objections must directed to the probation officer, but need not be filed via ecf, but must be served on chambers, the parties and probation.

**X** Sentencing motions/submissions (apart from PSR objections) shall be submitted as follows: defendant's submissions shall be filed by **9/1/2022,** and the government shall respond by **9/9/2022,** reply if any, by the defendant, shall be served and filed by **9/15/2022.** The court respectfully request that the parties shall serve chambers with two hard courtesy copies of all sentencing related materials, and one copy served on the probation department.

THIS WAIVER WAS SIGNED PRIOR TO THE HEARING ON 5/5/2022 AFTER BEING PROVIDED FOR THE FIRST TIME APPROXIMATELY 30 MINUTES BEFORE THE HEARING VIOLATING THE "OPEN COURT" REQUIREMENT. PLEA AGREEMENT SIGNED ON 5/4/2022.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT

for the
Eastern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   21-CR-0064 (KAM) |
| LARBY AMIROUCHE | ) | |
| | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year.  I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date:    05/05/2022

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

Michael Kushner, Esq.
*Printed name of defendant's attorney*

_____
*Judge's signature*

Hon. Kiyo A. Matsumoto, U.S.D.J.
*Judge's printed name and title*

NOTICE: This document was provided to Petitioner on May 3, 2022, already pre-signed by the government and pre-dated for May 5, 2022 (future date). Petitioner signed on May 4, 2022, as confirmed by email evidence (Exhibit A)

DG:DCP
F. # 2016R01393

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA                    PLEA AGREEMENT

- against -

LARBY AMIROUCHE,                            21 CR 64 (KAM)

                    Defendant.

– – – – – – – – – – – – – – – – – X

          Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States

Attorney's Office for the Eastern District of New York (the "Office") and LARBY

AMIROUCHE (the "defendant") agree to the following:

         1.     The defendant will waive indictment and plead guilty to a superseding

information to be filed in this district, charging a violation of 18 U.S.C. § 371.  The count carries

the following statutory penalties:

         a.     Maximum term of imprisonment: 5 years
               (18 U.S.C. § 371).

         b.     Minimum term of imprisonment: none
               (18 U.S.C. § 371).

         c.     Maximum supervised release term: 3 years, to follow any term of
               imprisonment; if a condition of release is violated, the defendant
               may be sentenced to up to 2 years without credit for pre-release
               imprisonment or time previously served on post-release
               supervision
               (18 U.S.C. § 3583 (b) & (e)).

d.      Maximum fine:  Greater of $250,000, or twice the gross gain or twice the gross loss (18 U.S.C. § 3571(b)(2), (b)(3) and (d)).

e.      Restitution:  Mandatory in the full amount of each victim's losses as determined by the Court. (18 U.S.C. §§ 3663A and 3664).

f.      $100 special assessment (18 U.S.C. § 3013).

g.      Other penalties: criminal forfeiture as set forth below in paragraphs 6 through 13 (18 U.S.C. §§ 982(a)(2) and 982(b)(1); 21 U.S.C. § 853(p)).

2.      The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case.  The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence.  See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").  The Office estimates the likely adjusted offense level under the Guidelines to be 32, which is predicated on the following Guidelines calculation:

| | | |
|---|---|---|
| Base Offense Level (§2B1.1(a)(2))) | | 6 |
| Plus: | Loss in excess of $3,500,000 (§ 2B1.1(b)(1)(J)) | +18 |
| Plus: | Offense was committed through mass marketing (§ 2B1.1(b)(2)(a)(ii)) | +2 |

| | | |
|---|---|---|
| Plus: | Sophisticated Means (§ 2B1.1(b)(10)(B)) | +2 |
| Plus: | Organizer or Leader of a Criminal Activity that involved five or more participants (§ 3B1.1(a)) | +<u>4</u> |
| Total: | | <u>32</u> |

If the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 30 and a range of imprisonment of 97 – 121 months, assuming that the defendant falls within Criminal History Category I. However, because of the statutory maximum sentence provided in 18 U.S.C. § 371 for the offense of conviction, the Guidelines range of imprisonment is 60 months. Furthermore, if the defendant has accepted responsibility as described above, to the satisfaction of the Office, and if the defendant pleads guilty on or before 5/5/2022 an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), resulting in an adjusted offense level of 29. This level carries a range of imprisonment of 87 - 108 months, assuming that the defendant falls within Criminal History Category I. However, because of the statutory maximum sentence provided in 18 U.S.C. § 371 for the offense of conviction, the Guidelines range of imprisonment is 60 months. The defendant stipulates to the above Guidelines calculation.

3.    The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

4.    The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the

event that the Court imposes a term of imprisonment of 60 months or below. This waiver is

binding without regard to the sentencing analysis used by the Court. The defendant waives all

defenses based on the statute of limitations and venue with respect to any prosecution that is not

time-barred on the date that this agreement is signed in the event that (a) the defendant's

conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the

defendant's plea is later withdrawn. The defendant further waives the right to raise on appeal or

on collateral review any argument that (1) the statute(s) to which the defendant is pleading guilty

is unconstitutional and (2) the admitted conduct does not fall within the scope of the statute(s).

Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the

defendant from raising a claim of ineffective assistance of counsel in an appropriate forum. The

defendant waives any right to additional disclosure from the government in connection with the

guilty plea. The defendant agrees that with respect to all charges referred to in paragraphs 1 and

5(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. §

3006A note, and will not file any claim under that law. The defendant agrees to pay the special

assessment by check payable to the Clerk of the Court at or before sentencing.

     5.     The Office agrees that:

     a.     no further criminal charges will be brought against the defendant for perpetrating a series of fraudulent internet marketing schemes between January 2012 and August 2016, as alleged in the underlying indictment in the above-captioned matter, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq., and at the time of sentence, it will move to dismiss the underlying indictment with prejudice;

and, based upon information now known to the Office, it will

     b.     take no position concerning where within the Guidelines range determined by the Court the sentence should fall; and

        c.      make no motion for an upward departure under the Sentencing Guidelines.

If information relevant to sentencing, as determined by the Office, becomes known to the Office after the date of this agreement, the Office will not be bound by paragraphs 5(b) and 5(c). Should it be judged by the Office that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including but not limited to: (a) moving for the additional one-level downward adjustment for timely acceptance of responsibility described in paragraph 2 above; and (b) the provisions of paragraphs 5(a)-(c).

      6.      The defendant acknowledges that he obtained and/or acquired property that is subject to forfeiture as a result of his violation of 18 U.S.C. § 371, as alleged in the above-captioned superseding information.  The defendant consents to the entry of a forfeiture money judgment in the amount of one million eight hundred eighty-eight thousand six hundred forty-seven dollars and eighty-nine cents ($1,888,647.89) (the "Forfeiture Money Judgment").  The defendant agrees that the amount of the Forfeiture Money Judgment and any payments toward the Forfeiture Money Judgment represent property constituting, or derived from, proceeds obtained directly or indirectly as a result of his violation of 18 U.S.C. § 371 and/or substitute assets, and thus are forfeitable to the United States pursuant to 18 U.S.C. §§ 982(a)(2) and 982(b)(1), and 21 U.S.C. § 853(p) in any administrative and/or judicial (civil or criminal) proceeding(s) at the Office's exclusive discretion.  The defendant consents to the entry of an Order of Forfeiture, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, imposing the Forfeiture Money Judgment.

      7.      The Forfeiture Money Judgment shall be paid in full 30 days in advance of sentencing (the "Due Date").  All payments made by the defendant toward the Forfeiture Money

Judgment shall be made by money order, certified check and/or official bank check, payable to the "U.S. Department of the Treasury." The defendant shall cause said payment(s) to be sent by overnight mail delivery to Assistant United States Attorney Tanisha R. Payne, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201, with the criminal docket number noted on the face of the instrument. The defendant consents to the restraint of all payments made toward the Forfeiture Money Judgment. The defendant also waives all statutory deadlines, including but not limited to deadlines set forth in 18 U.S.C. § 983.

       8.     If the defendant fails to pay any portion of the Forfeiture Money Judgment on or before the Due Date, the defendant consents to the forfeiture of any other property of his up to the amount of the unpaid Forfeiture Money Judgment, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1), and further agrees that the conditions of 21 U.S.C. § 853(p)(1)(A)-(E) have been met.

       9.     The defendant agrees to fully assist the government in effectuating the payment of the Forfeiture Money Judgment, by among other things, executing any documents necessary to effectuate any transfer of title to the United States. The defendant agrees not to file a claim or petition seeking remission or contesting the forfeiture of any property against which the government seeks to satisfy the Forfeiture Money Judgment in any administrative or judicial (civil or criminal) proceeding. The defendant further agrees not to assist any person or entity in the filing of any claim or petition seeking remission or contesting the forfeiture of any property against which the government seeks to satisfy the Forfeiture Money Judgment in any administrative or judicial (civil or criminal) forfeiture proceeding.

10.    The failure of the defendant to forfeit any monies and/or properties as required under this agreement, including the failure of the defendant to execute any document to accomplish the same on timely notice to do so, may constitute a material breach of this agreement.  Upon such a breach, the defendant will not be entitled to withdraw the plea, but the Office may bring additional criminal charges against the defendant.

11.    The defendant represents that he will disclose all of his assets to the United States on the financial statement entitled "United States Department of Justice Financial Statement" (hereinafter, the "Financial Statement") on or before June 1, 2022 and will provide a copy to Assistant United States Attorney David Pitluck.  The defendant agrees that a failure to disclose all assets on the Financial Statement and to inform the government in writing of any material changes up until the time of sentencing constitutes a material breach of this agreement.  Upon such a breach, the defendant will not be entitled to withdraw the plea, but the Office may bring additional criminal charges against the defendant.  Should undisclosed assets which the defendant owns or in which the defendant has an interest be discovered, the defendant knowingly and voluntarily waives his right to any required notice concerning the forfeiture of said assets and agrees that said assets shall be forfeited to the United States pursuant to 18 U.S.C. §§ 982(a)(2) and 982(b)(1), and 21 U.S.C. § 853(p), as property constituting, or derived from, proceeds obtained directly or indirectly as a result of his violation of 18 U.S.C. § 371 and/or as a substitute asset.

12.    The defendant knowingly and voluntarily waives his right to any required notice concerning the forfeiture of any monies and/or properties forfeited hereunder, including notice set forth in an indictment, information or administrative notice.  In addition, the defendant knowingly and voluntarily waives his right, if any, to a jury trial on the entry of a Forfeiture

Money Judgment, and waives all constitutional, legal and equitable defenses to the forfeiture of said monies and/or properties, including, but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto clause of the Constitution, any applicable statute of limitations, venue, or any defense under the Eighth Amendment, including a claim of excessive fines.

13.     The defendant agrees that the entry and payment of the Forfeiture Money Judgment are not to be considered a payment of a fine, penalty, restitution loss amount, or any income taxes that may be due, and shall survive bankruptcy.

14.     The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is a naturalized citizen of the United States.  Under federal law, an individual may be subject to denaturalization and removal if his naturalization was procured by concealment of a material fact or by willful misrepresentation or otherwise illegally procured.  Denaturalization and other immigration consequences are typically the subject of a separate proceeding, however, and the defendant understands that no one, including the defendant's attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration status.  The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences that the defendant's plea may entail, even if the consequence is the defendant's automatic denaturalization and removal from the United States.

15.     This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

16.     Apart from any written proffer agreements, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. Apart from any written proffer agreements, if applicable, this agreement

supersedes all prior promises, agreements or conditions between the parties.  To become

effective, this agreement must be signed by all signatories listed below.


Dated: Brooklyn, New York

＿＿＿May 5＿＿＿＿＿＿, 2022


                                    BREON PEACE
                                    United States Attorney
                                    Eastern District of New York


                    By:    ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
                                    David C. Pitluck
                                    Assistant United States Attorney


                                    Approved by:

                                    *David Gopstein*
                                    ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
                                    Supervising Assistant U.S. Attorney


I have read the entire agreement and discussed it with my attorney.  I understand all of its terms
and am entering into it knowingly and voluntarily.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
LARBY AMIROUCHE
Defendant


Approved by:


＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Michael Kushner, Esq.
Counsel to Defendant


                                    10

[13] Pursuant to Administrative Order 2020-26, as amended by Administrative Orders 2020-26-1, 2021-04, and 2021-04-1, and as recently extended by Administrative Order 2022-04, and for the reasons stated therein, this Court has suspended through March 31, 2022, in-person proceedings other than criminal and civil jury selections, trials, and bench trials; the selections of new grand juries and replacement grand jurors; and criminal hearings, conferences, sentencings, and change of plea hearings. In-person proceedings that remain suspended pursuant to Administrative Order 2020-26, as amended, include all civil proceedings other than those mentioned. The Court resumed in-person arraignments, detention hearings, preliminary hearings, and pre-indictment proceedings on March 14, 2022.



**Luke Williams <luke@blackout.dev>**

---

## Larby Touching base
9 messages

---

**Larby Amirouche <larby@blackout.dev>**                                    Wed, Apr 14, 2021 at 11:30 AM
To: Michael Kushner <mk@kushlawgroup.com>

Dear Michael,

I'm reaching out to let you know that I'm out of the hospital and everything is ok. I was wondering if there was anything pending you may be needing from me related to the case or otherwise. Please let me know at your earliest convenience. Thank you for your time and your support.

Best regards,

Larby

---

**Michael Kushner <mk@kushlawgroup.com>**                                    Tue, Apr 20, 2021 at 9:12 AM
To: Larby Amirouche <larby@blackout.dev>

Larby - can you contact me please. I am trying to reach you by phone but your phone hasn't been working properly.


Best Regards,


Michael P. Kushner, Esq.

Kushner Law Group, PLLC
16 Court Street, 36th Floor
Brooklyn, New York 11241

tel. 718.504.1440
fax. 718.504.4630
cel. 917.599.6117
_____

STATEMENT OF CONFIDENTIALITY: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may include privileged or otherwise confidential information. Any unauthorized review, forwarding, printing, copying, use, disclosure or distribution is strictly prohibited and may be unlawful. If you received this message in error, or have reason to believe you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

[Quoted text hidden]

---

**Larby Amirouche <larby@blackout.dev>**                                    Tue, Apr 20, 2021 at 5:32 PM
To: Michael Kushner <mk@kushlawgroup.com>, "hadley@emergeinternational.net" <hadley@emergeinternational.net>

Dear Michael,

I just remembered this that in 2016, I was not conducting any business, at all, other than with an investor which started in approximately March of 2016 which was selling flashlights (very clean business and unrelated to this case for sure). The group I was working with also stole and sold a car before February of 2016 to the Montagana crime family (Bonanno). There is an audio recording I provided to Hadley where an individual named Kyle Milliken lists all of the likely co-conspirators as being involved in a conspiracy to metaphorically kill me. I believe this information should be helpful due to

the 5 year statute of limitations as it's 2021 and if I conducted zero business (not even one customer) and the group was actively working together to mess me up and working without my involvement it may be helpful in some way to fight this case.

My thoughts are maybe at least some of the charges would be past the the five year mark. It's possible that the Government believes some of the companies involved in the 2016 business that was conducted belonged to me. The group was working without me from at least Fall of 2015 as there were companies formed running traffic to similar websites that had domains using the address of AJ in Miami as the original registration contact. (You can see this info with tools like domaintools.com a premium service for domainers that archives domain history). I don't remember the domains off hand though but could probably definitely say once I see the list of the companies which ones that I have absolutely no connection to.

Please absorb this and let me know what you think. If you don't think this will matter or isn't helpful you can just let me know. I'm thinking this case must have been sitting around and they decided to push it forward after seeing I was living in Illinois and had gotten my expired license and a passport updated. Maybe it's already past the 5 years and we have a chance at dismissal.

Best Regards,

Larby

[Quoted text hidden]

---

**Larby Amirouche** <larby@blackout.dev>                                      Tue, Apr 20, 2021 at 5:45 PM
To: Michael Kushner <mk@kushlawgroup.com>, "hadley@emergeinternational.net" <hadley@emergeinternational.net>

To be clear, it was a Mclaren MP4-12C that my company Purple Donkey owned. On the call recording, Kyle says, (after discussing AJ and Nathan stealing and selling the car while on special felony probation) that they sold it to one of the biggest drug dealers in Miami, one of AJs friends, that I later linked to the Montagana crime family. My neighbor, a Lt. Cmdr In the US Navy told me I likely stumbled on something and the State may offer me a care package to not speak about it. My lawyer in Miami asked me if I wanted to get myself killed (by blabbing about it).

[Quoted text hidden]

---

**Michael Kushner** <mk@kushlawgroup.com>                                      Wed, Apr 21, 2021 at 9:39 AM
To: Larby Amirouche <larby@blackout.dev>
Cc: "hadley@emergeinternational.net" <hadley@emergeinternational.net>

Thanks. I will review this along with the discovery as we move forward and process its impact.  Thanks!

Best Regards,


Michael P. Kushner, Esq.

Kushner Law Group, PLLC
16 Court Street, 36th Floor
Brooklyn, New York 11241

tel. 718.504.1440
fax. 718.504.4630
cel. 917.599.6117

_____

STATEMENT OF CONFIDENTIALITY:  This e-mail message, including any
attachments, is for the sole use of the intended recipient(s) and may
include privileged or otherwise confidential information. Any unauthorized
review, forwarding, printing, copying, use, disclosure or distribution is
strictly prohibited and may be unlawful. If you received this message in
error, or have reason to believe you are not the intended recipient, please
contact the sender by reply e-mail and destroy all copies of the original
message.

[Quoted text hidden]



April 25, 2022

**By ECF**

Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Larby Amirouche
               Criminal Docket 21-cr-0064-KAM

Your Honor,

      I represent the Defendant in connection with the above-referenced matter. I write to respectfully request an adjournment of the status conference, currently scheduled for April 26, 2022. The Defendant has accepted the Government's plea offer and the parties would request that the Court schedule a change of plea hearing. The parties would request that the matter be scheduled for May 5, 2022 at 10:00 a.m. A virtual appearance for the change of plea hearing is requested because Mr. Amirouche resides in Chicago and I recently tested positive for COVID 19 and will still be within the exclusion period for entering the Courthouse during the proposed date. Pursuant to Administrative Order No. 2022-05, the remote acceptance of Felony Pleas is still authorized in particular cases where the Court determines it is appropriate. The parties would further respectfully request that the Court issue an Order of Excludable Delay in this case until the date that the Court sets for the change of plea hearing. AUSA David Pitluck consents to this request.

                    Respectfully submitted,

                    Michael P. Kushner, Esq.

Cc:    AUSA David C. Pitluck (By ECF)

 **AT&T**

*...630.632.2193 continued*

**APRIL 2022 ONLY CALL WITH MICHAEL KUSHNER IS ON 4/22 FOR 6 MINUTES AFTER ~196 DAYS ABSOLUTLEY NO PHONE/VIDEO COMMUNICATION. AFTER 6 MINUTE CALL. DAYS LATER. HE INFORMS THE COURT THAT MR. WILLIAMS HAS AGRRED TO THE PLEA AND A REMOTE HEARING DESPITE TEXTS SHOWING HE IS WAITING TO DISCUSS THE PLEA. AND FACT THE PLEA HAS NEVER BEEN SHARED WITH MR. WILLIAMS - MR. WILLIAMS NEVER AGREED TO EITHER.**

| Time | Place Called | Number Called | Rate Code | | | |
|---|---|---|---|---|---|---|
| *Thursday, Apr 21* | | | | | | |
| 11:55am | RIVERG IL | 708.456.9122 | WIFI | | | |
| 11:58am | CHICAG IL | 773.271.7156 | WIFI | | | |
| 02:55pm | EULESS TX | 817.868.2300 | WIFI | | | |
| 03:42pm | DETROI MI | 313.736.5411 | WIFI | 16 | $0.00 | $0.00 |
| 04:43pm | INCOMI CL | 773.271.7156 | WIFI | 1 | $0.00 | $0.00 |
| 05:45pm | Toll F CL | 866.674.4313 | WIFI | 1 | $0.00 | $0.00 |
| *Friday, Apr 22* | | | | | | |
| 10:45am | DETROI MI | 313.736.5411 | WIFI | 1 | $0.00 | $0.00 |
| 10:58am | HALF D IL | 847.383.4870 | WIFI | 3 | $0.00 | $0.00 |
| 11:01am | CHICAG IL | 312.886.3506 | WIFI | 2 | $0.00 | $0.00 |
| 12:06pm | CHICAG IL | 312.353.4952 | WIFI | 1 | $0.00 | $0.00 |
| 12:16pm | Toll F CL | 866.674.4313 | WIFI | 1 | $0.00 | $0.00 |
| 12:52pm | ROSELL IL | 630.284.9661 | WIFI | 1 | $0.00 | $0.00 |
| 12:56pm | Toll F CL | 800.366.6303 | WIFI | 1 | $0.00 | $0.00 |
| 12:57pm | Toll F CL | 800.366.6303 | WIFI | 1 | $0.00 | $0.00 |
| 01:06pm | Toll F CL | 800.366.6303 | WIFI | 2 | $0.00 | $0.00 |
| 01:10pm | INCOMI CL | 202.870.9336 | WIFI | 6 | $0.00 | $0.00 |
| 01:19pm | INCOMI CL | 800.366.6303 | SDDV | 15 | $0.00 | $0.00 |
| 02:58pm | QUEENS NY | 917.599.6117 | SDDV | 6 | $0.00 | $0.00 |

**THIS IS THE CALL**

| Time | Place Called | Number Called | Rate Code | | | |
|---|---|---|---|---|---|---|
| *Saturday, Apr 23* | | | | | | |
| 03:10pm | INCOMI CL | 800.366.6303 | WIFI | 16 | $0.00 | $0.00 |
| 08:10pm | INCOMI CL | 312.550.6026 | WIFI | 64 | $0.00 | $0.00 |
| *Sunday, Apr 24* | | | | | | |
| 05:09pm | INCOMI CL | 224.392.3935 | WIFI | 3 | $0.00 | $0.00 |
| *Monday, Apr 25* | | | | | | |
| 10:51am | Toll F CL | 866.674.4313 | WIFI | 1 | $0.00 | $0.00 |
| *Tuesday, Apr 26* | | | | | | |
| 11:00am | Toll F CL | 866.674.4313 | WIFI | 1 | $0.00 | $0.00 |
| 05:57pm | EULESS TX | 817.868.2300 | WIFI | 2 | $0.00 | $0.00 |
| 07:06pm | INCOMI CL | 224.328.5135 | WIFI | 1 | $0.00 | $0.00 |
| *Wednesday, Apr 27* | | | | | | |
| 12:27pm | EULESS TX | 817.868.2300 | SDDV | 1 | $0.00 | $0.00 |
| *Thursday, Apr 28* | | | | | | |
| 10:43am | Toll F CL | 866.674.4313 | WIFI | 1 | $0.00 | $0.00 |
| 12:14pm | EULESS TX | 817.868.2300 | WIFI | 2 | $0.00 | $0.00 |
| 12:24pm | INCOMI CL | 800.366.6303 | WIFI | 21 | $0.00 | $0.00 |
| *Friday, Apr 29* | | | | | | |
| 09:32am | Toll F CL | 866.674.4313 | WIFI | 1 | $0.00 | $0.00 |
| 03:38pm | Toll F CL | 833.853.5638 | WIFI | 11 | $0.00 | $0.00 |
| 04:13pm | EULESS TX | 817.868.2300 | WIFI | 3 | $0.00 | $0.00 |
| 06:01pm | INCOMI CL | 312.550.6026 | WIFI | 65 | $0.00 | $0.00 |
| *Saturday, Apr 30* | | | | | | |
| 12:49pm | Toll F CL | 833.853.5638 | WIFI | 10 | $0.00 | $0.00 |
| *Sunday, May 01* | | | | | | |
| 02:05pm | INCOMI CL | 630.284.9661 | WIFI | 1 | $0.00 | $0.00 |
| **Total for Call Detail** | | | | 775 | $0.00 | $0.00 |

**Rate code:**
SDDV = Plan minutes
WIFI = Call over Wi-Fi
**Feature code:**
CW = Call Waiting

*630.632.2193 continues...*

**Data Detail**

| Time | To/From | Type/Unit | Rate Code | Charges |
|---|---|---|---|---|
| **Text Messages** | | | | |
| *Monday, Apr 04* | | | | |
| 01:36pm Rcvd | 903.420.9782 | Text Message | UNLMSG | $0.00 |
| 02:19pm Rcvd | 93557 | Text Message | UNLMSG | $0.00 |
| 05:03pm Rcvd | 93557 | Text Message | UNLMSG | $0.00 |
| 05:07pm Rcvd | 93557 | Text Message | UNLMSG | $0.00 |
| *Tuesday, Apr 05* | | | | |
| 09:05am Rcvd | 320.321.7795 | Text Message | UNLMSG | $0.00 |
| 10:20am Rcvd | 929.514.1339 | Text Message | UNLMSG | $0.00 |
| 10:20am Rcvd | 929.514.1339 | Text Message | UNLMSG | $0.00 |
| 10:20am Rcvd | 929.514.1339 | Text Message | UNLMSG | $0.00 |
| 10:20am Rcvd | 929.514.1339 | Text Message | UNLMSG | $0.00 |
| 11:32am Rcvd | 88811 | Text Message | UNLMSG | $0.00 |
| 01:19pm Rcvd | 86753 | Text Message | UNLMSG | $0.00 |
| 02:00pm Rcvd | 25392 | Text Message | UNLMSG | $0.00 |
| 03:17pm Rcvd | 779.246.3362 | Text Message | UNLMSG | $0.00 |
| *Wednesday, Apr 06* | | | | |
| 08:01am Rcvd | 561.709.3627 | Text Message | UNLMSG | $0.00 |
| 10:18am Rcvd | 313.487.7621 | Text Message | UNLMSG | $0.00 |
| 10:27am Rcvd | 929.514.1787 | Text Message | UNLMSG | $0.00 |
| 10:27am Rcvd | 929.514.1787 | Text Message | UNLMSG | $0.00 |
| 10:27am Rcvd | 929.514.1787 | Text Message | UNLMSG | $0.00 |
| 10:27am Rcvd | 929.514.1787 | Text Message | UNLMSG | $0.00 |
| 11:27am Rcvd | 88811 | Text Message | UNLMSG | $0.00 |
| 11:51am Rcvd | 88811 | Text Message | UNLMSG | $0.00 |
| 02:38pm Rcvd | 725.288.2283 | Text Message | UNLMSG | $0.00 |
| 02:44pm Rcvd | 323.709.8799 | Text Message | UNLMSG | $0.00 |
| 07:33pm Sent | 847.220.1153 | Text Message | UNLMSG | $0.00 |
| *Thursday, Apr 07* | | | | |
| 03:08am Rcvd | louizamilof80 | Text Message | UNLMSG | $0.00 |
| 10:30am Rcvd | 909.698.5823 | Text Message | UNLMSG | $0.00 |
| 10:39am Rcvd | 855.209.0634 | Text Message | UNLMSG | $0.00 |
| 02:24pm Rcvd | 262.558.4277 | Text Message | UNLMSG | $0.00 |
| *Friday, Apr 08* | | | | |
| 02:13pm Sent | 224.563.8538 | Text Message | UNLMSG | $0.00 |
| 05:23pm Rcvd | 833.658.0781 | Text Message | UNLMSG | $0.00 |
| 07:31pm Rcvd | 224.563.8538 | Text Message | UNLMSG | $0.00 |
| *Saturday, Apr 09* | | | | |
| 02:31pm Rcvd | 571.520.7267 | Text Message | UNLMSG | $0.00 |
| 03:01pm Sent | 224.563.8538 | Text Message | UNLMSG | $0.00 |
| 03:57pm Rcvd | 530.564.8708 | Text Message | UNLMSG | $0.00 |
| *Monday, Apr 11* | | | | |
| 12:14am Sent | 847.220.1153 | Text Message | UNLMSG | $0.00 |
| 09:35am Rcvd | skell@kitchen | Text Message | UNLMSG | $0.00 |
| 04:09pm Rcvd | 631.201.5193 | Text Message | UNLMSG | $0.00 |
| 04:09pm Rcvd | 631.201.5193 | Text Message | UNLMSG | $0.00 |
| 05:20pm Rcvd | 64556 | Text Message | UNLMSG | $0.00 |
| 11:13pm Sent | 847.494.1241 | Text Message | UNLMSG | $0.00 |
| *Tuesday, Apr 12* | | | | |
| 09:28am Sent | 872.266.9702 | Text Message | UNLMSG | $0.00 |
| 09:43am Rcvd | 872.266.9702 | Text Message | UNLMSG | $0.00 |
| 09:43am Rcvd | 872.266.9702 | Text Message | UNLMSG | $0.00 |
| 09:51am Sent | 872.266.9702 | Text Message | UNLMSG | $0.00 |
| 10:01am Rcvd | 872.266.9702 | Text Message | UNLMSG | $0.00 |
| 10:24am Sent | 847.220.1153 | Text Message | UNLMSG | $0.00 |
| 10:45am Rcvd | 808.431.0960 | Text Message | UNLMSG | $0.00 |



| | | | |
|---|---|---|---|
| Page: | A1 of A5 |
| Issue Date: | May 01, 2022 |
| Account Number: | 287309251403 |
| Foundation Account: | 60354748 |
| Invoice: | 287309251403X05092022 |

## Your detailed usage

### Wireless, 630.632.2193
STARLIGHT GROUP INC.

#### Call Detail

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Addl Charges |
|---|---|---|---|---|---|---|---|
| *Monday, Apr 04* | | | | | | | |
| 09:54am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 05:41pm | Toll F CL | 800.225.5935 | WIFI | | 15 | $0.00 | $0.00 |
| *Tuesday, Apr 05* | | | | | | | |
| 09:03am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 01:55pm | Toll F CL | 877.875.4347 | WIFI | | 6 | $0.00 | $0.00 |
| 02:56pm | Toll F CL | 888.233.2302 | WIFI | | 19 | $0.00 | $0.00 |
| *Wednesday, Apr 06* | | | | | | | |
| 09:43am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 12:39pm | CHICAG IL | 312.353.4528 | WIFI | | 20 | $0.00 | $0.00 |
| 01:27pm | HALF D IL | 847.383.4870 | WIFI | | 12 | $0.00 | $0.00 |
| 02:01pm | Toll F CL | 833.853.5638 | WIFI | | 19 | $0.00 | $0.00 |
| 02:21pm | EULESS TX | 817.868.2300 | WIFI | | 3 | $0.00 | $0.00 |
| 02:29pm | EULESS TX | 817.868.2300 | WIFI | | 9 | $0.00 | $0.00 |
| 03:30pm | INCOMI CL | 312.550.6026 | WIFI | | 15 | $0.00 | $0.00 |
| 03:44pm | CALL WAIT | 800.366.6303 | WIFI | CW | 3 | $0.00 | $0.00 |
| 06:22pm | Toll F CL | 833.853.5638 | WIFI | | 5 | $0.00 | $0.00 |
| *Thursday, Apr 07* | | | | | | | |
| 09:52am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 04:59pm | AMBLER PA | 215.542.7070 | WIFI | | 2 | $0.00 | $0.00 |
| 05:00pm | ATLANT GA | 404.389.9041 | WIFI | | 1 | $0.00 | $0.00 |
| 05:01pm | WINTER FL | 407.667.8811 | WIFI | | 2 | $0.00 | $0.00 |
| *Friday, Apr 08* | | | | | | | |
| 10:09am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 11:22am | DALLAS TX | 214.584.6505 | WIFI | | 2 | $0.00 | $0.00 |
| 11:34am | AMBLER PA | 267.470.1185 | WIFI | | 2 | $0.00 | $0.00 |
| 01:06pm | DALLAS TX | 214.584.6505 | WIFI | | 1 | $0.00 | $0.00 |
| 01:09pm | HALF D IL | 847.383.4870 | WIFI | | 2 | $0.00 | $0.00 |
| 02:13pm | DALLAS TX | 214.584.6505 | WIFI | | 3 | $0.00 | $0.00 |
| 02:20pm | NEWORL LA | 504.962.4280 | WIFI | | 2 | $0.00 | $0.00 |
| 03:30pm | INCOMI CL | 972.998.4439 | WIFI | | 1 | $0.00 | $0.00 |
| 03:42pm | INCOMI CL | 847.299.1920 | WIFI | | 2 | $0.00 | $0.00 |
| 03:45pm | HIGHLA IN | 219.595.5412 | WIFI | | 3 | $0.00 | $0.00 |
| 03:47pm | DESPLA IL | 847.299.1920 | WIFI | | 2 | $0.00 | $0.00 |
| 05:05pm | INCOMI CL | 219.595.5412 | WIFI | | 6 | $0.00 | $0.00 |
| 05:14pm | Toll F CL | 888.447.6564 | WIFI | | 4 | $0.00 | $0.00 |
| 05:21pm | INCOMI CL | 219.595.5412 | WIFI | | 2 | $0.00 | $0.00 |
| 05:23pm | Toll F CL | 800.606.6969 | WIFI | | 1 | $0.00 | $0.00 |
| 05:24pm | Toll F CL | 800.221.5743 | WIFI | | 1 | $0.00 | $0.00 |
| *Saturday, Apr 09* | | | | | | | |
| 11:48am | HIGHLA IN | 219.595.5412 | WIFI | | 6 | $0.00 | $0.00 |
| *Monday, Apr 11* | | | | | | | |
| 12:03am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 12:00pm | DEERFI IL | 847.945.0611 | WIFI | | 10 | $0.00 | $0.00 |
| 12:10pm | HIGHLA IL | 847.266.8520 | WIFI | | 24 | $0.00 | $0.00 |
| 12:34pm | HIGHLA IL | 847.266.8520 | WIFI | | 1 | $0.00 | $0.00 |
| 12:40pm | HIGHLA IL | 847.266.8520 | WIFI | | 2 | $0.00 | $0.00 |
| 12:47pm | HIGHLA IL | 847.432.8170 | WIFI | | 3 | $0.00 | $0.00 |

*630.632.2193 continues...*

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Addl Charges |
|---|---|---|---|---|---|---|---|
| 12:53pm | DEERFI IL | 847.940.8104 | WIFI | | 1 | $0.00 | $0.00 |
| 12:54pm | DEERFI IL | 847.940.8104 | WIFI | | 10 | $0.00 | $0.00 |
| 01:06pm | HIGHLA IL | 847.266.8520 | WIFI | | 4 | $0.00 | $0.00 |
| 01:10pm | HIGHLA IL | 847.433.5138 | WIFI | | 3 | $0.00 | $0.00 |
| 01:14pm | NORTHB IL | 847.272.3155 | WIFI | | 6 | $0.00 | $0.00 |
| 01:20pm | NORTHB IL | 847.272.3155 | WIFI | | 7 | $0.00 | $0.00 |
| 01:28pm | LAKEFO IL | 847.234.2413 | WIFI | | 9 | $0.00 | $0.00 |
| 01:37pm | LIBERT IL | 847.367.4652 | WIFI | | 5 | $0.00 | $0.00 |
| 01:43pm | NORTHB IL | 847.272.3155 | WIFI | | 7 | $0.00 | $0.00 |
| 01:50pm | NORTHB IL | 847.272.3155 | WIFI | | 10 | $0.00 | $0.00 |
| 02:00pm | LIBERT IL | 847.361.1611 | WIFI | | 4 | $0.00 | $0.00 |
| 03:44pm | Toll F CL | 866.674.4313 | SDDV | | 1 | $0.00 | $0.00 |
| *Tuesday, Apr 12* | | | | | | | |
| 09:22am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 11:47am | Toll F CL | 833.853.5638 | WIFI | | 12 | $0.00 | $0.00 |
| 12:59pm | INCOMI CL | 214.289.7816 | WIFI | | 16 | $0.00 | $0.00 |
| *Wednesday, Apr 13* | | | | | | | |
| 08:15am | Toll F CL | 866.674.4313 | SDDV | | 1 | $0.00 | $0.00 |
| 03:10pm | CHICAG IL | 773.271.7156 | WIFI | | 2 | $0.00 | $0.00 |
| 05:20pm | CHICAG IL | 773.802.0928 | WIFI | | 7 | $0.00 | $0.00 |
| *Thursday, Apr 14* | | | | | | | |
| 08:18am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| *Friday, Apr 15* | | | | | | | |
| 09:02am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 12:29pm | HALF D IL | 847.383.4870 | WIFI | | 2 | $0.00 | $0.00 |
| 01:58pm | CHICAG IL | 312.353.4528 | WIFI | | 3 | $0.00 | $0.00 |
| 02:00pm | CHICAG IL | 312.353.5430 | WIFI | | 3 | $0.00 | $0.00 |
| 02:48pm | Toll F CL | 833.853.5638 | WIFI | | 10 | $0.00 | $0.00 |
| 05:36pm | Toll F CL | 833.853.5638 | WIFI | | 6 | $0.00 | $0.00 |
| 06:08pm | INCOMI CL | 312.550.6026 | WIFI | | 58 | $0.00 | $0.00 |
| *Sunday, Apr 17* | | | | | | | |
| 11:54pm | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| *Monday, Apr 18* | | | | | | | |
| 12:56pm | INCOMI CL | 312.392.0885 | WIFI | | 1 | $0.00 | $0.00 |
| 01:48pm | Toll F CL | 833.853.5638 | WIFI | | 14 | $0.00 | $0.00 |
| 02:02pm | HALF D IL | 847.383.4870 | WIFI | | 1 | $0.00 | $0.00 |
| *Tuesday, Apr 19* | | | | | | | |
| 11:29am | WASHIN DC | 202.224.2152 | SDDV | | 9 | $0.00 | $0.00 |
| 11:40am | CHICAG IL | 312.353.4952 | SDDV | | 3 | $0.00 | $0.00 |
| 11:54am | Toll F CL | 866.674.4313 | SDDV | | 1 | $0.00 | $0.00 |
| 12:07pm | HALF D IL | 847.383.4870 | WIFI | | 2 | $0.00 | $0.00 |
| 04:59pm | HALF D IL | 847.383.4870 | WIFI | | 2 | $0.00 | $0.00 |
| 05:01pm | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 05:01pm | CHICAG IL | 312.353.4952 | WIFI | | 1 | $0.00 | $0.00 |
| 06:12pm | HALF D IL | 847.383.4870 | SDDV | | 1 | $0.00 | $0.00 |
| *Wednesday, Apr 20* | | | | | | | |
| 10:20am | Toll F CL | 866.674.4313 | SDDV | | 1 | $0.00 | $0.00 |
| 10:22am | HALF D IL | 847.383.4870 | SDDV | | 5 | $0.00 | $0.00 |
| 12:02pm | CHICAG IL | 312.392.0885 | SDDV | | 1 | $0.00 | $0.00 |
| 02:54pm | CHICAG IL | 312.353.4952 | SDDV | | 3 | $0.00 | $0.00 |
| 02:56pm | SPRING IL | 217.492.4062 | SDDV | | 2 | $0.00 | $0.00 |
| 02:58pm | CHICAG IL | 312.886.3506 | SDDV | | 1 | $0.00 | $0.00 |
| 02:59pm | CHICAG IL | 312.886.3506 | SDDV | | 10 | $0.00 | $0.00 |
| 03:09pm | WASHIN DC | 202.224.2152 | SDDV | | 9 | $0.00 | $0.00 |
| 06:32pm | EULESS TX | 817.868.2300 | WIFI | | 1 | $0.00 | $0.00 |
| 06:33pm | EULESS TX | 817.868.2300 | WIFI | | 3 | $0.00 | $0.00 |
| 06:35pm | Toll F CL | 833.853.5638 | WIFI | | 22 | $0.00 | $0.00 |
| 07:09pm | RIVERG IL | 708.456.9122 | WIFI | | 1 | $0.00 | $0.00 |



COUNSEL SENT THE PLEA AGREEMENT VIA DROPBOX ON MAY 3RD WITH NO EXPLANATION. I IMMEDIATELY TRIED TO CALL HIM BUT HE DID NOT ANSWER (SHOWN AS 1-MINUTE CALL ON MAY 3RD). THIS 26-MINUTE CALL ON MAY 4TH WAS MY ONLY OPPORTUNITY TO DISCUSS THE PLEA BEFORE THE MAY 5TH HEARING. THIS SINGLE 26-MINUTE CALL WAS THE ENTIRETY OF CONSULTATION REGARDING THE COMPLEX PLEA AGREEMENT, WAIVER OF INDICTMENT, AND SUPERSEDING INFORMATION. NO VIDEO CALLS OR IN-PERSON MEETINGS EVER OCCURRED. TOTAL ATTORNEY COMMUNICATION BY PHONE FROM RETENTION TO PLEA: 88 MINUTES OVER 18 MONTHS.

Invoice:    287309231403X06092022

# Your detailed usage

## Wireless, 630.632.2193
STARLIGHT GROUP INC.

### Call Detail

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Addl Charges |
|---|---|---|---|---|---|---|---|
| *Monday, May 02* | | | | | | | |
| 08:39am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 11:49am | EULESS TX | 817.868.2300 | WIFI | | 1 | $0.00 | $0.00 |
| 11:50am | EULESS TX | 817.868.2300 | WIFI | | 7 | $0.00 | $0.00 |
| 01:25pm | CHICAG IL | 312.353.4528 | WIFI | | 5 | $0.00 | $0.00 |
| 01:31pm | EULESS TX | 817.868.2300 | WIFI | | 3 | $0.00 | $0.00 |
| 01:36pm | Toll F CL | 833.853.5638 | WIFI | | 4 | $0.00 | $0.00 |
| 01:40pm | Toll F CL | 833.853.5638 | WIFI | | 3 | $0.00 | $0.00 |
| 02:04pm | INCOMI CL | 833.853.5638 | WIFI | | 6 | $0.00 | $0.00 |
| 04:14pm | HALF D IL | 847.383.4870 | WIFI | | 2 | $0.00 | $0.00 |
| 08:46pm | Toll F CL | 800.242.7338 | WIFI | | 95 | $0.00 | $0.00 |
| *Tuesday, May 03* | | | | | | | |
| 09:18am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 10:15am | Toll F CL | 866.564.2262 | WIFI | | 47 | $0.00 | $0.00 |
| 01:05pm | Toll F CL | 800.677.7477 | WIFI | | 1 | $0.00 | $0.00 |
| 01:06pm | Toll F CL | 877.805.8049 | WIFI | | 18 | $0.00 | $0.00 |
| 04:39pm | Toll F CL | 866.564.2262 | WIFI | | 7 | $0.00 | $0.00 |
| 08:22pm | INCOMI CL | 312.550.6026 | WIFI | | 66 | $0.00 | $0.00 |
| 10:23pm | QUEENS NY | 917.599.6117 | WIFI | | 1 | $0.00 | $0.00 |
| 11:49pm | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| *Wednesday, May 04* | | | | | | | |
| 10:53am | Toll F CL | 877.826.0648 | WIFI | | 9 | $0.00 | $0.00 |
| 11:03am | Toll F CL | 877.805.8049 | WIFI | | 1 | $0.00 | $0.00 |
| 11:04am | Toll F CL | 877.805.8049 | WIFI | | 2 | $0.00 | $0.00 |
| 11:37am | Toll F CL | 877.805.8049 | WIFI | | 1 | $0.00 | $0.00 |
| 12:10pm | Toll F CL | 877.805.8049 | WIFI | | 2 | $0.00 | $0.00 |
| 12:44pm | Toll F CL | 877.805.8049 | WIFI | | 1 | $0.00 | $0.00 |
| 12:45pm | Toll F CL | 877.805.8049 | WIFI | | 1 | $0.00 | $0.00 |
| 02:16pm | Toll F CL | 866.674.4313 | SDDV | | 1 | $0.00 | $0.00 |
| 02:16pm | Toll F CL | 877.805.8049 | SDDV | | 1 | $0.00 | $0.00 |
| 02:17pm | Toll F CL | 877.826.0648 | SDDV | | 26 | $0.00 | $0.00 |
| 02:19pm | Toll F CL | 877.805.8049 | WIFI | | 2 | $0.00 | $0.00 |
| 02:44pm | Toll F CL | 877.805.8049 | SDDV | | 3 | $0.00 | $0.00 |
| 02:48pm | HIGHLA IL | 847.433.3072 | SDDV | | 7 | $0.00 | $0.00 |
| 02:55pm | Toll F CL | 888.844.7979 | SDDV | | 1 | $0.00 | $0.00 |
| 02:56pm | Toll F CL | 888.844.7979 | SDDV | | 1 | $0.00 | $0.00 |
| 02:58pm | Toll F CL | 877.805.8049 | SDDV | | 2 | $0.00 | $0.00 |
| 03:02pm | Toll F CL | 877.805.8049 | SDDV | | 1 | $0.00 | $0.00 |
| 04:10pm | HIGHLA IL | 847.433.3072 | WIFI | | 2 | $0.00 | $0.00 |
| 04:17pm | Toll F CL | 877.805.8049 | WIFI | | 1 | $0.00 | $0.00 |
| 04:18pm | Toll F CL | 877.805.8049 | WIFI | | 2 | $0.00 | $0.00 |
| 04:24pm | Toll F CL | 877.805.8049 | WIFI | | 1 | $0.00 | $0.00 |
| 04:25pm | Toll F CL | 877.805.8049 | WIFI | | 1 | $0.00 | $0.00 |
| 04:29pm | Toll F CL | 877.805.8049 | WIFI | | 1 | $0.00 | $0.00 |
| 05:34pm | INCOMI CL | 917.599.6117 | WIFI | | 26 | THIS IS THE CALL | |
| 06:40pm | Toll F CL | 866.674.4313 | SDDV | | 1 | $0.00 | $0.00 |
| *Thursday, May 05* | | | | | | | |
| 09:40am | INCOMI CL | 917.599.6117 | WIFI | | 2 | $0.00 | $0.00 |
| 10:50am | QUEENS NY | 917.599.6117 | WIFI | | 2 | $0.00 | $0.00 |

*630.632.2193 continues...*

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Addl Charges |
|---|---|---|---|---|---|---|---|
| 10:59am | INCOMI CL | 888.844.7979 | WIFI | | 6 | $0.00 | $0.00 |
| 11:51am | QUEENS NY | 917.599.6117 | WIFI | | 1 | $0.00 | $0.00 |
| 12:08pm | CHICAG IL | 773.271.7156 | WIFI | | 5 | $0.00 | $0.00 |
| 01:34pm | CHICAG IL | 773.271.7156 | WIFI | | 9 | $0.00 | $0.00 |
| 02:57pm | Toll F CL | 866.674.4313 | SDDV | | 1 | $0.00 | $0.00 |
| 03:08pm | INCOMI CL | 888.844.7979 | SDDV | | 2 | $0.00 | $0.00 |
| 05:36pm | QUEENS NY | 917.599.6117 | SDDV | | 1 | $0.00 | $0.00 |
| 07:07pm | Toll F CL | 833.853.5638 | WIFI | | 16 | $0.00 | $0.00 |
| 08:48pm | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| *Friday, May 06* | | | | | | | |
| 10:01am | LIBERT IL | 847.367.1611 | WIFI | | 5 | $0.00 | $0.00 |
| 10:10am | INCOMI CL | 847.367.1611 | WIFI | | 5 | $0.00 | $0.00 |
| 11:54am | Toll F CL | 833.853.5638 | WIFI | | 3 | $0.00 | $0.00 |
| 12:20pm | Toll F CL | 866.674.4313 | SDDV | | 1 | $0.00 | $0.00 |
| 02:00pm | ELMHUR IL | 630.546.0271 | SDDV | | 4 | $0.00 | $0.00 |
| 02:04pm | RIVERG IL | 708.456.9122 | SDDV | | 5 | $0.00 | $0.00 |
| 02:09pm | CHICAG IL | 773.271.7156 | SDDV | | 2 | $0.00 | $0.00 |
| 02:30pm | INCOMI CL | 602.485.1911 | SDDV | | 1 | $0.00 | $0.00 |
| *Saturday, May 07* | | | | | | | |
| 06:46pm | ROSELL IL | 630.284.9653 | SDDV | | 4 | $0.00 | $0.00 |
| *Sunday, May 08* | | | | | | | |
| 10:34pm | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| *Monday, May 09* | | | | | | | |
| 04:28pm | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 04:28pm | QUEENS NY | 917.599.6117 | WIFI | | 1 | $0.00 | $0.00 |
| 11:29pm | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| *Tuesday, May 10* | | | | | | | |
| 09:58am | | DID NOT PICK UP AT*T SHOWS 1 M WHEN NO PICK UP 4313 | WIFI | | 1 | $0.00 | $0.00 |
| 02:12pm | QUEENS NY | 917.599.6117 | WIFI | | 1 | $0.00 | $0.00 |
| 04:57pm | ROSELL IL | 630.284.9661 | WIFI | | 1 | $0.00 | $0.00 |
| 11:23pm | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| *Wednesday, May 11* | | | | | | | |
| 08:53am | DEERFI IL | 847.945.0611 | SDDV | | 15 | $0.00 | $0.00 |
| 10:45am | LIBERT IL | 847.367.1611 | SDDV | | 2 | $0.00 | $0.00 |
| 10:47am | LIBERT IL | 847.367.1611 | SDDV | | 2 | $0.00 | $0.00 |
| 10:54am | QUEENS NY | 917.599.6117 | SDDV | | 2 | $0.00 | $0.00 |
| 12:25pm | CHICAG IL | 773.271.7156 | WIFI | | 2 | $0.00 | $0.00 |
| 02:10pm | LIBERT IL | 847.367.1611 | WIFI | | 3 | $0.00 | $0.00 |
| 02:41pm | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 04:31pm | INCOMI CL | 312.550.6026 | WIFI | | 65 | $0.00 | $0.00 |
| 11:43pm | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| *Thursday, May 12* | | | | | | | |
| 01:15pm | QUEENS NY | 917.599.6117 | WIFI | | 1 | $0.00 | $0.00 |
| 02:26pm | CHICAG IL | 773.271.7156 | WIFI | | 1 | $0.00 | $0.00 |
| 02:48pm | Toll F CL | 833.853.5638 | WIFI | | 9 | $0.00 | $0.00 |
| 03:24pm | CHICAG IL | 773.271.7156 | WIFI | | 3 | $0.00 | $0.00 |
| 11:37pm | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| *Friday, May 13* | | | | | | | |
| 09:22am | INCOMI CL | 917.599.6117 | SDDV | | 1 | $0.00 | $0.00 |
| 09:59am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |
| 11:57am | INCOMI CL | 917.599.6117 | WIFI | | 16 | $0.00 | $0.00 |
| 01:12pm | INCOMI CL | 312.550.6026 | WIFI | | 100 | $0.00 | $0.00 |
| 04:28pm | Toll F CL | 866.399.0537 | WIFI | | 1 | $0.00 | $0.00 |
| 04:29pm | Toll F CL | 866.399.0537 | WIFI | | 2 | $0.00 | $0.00 |
| 04:30pm | Toll F CL | 866.399.0537 | WIFI | | 9 | $0.00 | $0.00 |
| 05:28pm | INCOMI CL | 847.715.6315 | SDDV | | 10 | $0.00 | $0.00 |
| *Monday, May 16* | | | | | | | |
| 12:08am | Toll F CL | 866.674.4313 | WIFI | | 1 | $0.00 | $0.00 |

Sorry Larby. My phone died at my meeting and then I got home and kids were trouble.

I'm on a phone call at 9 eastern time and a conference at 11 eastern time.

Let's talk this morning at 10:15 eastern time?

Or right around 11:45 eastern time.

Or literally anytime after that

Is the agreement what you were expecting?

Absolutely.

Yeah I'll be around ok good that's a relief

Yep. It doesn't have anything different and doesn't change my mind

About what the judge will give you.

Thank God

It's just an analysis of the GUidelines which is required.

Going to chill out now I was freaking out lol

Ultimately you have so so so much mitigation that gets factored in before judge pronounces sentence.

I'm so sorry i didn't have the ability to answer your calls.

That was some unnecessary stress for you and your family.

I will call you as soon as I am free this opening.

Morning.

Ok thank you so much

4/22/2022, 2:55 PM

You free in half hour?

Yeah

Well actually I'm doing urine screening

Can we talk now or do you need time

I'm on a train back home... I'll text you a little later this weekend I'm free completely. I'll be around at my home in about 2 hours for sure. No worries at all whenever you want to speak. Thank you.

4/22/2022, 5:17 PM

I'm home now we can talk anytime this evening or weekend whenever is convenient for your

You*

### United States District Court
### Northern District of Illinois - CM/ECF NextGen 1.8 (rev. 1.8.3) (Chicago)
### CRIMINAL DOCKET FOR CASE #: 1:21-cr-00127-1

Case title: USA v. Amirouche

Date Filed: 02/23/2021

Date Terminated: 02/23/2021

| Date Filed | # | Docket Text |
|---|---|---|
| 02/23/2021 | 1 | RULE 5(c)(3) Affidavit in Removal Proceedings signed by Judge Honorable M. David Weisman as to Larby Amirouche (1) (mc, ) (Entered: 02/24/2021) |
| 02/23/2021 | | ARREST of defendant Larby Amirouche (mc, ) (Entered: 02/25/2021) |
| 02/23/2021 | | ORAL MOTION by Larby Amirouche for leave to file appearance of Jack Corfman. (mc, ) (Entered: 02/25/2021) |
| 02/23/2021 | 2 | ORDER as to Larby Amirouche :Initial appearance hearing held. Removal proceedings held. Defendant Lardy Amirouche appeared before Judge Weisman on 2/23/21in response to an arrest warrant issued out of the Eastern District of New York. Pursuant to CARES Act, this hearing was conducted by telephone. See generally, CARES Act, Pub. L. 116-136 § 15002(b)(1). Defendant was advised of rights and the charges pending against him pursuant to Fed. R. Crim. P. 5. The court finds that the Defendant is able to understand his rights as they are reviewed. Attorney Jack Corfman's oral motion for leave to file an appearance on behalf of Defendant is granted. Enter order appointing Jack Corfman as counsel for defendant. The Government is not seeking detention. The Court questioned on the record and admonished the defendant's father and finds that Defendant's father Farid Amirouche is a suitable third-party custodian. The Government and Defendant agree on certain conditions of release. Defendant signed an unsecured bond in the amount of $500,000. Enter Order Setting Conditions of Release and Appearance bond. Defendant was advised of his right to a so-called identity hearing and waived an identity hearing. Fed. R. Crim. P. 5(c)(3)(D)(ii). Defendant advised of his right under Rule 20 to resolve the pending charges in the Northern District of Illinois. Defendant ordered removed to the Eastern District of New York Enter Commitment to Another District. Signed by the Honorable M. David Weisman on 2/23/2021. Mailed notice (mc, ) (Entered: 02/25/2021) |
| 02/23/2021 | 3 | ORDER Setting Conditions of Release as to Larby Amirouche in amount of $ 500,000, unsecured. Signed by the Honorable M. David Weisman on 2/23/2021. Mailed notice (mc, ) (Entered: 02/25/2021) |
| 02/23/2021 | 4 | APPEARANCE Bond as to Larby Amirouche in the amount of $ 500,000 (mc, ) (Entered: 02/25/2021) |
| 02/23/2021 | 5 | ORDER REQUIRING A DEFENDANT TO APPEAR IN THE DISTRICT WHERE CHARGES ARE PENDING AND TRANSFERRING BAIL as to Larby Amirouche. Signed by the Honorable M. David Weisman on 2/23/2021. Mailed notice (mc, ) (Entered: 02/25/2021) |

| 02/25/2021 | 6 | CERTIFIED and Transmitted to USDC Eastern District of New York the complete record as to Larby Amirouche. (mc, ) (Entered: 02/25/2021) |
| 03/01/2021 | 7 | PRETRIAL Bail Report as to Larby Amirouche (SEALED) (AR) (Entered: 03/01/2021) |
| 08/13/2024 | 8 | NOTICE of filing by Defendant Larby Amirouche to file as Pro Se. (Received via pro se email on 08/13/2024) (rc, ) (Entered: 08/14/2024) |
| 08/13/2024 | 9 | MOTION by Larby Amirouche for production of transcripts and other materials related to removal proceeding. (Received via pro se email on 08/13/2024) (rc, ) (Entered: 08/14/2024) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/05/2025 23:05:23 | | |
| **PACER Login:** | lukewilliams317 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cr-00127 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# FEDERAL DEFENDER PROGRAM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

55 E. MONROE STREET · SUITE 2800
CHICAGO, ILLINOIS 60603

PHONE 312.621.8300
FAX 312.621.8399

**JOHN F. MURPHY**
EXECUTIVE DIRECTOR

**CHRISTINA L. FARLEY JACKSON**
DEPUTY DIRECTOR

**ROBERT D. SEEDER**
CHIEF TRIAL ATTORNEY

**MICHAEL T. WYSOPAL**
ADMINISTRATIVE OFFICER

SEEMA AHMAD
PIYUSH CHANDRA
IMANI CHIPHE
JACK CORFMAN
ERIN K. DEGRAND
WILLIAM B. HARDWICKE
DANIEL J. HESLER
EMILY HOSSEINI
JASMINE J. JOHNSON
MARY H. JUDGE
KATHLEEN LEON
DANIEL P. McLAUGHLIN
GEOFFREY M. MEYER
EMILY MOLLINEDO
AMANDA PENABAD
MIKIKO THELWELL
AKANE TSURUTA

*VIA U.S. Mail*

January 8, 2024

Larby Amirouche
835 Woodbine Road
Highland Park, IL 60035

Dear Mr. Amirouche,

You contacted me asking for copy of a letter I received some time after your Rule 5 proceedings here in Chicago. It was sent to me, apparently believing that I was still your attorney. I forwarded a copy to Mr. Kusher, who was representing you in the substantive case in New York.

As you have now asked me for a copy for yourself, please find included with this letter a copy of that letter and a scan of the envelope. There were no other documents or items included with it; this is everything I received. I hope it answers whatever questions you might have.

Sincerely,

/s/ *Jack Corfman*
Jack Corfman


JC:mv
Encl.

David Pitluck
U.S. Attorney's Office – Eastern District of New York
RE: **E.D.N.Y. Docket No. 21-CR-64**
271 Cadman Plaza East,
Brooklyn NY 11201
Tel: (718) 254-6108

Cherie L. Howe
Assistant Attorney General
RE: **Arizona State Court Case No: CV2009-035314**
1275 W. Washington Street Phoenix,
Arizona 85007B2997
(602) 542-7725

CC:     *Jonathan D. Larsen, Special Agent-in-Charge; IRS- Criminal Investigation*
        *New York Field Office: 290 Broadway; 4th Floor; New York, NY 10007*
        *Illinois Field Office: 230 S. Dearborn Street; Suite: 1600; Chicago, IL 60604*
        *Jack Corfman, Federal Defender Program55 E. Monroe St.; Suite 2800; Chicago, IL 60603*

RE:             **E.D.N.Y. Docket No. 21-CR-64 (RPK); LARBY AMIROUCHE**
                **Arizona State Court Case No: CV2009-035314**
                **Robert Thomas Norton** (07/18/1987)
                Current Address: 3912 E Avery Ln; Coeur D Alene, Idaho 83814;
                704 Turquoise Street; Unit #2; La Jolla, California, CA 92037
                Tel: 480.323.6747

Dear Mr. Pitluck and Ms. Howe,

        Upon review of Larby Amirouche's indictment and EDNY Department of Justice Release dated: Tuesday, February 23, 2021, the charges are incomplete as they omit his fellow co-conspirator Robert Thomas Norton. The indictment in paragraph 12, advises that Amirouche devised and engaged in fraudulent internet e-commerce "Schemes" back in 2012 however, this is factually incorrect. Amirouche's financial fraud scheme and wrongful actions identified in the indictment commenced before the formation of Angry Elephant Marketing LLC or Purple Whale Management LLC. The fraud Schemes as defined and outlined in paragraph 13 of the indictment, were devised in the mid-2000 by Amirouche and Norton when they defrauded millions from consumers with their financial fraud Schemes. These co-conspirators carried *out such activities under various entities, including Amir and Sanchez Nutraceuticals, LLC; Amirouche and Norton LLC; Nature's Acaiberry.com and Simplecleanser LLC.*

        *Arizona Attorney General* brought charges against Amirouche and Norton in 2009 under the *Arizona Consumer Fraud Act, in the Arizona State Claim* CV2009-035314; however, these charges did not *dissuade either defendant as both Amirouche and Norton executed a consent judgment, paid a nominal fee, then nearly immediately thereafter both breached their agreements by both employing subsequent fraud Schemes, but only this time separately.*

                                                                                    February 16, 2022

*E.D.N.Y. Docket No. 21-CR-64: Amirouche*
*AZ State Case No: CV2009-035314: Amirouche & Norton*

As you are aware, after the execution of the consent judgement in the state case Amirouche went on to the Ukraine where he repeated those financial fraud Schemes that he devised in partnership with Norton. Similarly, Norton, after executing the consent judgement, he went on to employ another financial fraud e-commerce scheme in which he would falsely promise consumers gift cards in exchange for their private financial information including addresses, emails, bank accounts, credit cards and other confidential financial information with the false promise that upon completion a gift card would be sent out. Once securing this information Norton would utilize such information for his personal gain. Further Norton tried to shield his fraud and wrongdoings, by purchasing gift cards as "business expenses" and then utilize these gift cards for private expenditures. One such expenditure was a plastic surgery procedure, specifically a rhinoplasty, for his then girlfriend, Arizona attorney Feliz Akkurt which was paid for in gift cards.

More concerning is that prior to the execution of the Arizona State Case Consent Judgment Amirouche and Norton had taken a trip to the Caribbean where they opened offshore bank accounts. These ill-gotten gains were never recaptured, were never inquired into by the state and more specifically the funds were used to start future ventures. As you may be aware, Amirouche dealt with some mental issues and was somewhat absent during the defense of the Arizona State charges. Norton took advantage of his partners absence and health issues, and ultimately shifted millions of their fraudulently acquired profits and other ill-gotten gains into his own personal offshore accounts. To this day Amirouche may be unaware of Norton's actions.

Since Norton's previous fraud schemes, he has taken elaborate measure to legitimize his earnings and distance himself from his ill-gotten gains. Specifically, he has taken his fraudulently acquired gains to create legitimate business ventures to shield his wrongdoings. Such ventures include:
- Waste Disposal LLC an Arizona Entity, a garbage collection business
- A commercial building in Arizona with positive lease cash flow, a call center located in the building and appreciation on the building itself
- Has multiple residential homes/properties in Idaho which he leases out
- Has a software business www.routenavigator.com/
- A slew of personal assets including a home in Coeur D'Alene Idaho, an Avait Aircraft N251WY, a RV held in a Montana Registered Entity
- Jointly purchased an aircraft with his friend David Megdal, VP of Mega Metals LLC,
- Jointly purchased a commercial building with colleague George Akkurt of Best Auto LLC,
- Made joint business ventures with Adam Goldberg of Goldies Motors, a Phoenix AZ Car dealership.

While some of Norton's recent earnings may have resulted from his now legitimate business ventures, but for the initial financial fraud Schemes devised by him and Amirouche; Norton would not have had the capital to purchase, create and/or invest in such business ventures.

I hope this information serves as a guide for your own future inquires and investigation into the financial fraud Schemes by either Amirouche and Norton. It would behoove you to question Norton's present and past romantic relationships as well as previous and present business colleagues to further corroborate this information and grasp the extent of the allegations.

February 16, 2022

E.D.N.Y. Docket No. 21-CR-64: _Amirouche_
AZ State Case No: CV2009-035314: _Amirouche & Norton_

ACT Special Testing
PO Box 4028
Iowa City, IA 52243-4028

Re: Larby Amirouche (Date of Birth: 7/23/89)

To Whom It May Concern:

Larby recently underwent an updated evaluation to assess processing speed and its impact on academic functioning.  This updated assessment was requested to provide objective documentation to support Larby receiving extended time on the ACT.

Larby previously underwent a comprehensive cognitive and social/emotional evaluation with this examiner in September 2003.  He generally displayed average intellectual skills, and he exhibited very superior nonverbal reasoning and concept formation skills.

In significant contrast, Larby exhibited processing speed skills in the mildly impaired to borderline ranges during the previous evaluation. Findings indicated the combination of strong reasoning, weak processing speed, and concerns with social/emotional functioning contributed to difficulties coping with academic demands.

Academic achievement testing was not completed in 2003; however, Larby subsequently received an individualized education plan due to the identified concerns. He receives extended time for lengthy in class assignments and tests, as part of his plan.  Larby has received direct instruction 50 minutes per day to assist with study strategies and organization.  With these supports, Larby currently performs within the average range academically.

The present findings indicated Larby performed at the low end of the borderline range (i.e., 3rd percentile) in his processing speed, using several of the same measures.  These findings are highly consistent with the initial evaluation.

During the present evaluation, on a timed measure of passage reading, Larby exhibited reading comprehension in the low average range (i.e., grade equivalent = 7.1).  Findings indicated that his lower performance related to his failure to complete approximately 30 percent of the questions in the allotted time.  Larby's reading rate fell at the 18th percentile, reflecting his slow completion of items.  This measure (Nelson-Denny) is considered representative of passage reading on the ACT and reflects the adverse impact on processing speed on performance.

In math, Larby demonstrated average math computation and reasoning on untimed measures. He displayed average rapid retrieval of math facts; this average performance does not validly reflect the efficiency required to complete high school level math. Behavioral observations indicated specific concerns with his slowed efficiency.

In summary, Larby has demonstrated deficits in processing speed during two evaluations.  Findings indicate slow processing speed adversely impacts his efficiency and performance with academic tasks.  These skills represent a significant discrepancy from his range of well-developed abilities.

As a result, findings are consistent with a learning disability, based on this discrepancy and processing deficit.  Larby has demonstrated average academic performance, representing improved functioning, when given direct instruction and accommodations, including extended time.  It is recommended that he receive up to 50 percent extended time on the ACT.

Please contact me with any further questions.   Thank you for your consideration.

Jeffrey O'Koon, Ph.D.
Pediatric Neuropsychologist
Licensed Clinical Psychologist
Assistant Professor
Feinberg School of Medicine
Northwestern University



To: Michael Kushner

May 5, 2022 at 8:28 AM

Good morning.

We have to formally sign a waiver of indictment. I attach it to this text.

**Amirouche.Waiver of Indictment copy.pdf**
PDF Document · 42 KB

Can you electronically sign this?

larby you around?

Larby?

You aren't answering phone.



To: Michael Kushner, Hadley Rose

iMessage
May 5, 2022 at 8:37 AM

**Michael Kushner**
Larby?

you aren't answering phone or email or text...

You around?

Here is the allocution:

Together with others he agreed to file false documents with financial institutions in order to obtain money and property from those banks.

That's what the Government wants us to say.

Can you let me know what's up?

He should also proffer the scheme occurred during the dates in the information

I'm on it now. I will read "Together with others I agreed to file false documents with financial institutions in order to obtain money and property from those banks.  The scheme took place between 2012-2016."

Sound good?

**Michael Kushner**
yes

Will they use this word allocution so I know that's when to say this

**Michael Kushner**
Yes

The judge will likely ask you "In your own words please tell me what you did"

Ok perfect

appear that foreign purchases had in fact come from domestic sales. AMIROUCHE also hired a company to create billing software that allowed him to alter and fabricate invoices in order to stay in compliance with the requirements of the Payment Processors.

32.     For example, on or about April 21, 2015, the defendant LARBY AMIROUCHE emailed four co-conspirators, including Co-Conspirator 1, and stated, in sum and substance, that a payment processor was complaining about the high rate of foreign transactions. In response, AMIROUCHE directed the co-conspirators, in sum and substance, to mask foreign customers with customer data from U.S.-based customers to hide the true identities of the individuals who were making payments.

D.      Customers Request Chargebacks

33.     As a result of the Schemes, the Payment Processors reported large amounts of chargebacks stemming from fraudulent transactions reported by both retail consumers of the websites and unauthorized credit card purchases transacted by the websites, including within the Eastern District of New York.

34.     At the direction of the defendant LARBY AMIROUCHE, co-conspirators contacted the Payment Processors and attempted to negotiate an early release of the reserve funds for the shell company merchant accounts before the merchant acquiring banks could alert the Payment Processors to any chargebacks. For example, in an email on or about March 3, 2015, at the direction of the defendant LARBY AMIROUCHE, Co-Conspirator 1 instructed another co-conspirator to contact the Payment Processors seeking the early release of reserve funds and to pose as the nominee for the shell company. Co-Conspirator 1, at AMIROUCHE's direction, further instructed the co-conspirator to utilize the following talking points when communicating with the Payment Processors:

10

E.    Wire Activity Between the Shell Companies

37.    Many of the shell companies controlled by the defendant LARBY AMIROUCHE generated significant profits from the Schemes.  At the direction of AMIROUCHE, these funds were funneled to a bank account held in the name of Flare Education, LLC, a company controlled by AMIROUCHE.  For example, one company controlled by AMIROUCHE, Jump Learning, LLC, wired approximately $780,000 to Flare Education, LLC.  Both Jump Learning, LLC and Flare Education, LLC were utilized by AMIROUCHE to perpetrate the Schemes against unwitting victims.

38.    In total, approximately 35 shell companies controlled by the defendant LARBY AMIROUCHE, and registered using the PII of nominees, transferred via wire approximately $6,554,656 to the Flare Education, LLC account.  These transfers were made from bank accounts opened by nominees at the direction of AMIROUCHE in the name of their respective shell companies at Miami-based banks.  The shell company bank accounts were also controlled by AMIROUCHE and his co-conspirators.

39.    Thereafter, between February 2014 and August 2015, the Flare Education, LLC account transferred via wire a total of approximately $971,200 to Angry Elephant and $354,000 to Purple Whale.  As discussed above, Angry Elephant and Purple Whale are entities controlled by the defendant LARBY AMIROUCHE.

### COUNT ONE
(Conspiracy to Commit Bank Fraud and Wire Fraud)

40.    The allegations contained in paragraphs one through 39 are realleged and incorporated as if fully set forth in this paragraph.

12



## Fwd: Guilty Plea 21cr64 USA v Larby Amirouche (dob)
4 messages

**Michael Kushner** <mk@kushlawgroup.com>                    Thu, May 5, 2022 at 8:35 AM
To: Larby Amirouche <larby@blackout.dev>, Larby Amirouche <larbyamirouche7@gmail.com>, Hadley Rose
<hadley@emergeinternational.net>

    Please log on. Also you aren't answering texts of emails or calls.

    Best Regards,


    Michael P. Kushner, Esq.

    Kushner Law Group, PLLC
    16 Court Street, 36th Floor
    Brooklyn, New York 11241

    tel. 718.504.1440
    fax. 718.504.4630
    cel. 917.599.6117
    _____

    STATEMENT OF CONFIDENTIALITY:  This e-mail message, including any
    attachments, is for the sole use of the intended recipient(s) and may
    include privileged or otherwise confidential information. Any unauthorized
    review, forwarding, printing, copying, use, disclosure or distribution is
    strictly prohibited and may be unlawful. If you received this message in
    error, or have reason to believe you are not the intended recipient, please
    contact the sender by reply e-mail and destroy all copies of the original
    message.


    ---------- Forwarded message ---------
    From: **Sandy Williams-Jackson** <Sandy_D_Williams@nyed.uscourts.gov>
    Date: Tue, May 3, 2022 at 3:10 PM
    Subject: Guilty Plea 21cr64 USA v Larby Amirouche (dob)
    To: Kiyo Matsumoto <Kiyo_Matsumoto@nyed.uscourts.gov>, Lois Ahn <Lois_Ahn@nyed.uscourts.gov>,
    lindacsr_aol.com <lindacsr@aol.com>, mk@kushlawgroup.com <mk@kushlawgroup.com>, Sandy Williams-Jackson
    <Sandy_D_Williams@nyed.uscourts.gov>, david.pitluck@usdoj.gov <david.pitluck@usdoj.gov>


    Sandra Williams is inviting you to a scheduled ZoomGov meeting.

    Join ZoomGov Meeting
    https://nyed.zoomgov.com/j/1613193453?pwd=ZkxjUkJFOGJCRnFlSXd3Nm5qNXBxUT09

    Meeting ID: 161 319 3453
    Passcode: 145094
    One tap mobile
    +16692545252,,1613193453#,,,,*145094# US (San Jose)
    +16468287666,,1613193453#,,,,*145094# US (New York)

    Dial by your location
        +1 669 254 5252 US (San Jose)
        +1 646 828 7666 US (New York)
        +1 669 216 1590 US (San Jose)
        +1 551 285 1373 US
    Meeting ID: 161 319 3453

Passcode: 145094
Find your local number: https://nyed.zoomgov.com/u/acUMnNljKW

Join by SIP
1613193453@sip.zoomgov.com

Join by H.323
161.199.138.10 (US West)
161.199.136.10 (US East)
Meeting ID: 161 319 3453
Passcode: 145094

Join by Skype for Business
https://nyed.zoomgov.com/skype/1613193453

---

📄 **invite.ics**
4K

---

**Michael Kushner** <mk@kushlawgroup.com>                      Thu, May 5, 2022 at 8:39 AM
To: Larby Amirouche <larby@blackout.dev>, Larby Amirouche <larbyamirouche7@gmail.com>, Hadley Rose <hadley@emergeinternational.net>

Sandra Williams is inviting you to a scheduled ZoomGov meeting.

Join ZoomGov Meeting
https://nyed.zoomgov.com/j/1613193453?pwd=ZkxjUkJFOGJCRnFISXd3Nm5qNXBxUT09

Meeting ID: 161 319 3453
Passcode: 145094
One tap mobile
+16692545252,,1613193453#,,,,*145094# US (San Jose)
+16468287666,,1613193453#,,,,*145094# US (New York)

Dial by your location
      +1 669 254 5252 US (San Jose)
      +1 646 828 7666 US (New York)
      +1 669 216 1590 US (San Jose)
      +1 551 285 1373 US
Meeting ID: 161 319 3453
Passcode: 145094
Find your local number: https://nyed.zoomgov.com/u/acUMnNljKW

Best Regards,

Michael P. Kushner, Esq.

Kushner Law Group, PLLC
16 Court Street, 36th Floor
Brooklyn, New York 11241

tel. 718.504.1440
fax. 718.504.4630
cel. 917.599.6117

_____

STATEMENT OF CONFIDENTIALITY: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may include privileged or otherwise confidential information. Any unauthorized review, forwarding, printing, copying, use, disclosure or distribution is

strictly prohibited and may be unlawful. If you received this message in
error, or have reason to believe you are not the intended recipient, please
contact the sender by reply e-mail and destroy all copies of the original
message.

[Quoted text hidden]

---

**Larby Amirouche** <larby@blackout.dev>                          Thu, May 5, 2022 at 8:44 AM
To: Michael Kushner <mk@kushlawgroup.com>
Cc: Larby Amirouche <larbyamirouche7@gmail.com>, Hadley Rose <hadley@emergeinternational.net>

Dear Michael,

I'm on it now. I will read "Together with others I agreed to file false documents with financial institutions in order to obtain money and property from those banks.  The scheme took place between 2012-2016."

Best Regards,

Larby

[Quoted text hidden]

---

**Michael Kushner** <mk@kushlawgroup.com>                          Thu, May 5, 2022 at 8:46 AM
To: Larby Amirouche <larby@blackout.dev>
Cc: Larby Amirouche <larbyamirouche7@gmail.com>, Hadley Rose <hadley@emergeinternational.net>

Yep.

Best Regards,


Michael P. Kushner, Esq.

Kushner Law Group, PLLC
16 Court Street, 36th Floor
Brooklyn, New York 11241

tel. 718.504.1440
fax. 718.504.4630
cel. 917.599.6117

_____

STATEMENT OF CONFIDENTIALITY:  This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may include privileged or otherwise confidential information. Any unauthorized review, forwarding, printing, copying, use, disclosure or distribution is strictly prohibited and may be unlawful. If you received this message in error, or have reason to believe you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

[Quoted text hidden]